**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KATHRYN HYLAND, MELISSA GARCIA, ELDON R. GAEDE, ELIZABETH TAYLOR, JESSICA SAINT-PAUL, REBECCA SPITLER-LAWSON, MICHELLE MEANS, ELIZABETH KAPLAN, JENNIFER GUTH, MEGAN NOCERINO, and ANTHONY CHURCH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NAVIENT CORPORATION and NAVIENT SOLUTIONS, LLC,<br><br>Defendants. | No. 18-cv-9031-DLC<br><br>**JURY DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT

Date:  January 16, 2019

Mark Richard
PHILLIPS, RICHARD & RIND, P.A.
9360 SW 72 Street, Suite 283
Miami, FL 33173
Telephone: 305-412-8322
E-mail: mrichard@phillipsrichard.com
(*pro hac vice*)

Faith Gay
Maria Ginzburg
Yelena Konanova
Margaret England
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY  10104
Telephone: 212-390-9000
E-mail: fgay@selendygay.com
          mginzburg@selendygay.com
          lkonanova@selendygay.com
          mengland@selendygay.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Pages**

NATURE OF ACTION ................................................................................... 1

THE PARTIES ............................................................................................. 21

    Plaintiffs ................................................................................................ 21

    Defendants ............................................................................................ 45

JURISDICTION.......................................................................................... 49

VENUE........................................................................................................ 51

FACTUAL ALLEGATIONS ....................................................................... 51

    Background On Federal Student Loans.............................................. 51

    The Life Of A Federal Student Loan.................................................. 55

    The Public Service Loan Forgiveness Program ............................... 64

    The Loan Servicer: Navient................................................................ 72

CLASS ACTION ALLEGATIONS ........................................................... 102

CAUSES OF ACTION .............................................................................. 105

    Count I – Breach Of Contract For Violations Of The Servicing
        Contracts........................................................................... 105

    Count II – Breach Of Implied Warranty Of Authority.................... 107

    Count III – Tortious Interference With Contract ........................... 109

    Count IV – Tortious Interference With Expectancy ...................... 112

    Count V – Unjust Enrichment.......................................................... 114

    Count VI – Breach Of Fiduciary Duty ............................................ 115

    Count VII – Negligence..................................................................... 117

    Count VIII – Negligent Misrepresentation..................................... 118

    Count IX – Negligent Misrepresentation........................................ 119

i

Count X – Negligent Misrepresentation ........................................................... 120

Count XI – Negligent Misrepresentation ......................................................... 121

Count XII – Violations Of The Maryland Consumer Protection Act,
Md. Code Ann., Com. Law § 13-301 et seq. ........................................... 122

Count XIII – Violations Of The Florida Deceptive And Unfair Trade
Practices Act, Fla. Stat. § 501.201 et seq. ............................................. 123

Count XIV – Violations Of The New York Consumer Protection From
Deceptive Acts And Practices Law, New York General Business
Law § 349 et seq. ................................................................................. 124

Count XV – Violations Of The California Consumers Legal Remedies
Act, Cal. Civ. Code § 1750 et seq. ........................................................ 125

PRAYER FOR RELIEF ........................................................................................ 127

JURY DEMAND ................................................................................................. 129

Plaintiffs Kathryn Hyland, Melissa Garcia, Eldon R. Gaede, Elizabeth Taylor, Jessica Saint-Paul, Rebecca Spitler-Lawson, Michelle Means, Elizabeth Kaplan, Jennifer Guth, Megan Nocerino, and Anthony Church, individually and on behalf of all others similarly situated, through their attorneys, Selendy & Gay PLLC and Phillips, Richard & Rind, P.A., allege the following against Defendants Navient Corporation and Navient Solutions, LLC (collectively, "Navient").

Plaintiffs allege the following on personal knowledge as to themselves and their own acts, and on information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of the undersigned counsel.[1]

## NATURE OF ACTION

1. Since 1983, the cost of higher education has risen more than 700%—five times greater than inflation, and even faster than healthcare costs.[2] In the face of the massive cost of education, over 40 million people in the United States—more than 10% of the nation's population—have taken out student loans, totaling over $1.4

---

[1] This investigation included, but is not limited to, a review and analysis of: (i) interviews with affected individuals; (ii) public reports, news articles, and academic literature; and (iii) other publicly available material and data identified herein. The investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations are known only to Navient or are exclusively within its custody or control. Plaintiffs believe a reasonable opportunity for discovery will afford further substantial evidentiary support for the allegations contained herein.

[2] *See* Jack Remondi, *Five Recommendations For Better Student Loans* 2, NAVIENT (July 2018), https://news.navient.com/static-files/4a05a5f2-bfb1-4cff-a4de-2e471ba01af1.

trillion.[3]   Loan volume has increased "substantially" since 1999.[4]   90% of the outstanding student loan volume is comprised of loans backed or funded by the Federal Government.[5]

2.     The skyrocketing cost of education hits our public servants, including teachers, nurses, and police officers—the backbone of our nation—especially hard. Those workers, who have dedicated themselves to helping others, are forced to take out substantial student loans to meet requirements of their job and to maintain and enhance their professional certifications.   Yet public service professionals are not highly compensated and struggle to pay back their student debt while meeting their day-to-day financial needs.

3.     "In recent months, educators and other school personnel have walked out to demand a living wage in exchange for the jobs they love.  Teachers are working in fast food restaurants or selling plasma to pay their bills."[6]  "[I]n no state does a teacher's assistant making the average salary earn enough to provide for the basics

---

[3] *See id.* at 1; U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities: Nonbank Financials, Fintech, and Innovation* 122 (July 2018), https://home.treasury.gov/sites/default/files/2018-07/A-Financial-System-that-Cre-ates-Economic-Opportunities---Nonbank-Financi....pdf; Jessica Silver-Greenberg & Stacey Cowley, *In Navient Lawsuits, Unsettling Echoes of Past Lending Crisis*, N.Y. TIMES (Jan. 19, 2017), https://www.nytimes.com/2017/01/19/business/dealbook/na-vient-loans-lawsuit.html; AFT Higher Education, On the Backs of Students and Families: Disinvestment in Higher Education and the Student Loan Debt Crisis 1, 14, https://www.aft.org/sites/default/files/studentdebt0613.pdf.

[4] Dep't of Educ., Student Loans Overview Fiscal Year 2019 Budget Proposal 29, https://www2.ed.gov/about/overview/budget/budget19/justifications/q-slover-view.pdf.

[5] U.S. Dep't of the Treasury, *supra* note 3, at 11.

[6] Randi Weingarten, *Public Service Debt Relief Is Broken*, N.Y. TIMES (Sept. 27, 2018), https://www.nytimes.com/2018/09/27/opinion/public-service-loans-education.html.

for him- or herself and one child."[7] "In 38 states, the average teacher salary in 2018 is lower than it was in 2009 in real terms.... According to the Economic Policy Institute, teacher pay fell by $30 per week from 1996 to 2015, while pay for other college graduates increased by $124."[8] Teachers and other public servants who are unable to pay back their student loans on these dramatically inadequate wages often face seizure of their professional licenses and loss of their livelihood, with ruinous effects on their families, neighborhoods, and communities.[9]

4. It was not supposed to be this way. To encourage students to enter public service and to help students address the huge financial burdens they face in paying for their education, the Federal Government created Public Service Loan Forgiveness ("PSLF"), which is the subject of this lawsuit. Under the PSLF program, a public service worker's federal student debt is forgiven entirely after 120 qualifying payments. Public servants' entitlement to the PSLF program is enshrined in federal law.[10] Moreover, the Federal Government, as the guarantor or lender of the vast majority of the crushing student debt load, through the United States Department of Education (the "Department of Education"), enters into a standardized Master Promissory Note Contract ("MPN Contract") with each borrower of a federal student loan, which explains the terms and conditions of the loan. This MPN Contract details

---

[7] AFT, A Decade of Neglect: Public Education Funding in the Aftermath of the Great Recession 4, https://www.aft.org/sites/default/files/decade-of-neglect-2018.pdf.

[8] *Id.* at 5.

[9] Jessica Silver-Greenberg, Stacy Cowley, and Natalie Kitroeff, *When Unpaid Student Loan Bills Mean You Can No Longer Work*, N.Y. TIMES (Nov. 18, 2017), https://www.nytimes.com/2017/11/18/business/student-loans-licenses.html.

[10] College Cost Reduction and Access Act, Pub. L. No. 110-84, § 401, 121 Stat. 784, 800 (2007) (codified at 20 U.S.C. § 1087e(m)).

a borrower's rights under the loans, including the availability of the PSLF program. A report publicly issued by the Government Accountability Office ("GAO") in September 2018, stated that the "[Department of] Education is responsible for establishing the administrative structure necessary to fulfill the PSLF program's goal of encouraging individuals to enter and continue in public service employment by providing loan forgiveness to eligible borrowers who meet program requirements."[11]

5.     The PSLF program is life-or-death critical to America's public servants who otherwise would never be able to overcome their student debt burden.  Student loan debt is materially different from most forms of debt as it generally cannot be discharged in bankruptcy unless the borrower can establish that repaying the loan would cause "undue hardship," a standard that is extremely difficult to meet unless the borrower has a severe disability.  Consequently, for many public servants, PSLF is their only means of escaping their student debt.[12]

6.     Qualification for PSLF is intended to be straightforward—a borrower must: (i) have loans issued directly from the Federal Government; (ii) be employed full-time, as defined by the program, by a qualifying public service employer; and (iii) make 120 on-time payments under a qualifying repayment plan.  A borrower may confirm eligibility for PSLF and track qualifying payments by regularly submitting "Employment Certification Forms" to the Department of Education.

7.     The qualifying repayment plans available to borrowers are supposed to work in concert with PSLF.  Specifically, borrowers are entitled to repay their debt

---

[11] U.S. GAO, Public Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers 24 (Sept. 2018), https://www.gao.gov/assets/700/694304.pdf.

[12] *See* 11 U.S.C. § 523(a)(8); *see also* Kayla Webley, *Why Can't You Discharge Student Loans in Bankruptcy?*, TIME (Feb. 9, 2012), http://business.time.com/2012/02/09/why-cant-you-discharge-student-loans-in-bankruptcy/.

on income-driven repayment plans, which tie monthly payments to the borrower's wages and family size and can result in payments as low as $0 a month. Thus, a public servant is supposed to be able to make manageable monthly payments toward the student loan for ten years, and after ten years, the remaining student debt is forgiven.

8. Tragically, it does not work that way in practice, in large part because the proper administration of the PSLF program depends on private, for-profit "servicing companies," with which the Department of Education has contracted to administer and manage federal student loan repayments. The PSLF program depends on the performance of these private servicing companies and their truthful communication with our nation's most deserving borrowers when they are at their most vulnerable.

9. Navient is a massive servicing company for federal student loans. Navient is responsible for servicing over $205.9 billion in federal student loans, owed by approximately 6.1 million accounts.[13]

10. Navient has entered into lucrative Servicing Contracts (as defined herein) with the Department of Education to administer borrowers' loans and to communicate with borrowers on behalf of the Department of Education about their loans. Under the Servicing Contracts, Navient is charged with providing borrowers with the best repayment options for each borrower's specific financial circumstances. Navient is required to give borrowers accurate information about the repayment and forgiveness options available under federal law, including PSLF.

11. When borrowers face financial distress and cannot make their payments, they contact Navient as their servicer to discuss alternative payment

---

[13] *See* Navient Corp., 2017 Annual Report (Form 10-K) 9 (released Feb. 26, 2018).

options, and Navient has held itself out as a source of reliable information and assistance for borrowers to gain their trust in a time of financial crisis.

12.    In its 2017 Annual Report (Form 10-K) filed with the United States Securities and Exchange Commission ("SEC"), Navient stated, "We help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals. We promote awareness of federal repayment plan options, including Income-Driven Repayment …, through more than 162 million communications annually, including mail, email, phone calls, videos and text messages."[14]

13.    In blog posts that remain available, Navient's leadership has promised to help those borrowers in their most difficult times:

- "All borrowers, and especially those facing financial strain, should be encouraged to engage directly with their servicers —not driven away from them by misleading and false rhetoric. Together, we can ensure that even those who are anxious about their loans know they have options. Help is a phone call away."[15]

- Navient's "priority is to help each of our 12 million customers successfully manage their loans in a way that works for their individual circumstances."[16]

14.    Navient's website used to contain further promises to aid borrowers, such as:

---

[14] *Id.*

[15] Jack Remondi, *It's Time To Put Students First*, MEDIUM (May 23, 2016), https://medium.com/@JackRemondi/its-time-to-put-students-first-7cd578ca266e.

[16] Jack Remondi, *What CFPB Consumer Data Prescribes For Student Loans*, MEDIUM (Mar. 20, 2017), https://medium.com/@JackRemondi/whatcfpb-consumer-data-prescribes-for-student-loans-ab46b8e62179.

- "Contact us to discuss your student loan obligations. We can answer any questions you have about paying back your loans and the types of repayment plans available to you."[17]

- Navient is available to help—with "expert guidance"—if borrowers have questions or concerns about the types of repayment plans or forgiveness options available.[18]

15.     On information and belief, Navient removed these particular statements from their prior locations on its website after this lawsuit was filed. But Navient's website continues to induce borrowers to reach out to it for help with questions about how to pay back their loans:

- "Student borrowers who reach out to their servicer when they have questions tend to be more successful in repayment. Navient is here to help."[19]

- "We keep in touch with you throughout your repayment period and are here to answer any questions along the way…. We're here to answer your questions, provide you with solutions, and process your payments."[20]

16.     Navient has not been living up to its obligation to help vulnerable borrowers get on the best possible repayment plan and qualify for PSLF. Instead, Navient has harmed and continues to harm millions of hard-working public servants by routinely providing false information to these borrowers, preventing them from qualifying for the PSLF program.

---

[17] Exhibit 1.

[18] Exhibits 1-3.

[19] Navient Solutions, LLC, *5 Habits Of Successful Student Loan Borrowers*, https://www.navient.com/loan-customers/getting-started/successful-student-loan-borrowers/ (last visited Jan. 16, 2019) (Exhibit 4).

[20] Navient Solutions, LLC, *New To Navient*, https://www.navient.com/new-to-navient (last visited Jan. 16, 2019) (Exhibit 5).

17.     Solely in the pursuit of increasing its own profits, and at the direct expense of our nation's public servants, Navient has:

- Deceived borrowers by informing them PSLF was not available to them or that Navient does not offer PSLF, without specifying that the Department of Education offers PSLF and another servicer, FedLoan Servicing, administers it;

- Misrepresented to borrowers they were "on track" for PSLF when in fact their loans would not qualify for PSLF without consolidation;

- Misled borrowers by stating they were "on track" for PSLF when in fact their repayment plan did not qualify for PSLF; and

- Advised borrowers not to submit paperwork that would verify their employment and other qualifying factors for PSLF, which would have resulted in their loans being transferred to FedLoan Servicing.

18.     As a direct result of Navient's fraudulent misconduct, borrowers have been denied loan forgiveness at alarming rates, with horrifying effects on the borrowers and their families and communities.

19.     Recent data last updated by the Department of Education on September 30, 2018 and released to the public in December 2018 revealed that a shocking 89.19% of borrowers who submitted PSLF applications since October 2017 have been rejected. ***Only 206 borrowers*** had received loan forgiveness under the program. This number is negligible compared to the estimated ***32 million borrowers*** who were repaying loans that are potentially eligible for PSLF at the end of 2016, according to the Consumer Financial Protection Bureau ("CFPB").[21]

---

[21] Fed. Student Aid, PSLF Report, https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/pslf-data (last updated Sept. 30, 2018); *see* Gregory Korte, *More Than 41,000 Public Service Workers Sought Federal Student Loan Forgiveness. The Government Approved Just 206*, USA TODAY (Dec. 27, 2018),

20.     Of the 44,724 applications for PSLF that the Department of Education has received and processed, a staggering 72.46% of these public servants were denied for purportedly failing to meet program requirements, including the borrower's loan type, payment plan, or employment.[22]

21.     The financial consequences of Navient's misconduct are enormous. In a recent survey conducted by the American Federation of Teachers ("AFT") of their members, eight out of every ten respondents who struggle financially reported that student loan debt was a "major burden or challenging."[23] Many AFT members, which include teachers, nurses, and other health professionals, reported being unable to afford basic household needs, including food, rent, and other bills because of their student loan burden.[24] Student debt obligations leave public service workers unable to save for retirement or for their own children's education—thereby repeating and deepening a permanent cycle of unmanageable student debt.[25]

22.     In response to survey questions from AFT, members wrote that their crushing student debt obligations impacted their marital lives, their ability to maintain family connections, their ability to provide basic life necessities for their children, and their mental health. Some members even reported suicidal tendencies as a result of the weight of loan debt.

https://www.usatoday.com/story/news/nation/2018/12/27/student-loan-debt-department-education-public-service-loan-forgiveness-denial/2366589002/.

[22] Fed. Student Aid, PSLF Report, *supra* note 21.

[23] Hart Research Association, Effects of Debt on AFT Members Who Struggle Financially 3, https://www.aft.org/sites/default/files/ppt_aft-member-debt_hart2018.pdf (June, 2018).

[24] *Id.*

[25] *Id.* at 8.

23.     According to a report issued by AFT: "The challenges posed are not only economic—with billions of dollars going toward servicing debt instead of being used to purchase homes, start families or simply have a night on the town—but are moral as well.  The promise of higher education, which has historically been a vehicle for social mobility and, in these times, is considered necessary for a decent job, is becoming out of reach for those facing economic hardship and, increasingly, for members of the middle class."[26]

24.     While Navient's misconduct has devastating consequences for public servants who are drowning in student loan debt, it has been and continues to be extremely lucrative for Navient.  One way in which Navient profits at the expense of the borrowers is by cutting the costs of its interactions with those borrowers.  Navient structures its employees' compensation to incentivize short calls by rewarding employees for rushing borrowers off the phone, thereby preventing borrowers from receiving full and accurate information about their best repayment options.  Navient pays its customer service and pre-default collections employees based on average call time with borrowers—the shorter, the better.  ***Navient targets less than 7 minutes per call with borrowers***—a woefully inadequate amount of time for a servicer to assess a borrower's financial situation, analyze and present the best options, and advise on how to proceed to meet program requirements and the borrower's financial goals.

25.     Because Navient pays its employees to avoid engaging in lengthy conversations with a borrower, they instead advocate for quick and easy options that are not in the borrower's best interests.  According to Lynn Sabulski, who worked for Navient's Wilkes-Barre, Pennsylvania call center for five months in 2012:

---

[26] AFT Higher Education, *supra* note 3.

"Performing well meant keeping calls to seven minutes or under…. If you only have seven minutes, the easiest options to put a borrower in, first and foremost, is a [F]orbearance."[27]

26.　A Forbearance can be devastating for a borrower as it potentially ***increases*** the total loan amount the borrower has to pay. A borrower who enters loan Forbearance is temporarily relieved from making loan payments, but the interest continues to accrue, and the borrower may end up owing more money at the end of the Forbearance period than before. At the same time, a borrower on Forbearance has been unable to make any progress in qualifying for PSLF as he/she is not making any qualifying payments.

27.　Because of the devastating effects of Forbearance on a borrower's financial life, Forbearance is not supposed to be used when borrowers can afford to pay some amount each month. Instead, borrowers in such situations should be offered income-driven repayment plans, which tie manageable monthly payments to the borrower's wages and family size and which qualify for PSLF.

28.　Yet, even though Navient knows or should have known of the deleterious effects of Forbearance on borrowers, as another Navient call center employee admitted, Navient call center workers still routinely pushed borrowers into Forbearance rather than income-driven repayment plans, and some even hung up on borrowers who sought help filling out income-driven repayment forms.[28]

---

[27] Daniel Rivero, *Debt Trap: How The Student Loan Industry Fails Young Americans*, FUSION (Sept. 7, 2017), **Error! Hyperlink reference not valid.**https://fusion.tv/story/580018/debt-trap-how-the-student-loan-industry-fails-young-americans/.

[28] Molly Hensley-Clancy, *How America's Student Loan Giant Dropped The Ball*, BUZZFEED NEWS (Feb. 13, 2017), https://www.buzzfeednews.com/article/mollyhensleyclancy/how-things-went-wrong-at-americas-student-loan-giant.

29.     "Sabulski said customer service representatives were trained to offer [F]orbearance first, and after that, Navient's call policy did not leave enough time to discuss other options.  If a Navient call center worker didn't hit her target call time, 'I could be written up.  I could lose my job,' she added."[29]  Navient effectively made its employees choose between their own livelihoods and their duty to borrowers.

30.     Another insidious way Navient lined its own pockets at the expense of borrowers is by retaining the servicing (and the associated fees) of student loans that should have been transferred away to another servicer, FedLoan Servicing, that administers PSLF.

31.     The PSLF program permits a borrower seeking qualification for PSLF to submit an Employment Certification Form.  Upon successful completion of that form, if the borrower is on a qualifying plan and works for a qualifying employer, that borrower's loans are transferred to FedLoan Servicing.  FedLoan Servicing is the exclusive servicer for those borrowers who qualify or are on track for loan forgiveness under PSLF and gives borrowers the ability to track their qualifying payments toward PSLF.  But when the borrower's loans get transferred away from Navient to FedLoan Servicing, Navient loses the associated servicing fees.

32.     As a result—solely to line its pockets at the expense of the borrower—Navient keeps borrowers from getting transferred to FedLoan Servicing by instructing borrowers not to submit any PSLF Employment Certification Forms until borrowers have made the required 120 payments and are ready to request loan forgiveness.

33.     That is extraordinarily harmful to the borrower because the submission of the Employment Certification Form allows a borrower to determine whether the

---

[29] Rivero, *supra* note 27.

borrower's loans, payment plans, and employment qualify for PSLF. That is why even the Department of Education recommends that borrowers send in those forms as early as possible. Delaying submission places the borrower at risk of making payments thinking they are qualifying, when they are in fact not. That is exactly what happens as a result of Navient's misrepresentations.

34. Navient's misconduct has caused public service employees to spend millions, if not billions, of dollars on student loan payments that could have been reduced or eliminated through PSLF. When these borrowers try to apply for PSLF, they learn that their prior payments did not qualify for PSLF, as Navient claimed they would. And the borrowers then have to make additional payments to qualify or default on their loans. Navient's misconduct has thus forced thousands of hard-working public servants into a lifetime of debt servitude.

35. Each of the Plaintiffs herein has confronted this terrible financial predicament as a direct result of Navient's misrepresentations:

- Plaintiff Kathryn Hyland is a full-time public school literacy teacher and coach living in New York who took out FFEL Loans[30] for both her undergraduate and graduate education. Ms. Hyland submitted her Employment Certification Forms to Navient in an attempt to apply for the PSLF program in January 2014. ***For three years, Navient informed Ms. Hyland that her employment was approved and she was "on track" for PSLF. Then, in December 2016, Navient informed Ms. Hyland for the first time that none of the loan payments she had made to that point qualified for***

---

[30] As explained further below, "FFEL" stands for Federal Family Education Loans. FFEL Loans are issued by private companies and are reinsured by the Federal Government. The Direct Loan program was introduced in 1994 with the two loan programs operating in tandem until 2010. In 2010, the FFEL program was terminated in favor of an expanded Direct Loan program. Under the Direct Loan program, the Federal Government issues loans directly to the borrower. Only payments made under Direct Loans are eligible for PSLF but FFEL borrowers may consolidate their loans into Direct Loans to take advantage of PSLF.

*PSLF* because she had not consolidated her FFEL Loans into Direct Loans issued from the Federal Government. Ms. Hyland lost nearly three years of qualifying payments for PSLF. As a result, Ms. Hyland does not have money to purchase her own home, cannot afford after-school programs for her child, and must borrow money from family to send her daughter to preschool.

- Plaintiff Melissa Garcia is a full-time public school teacher living in New York who took out Direct Loans for her graduate degree. Starting in 2012, Ms. Garcia repeatedly sought Navient's advice about the best repayment options for her, and Navient advised she would save money by consolidating her loans. This was wrong—***Ms. Garcia actually lost 37 qualifying payments she had made toward PSLF***. Navient then advised Ms. Garcia that she should not submit her Employment Certification Form until after she made 120 qualifying payments for PSLF. This was also wrong—Ms. Garcia could file her Employment Certification Form at any time. When she called Navient for advice about remaining on track for PSLF, Navient advised Ms. Garcia to switch to an extended repayment plan to lower her monthly payments. Unbeknownst to Ms. Garcia, but not Navient, ***payments made under the extended repayment plan were not eligible for PSLF. After enrolling in the new plan, Ms. Garcia continued to ask Navient for assistance with making qualifying payments for PSLF, and each time Navient offered her Forbearances, misleading her into believing that the payments qualified for PSLF.*** As a result of Navient's misrepresentations, Ms. Garcia lost years of qualifying payments toward PSLF and has made and will be required to make thousands of dollars in payments of principal and interest that otherwise would have been forgiven under PSLF.

- Plaintiff Eldon Gaede is a full-time associate professor at a community college living in New York who took out FFEL Loans to pay for his doctoral degree. He has spent 35 years in higher education. After completing his PhD, Dr. Gaede asked Navient repeatedly if his loan payments could be based on his income. Although income-driven repayment plans were available to Dr. Gaede, ***Navient falsely informed Dr. Gaede that his only option for reducing his payment was to enter into Deferment or Forbearance. When Dr. Gaede asked Navient whether he would be able to enroll in***

14

*PSLF, Navient repeatedly, and incorrectly, informed him that Navient did not offer such a program, without specifying that the Department of Education offers PSLF and another servicer, FedLoan Servicing, administers it.* Had Navient provided Dr. Gaede truthful information about PSLF and income-driven repayment plans, he would have consolidated his FFEL Loans into Direct Loans and been more than halfway through his qualifying payments for loan forgiveness under PSLF. Instead, he must spend another ten years making qualifying payments. By that time, he will be 78 years old.

- Plaintiff Elizabeth Taylor is a full-time Program Research Specialist for the State of New York who took out FFEL loans for her undergraduate and graduate degrees. *Navient falsely told Ms. Taylor that in order to qualify for PSLF, she simply needed to continue making payments while working for a qualifying employer until she had made 120 payments. In fact, Ms. Taylor needed to consolidate her FFEL loans into Direct loans and enroll in an income-driven repayment plan in order to qualify for PSLF.* Relying on Navient's advice, Ms. Taylor continued making payments on her student loans, unaware that none of these payments would count towards loan forgiveness. Ms. Taylor lost years of payments that could have been qualifying toward PSLF and has made and will be required to make thousands of dollars in payments of principal and interest that otherwise would have been forgiven under PSLF.

- Plaintiff Jessica Saint-Paul is a full-time executive director for a nonprofit organization and adjunct college professor in California who took out FFEL Loans for her graduate education. Ms. Saint-Paul has spent her entire career, over seventeen years, working full time for nonprofit organizations. Beginning in 2007, she asked Navient multiple times if she qualified for PSLF and if she could make her loan payments on an income-driven repayment plan. *Navient told Ms. Saint-Paul that her option to reduce her loan payments was limited to entering into a Deferment or Forbearance, that she would qualify for PSLF after 120 consecutive loan payments, and that she should submit the paperwork for PSLF after making all of those payments. This was false. A borrower's loan payments need not be consecutive in order to qualify for PSLF, and payments on FFEL*

***Loans do not qualify for PSLF unless they are consoli-
dated into Direct Loans***.  As a result of Navient's misrepre-
sentations, Ms. Saint-Paul entered into multiple Forbear-
ances, believing that was her only option for reducing her pay-
ments and that she would never qualify for loan forgiveness.
Ms. Saint-Paul lost a decade of payments that could have been
qualifying toward PSLF and has made and will be required to
make thousands of dollars in payments of principal and inter-
est that otherwise would have been forgiven under PSLF.

- Plaintiff Rebecca Spitler-Lawson is a college professor living
in California who has Direct and FFEL Loans.  ***Navient
falsely informed her that because she holds positions at
multiple colleges, she could not qualify for PSLF.  But a
borrower may meet PSLF's full-time work requirement
with a combination of part-time positions or with one
full-time position.***  As a result of Navient's misrepresenta-
tions, Ms. Spitler-Lawson believed that she was not eligible for
PSLF and continued making non-qualifying payments and
has made and will be required to make thousands of dollars in
payments of principal and interest that otherwise would have
been forgiven under PSLF.

- Plaintiff Michelle Means is a full-time public school teacher
living in Maryland who took out Direct Loans to pursue her
graduate degree.  She saves money and clips coupons to pro-
vide food and other necessities for her students, who live in
poverty and are often faced with eviction and domestic vio-
lence in the home.  ***Navient misled Ms. Means by telling
her that a single missed or late payment would be
enough to completely disqualify her for PSLF.  But a bor-
rower's qualifying payments for PSLF need not be con-
secutive, and a borrower may continue making qualify-
ing payments even if they have missed payments in the
past.***  Ms. Means did not pursue PSLF or income-driven re-
payment plans further, believing that in her challenging fi-
nancial situation she would be unable to make 120 payments
without a single interruption.  As a result of Navient's misrep-
resentations, Ms. Means has made and will be required to
make thousands of dollars in payments of principal and inter-
est that otherwise would have been forgiven under PSLF.

- Plaintiff Elizabeth Kaplan is a full-time public school teacher
living in Maryland who took out Direct Loans for her

undergraduate degree. Upon graduation, Ms. Kaplan was working at a nonprofit entity and was enrolled in an income-driven repayment plan with payments of $0 per month. Payments of $0 under an income-driven repayment plan are qualifying payments for the purpose of PSLF. ***When she specifically asked about PSLF, Navient falsely informed Ms. Kaplan that to be eligible for PSLF, her payments must be consecutive, and any break in payment would require her to start the 120 qualifying payments over from the beginning. Because of this misrepresentation, after Ms. Kaplan went to graduate school for her master's degree and her loans were placed in Deferment, Ms. Kaplan believed that her prior payments of $0 per month no longer qualified. However, a borrower's qualifying payments for PSLF need not be consecutive.*** After Ms. Kaplan began working as a teacher, she asked Navient about recertifying her income for income-driven repayment. Navient advised Ms. Kaplan that her monthly payment would be higher under the income-driven repayment plan. This advice was incorrect. Because of Navient's misrepresentations, Ms. Kaplan has made payments under the standard repayment plan for the last two years. She has made and will be required to make thousands of dollars in payments of principal and interest that otherwise would have been forgiven under PSLF.

- Plaintiff Jennifer Guth is a full-time pre-K-8 library teacher living in Maryland who took out FFEL Loans to pursue her law and master's degrees. Ms. Guth consolidated her FFEL Loans into Direct Loans in order to pursue PSLF. ***Navient misled her by informing her she had to make consecutive payments in order to be eligible for PSLF and advised her not to pursue PSLF if she were going to continue with school and only make intermittent payments.*** After heeding Navient's advice, Ms. Guth has been in Deferment or Forbearance on her loans for multiple years, incurring additional interest and simultaneously not making any qualifying payments toward PSLF. Based on Navient's misrepresentation, Ms. Guth has resigned herself to taking two community college courses each semester to remain in Deferment because she believes she cannot afford to repay her loans. Ms. Guth will be required to make hundreds of thousands of dollars in payments of principal and interest that otherwise would have been forgiven under PSLF.

- Plaintiff Megan Nocerino is a full-time middle school literacy teacher living in Florida who took out both Direct and FFEL Loans for her master's and doctoral degree. ***When Dr. Nocerino asked Navient about income-driven repayment plans and loan forgiveness, Navient misled Dr. Nocerino by informing her that she was only eligible for a temporary Forbearance and that she was not eligible for any forgiveness programs***. After heeding Navient's advice, Dr. Nocerino has been in Forbearance on her loans multiple times, thereby incurring additional interest and simultaneously not making any qualifying payments toward PSLF. Dr. Nocerino lost years of payments that could have been qualifying toward PSLF and has made and will be required to make thousands of dollars in payments of principal and interest that otherwise would have been forgiven under PSLF.

- Plaintiff Anthony Church is a full-time middle school band director living in Florida who took out both FFEL and Direct Loans for his bachelor's and master's degrees. ***When Mr. Church asked Navient about PSLF in 2012, Navient misled Mr. Church by stating that he only needed to make 120 payments while working for a qualifying employer***. From 2012 until 2017, Navient continued to falsely inform Mr. Church that he was on track for PSLF and was making progress on his qualifying payments. In 2017, however, when Mr. Church asked Navient how many payments remained until forgiveness, ***Navient informed him for the first time that his FFEL Loans were ineligible for PSLF. Mr. Church then consolidated his FFEL Loans into a Direct Loan, losing years of payments that could have qualified for PSLF.*** Mr. Church has made and will be required to make thousands of dollars in payments of principal and interest that otherwise would have been forgiven under PSLF.

36. These are just a few of the examples in which public servants' and their families' lives have been ruined by Navient's evisceration of the promise of PSLF debt relief. As Senator Hillary Clinton remarked on the Senate floor the day that the final bill creating PSLF was approved:

> I hear from many young people in New York and around the country, who want to be teachers, police officers, nurses, social workers and public defenders, but sadly are so straddled with debt, such careers are not an option for them. This is the wrong policy; and today, we send the

message that we want to encourage more young people to go into lower paying public service jobs.... I strongly believe this program will help to fill the void in public service our nation will soon face as our baby boomer generation sets to retire by providing an incentive for college graduates to pursue lower paying, but vital professions.[31]

37.     And as Senator Patrick Leahy stated:

Because tuition has increased well beyond the rate of student assistance, students today are graduating with staggering debt burdens. With the weight of this debt on their backs, recent college graduates understandably gravitate toward higher paying jobs that allow them to pay back their loans.  Unfortunately, all too often these jobs are not in the arena of public service or areas that serve the vital public interests of our communities and of our country.  We need to be doing more to support graduates who want to enter public service, be it as a child care provider, a doctor or nurse in the public health field, or a police officer or other type of first responder.[32]

38.     Instead of helping relieve the financial burden of student loans by supporting PSLF, Navient has locked these public servants in a prison of permanent financial distress.

39.     Borrowers who place their trust in Navient find themselves in worse, not better, circumstances.  This action seeks to compensate borrowers who qualify for PSLF based on their employment for the harm caused by Navient's misconduct and to stop Navient from continuing to lead borrowers into financial ruin simply to increase its own profits.

40.     By misleading borrowers about the PSLF program, Navient

   a.     breaches the Servicing Contracts between Navient and the Department of Education for which Plaintiffs and those similarly situated are intended third-party beneficiaries;

   b.     breaches an implied warranty made to Plaintiffs and those similarly situated;

---

[31] 9/7/2007 Sen. Hillary Clinton Congressional Record S11249.

[32] 7/19/2007 Sen. Patrick Leahy Congressional Record S9574-02.

c.      tortiously interferes with the MPN Contracts;

d.      tortiously interferes with expectancy of loan forgiveness after 120 PSLF-qualifying payments;

e.      unjustly enriches itself at the expense of Plaintiffs and those similarly situated;

f.      violates its fiduciary duty owed to Plaintiffs and those similarly situated;

g.      violates the standard of care that Navient owed Plaintiffs and those similarly situated;

h.      makes negligent misrepresentations in violation of Maryland law;

i.      makes negligent misrepresentations in violation of Florida law;

j.      makes negligent misrepresentations in violation of New York law;

k.      makes negligent misrepresentations in violation of California law;

l.      violates the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-301 et seq.;

m.      violates the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq.;

n.      violates the New York Consumer Protection from Deceptive Acts and Practices Law, New York General Business Law § 349 et seq.; and

o.      violates the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq.

41.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the proposed Nationwide Classes and Subclasses of borrowers in Maryland, Florida, New York, and California, of all individuals who: (i) have or had federal FFEL or Direct Loans serviced by Navient; (ii) have been employed full-time, under the definition used by the program, by a qualifying public service employer for purposes of PSLF; (iii) have contacted Navient

regarding their eligibility for PSLF; and, for the injunctive relief classes, (iv) intend to contact Navient in the future regarding their eligibility for PSLF. Navient caused Plaintiffs, along with those similarly situated, significant damage including: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

42.   Navient places Plaintiffs, along with those similarly situated, in imminent danger of future irreparable harm by continuing its pattern of providing false information to borrowers. Plaintiffs therefore seek to enjoin Navient from continuing to misrepresent to borrowers that they are not eligible for PSLF, from providing incorrect information to borrowers regarding PSLF, and from affirmatively restricting borrowers' ability to enroll in PSLF, and to require Navient to change its incentive compensation programs so that Navient employees are not paid based on how quickly they can end a conversation with a borrower.

## THE PARTIES

### Plaintiffs

#### Kathryn Hyland

43.   Plaintiff Kathryn Hyland is a middle school literacy teacher and coach in New York.

44.   Ms. Hyland took out student loans for her undergraduate and master's degree under the FFEL program.

45.   Upon graduating with her master's degree in 2009, Ms. Hyland began repaying her loans under the graduated repayment plan.

46.   Ms. Hyland trusted Navient to provide her with truthful and accurate information about her loan repayment options. Ms. Hyland trusted Navient because

Navient and the Department of Education represented that Navient has expertise as a student loan servicer and offers needed services to federal student loan borrowers, including assistance with enrolling in repayment plans and loan forgiveness programs.

47.     Since 2009, Ms. Hyland has reached out to Navient several times when she was having difficulty making payments.  Navient falsely informed her that Forbearance was her best option even though there were income-driven repayment plans available to her.

48.     Ms. Hyland first asked Navient about qualifying for PSLF in 2013.  Ms. Hyland faxed her Employment Certification Form for PSLF to Navient in January 2014.  Navient indicated that the forms were incomplete, so she continued to resubmit them through January of 2015.

49.     Once a completed version was received, Navient informed Ms. Hyland at that time that she did not need to submit these forms until 2017, and that she would be eligible for PSLF in 2017 because by then, PSLF would have existed for ten years.  Navient further informed Ms. Hyland that her employment was approved for purposes of PSLF and that her Employment Certification Forms would be kept on file with Navient until 2017.

50.     Ms. Hyland made a note in her yearly planner to call Navient in 2016 and 2017 regarding PSLF to ensure that her loans and employment were eligible for PSLF.  In telephone calls in 2015 and 2016, Navient continued to tell Ms. Hyland that she was eligible and "on track" for PSLF.  Based on this information, Ms. Hyland continued to make payments under the graduated repayment plan.

51.     In November of 2016, Ms. Hyland called Navient to ensure she had everything she needed to begin the process of applying for PSLF in 2017.  During that call, Navient informed Ms. Hyland for the first time that none of her loan payments

had qualified for PSLF and that she would need to consolidate her loans from FFEL Loans into Direct Loans in order to begin making qualifying payments for PSLF.

52.     Ms. Hyland requested the call logs from her previous conversations with Navient representatives.  Navient refused to produce them and denied that Ms. Hyland had ever inquired about PSLF or that Navient had given her any incorrect information.

53.     Ms. Hyland filed a complaint with the CFPB on January 21, 2017 stating that "[o]ver the years I have been forced into [F]orbearance [and] never informed that the interest would continue to accrue.  I have specifically called and asked about repayment and forgiveness options and been given incorrect information.… I have been a teacher in NYC for the last ten year[s] and am a mother of two.  I am struggling to get by and live paycheck to paycheck.  I was never made aware of other options than Forbearance in the past and never told about forgiveness or repayment options and given false information when I asked directly."  The CFPB closed Ms. Hyland's complaint purportedly based on Navient's response without further investigation.

54.     Ms. Hyland also filed a complaint with the Department of Education's office of Federal Student Aid in March of 2017.  Ms. Hyland was assigned an advocate by Navient due to her complaint but, even after five attempts, never got a return phone call.  Instead, Navient provided a response to her complaint directly to the Department of Education, stating that it had "found no circumstances where Public Service Loan Forgiveness was discussed or where you were given incorrect information."  The Department of Education then closed the complaint without further inquiry.

55.     At this stage in her career, Ms. Hyland would like to pursue a master's degree in Special Education Administration but "cannot fathom taking out additional

loans." Ms. Hyland does not have money to purchase her own home, cannot afford after-school programs for her children, and has to borrow money from family to send her daughter to preschool. After 11 years of teaching in the Bronx, she "doesn't have anything to show for it for what she can do for her family or herself."

56.     As a result of Navient's misrepresentations, Ms. Hyland lost three years of qualifying payments toward PSLF and has made, and will be required to make, payments of principal and interest that would otherwise have been forgiven under PSLF. Had Navient not misrepresented Ms. Hyland's loan repayment options under PSLF, she would have submitted an Employment Certification Form to FedLoan Servicing and would have consolidated her loans to ensure that her loan payments qualified for PSLF.

57.     Navient remains Ms. Hyland's loan servicer, and until she is able to consolidate her loans into Direct Loans, enroll in a PSLF-qualifying repayment plan, and file her Employment Certification Form with FedLoan Servicing, it is likely that Ms. Hyland will be forced to contact Navient again to seek advice about her specific loan circumstances and getting on track to qualify for PSLF, despite her fear that Navient will again provide untruthful or incorrect information.

58.     On information and belief, the exact dates of Ms. Hyland's conversations with Navient, recordings of these conversations, and the names of the Navient employees with whom Ms. Hyland spoke are contained in records within Navient's control.

**Melissa Garcia**

59.     Plaintiff Melissa Garcia resides in New York and is a public school teacher with the New York City Department of Education.

60.     Ms. Garcia took out Direct Loans beginning in 2010 to pay for a master's degree program.   Her loans were originally serviced by Sallie Mae, Navient's predecessor, which became Navient in 2014.

61.     Ms. Garcia began repaying her loans in 2012 on an income-driven repayment plan.

62.     Ms. Garcia trusted Navient to provide her with truthful and accurate information about her loan repayment options.  Ms. Garcia trusted Navient because Navient and the Department of Education represented that Navient has expertise as a student loan servicer and offers needed services to federal student loan borrowers, including assistance with enrolling in repayment plans and loan forgiveness programs.   In 2013, Navient advised Ms. Garcia she would save money if she consolidated her loans.  This representation was false, as the consolidation caused her to lose the 37 qualifying payments she had made toward PSLF.

63.     In 2014, Ms. Garcia asked Navient whether, as a teacher, she was eligible for loan forgiveness, and Navient told her she would get the greatest benefit from PSLF.   Ms. Garcia then informed Navient that she had completed her Employment Certification Form for PSLF.  Navient instructed her not to submit this form, but instead to wait until she had made the 120 qualifying payments.  This was false; borrowers can submit their Employment Certification Form to FedLoan Servicing at any time.  But when a borrower submits those forms and qualifies for PSLF, the borrower's loan is sent to FedLoan Servicing and is no longer serviced by Navient (and Navient no longer collects servicing fees)—a situation Navient has taken pains to avoid.

64.     Had Ms. Garcia not been misinformed by Navient regarding the submission of her Employment Certification Form, she would have qualified for the PSLF program and her student loan servicing would have been transferred to

FedLoan Servicing. After submitting her Employment Certification Form, Ms. Garcia would have been able to determine how many payments she had made toward PSLF. Instead, Ms. Garcia's loan remained with Navient.

65. Ms. Garcia spoke to Navient representatives several times regarding her desire to qualify for PSLF and inquired as to whether she was on track for loan forgiveness. In response, Navient assured Ms. Garcia she was making progress toward PSLF and told her how many qualifying payments she had made for PSLF. This representation was false, as borrowers can only obtain accurate information about their progress toward PSLF after submitting an Employment Certification Form to FedLoan Servicing.

66. In 2016, after Ms. Garcia filed a joint tax return with her spouse for the first time, Navient told Ms. Garcia that her income-driven repayment payments would increase. Ms. Garcia asked how her payments could be lowered, and Navient told Ms. Garcia that she could enroll in an extended repayment plan. Even though Navient knew Ms. Garcia intended to qualify for PSLF, Navient did not inform Ms. Garcia that the extended repayment plan was not a qualifying plan. Ms. Garcia began making her student loan payments on the extended repayment plan, unaware that none of these payments was considered a "qualifying payment" for PSLF.

67. Ms. Garcia contacted Navient several times after enrolling in the extended repayment plan to express her difficulty in making her loan payments and her desire to qualify for PSLF. Each time, Navient offered Ms. Garcia Forbearances rather than giving her accurate information about qualifying for PSLF through income-driven repayment plans.

68. Had Navient not falsely instructed Ms. Garcia not to submit her Employment Certification Form, Ms. Garcia would have obtained accurate information from FedLoan Servicing about qualifying for PSLF. Ms. Garcia trusted

Navient's expertise in continuing to make her payments and believed that Navient would assist her in qualifying for PSLF. Navient knew that Ms. Garcia was trusting Navient's guidance to qualify for PSLF but nevertheless falsely represented to her that her loan payments were qualifying payments for PSLF and instructed her not to submit the paperwork that would have allowed her to discover the truth.

69. As a result of Navient's misrepresentations, Ms. Garcia lost years of qualifying payments towards PSLF and has made, and will be required to make, payments of principal and interest that would otherwise have been forgiven under PSLF. Had Navient not misrepresented Ms. Garcia's loan repayment options under PSLF, she would have been able to choose a loan repayment plan under which she could have made qualifying payments for PSLF.

70. Navient remains Ms. Garcia's loan servicer, and until she is able to enroll in a PSLF-qualifying repayment plan and file her Employment Certification Forms with FedLoan Servicing, it is likely that Ms. Garcia will be forced to contact Navient again to seek advice about her specific loan circumstances and getting on track to qualify for PSLF, despite her fear that Navient will again provide untruthful or incorrect information.

71. On information and belief, the exact dates of Ms. Garcia's conversations with Navient, recordings of these conversations, and the names of the Navient employees with whom Ms. Garcia spoke are contained in records within Navient's control.

### Eldon Gaede

72. Plaintiff Eldon Gaede is an associate professor of anthropology at a community college and lives in New York.

73. Dr. Gaede took out FFEL Loans to pay for his doctoral degree.

74.    Dr. Gaede trusted Navient to provide him with truthful and accurate information about his loan repayment options.  Dr. Gaede trusted Navient because Navient and the Department of Education represented that Navient has expertise as a student loan servicer and offers needed services to federal student loan borrowers, including assistance with enrolling in repayment plans and loan forgiveness programs.

75.    Dr. Gaede frequently requested information about income-driven repayment plans from Navient for over two years after receiving his PhD.  Navient falsely told him his only two options were standard repayment or Forbearance.  As a consequence, Dr. Gaede continued to enter into Forbearances until Navient informed him that he had no Forbearances remaining.

76.    Dr. Gaede also asked Navient representatives multiple times, from the time he started repayment, about his eligibility for loan forgiveness programs based on his occupation as a community college professor.  Each time he asked Navient representatives about PSLF, Navient representatives told him Navient did not have any such program, without telling him that another servicer, FedLoan Servicing, administers PSLF.

77.    In 2012, after finally receiving truthful information from Navient about income-driven repayment, Dr. Gaede enrolled in the income-driven repayment plan and was able to begin making payments on his loans.  Due to Navient's repeated false statements that it did not offer PSLF, without informing him that another servicer, FedLoan Servicing, administers PSLF, Dr. Gaede was "resigned that this would be a lifelong sentence" and believed that he would be "paying until [he] died."

78.    Dr. Gaede was determined to make payments on his student loans.  In order to make his payments on the income-driven repayment plan, Dr. Gaede had to cash in a substantial pension fund that he had saved for retirement, 25% of which

was withheld for taxes. As a result, Dr. Gaede is in an "economically perilous position" with regard to his retirement.

79. Then, Dr. Gaede learned from a colleague that Navient had misrepresented his loan forgiveness options and that he could apply for PSLF. Dr. Gaede submitted an Employment Certification Form for PSLF in 2017. Dr. Gaede received a letter in reply stating that his years of payments on his FFEL Loans did not qualify him for PSLF and that he would need to consolidate his loans into Direct Loans to begin the ten-year process of qualifying for PSLF.

80. Had Navient truthfully replied to Dr. Gaede's questions about his loan repayment and loan forgiveness options, Dr. Gaede would have learned when he first began repaying his loans that his position as a college professor did in fact qualify him for PSLF and that he would simply need to consolidate his loans into Direct Loans in order to begin making qualifying payments. Had Navient not misrepresented the PSLF requirements to Dr. Gaede, Dr. Gaede would have consolidated his FFEL Loans into Direct Loans to ensure his student loans qualified for PSLF. Now he is faced with repayment of his FFEL Loans at the total amount with no opportunity for forgiveness. Moreover, Dr. Gaede would have also made payments on an income-driven repayment plan rather than entering into multiple Forbearances. Instead, due to Navient's misrepresentations, Dr. Gaede has spent over five years in Forbearance or making payments that do not qualify for PSLF.

81. Dr. Gaede has been teaching for over 18 years and has been working in higher education for 35 years. Even if he starts making qualifying payments toward PSLF now, he will not qualify for PSLF until he is 78 years old. Dr. Gaede equates his student debt with being in a prison.

82. Navient remains Dr. Gaede's loan servicer, and until he is able to consolidate his loans into Direct Loans, enroll in a PSLF-qualifying repayment plan,

and file his Employment Certification Form with FedLoan Servicing, it is likely that Dr. Gaede will be forced to contact Navient again to seek advice about his specific loan circumstances and getting on track to qualify for PSLF, despite his fear that Navient will again provide untruthful or incorrect information.

83.     On information and belief, the exact dates of Dr. Gaede's conversations with Navient, recordings of these conversations, and the names of the Navient employees with whom Dr. Gaede spoke are contained in records within Navient's control.

**Elizabeth Taylor**

84.     Plaintiff Elizabeth Taylor is a full-time Program Research Specialist for the New York State Department of Education who resides in New York.

85.     Ms. Taylor took out FFEL loans to finance her undergraduate and master's degrees.

86.     Ms. Taylor trusted Navient to provide her with truthful and accurate information about her loan repayment options.  Ms. Taylor trusted Navient because Navient and the Department of Education represented that Navient has expertise as a student loan servicer and offers needed services to federal student loan borrowers, including assistance with enrolling in repayment plans and loan forgiveness programs.

87.     Ms. Taylor began repaying her undergraduate FFEL loans in 2001.  Ms. Taylor made loan repayments until she began a full-time master's program in 2006. When she began her master's program, Ms. Taylor put her undergraduate loans in Deferment and took out additional FFEL loans to finance her graduate degree.

88.     After graduating from her master's program, Ms. Taylor began repaying her federal student loans in 2010.  Since October 2011, Navient has been the servicer

for Ms. Taylor's federal student loans, which Ms. Taylor has been repaying on a graduated repayment plan.

89.     In approximately 2012, Ms. Taylor contacted Navient to inquire about the requirements for PSLF.

90.     Navient falsely informed Ms. Taylor that in order to qualify for PSLF, she simply needed to continue making payments on her loans while working for a qualifying employer for a total of ten years.  This is false, as neither Ms. Taylor's loans nor her repayment plan qualified for PSLF.  In order to qualify for PSLF, Ms. Taylor needed to consolidate her loans into a Direct Loan and enroll in an income-driven repayment plan.

91.     Navient also misled Ms. Taylor by informing her that she did not need to submit any paperwork at that time, and that she should simply call back once she had made ten years of payments while working for a qualifying employer.  This is false as the Department of Education encourages borrowers to submit their Employer Certification Forms as soon as possible.

92.     Had Navient truthfully informed Ms. Taylor that she would need both to consolidate her loans and to change her payment plan in order to qualify for PSLF, Ms. Taylor would have done so and would have made qualifying payments towards loan forgiveness under PSLF.

93.     Had Navient truthfully informed Ms. Taylor that she should submit an Employment Certification Form to FedLoan Servicing as soon as possible, she would have done so and would have learned that her FFEL loans and payment plan did not qualify for PSLF.

94.     Instead, believing Navient's misrepresentations, Ms. Taylor continued making non-qualifying payments on her student loans believing that those payments would lead to loan forgiveness under PSLF after ten years.

95. In approximately 2017, Ms. Taylor again asked Navient about PSLF. Navient informed Ms. Taylor for the first time that none of her loan payments had qualified for PSLF. Navient advised Ms. Taylor to switch to an income-driven repayment plan in order to begin making qualifying payments for PSLF. This advice was misleading, as Ms. Taylor's FFEL loans must first be consolidated into Direct Loans before she can begin making PSLF-eligible payments under an income-driven repayment plan.

96. Distrustful of Navient's changing advice, Ms. Taylor has not made any changes to her student loans or repayment plan.

97. Navient remains Ms. Taylor's loan servicer, and until she is able to consolidate her loans into Direct Loans, enroll in a PSLF-qualifying repayment plan, and file her Employment Certification Forms with FedLoan Servicing, it is likely that Ms. Taylor will be forced to contact Navient again to seek advice about her specific loan circumstances and getting on track to qualify for PSLF, despite her fear that Navient will again provide untruthful or incorrect information.

98. On information and belief, the exact dates of Ms. Taylor's conversations with Navient, recordings of these conversations, and the names of the Navient employees with whom Ms. Taylor spoke are contained in records within Navient's control.

**Jessica Saint-Paul**

99. Plaintiff Jessica Saint-Paul is a full-time director of a nonprofit organization and adjunct college professor who resides in California.

100. Ms. Saint-Paul took out student loans under the FFEL program to pay for her master's degree. Ms. Saint-Paul has been working for nonprofit organizations and as a college professor since completing graduate school in 2005.

101.    In 2008, Ms. Saint-Paul called Navient to inquire about PSLF.  Navient told Ms. Saint-Paul that in order to qualify for PSLF, she would have to make 120 consecutive payments on her loans.  This representation was false, as Ms. Saint-Paul's student loans were under the FFEL program and needed to be consolidated into Direct Loans in order for her payments to qualify for PSLF.

102.    Had Navient not misrepresented the PSLF requirements to Ms. Saint-Paul, Ms. Saint-Paul would have consolidated her FFEL Loans into Direct Loans to ensure her student loans qualified for PSLF.  Now she is faced with repayment of her FFEL Loans at the total amount with no opportunity for forgiveness.

103.    Ms. Saint-Paul called Navient multiple times due to difficulties making her loan payments and inquired about her options for reducing her payments.  In response to Ms. Saint-Paul's questions, Navient told her that her option to reduce her loan payments was limited to entering into a Deferment or Forbearance.

104.    In 2014, Ms. Saint-Paul called Navient again to inquire about her loan repayment options and PSLF.  A Navient representative told Ms. Saint-Paul that in ten years, her loans would be forgiven.  This representation was false, as Ms. Saint-Paul's student loans were under the FFEL program and needed to be consolidated into Direct Loans in order for her payments to qualify for PSLF.  Navient told Ms. Saint-Paul that she should submit paperwork for PSLF after ten years of repayment.  This representation was also false, as the Department of Education instructs borrowers to submit their Employment Certification Form as early as possible.

105.    Navient also did not inform Ms. Saint-Paul that she had to be on an income-driven repayment plan in order to qualify for PSLF.  She has been making payments under an interest-only plan and a graduated repayment plan, neither of which qualifies for PSLF.

106. Navient remains Ms. Saint-Paul's loan servicer, and until she is able to consolidate her loans into Direct Loans, enroll in a PSLF-qualifying repayment plan, and file her Employment Certification Form with FedLoan Servicing, it is likely that Ms. Saint-Paul will be forced to contact Navient again to seek advice about her specific loan circumstances and getting on track to qualify for PSLF, despite her fear that Navient will again provide untruthful or incorrect information.

107. On information and belief, the exact dates of Ms. Saint-Paul's conversations with Navient, recordings of these conversations, and the names of the Navient employees with whom Ms. Saint-Paul spoke are contained in records within Navient's control.

### Rebecca Spitler-Lawson

108. Plaintiff Rebecca Spitler-Lawson is an adjunct professor at two nonprofit colleges and resides in California.

109. Ms. Spitler-Lawson took out both FFEL Loans and Direct Loans while pursuing her master's degree in English.

110. After her graduation in 2011, she began making payments on her loans under an income-driven repayment plan.

111. Ms. Spitler-Lawson trusted Navient to provide her with truthful and accurate information about her loan repayment options. Ms. Spitler-Lawson trusted Navient because Navient and the Department of Education represented that Navient has expertise as a student loan servicer and offers needed services to federal student loan borrowers, including assistance with enrolling in repayment plans and loan forgiveness programs.

112. In early 2016, Ms. Spitler-Lawson began the process of recertifying her income for her income-driven repayment plan. After her recent marriage, however,

her payments increased to an amount she could not afford. She went into Forbearance until July of 2016.

113. After her Forbearance period ended, Ms. Spitler-Lawson realized her payments on the income-driven repayment plan were not reducing her principal. Ms. Spitler-Lawson then called Navient in July 2016 to inquire about her eligibility for PSLF due to her position as an adjunct professor at two nonprofit colleges. Navient representatives falsely informed Ms. Spitler-Lawson that in order to qualify for PSLF, she would need to work full-time in one position. In fact, working in multiple qualifying positions that add up to thirty hours per week for eight months of the year qualifies a borrower for PSLF.

114. Due to Navient's misrepresentations, Ms. Spitler-Lawson believed she was not eligible for PSLF and continued making non-qualifying payments on her FFEL Loans. Had Navient not misrepresented the requirements for PSLF, Ms. Spitler-Lawson would have consolidated her FFEL Loans into Direct Loans in order to begin making qualifying payments for PSLF.

115. In addition, due to Navient's false statement that Ms. Spitler-Lawson's employment with multiple colleges would not qualify her for PSLF, Ms. Spitler-Lawson decided not to recertify her income for the income-driven repayment plan and instead to make the standard monthly payments in order to pay off her loans. While she technically still remains within the income-driven repayment plan, her choice not to recertify her income based on Navient's inaccurate advice resulted in her payments increasing to the standard monthly amount. She has made these increased payments for over two years.

116. Ms. Spitler-Lawson made a number of financial sacrifices in order to make these larger payments. Had Navient not misrepresented the PSLF requirements to Ms. Spitler-Lawson, Ms. Spitler-Lawson would have remained on

income-driven repayment rather than make larger payments under the standard repayment plan. Moreover, she would have consolidated her FFEL Loans into Direct Loans to ensure all of her student loans qualified for PSLF. Now she is faced with repayment of her FFEL Loans at the total amount with no opportunity for forgiveness.

117. Navient remains Ms. Spitler-Lawson's loan servicer, and until she is able to consolidate her loans into Direct loans, enroll in a PSLF-qualifying repayment plan, and file her Employment Certification Forms with FedLoan Servicing, it is likely that Ms. Spitler-Lawson will be forced to contact Navient again to seek advice about her specific loan circumstances and getting on track to qualify for PSLF, despite her fear that Navient will again provide untruthful or incorrect information.

118. On information and belief, the exact dates of Ms. Spitler-Lawson's conversations with Navient, recordings of these conversations, and the names of the Navient employees with whom Ms. Spitler-Lawson spoke are contained in records within Navient's control.

**Michelle Means**

119. Plaintiff Michelle Means is a first-grade teacher who resides in Maryland.

120. Ms. Means took out Direct Loans to pay for her master's degree.

121. Ms. Means trusted Navient to provide her with truthful and accurate information about her loan repayment options. Ms. Means trusted Navient because Navient and the Department of Education represented Navient has expertise as a student loan servicer and offers needed services to federal student loan borrowers, including assistance with enrolling in repayment plans and loan forgiveness programs.

122. Ms. Means has asked Navient multiple times since 2012 whether any loan forgiveness options were available to her as a teacher, including PSLF.

123. In 2012, Navient representatives falsely told Ms. Means that in order to qualify for PSLF, she would need to make 120 consecutive, on-time payments and would be disqualified if she missed a payment, went into Deferment or Forbearance. Based on this misrepresentation, Ms. Means believed she would not be able to qualify for PSLF and did not submit an Employment Certification Form or otherwise pursue PSLF.

124. Had Navient representatives truthfully informed Ms. Means that the 120 PSLF-qualifying payments need not be consecutive and that a borrower seeking PSLF will not be disqualified from PSLF by going into Forbearance while in repayment, Ms. Means would have submitted an Employment Certification Form to FedLoan Servicing and would have switched her repayment plan to a plan that qualifies for PSLF.

125. In subsequent conversations, when Ms. Means has contacted Navient to ask about her loan repayment options, Navient representatives have steered Ms. Means away from income-driven repayment plans and into Forbearances or non-qualifying repayment plans.

126. After several years of asking Navient about income-driven repayment, Ms. Means initially enrolled in an income-driven repayment plan in 2016 but was subsequently enrolled in the graduated repayment plan. Ms. Means ultimately went into Forbearance in 2018 when she was unable to make loan payments during maternity leave and currently remains in Forbearance. Based on Navient's misrepresentations, Ms. Means has spent years believing that she could not qualify for PSLF and making loan payments that did not qualify for PSLF.

127.	Ms. Means has made several financial sacrifices in order to pay her student loans.  She has been forced to borrow money from her parents and was not able to purchase a home for several years due to her student loan debt.  This debt has caused anxiety and stress in her life, and she is concerned about the damage such debt will have on her credit and ability to put away savings for her and her family's future.  Ms. Means' student loan debt has also prevented her from seeking additional teaching certifications out of fear she will incur greater student debt.  Ms. Means is approaching recertification in 2020 and will have to either pay out of pocket or get more loans to remain a licensed teacher in her state.

128.	Navient remains Ms. Means' loan servicer, and until she is able to enroll in a PSLF-qualifying repayment plan and file her Employment Certification Forms with FedLoan Servicing, it is likely that Ms. Means will be forced to contact Navient again to seek advice about her specific loan circumstances and getting on track to qualify for PSLF, despite her fear that Navient will again provide untruthful or incorrect information.

129.	On information and belief, the exact dates of Ms. Means' conversations with Navient, recordings of these conversations, and the names of the Navient employees with whom Ms. Means spoke are contained in records within Navient's control.

### Elizabeth Kaplan

130.	Plaintiff Elizabeth Kaplan is a full-time public school third grade reading teacher who resides in Maryland.

131.	Ms. Kaplan took out Direct Loans to pay for her undergraduate degree.

132.	After graduating with her bachelor's degree in 2012, Ms. Kaplan began working at a nonprofit organization and was enrolled in an income-driven repayment

plan with payments of $0 per month. Payments of $0 under an income-driven repayment plan are qualifying payments for the purpose of PSLF.

133. Ms. Kaplan trusted Navient to provide her with truthful and accurate information about her loan repayment options. Ms. Kaplan trusted Navient because Navient and the Department of Education represented that Navient has expertise as a student loan servicer and offers needed services to federal student loan borrowers, including assistance with enrolling in repayment plans and loan forgiveness programs.

134. Navient falsely informed Ms. Kaplan that she would need to make 120 consecutive, on-time loan payments in order to qualify for PSLF.

135. In 2013, Ms. Kaplan entered a master's degree program full-time, and her loans were in Deferment while she was in school. Due to Navient's misrepresentations, Ms. Kaplan believed this Deferment would prevent her previous $0 payments from qualifying for PSLF and that she would have to restart her 120 qualifying payments at that point.

136. When Ms. Kaplan began teaching in 2015, she contacted Navient to inquire about recertifying her income for her income-driven repayment program. Navient advised Ms. Kaplan that her monthly payment under the income-driven repayment plan would be higher than the standard repayment plan amount. This advice was incorrect.

137. In reliance on Navient's misrepresentations, Ms. Kaplan began making payment equivalent to the standard repayment plan amount.

138. Had Navient not misrepresented the PSLF requirements to Ms. Kaplan, Ms. Kaplan would have remained on income-driven repayment rather than make larger payments under the standard repayment plan.

139.    Navient remains Ms. Kaplan's loan servicer, and until she is able to enroll in a PSLF-qualifying repayment plan and file her Employment Certification Forms with FedLoan Servicing, it is likely that Ms. Kaplan will be forced to contact Navient again to seek advice about her specific loan circumstances and getting on track to qualify for PSLF, despite her fear that Navient will again provide untruthful or incorrect information.

140.    On information and belief, the exact dates of Ms. Kaplan's conversations with Navient, recordings of these conversations, and the names of the Navient employees with whom Ms. Kaplan spoke are contained in records within Navient's control.

### Jennifer Guth

141.    Plaintiff Jennifer Guth is a full-time elementary and middle school library teacher who resides in Maryland.

142.    Ms. Guth took out FFEL loans to finance her law and LLM degrees and her master's degree in library science.  She consolidated her FFEL Loans into Direct Loans in 2011 in order to pursue PSLF.

143.    Ms. Guth trusted Navient to provide her with truthful and accurate information about her loan repayment options.  Ms. Guth trusted Navient because Navient and the Department of Education represented that Navient has expertise as a student loan servicer and offers needed services to federal student loan borrowers, including assistance with enrolling in repayment plans and loan forgiveness programs.

144.    From 2011 through 2014, Ms. Guth made intermittent payments and had a series of hardship Forbearances.  In 2014, Ms. Guth contacted Navient about income-driven repayment plans so that she could begin repaying her loans in order to make progress toward PSLF.  Navient told Ms. Guth her loans needed to be

removed from Forbearance to calculate her income-driven repayment amount, and subsequently stated her monthly payment would be approximately $530. When repayment started, however, Navient informed Ms. Guth her monthly payment would in fact be more than $800. Ms. Guth was unable to afford this payment and was forced to go into Deferment.

145. Ms. Guth asked what actions she needed to take at that point to ensure she qualified for PSLF. Navient misled Ms. Guth by informing her that no paperwork needed to be submitted; she simply needed to make payments under an income-driven repayment plan for ten years. This is false as the Department of Education encourages borrowers to submit their Employer Certification Forms as soon as possible.

146. In addition, Navient falsely informed Ms. Guth that in order to qualify for PSLF, her payments must be consecutive. Navient advised her not to pursue PSLF if she thought she may re-enroll in school as that would result in a break in payments.

147. As a result of Navient's misrepresentation, Ms. Guth did not pursue PSLF because she knew she may need to take additional coursework in order to renew her certification. She entered Forbearance, incurring additional interest while also not making any qualifying payments toward PSLF. Had Navient not misrepresented her eligibility for PSLF, Ms. Guth would have made qualifying payments to ensure that her loans would be on track for forgiveness.

148. Ms. Guth has resigned herself to taking two college courses per semester —indefinitely—in order to qualify for a Deferment. To even afford these courses, she must negotiate a payment plan or put the cost on her credit card.

149. Navient remains Ms. Guth's loan servicer, and until she is able to enroll in a PSLF-qualifying repayment plan and file her Employment Certification Forms

with FedLoan Servicing, it is likely that Ms. Guth will be forced to contact Navient again to seek advice about her specific loan circumstances and getting on track to qualify for PSLF, despite her fear that Navient will again provide untruthful or incorrect information.

150.    On information and belief, the exact dates of Ms. Guth's conversations with Navient, recordings of these conversations, and the names of the Navient employees with whom Ms. Guth spoke are contained in records within Navient's control.

## Megan Nocerino

151.    Plaintiff Megan Nocerino is a full-time middle school literacy teacher who resides in Florida.

152.    Dr. Nocerino took out loans to finance her master's degree in literacy and her doctoral degree in higher education and educational leadership.    She consolidated her loans into Direct Loans in November 2013.

153.    Dr. Nocerino trusted Navient to provide her with truthful and accurate information about her loan repayment options.  Dr. Nocerino trusted Navient because Navient and the Department of Education represented that Navient has expertise as a student loan servicer and offers needed services to federal student loan borrowers, including assistance with enrolling in repayment plans and loan forgiveness programs.

154.    Due to her family's financial circumstances, Dr. Nocerino repeatedly asked Navient about different repayment options so that she could continue to make payments on her student loans.  Navient told her every year that her best option was to enter into Forbearance, and she did so, assuming Navient was acting in her best interest.

155. When she asked Navient about forgiveness options, Navient falsely informed her that she was not eligible for any forgiveness.

156. Due to Navient's misrepresentations, Dr. Nocerino believed that she was not eligible for PSLF. As a result, Dr. Nocerino has continued to put her loans into Forbearance, accruing additional interest and not making any qualifying payments toward PSLF. Had Navient not misrepresented her eligibility for PSLF, Dr. Nocerino would have made qualifying payments to ensure that her loans would be on track for forgiveness.

157. Navient remains Dr. Nocerino's loan servicer, and until she is able to enroll in a PSLF-qualifying repayment plan and file her Employment Certification Forms with FedLoan Servicing, it is likely that Dr. Nocerino will be forced to contact Navient again to seek advice about her specific loan circumstances and getting on track to qualify for PSLF, despite her fear that Navient will again provide untruthful or incorrect information.

158. On information and belief, the exact dates of Dr. Nocerino's conversations with Navient, recordings of these conversations, and the names of the Navient employees with whom Dr. Nocerino spoke are contained in records within Navient's control.

## Anthony Church

159. Plaintiff Anthony Church is a full-time middle school band director who resides in Florida.

160. Mr. Church took out FFEL and Direct Loans for his bachelor's and master's degrees, both in Studio Music and Jazz Performance. The majority of Mr. Church's loans were FFEL Loans.

161. Mr. Church trusted Navient to provide him with truthful and accurate information about his loan repayment options. Mr. Church trusted Navient because

Navient and the Department of Education represented that Navient has expertise as a student loan servicer and offers needed services to federal student loan borrowers, including assistance with enrolling in repayment plans and loan forgiveness programs.

162. In 2012, Mr. Church began teaching and asked Navient about PSLF. Navient falsely informed Mr. Church that in order to qualify for PSLF, he simply needed to make 120 payments while working for a qualifying employer. From 2012 until 2017, Mr. Church spoke with Navient a few times per year, and each time, Navient informed him he was on track for PSLF and provided him with an updated number of qualifying payments. This was false, as Mr. Church's FFEL Loans did not qualify for PSLF. In order to qualify for PSLF, Mr. Church needed to consolidate his FFEL Loans into a Direct Loan. Had Navient truthfully informed Mr. Church that he needed to consolidate his FFEL Loans in order to qualify for PSLF, Mr. Church would have done so and would have made qualifying payments towards loan forgiveness under PSLF.

163. Instead, trusting Navient's misrepresentations, Mr. Church continued making non-qualifying payments on his FFEL Loans believing that those payments would lead to loan forgiveness under PSLF after ten years.

164. In 2017, when Mr. Church recertified his income for income-based repayment, he asked Navient how many qualifying payments remained toward forgiveness. At that point, Navient informed him that his FFEL Loans did not qualify for PSLF. Mr. Church then consolidated his FFEL Loans into Direct Loans, which restarted the clock on the 120 payments required for PSLF.

165. Navient remains Mr. Church's loan servicer, and until he is able to file his Employment Certification Forms with FedLoan Servicing, it is likely that Mr. Church will be forced to contact Navient again to seek advice about his specific loan

circumstances and getting on track to qualify for PSLF, despite his fear that Navient will again provide untruthful or incorrect information.

166. On information and belief, the exact dates of Mr. Church's conversations with Navient, recordings of these conversations, and the names of the Navient employees with whom Mr. Church spoke are contained in records within Navient's control.

### Defendants

167. Defendant Navient Corp. is the successor to the Student Loan Marketing Association (commonly referred to as "Sallie Mae"), a government-sponsored student enterprise created by Congress in 1972 to support the guaranteed student loan program created by the Health and Education Act.

168. Sallie Mae became fully privatized by 2004. Sallie Mae then split into SLM Corporation, which served as the parent company, and Sallie Mae, Inc., which served as the subsidiary responsible for a majority of the company's servicing and collections businesses.

169. In April 2014, SLM Corporation separated into two publicly-traded entities: (i) Defendant Navient Corporation ("Navient Corp."), a servicing and debt collection business, and (ii) SLM Corporation, a student lending business.

170. This split enabled Navient Corp. to continue servicing loans while SLM Corporation was able to provide private loans at interest rates and fee structures lower than other lenders. According to Forbes magazine: "The bottom line is that Sallie Mae is changing, and it's going to leverage its brand recognition among college students to provide other services that will likely be more profitable for them."[33]

---

[33] Robert Farrington, *How The Sallie Mae And Navient Split May Help Student Loan Borrowers*, FORBES (May 20, 2014), https://www.forbes.com/sites/robertfarrington/2014/05/20/how-the-sallie-mae-navient-split-may-help-student-loan-borrowers/#522d1a3c19af.

171.     Jack Remondi, former president and CEO of Sallie Mae and current CEO of Navient Corp. and Navient Solutions as defined below, described the transition to Navient as follows: "Helping our customers navigate the path to financial success is everything we stand for…. Our new name—Navient—symbolizes the expertise, experience, and dedication we consistently deliver for our clients and customers."[34]

172.     Pursuant to the 2014 split between Navient Corp. and SLM Corporation, Navient Corp. assumed responsibility for liabilities resulting from the pre-reorganization conduct of the prior SLM Corporation and its subsidiaries related to servicing student loans.  Navient Corp. is included in this Complaint as a successor to SLM Corporation, for servicing misconduct occurring prior to 2014, as well as a stand-alone entity for the similar misconduct it engaged in after the 2014 split.

173.     Navient Corp. is a Delaware corporation with its principal place of business located at 123 Justison Street, Wilmington, Delaware 19801 with call centers in Fishers, Indianapolis, and Muncie, Indiana; Newark, Delaware; Newton, Massachusetts; Reston, Virginia; Washington, D.C.; and Wilkes-Barre, Pennsylvania.[35]

174.     Navient Corp. is a publicly-traded corporation trading under the symbol NAVI.

175.     Navient Corp. is the parent company of Defendant Navient Solutions, LLC ("Navient Solutions") f/k/a Navient Solutions, Inc. ("NSI").

---

[34] Sallie Mae, *Sallie Mae Selects Navient As Name For New Loan Management, Servicing, And Asset Recovery Company* (Feb. 25, 2014), https://news.sal-liemae.com/press-release/corporate-and-financial/sallie-mae-selects-navient-name-new-loan-management-servicing-.

[35] *See id.*

176.    As of December 31, 2016, Navient Corp. held a portfolio $87.7 billion worth of FFEL Loans.   Navient Corp. pools individual FFEL Loans held in its portfolio into securitized trusts known as student loan asset-backed securities ("SLABS"), which are then sold to investors.   The net interest income earned by SLABS backed by FFEL Loans is Navient Corp.'s greatest source of revenue.[36]

177.    The 2014 split also resulted in the transfer of Sallie Mae, Inc. to Navient Corp.  Sallie Mae, Inc. then changed its name to Navient Solutions, Inc.

178.    NSI is a Delaware corporation and wholly-owned subsidiary of Navient Corp.   NSI is the main servicing subsidiary of Navient Corp., servicing over $300 billion in student loans for more than 12 million borrowers.   Of those 12 million borrowers, approximately 6.1 million have federal student loans.   Federal student loans make up $205.7 billion of Navient's total servicing portfolio.[37]

179.    Following a corporate reorganization, NSI changed its name, effective January 31, 2017 to Navient Solutions, LLC ("Navient Solutions," and together with Navient Corp., "Navient" or "Defendants").

180.    Defendant Navient Solutions is a Delaware limited liability company and wholly-owned subsidiary of Navient Corp.

181.    Since their founding, there has been significant overlap between the corporate governance and management of Defendants.

182.    Defendants have acted and continue to act as a single enterprise, including by having identical equitable ownership and identical directors and officers. For example:

      a.    Jack Remondi simultaneously serves as President and Chief Executive Officer of both Navient Corp. and Navient Solutions;

---

[36] *See* Navient Corp., 2017 Annual Report, *supra* note 13, at 8, 40.

[37] *Id.* at 4, 9.

<ol type="a" start="2">
<li>John Kane simultaneously serves as Chief Operating Officer for both Navient Corp. and Navient Solutions;</li>

<li>Christian Lown simultaneously serves as Executive Vice President and Chief Financial Officer for both Navient Corp. and Navient Solutions;</li>

<li>Steve Hauber simultaneously serves as Senior Vice President and Chief Risk and Compliance Officer for both Navient Corp. and Navient Solutions; and</li>

<li>Stephen O'Connell simultaneously serves as Senior Vice President and Treasurer for both Navient Corp. and Navient Solutions.[38]</li>
</ol>

183. Navient Corp. issues consolidated annual reports and SEC filings for itself and all subsidiaries outlined above.

184. Navient Corp. owns or leases the offices used by Navient Solutions.

185. Navient Corp. controls and directs the hiring of employees for its subsidiaries.

186. Navient Corp. and Navient Solutions use the same website.

187. Navient Corp.'s website provides links to investor information, which includes quarterly investor presentations issued by Navient Corp. but are copyrighted by Navient Solutions.

188. Navient's Code of Business Conduct states that it "applies equally to all of us – employees, officers and directors of all Navient companies, including Navient Solutions, LLC … and all other direct and indirect subsidiaries of Navient

---

[38] Navient, *Leadership*, https://about.navient.com/values-and-people (last visited Jan. 16, 2019); Stephen O'Connell, LinkedIn, https://www.linkedin.com/in/stephen-o-connell-b632b512/ (last visited Jan. 16, 2019).

Corporation (referred to collectively as 'Navient'), as well as consultants hired by Navient."[39]

189. At all relevant times, each Defendant acted individually and jointly with every other named Defendant in committing all acts alleged in this Amended Class Action Complaint.

190. At all relevant times, each Defendant acted: (a) as a principal; (b) under express or implied agency; or (c) with actual or ostensible authority to perform the acts alleged in this Amended Class Action Complaint on behalf of every other named Defendant.

191. At all relevant times, each Defendant acted as the agent of the others, and each Defendant acted within the scope of its agency as an agent of another.

192. At all relevant times, each Defendant knew or realized, or should have known or realized, that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Amended Class Action Complaint. Knowing or realizing that the other Defendants were engaging in such unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

## JURISDICTION

193. This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this action has been brought as a class action on behalf of proposed classes each in excess of 100

---

[39] Navient, *Navient Code of Business Conduct* 5 (Aug. 2017), https://www.navient.com/assets/about/investors/corp-governance/business-code/Navient-CodeOfBusinessConduct.pdf.

members; the aggregate claims of the Class members exceed $5 million exclusive of interest and costs; and one or more of the members of each Class is a citizen of a different state than one or more Defendants.

194. Plaintiffs Kathryn Hyland, Melissa Garcia, Eldon R. Gaede, and Elizabeth Taylor are residents of the State of New York.

195. Plaintiffs Jessica Saint-Paul and Rebecca Spitler-Lawson are residents of the State of California.

196. Plaintiffs Michelle Means, Elizabeth Kaplan, and Jennifer Guth are residents of the State of Maryland.

197. Plaintiffs Megan Nocerino and Anthony Church are residents of the State of Florida.

198. Defendant Navient Corp. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 123 Justison Street, Wilmington, Delaware 19801.

199. Defendant Navient Solutions is a limited liability corporation organized under the laws of the State of Delaware. Defendant Navient Solutions is wholly owned by, and shares its principal place of business with, Defendant Navient Corp.

200. Publicly available information suggests that approximately 1 in 4 U.S. workers is employed in the public service.[40] As explained above, Navient services approximately 6.1 million federal student loan accounts, such that approximately 1.525 million out of the 6.1 million borrowers serviced by Navient are likely eligible for PSLF.

---

[40] Consumer Fin. Prot. Bureau, Staying On Track While Giving Back: The Cost Of Student Loan Servicing Breakdowns For People Serving Their Communities 1 (Jun. 2017), https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/201706_cfpb_PSLF-midyear-report.pdf.

201. Spending 3 years of repayment in Forbearance would cost an average borrower an additional $6,742.[41] If Navient steered just 10% of the potential 1.525 million PSLF-eligible borrowers into Forbearance for 3 years through its affirmative misrepresentations, damages would far exceed $5 million, without accounting for other types of harm that Navient inflicts on borrowers, as pleaded below.

202. This Court has personal jurisdiction over Navient Corp. because it does business in this District and/or a substantial part of the events or omissions giving rise to the claims occurred in this District.

203. This Court has personal jurisdiction over Navient Solutions because it does business in this District and/or a substantial part of the events or omissions giving rise to the claims occurred in this District.

## VENUE

204. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the unlawful conduct alleged in this Amended Class Action Complaint occurred in this District.

## FACTUAL ALLEGATIONS

### Background On Federal Student Loans

205. Federal student loans are made to students regardless of creditworthiness and are touted as offering more flexible repayment terms and options than private loans.

206. Federal student loans have several specific characteristics that make them desirable for borrowers: (i) they are primarily need-based and are made to student borrowers regardless of credit history, as long as a given borrower meets

---

[41] See U.S. GAO, Federal Student Loans: Actions Needed To Improve Oversight Of Schools' Default Rates 19 (Apr. 2018), https://www.gao.gov/assets/700/691520.pdf.

program requirements; (ii) their interest rate is set by the federal government; (iii) they have several repayment options, including those determined by a borrower's income and family size; and (iv) they may be discharged in some circumstances such as a school's closure or a borrower's permanent disability.

207. The Federal Student Aid office of the Department of Education ("FSA")—under the slogan "Proud Sponsor of the American Mind®"—advises that "students and parents should always exhaust federal student loan options first before considering a private loan."[42]

208. Therefore, borrowers typically take on federal student loans first before private student loans. Federal student loans account for the vast majority of the country's outstanding student loan debt, with over 90% of student loans federally funded or guaranteed.[43] Private student loan debt currently only accounts for $119.3 billion of the overall $1.558 trillion of student debt in the United States.[44]

---

[42] *See* U.S. Dep't of Educ., Federal Student Aid, *Federal Student Loan Programs* (Aug. 2017), https://studentaid.ed.gov/sa/sites/default/files/federal-loan-programs.pdf.

[43] *Size of the U.S. Student Lending Market*, MEASUREONE, https://measureone.com (Sept. 30, 2018).

[44] The Student Loan Report, *Student Loan Debt Statistics 2019*, https://student-loans.net/student-loan-debt-statistics/ (last updated Mar. 2, 2018).

209.    The Department of Education is one of the world's largest lenders.  Its assets totaled $1,259.2 billion as of September 30, 2017.  If it were a bank, it would be one of the biggest.  The vast majority of the Department of Education's assets—91.1%—relate to credit program receivables.[45]  But, unlike a bank, it operates outside of the oversight of the rules and regulations that govern banking.

210.    Until about 1994, federal student loans were originated pursuant to the Federal Family Education Loan ("FFEL") Program.  Federal student loans given to borrowers through that program are referred to as "FFEL Loans." FFEL Loans were originated and funded almost exclusively by private lenders, including Sallie Mae, and then insured by guaranty agencies.  These guaranty agencies were then reinsured by the federal government.

211.    There were four types of FFEL Loans: (i) Subsidized Federal Stafford Loans made to eligible undergraduate students, who demonstrated financial need, to cover the costs of higher education at a college or career school; (ii) Unsubsidized Federal Stafford Loans made to eligible undergraduate, graduate, and professional students who do not have to have a demonstrated financial need; (iii) FFEL PLUS Loans made to graduate or professional students and parents of dependent undergraduate students to help pay for educational expenses not covered by other financial aid; and (iv) FFEL Consolidation Loans, which allowed the borrower to combine all eligible federal student loans into a single loan with a single loan servicer.

212.    In 1994, through the William D. Ford Direct Student Loan Program ("Direct Loan Program"), the federal government began originating loans directly to borrowers.  The federal student loans given to borrowers through that program are called "Direct Loans."

---

[45] U.S. Dep't of Educ., FY 2017 Agency Financial Report 13 (Nov. 12, 2017), https://www2.ed.gov/about/reports/annual/2017report/agency-financial-report.pdf.

213.    Similar to the structure of FFEL Loans, there are four types of Direct Loans: (i) Direct Subsidized Loans made to eligible undergraduate students, who demonstrate financial need, to cover the costs of higher education at a college or career school; (ii) Direct Unsubsidized Loans made to eligible undergraduate, graduate, and professional students who do not have to have a demonstrated financial need; (iii) Direct PLUS Loans made to graduate or professional students and parents of dependent undergraduate students to help pay for educational expenses not covered by other financial aid; and (iv) Direct Consolidation Loans, which allow the borrower to combine all eligible federal student loans into a single loan with a single loan servicer.

214.    The FFEL Program and Direct Loan Program operated in tandem until the economic crisis of 2008, in which major private banks largely left the student loan market.[46]

215.    With the introduction of the Health Care and Education Reconciliation Act of 2010, the FFEL Program was terminated in favor of an expanded Direct Loan Program.[47]  No new FFEL Loans have been issued since June 30, 2010.

216.    The Health Care and Education Reconciliation Act of 2010 also provided an opportunity for FFEL Loan borrowers to consolidate their loans into Direct Loans and offered a 0.25% interest discount on the resulting Direct Consolidation Loan.

---

[46] Eric M. Fink and Roland Zullo, *Federal Student Loan Servicing: Contract Problems and Public Solutions* 4 (June 25, 2014), http://emfink.net/publications/Student_Loan_Servicing.pdf.

[47] *Id.*

217.  Despite the elimination of the FFEL Program, FFEL Loans still constitute approximately 23% of the outstanding federal student loan portfolio of around $1.34 trillion.[48]

## The Life Of A Federal Student Loan

### Taking Out The Loan By Signing An MPN Contract

218.  When a borrower takes out a student loan, the borrower must first sign a Master Promissory Note ("MPN") Contract with the lender (for a FFEL Loan) or the Department of Education (for a Direct Loan), which outlines the terms and conditions of the loan, before funds are disbursed.  *See* Exhibit 7 (FFEL MPN Contract); Exhibit 8 (Direct Loan MPN Contract).  The lender or the Department of Education may delegate or contract out the performance of its functions, including under the MPN Contract, to, among others, a servicer.[49]

219.  Both the FFEL MPN Contract (Exhibit 7, at 3), and the Direct Loan MPN Contract (Exhibit 8, at 7) label loan "forgiveness" "a benefit" for the borrower.

### FFEL Loan MPN Contract

220.  Congress required lenders to issue an identical FFEL Loan MPN Contract to each FFEL borrower.[50]

221.  The FFEL Loan MPN Contract incorporates a Borrower's Rights and Responsibilities Statement, which "provides additional information about the terms and conditions of loans [the borrower] receive[s] under the [MPN Contract]."  Exhibit 7, at 4.

---

[48] Matt Sessa, *Federal Student Aid Posts New Reports to FSA Data Center* (Sept. 21, 2017), https://ifap.ed.gov/eannouncements/092117FSAPostsNewReportsToF-SADataCenter.html.

[49] 34 C.F.R. § 682.203; *see* 20 U.S.C. § 1087f.

[50] 20 U.S.C. § 1082(m)(1)(D).

222.    The FFEL Loan MPN Contract also specifically incorporates the borrower's statutory rights and applicable Department of Education regulations, stating:

> Loans disbursed under this MPN [Contract] are subject to the … [HEA] and applicable U.S. Department of Education regulations …. The terms of this MPN [Contract] will be interpreted in accordance with the applicable federal statutes and regulations, and the guarantor's policies.  Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this MPN [Contract].

*Id.* at 2, 4.[51]

223.    The Department of Education's regulations expressly require that FFEL Loan borrowers have a right to consolidate their FFEL Loans into Direct Loans to pursue PSLF.[52]

224.    The Department of Education's regulations also require, among other things, that the Department of Education or its agents or servicers "provide for graduated or income-sensitive repayment terms.  The Secretary strongly encourages lenders to provide a graduated or income-sensitive repayment schedule to a borrower … to make the borrower's repayment burden commensurate with his or her projected ability to pay …."[53]

---

[51] *See* Consumer Fin. Prot. Bureau, Student Loan Servicing 11 (Sept. 2015), https://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf ("Servicers generally must comply with applicable federal and state consumer financial laws and regulations and, for certain older federal student loans, regulations promulgated by the Department of Education and authorized by the Higher Education Act (HEA).").

[52] 34 C.F.R. § 682.201(e)(5)(i).

[53] 34 C.F.R. § 682.208(d).

225. The Department of Education's regulations expressly provide that FFEL Loan borrowers have a right to one of the income-driven repayment plans described below.[54]

226. Specifically, "not more than six months prior to the date that the borrower's first payment is due, the lender must offer the borrower a choice of a standard, income-sensitive, income-based, graduated, or, if applicable, an extended repayment schedule."[55] A borrower may request a change in the repayment plan of his/her loan one per year or any time, in the case of a borrower in an income-based repayment plan.[56]

227. Federal law provides that "FFEL loan agreements shall be enforceable in all federal and state courts … in accordance with the terms of the [MPN Contract]."[57]

### Direct Loan MPN Contract

228. The Department of Education issues an identical Direct Loan MPN Contract to each Direct Loan borrower.

229. The Direct Loan MPN incorporates the Borrower's Rights and Responsibilities Statement, the borrower's statutory rights, and applicable Department of Education's regulations, stating:

> The terms of this [MPN Contract] will be interpreted in accordance with the [Higher Education Act] (20 U.S.C. 1070 et seq.), [the Department of Education's] regulations, any amendments to the [Higher Education

---

[54] 34 C.F.R. § 682.209.

[55] *Id.* § 682.209(a)(6)(iii).

[56] *Id.* § 682.209(a)(6)(xi).

[57] 20 U.S.C. § 1082(m); *see also* National Consumer Law Center, Inc., NCLC Digital Library, Section 5.6.4.2 Other State Law and Common Law Claims (June 22, 2018), https://library.nclc.org.

Act] and the regulations in accordance with the effective date of those amendments, and other applicable federal laws and regulations. …

Under applicable state law, except as preempted by federal law, you may have certain borrower rights, remedies, and defenses in addition to those stated in this MPN [Contract] and the Borrower's Rights and Responsibilities Statement. …

The terms and conditions of loans made under this MPN [Contract] are determined by the [Higher Education Act] and other applicable federal laws and regulations. … Under applicable state law, except as preempted by federal law, you may have certain borrower rights, remedies, and defenses in addition to those stated in the MPN [Contract] and this Borrower's Rights and Responsibilities Statement.[58]

230. The Direct Loan MPN Contract specifically states: "A Public Service Loan Forgiveness (PSLF) program is also available. Under this program, we will forgive the remaining balance due on your eligible Direct Loan Program loans after you have made 120 payments on those loans (after October 1, 2007) under certain repayment plans while you are employed full-time in certain public service jobs."[59]

231. The Department of Education's regulations applicable to Direct Loans also expressly require that borrowers have a right to access the PSLF Program.[60]

232. Federal law mandates that Direct Loan borrowers have the right to access the full complement of income-driven repayment plans.[61]

### Repaying The Loan

233. The FFEL Loan MPN Contract and the Direct Loan MPN Contract both outline available repayment plans. *See* Exhibit 7, at 5; Exhibit 8, at 13-16.

234. The standard repayment term is 10 years ("Standard Repayment Plan").

[58] Exhibit 8, at 3, 8.

[59] *Id.* at 18.

[60] 34 C.F.R. § 685.219.

[61] *See* 34 C.F.R. §§ 685.208-685.209, 685.221.

235.   In addition to this Standard Repayment Plan, there are repayment plans for FFEL Loan and Direct Loan borrowers with various eligibility requirements.  For example, a borrower may enroll in the Graduated Repayment Plan in which the payments increase every two years, but the repayment term remains 10 years; a borrower may enroll in the Extended Repayment Plan in which the repayment term increases to 25 years; or a borrower may enroll in an income-driven repayment plan, which tailors repayment obligations to the borrower's income and family size.

236.   FFEL Loan and Direct Loan borrowers can also enter periods of Deferment and Forbearance.

Income-Driven Repayment Plans

237.   Income-driven repayment plans allow eligible borrowers to pay an amount that is determined by their income and family size.  Income-driven repayment plans can lower a borrower's monthly payments to as low as $0 per month. These plans help borrowers avoid delinquency, pay down their debt faster, and increase their overall creditworthiness.[62]

238.   There is one income-driven repayment plan available to FFEL Loan borrowers: the Income-Based Repayment Plan.[63]

---

[62] *See, e.g.*, Daniel Herbst, *Liquidity and Insurance in Student Loan Contracts* (Jan. 31, 2018), https://drive.google.com/file/d/1A-gq_LIqffY6r2gDTcUK9-Y3ZV8Go6SU/view ("Within seven months of take up, IDR enrollees [with FFEL Loans] are 21 percentage points less likely to fall delinquent and pay down $90 more student debt each month compared to those who remain on standard repayment plans.  IDR enrollees have credit scores that are 7.5 points higher ….  IDR enrollees are also 2 percentage points more likely to hold a mortgage …."); *id*. at 3 ("Results suggest IDR increases loan repayment, credit scores, homeownership, and consumption among student borrowers.").

[63] *See* 34 C.F.R. §§ 682.209, 682.215.

239. There are four income-driven repayment plans available to Direct Loan borrowers: (i) the Revised Pay As You Earn Repayment Plan ("REPAYE"); (ii) the Pay As You Earn Repayment Plan ("PAYE"); (iii) the Income-Based Repayment Plan; and (iv) the Income-Contingent Repayment Plan ("ICR").[64]

240. The Department of Education provides the below descriptions of, and comparisons between, each of the income-driven repayment plans:[65]

---

[64] *See* 34 C.F.R. §§ 685.208-685.209, 685.221.

[65] U.S. Dep't of Educ., Federal Student Loans: Repaying Your Loans 11 (Feb. 2015), https://studentaid.ed.gov/sa/sites/default/files/repaying-your-loans.pdf.

## Income-Driven Repayment Plans

The following income-driven repayment plans will set your monthly payment at an amount that is intended to be affordable based on your income and family size. For details, visit **StudentAid.gov/idr**. Under all income-driven repayment plans, your monthly payment amount is recalculated annually.

| PLAN | ELIGIBLE BORROWERS | ELIGIBLE LOANS | QUICK COMPARISON |
|---|---|---|---|
| **Revised Pay As You Earn Repayment (REPAYE) Plan** | • Direct Loan Program borrowers with eligible loans | • Direct Subsidized Loans<br>• Direct Unsubsidized Loans<br>• Direct PLUS Loans made to students<br>• Direct Consolidation Loans that do not include PLUS loans (Direct or FFEL) made to parents | • Any outstanding balance on your loan will be forgiven if you haven't repaid your loan in full after 20 or 25 years. You may have to pay income tax on any amount that is forgiven.<br>• Your monthly payments will be 10 percent of your discretionary income** and can be more than the 10-year Standard Repayment Plan amount. Payments are recalculated each year and are based on your updated income and family size.<br>• If you're married, both your and your spouse's income or loan debt will be considered, whether taxes are filed jointly or separately (with limited exceptions).<br>• This is a good option if you are seeking Public Service Loan Forgiveness (PSLF). |
| **Pay As You Earn Repayment (PAYE) Plan** | • Direct Loan Program borrowers who meet these requirements:<br>　• You must be a new borrower* on or after Oct. 1, 2007.<br>　• You must have received a disbursement of a Direct Loan on or after Oct. 1, 2011.<br>　• To be initially eligible, the required payment amount under this plan must be less than what you would pay under the 10-year Standard Repayment Plan. | • Direct Subsidized Loans<br>• Direct Unsubsidized Loans<br>• Direct PLUS Loans made to students<br>• Direct Consolidation Loans that do not include PLUS loans (Direct or FFEL) made to parents | • Any outstanding balance on your loan will be forgiven if you haven't repaid your loan in full after 20 years. You may have to pay income tax on any amount that is forgiven.<br>• Your maximum monthly payments will be 10 percent of your discretionary income** and will never be more than the 10-year Standard Repayment Plan amount. Payments are recalculated each year and are based on your updated income and family size.<br>• If you're married, your spouse's income or loan debt will be considered only if you file a joint tax return.<br>• You must have a high debt relative to your income.<br>• You'll pay more for your loan over time than you would under the 10-year Standard Repayment Plan.<br>• This is a good option if you are seeking Public Service Loan Forgiveness (PSLF). |
| **Income-Based Repayment (IBR) Plan** | • Direct Loan Program and FFEL Program borrowers who meet this requirement:<br>　• To be initially eligible, the required payment amount under this plan must be less than what you would pay under the 10-year Standard Repayment Plan. | • Direct Subsidized Loans<br>• Direct Unsubsidized Loans<br>• Subsidized Federal Stafford Loans<br>• Unsubsidized Federal Stafford Loans<br>• Direct or FFEL PLUS Loans made to students<br>• Direct or FFEL Consolidation Loans that do not include PLUS loans made to parents | • Any outstanding balance on your loan will be forgiven if you haven't repaid your loan in full after 20 or 25 years. You may have to pay income tax on any amount that is forgiven.<br>• Your monthly payments will be 10 or 15 percent of your discretionary income** and your monthly payment will never be more than the 10-year Standard Repayment Plan amount. Payments are recalculated each year and are based on your updated income and family size.<br>• If you're married, your spouse's income or loan debt will be considered only if you file a joint tax return.<br>• You must have a high debt relative to your income.<br>• You'll pay more for your loan over time than you would under the 10-year Standard Repayment Plan.<br>• This is a good option if you are seeking Public Service Loan Forgiveness (PSLF). |
| **Income-Contingent Repayment (ICR) Plan** | • Direct Loan Program borrowers with eligible loans | • Direct Subsidized Loans<br>• Direct Unsubsidized Loans<br>• Direct PLUS Loans made to students<br>• Direct Consolidation Loans (including Direct Consolidation Loans made after July 1, 2006 that repaid PLUS loans made to parents) | • Any outstanding balance will be forgiven if you haven't repaid your loan in full after 25 years. You may have to pay income tax on the amount that is forgiven.<br>• Your payments will be lesser of<br>　• 20 percent of your discretionary income;** or<br>　• the amount you would pay on a repayment plan with a fixed payment over 12 years, adjusted according to your income.<br>• Payments are recalculated each year and are based on your updated income, family size, and the total amount of your Direct Loans. Your monthly payment can be more than the 10-year Standard Repayment Plan amount.<br>• You'll pay more for your loan over time than you would under the 10-year Standard Repayment Plan.<br>• If you're married, your spouse's income or loan debt will be considered only if you file a joint tax return or you choose to repay your Direct Loans jointly with your spouse.<br>• This is a good option if you are seeking Public Service Loan Forgiveness (PSLF). |

*For PAYE and IBR plans, you are a new borrower if you had no outstanding balance on a Direct Loan or Federal Family Education Loan (FFEL) Program loan when you received a Direct Loan on or after the date specified above for each plan.

Note: There are additional eligibility requirements. View repayment plan details at **StudentAid.gov/repay**.

**For PAYE and IBR plans, discretionary income is the difference between your total income and 150 percent of the poverty guideline for your family size and state of residence. For the ICR Plan, discretionary income is the difference between your total income and the poverty guideline for your family size and state of residence. If you are married, under certain circumstances your discretionary income may include your spouse's income.

241.    Borrowers can switch to an income-driven repayment plan at any point during the repayment process.  To do so, the borrower must complete an application with the Department of Education that verifies income and family size using the borrower's most recent federal tax return or other evidence of income.

242. To remain in an income-driven repayment plan, a borrower must recertify his/her income and family size on a yearly basis. If a borrower fails to do so, his/her payments automatically return to the amount provided for by the Standard Repayment Plan.

243. According to the Government Accountability Office ("GAO"), when examining the "status of loans by cohort for borrowers who entered repayment in the same fiscal year, we found [Income-Based Repayment] and PAYE participants had substantially lower default rates than Standard plan participants. Specifically, among borrowers who entered repayment from fiscal year 2010 to fiscal year 2014, less than 1 percent of [Income-Based Repayment] and PAYE participants had defaulted on their loan, compared to 14 percent in Standard repayment."[66]

## Deferment And Forbearance

244. FFEL and Direct Loans are also eligible for Deferment or Forbearance if the borrower meets certain criteria. A Deferment allows a borrower to temporarily stop making payments on a loan. If a borrower cannot make scheduled payments but is ineligible for a Deferment, the borrower may receive a Forbearance, which is intended to serve as a short-term, temporary postponement of payment, usually due to financial hardship.

245. During a Deferment period, borrowers of FFEL or Direct Unsubsidized Loans and FFEL or Direct PLUS Loans are responsible for paying the interest that accrues during the period of Deferment.

246. During Forbearance, borrowers of FFEL and Direct Loans are also responsible for paying the accruing interest.

---

[66] GAO Highlights, Federal Student Loans: Education Could Do More to Help Ensure Borrowers Are Aware of Repayment and Forgiveness Options 20 (Aug. 2015), https://www.gao.gov/assets/680/672136.pdf (citation omitted).

247.　According to the Department of Education, in circumstances where the borrower is responsible for paying the interest on his/her FFEL Loans or Direct Loans during a Deferment or Forbearance, the borrower can either pay the interest as it accrues or can allow it to accrue and be capitalized (added to the loan principal balance) at the end of the Deferment or Forbearance period.  If the borrower does not pay the interest on the loan and allows it to be capitalized, the total amount the borrower repays over the life of the loan may be higher than the borrower initially was expected to repay.[67]

248.　Because of the risk of the borrower having to pay more over the life of the loan as a result of a Forbearance—risk that increases as a result of multiple Forbearances—a Forbearance should only be used if a borrower is temporarily unable to make scheduled monthly payments, because of, for example, temporary financial difficulties or medical expenses.  Forbearance should not be used instead of income-driven repayment plans.

### Forgiving The Loan

249.　The Department of Education is required by law to forgive outstanding student loans for certain qualified borrowers after those borrowers paid back a portion of their loans.

250.　This case focuses on the Public Service Loan Forgiveness Program, or PSLF, which forgives eligible public servants' loans after 120 on-time qualifying payments.

---

[67] U.S. Dep't of Educ., *Deferment and Forbearance*, https://studentaid.ed.gov/sa/repay-loans/deferment-forbearance (last visited Jan. 16, 2019).

## The Public Service Loan Forgiveness Program

### Background On PSLF

251. Borrowers with average student loan debt and salaries in public service fields are more likely to face financial hardship when repaying their student loans. Specifically, many workers in the public service sector work "in professions where credentials are required under federal or state law, as part of professional licensure requirements, or by employer prerequisites. These borrowers may have little control over education or credential requirements required of them, yet the financial costs of these credentials fall on the individuals—particularly those where limited opportunity for wage growth may limit borrowers' ability to offset these costs."[68]

252. In response to this problem, Congress created the PSLF program in 2007 as part of the College Cost Reduction and Access Act.

253. The PSLF program was intended to give students the opportunity to choose careers in public service despite their need for student loans. As Senator Edward Kennedy remarked on the Senate floor when the final text of the bill was approved:

> It is the desire of so many of these young people to be involved in public service and to help respond to the needs in their communities. They want to be part of the solution, not part of the problem. So often, because of their indebtedness, they have to choose careers in order to deal with the indebtedness. So this legislation will open up or help us take advantage of that idealism that is out there. We are giving them a pathway to making a difference in terms of the future of our country, and I think that is enormously important. That is one of the most important parts of this legislation.[69]

---

[68] *See* Consumer Fin. Prot. Bureau, *Staying On Track While Giving Back: The Cost Of Student Loan Servicing Breakdowns For People Serving Their Communities* 20 (Jun. 2017), https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/201706_cfpb_PSLF-midyear-report.pdf.

[69] 9/7/2007 Sen. Edward M. Kennedy Congressional Record S11258.

254. Under the PSLF program, teachers, administrators, and other individuals in public service, including government employees and employees of nonprofit organizations, may have their loan balances forgiven after 120 on-time payments under a qualifying repayment plan while working full-time for a qualifying employer.

255. To qualify for PSLF, borrowers must:

    a.    Have Direct Loans or consolidate FFEL Loans into Direct Loans;

    b.    Be employed full-time, as defined by the program and verified by completing Employment Certification Form(s), by a qualifying public service employer or employers;

    c.    Make 120 on-time qualifying payments on a qualifying repayment plan; and

    d.    Complete the PSLF Application for Forgiveness.

256. More specifically, *first*, only non-defaulted Direct Loans are eligible for PSLF.[70] If a borrower has FFEL Loans, the borrower must consolidate them into a Direct Consolidation Loan in order for payments to be considered qualifying payments under PSLF.

257. *Second*, the borrower must be employed by a qualifying employer which includes: (i) government organizations; (ii) not-for-profit organizations that are tax-exempt under Section 501(c)(3) of the Internal Revenue Code; and (iii) other not-for-profit organizations that are not tax-exempt but provide certain types of qualifying public services as their primary function. Certain employers do not qualify for PSLF,

---

[70] According to a letter from AFT to Under Secretary Ted Mitchell, one in four federal borrowers are in default or are struggling to stay current on their loans. Letter From Randi Weingarten, President, AFT, to Ted Mitchell, Under Secretary, U.S. Dep't of Educ. (July 15, 2016), https://www.aft.org/sites/default/files/ltr_doe-student-loans_071516.pdf.

including: (i) labor unions; (ii) partisan political organizations; (iii) for-profit organizations; and (iv) not-for-profit organizations that are not tax-exempt and do not provide a qualifying public service as their primary function.

258.   The CFPB estimates that approximately 1 in 4 U.S. workers is employed in the public service[71] and that, "[b]y the end of 2016, more than 32 million borrowers were repaying loans that [we]re potentially eligible for PSLF."[72]

259.   The full-time-employment requirement is defined as the greater of (i) meeting the borrower's employer's definition of full-time employment or (ii) working at least 30 hours per week. If the borrower is working in more than one qualifying part-time job, the borrower may be able to meet the full-time employment requirement by working a combined 30 hours per week with all employers.

260.   *Third*, the borrower must make 120 qualifying payments, which are defined as payments that were made: (i) after October 1, 2007; (ii) under a qualifying repayment plan; (iii) for the full amount due as shown on the invoice; (iv) no later than 15 days after the due date shown on the invoice; and (v) while employed full-time by a qualifying employer. Borrowers cannot make qualifying payments while their Direct Loans are in: (i) in-school status; (ii) a grace period; (iii) Deferment; or (iv) Forbearance.

261.   The 120 qualifying payments do not have to be consecutive. If the borrower makes a monthly payment for more than is due on the invoice, he/she will only receive credit for one qualifying payment for each month.

262.   Qualifying repayment plans include all of the income-driven repayment plans outlined above. Although the Standard Repayment Plan is also a qualifying

---

[71] Consumer Fin. Prot. Bureau, *Staying On Track While Giving Back*, *supra* note 68, at 1.

[72] *Id.* at 20 n.34.

repayment plan, if a borrower is in repayment on the Standard Repayment Plan, there will be no remaining balance left to forgive after 120 qualifying payments as the term of the Standard Repayment Plan is ten years. Moreover, if a borrower consolidates his/her FFEL or Direct Loans into a Direct Consolidation Loan, payments made for the prior loan do not qualify for PSLF.

263. The Department of Education advises borrowers seeking to qualify for PSLF to enroll in an income-driven repayment plan: "Therefore, if you are seeking PSLF and are not already repaying under an income-driven repayment plan, you should change to an income-driven repayment plan as soon as possible."[73]

264. Borrowers may submit an Employment Certification Form(s) for each employer for whom they worked during the repayment to determine if their employment or loan repayments qualify for PSLF. Borrowers may begin the PSLF tracking process by submitting this Employment Certification Form at any time during repayment. Borrowers are advised to do so annually or when changing employers.

265. The Department of Education has urged borrowers to complete their first Employment Certification Form and begin the PSLF process at the earliest possible date: "If you want to qualify for PSLF now or in the future, complete and submit the Employment Certification Form as soon as possible. Too many borrowers wait to submit this important form until they have been in repayment for several years, at which point they learn that they have not been making qualifying payments. In order to ensure you're on track to receive forgiveness, you should continue to

---

[73] U.S. Dep't of Educ., *Public Service Loan Forgiveness*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service (last visited Jan. 16, 2019).

submit this form both annually and every time you switch employers."[74]   The Department of Education continues to urge borrowers to submit the Employment Certification Form "annually or when [a borrower] changes employers."[75]

266.   A presentation by the Department of Education at the 2016 FSA Training Conference for Financial Aid Professionals states, in a slide entitled "Common Program Misconceptions," "Borrowers shouldn't wait to submit an [Employment Certification Form] until after they have made 10 years of qualifying payments."[76]

267.   This certification must be sent to the Department of Education's designated servicer for PSLF loans, FedLoan Servicing, rather than the borrower's current servicer.  *See* Exhibit 9, at 4.[77]

268.   If the borrower's employment qualifies, and if some or all of the borrower's Direct Loans are not already serviced by FedLoan Servicing, those Direct Loans will be transferred to FedLoan Servicing.  The borrower will receive a notice of the loans after transferred.

269.   The process for the servicer's evaluation of Employment Certification Forms and eligibility for PSLF is outlined below.[78]

---

[74] Exhibit 6.

[75] U.S. Dep't of Educ., *Public Service Loan Forgiveness*, *supra* note 73.

[76] U.S. Dep't of Educ*., 2016 FSA Training Conference For Financial Aid Professionals* 20 (Nov. 2016), http://fsaconferences.ed.gov/conferences/library/2016/2016FSAConfSession18.ppt.

[77] *See also* U.S. Dep't of Educ., *Public Service Loan Forgiveness*, *supra* note 73.

[78] GAO Highlights, *supra* note 66, at 12.



Source: GAO analysis of Education's process for certification of employment and loans for Public Service Loan Forgiveness.  |  GAO-15-663

270.    *Fourth*, after the borrower makes 120 on-time qualifying payments, he/she must complete the PSLF Application for Forgiveness in order to have the balance of his/her eligible loans forgiven.  Exhibit 12.

271.    The PSLF Application for Forgiveness must also be sent to the Department of Education's designated servicer for PSLF, FedLoan Servicing.  *See Id.* at 4.[79]

272.    The loan amount forgiven under the PSLF program is not considered taxable income by the Internal Revenue Service; therefore, borrowers are not required to pay tax on the amount that is forgiven.

273.    According to the GAO, "As of September 2014, [the Department of] Education's loan servicer for the program had certified employment and loans for

---

[79] *See also* U.S. Dep't of Educ., *Public Service Loan Forgiveness*, *supra* note 73.

fewer than 150,000 borrowers;... While the number of borrowers eligible for the program is unknown, if borrowers are employed in public service at a rate comparable to the U.S. workforce, about 4 million may be employed in public service."[80]

274. As of March 31, 2018, there were approximately 875,000 borrowers who have submitted one or more Employment Certification Forms with at least one Form approved by FedLoan Servicing as eligible for PSLF.[81]

275. Data released by the Department of Education indicates that low-to-moderate income borrowers comprise the largest share of borrowers expected to benefit from PSLF.[82] As of 2016, nearly two-thirds (62%) of borrowers who had certified their intent to pursue PSLF reported earning less than $50,000 per year.[83] The vast majority of borrowers (86%) earned less than $75,000 per year.[84]

276. As shown in the slide below from the Department of Education presentation to the 2016 Conference of the National Association of Student Financial Aid Administrators, qualifying for and enrolling in PSLF has the greatest impact for borrowers in terms of total amount paid on their loans, time in repayment, and the amount that is forgiven.[85]

---

[80] GAO Highlights, *supra* note 66.

[81] FedLoan Servicing, *Public Service Loan Forgiveness Employment Certification Forms (ECFs)* (Mar. 31, 2018), https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/ECFReport.xls.

[82] *See* U.S. Dep't of Educ., *Direct Loan Public Service Loan Forgiveness* 23 (July, 2016), http://fsaconferences.ed.gov/conferences/library/2016/NASFAA/2016NASFAA-DirectLoanPSLF.pdf.

[83] U.S. Dep't of Educ*., 2016 FSA Training Conference For Financial Aid Professionals* 28, *supra* note 76.

[84] *Id.*

[85] *See id.* at 14.

# The bigger picture

| Payment Type | Repayment Plan | Payments | Total Paid | Time in Repayment | Forgiven Amount |
|---|---|---|---|---|---|
| Income | IBR | $277 → $680 | $101,452 | 17 yrs., 5 mos. | $0 |
| Income | PAYE | $185 → $612 | $87,705 | 20 years | $31,086 |
| Income | REPAYE | $185 → $771 | $119,535 | 23 yrs., 10 mos. | $0 |
| Income | ICR | $469 → $594 | $88,944 | 13 yrs., 7 mos. | $0 |
| Fixed | Standard | $680 | $81,615 | 10 years | N/A |
| Fixed | Extended | $416 | $124,678 | 25 years | N/A |
| Fixed | Consolidation Standard | $333 | $120,050 | 30 years | N/A |
| Graduated | Graduated | $383 → $1,148 | $85,699 | 10 years | N/A |
| Graduated | Extended-Graduated | $248 → $620 | $119,910 | 25 years | N/A |
| Graduated | Consolidation Graduated | $248 → $507 | $127,641 | 30 years | N/A |

| Payment Type | Repayment Plan | Payments | Total Paid | Time in Repayment | PSLF |
|---|---|---|---|---|---|
| Income | IBR | $277 → $503 | $45,972 | 10 years | $46,605 |
| Income | PAYE | $185 → $335 | $30,649 | 10 years | $64,323 |
| Income | REPAYE | $185 → $335 | $30,649 | 10 years | $62,967 |
| Income | ICR | $469 → $571 | $63,970 | 10 years | $22,986 |

14


U.S. Department of Education

277.   According to the GAO, "[b]orrowers who had employment and loans certified for PSLF had higher student loan debt than Direct Loan borrowers generally.  According to the September 2014 data on borrowers who had employment and loans certified for PSLF, 80 percent of borrowers had borrowed more than $30,000, compared to 36 percent of Direct Loan borrowers overall based on [the Department of] Education's data."[86]

278.   According to a report issued by the CFPB, "[t]hrough a combination of [PSLF] and [income-driven repayment] plan[s], public service borrowers can make the same number of payments as a typical borrower would under a standard payment

---

[86] GAO Highlights, *supra* note 66, at 30-31 (citation omitted).

plan (120 months or 10 years of qualifying payments), but with a monthly payment amount that is manageable relative to their salary."[87]

279.   Moreover, "absent PSLF, these public service borrowers may pay comparatively more toward their student debt in total than typical borrowers in [income-driven repayment] plans – a result of accruing interest charges over a prolonged repayment term.  In this key respect, PSLF offers a path forward for public service borrowers that [income-driven repayment] alone does not – PSLF ensures that both the total loan costs and the repayment term for these borrowers remain manageable over the long term."[88]

## The Loan Servicer: Navient

280.   Borrowers' repayments of their federal student loans are typically administered by servicing companies.

281.   Under federal law creating the FFEL Program, the lender or the Department of Education is able to "contract[] with another entity to perform any of the lender's or the [Department of Education's] functions [with respect to the MPN Contracts], or otherwise delegate[] the performance of such functions to such other entity."[89] And under federal law creating the Direct Loan Program too, the Department of Education may enter into contracts for "the servicing and collection of loans made or purchased."[90]

---

[87] *See* Consumer Fin. Prot. Bureau, *Staying On Track While Giving Back*, *supra* note 68, at 24.

[88] *Id.* at 25 (footnote omitted).

[89] 20 U.S.C. § 1086(a).

[90] 20 U.S.C. § 1087f(b)(2).

282.    As the Department of Education's regulations outline: "A school, lender, or guaranty agency may contract or otherwise delegate the performance of its functions under the [Higher Education Act] and this part to a servicing agency or other party."[91]  The Direct Loan MPN Contract similarly states that the Department of Education "may use a servicer to handle billing and other communications related to your loan." Exhibit 8, at 4.

**Navient's Servicing Contracts With The Department Of Education**

283.    Former Education Secretary Arne Duncan stated: "All hard-working students and families deserve high-quality support from their federal loan servicer, and we are continuing to take steps to make sure that is the case."[92]

284.    The Department of Education entered into the Servicing Contracts (as defined herein) with Navient, wherein Navient agrees to manage on behalf of the Department of Education the loans the Federal Government issued to borrowers.[93]

285.    Navient's predecessor, SLM Corporation, entered into a contract with the Department of Education to service federal student loans in 2009 ("2009 Servicing Contract").  *See* Exhibit 10.

286.    Pursuant to the 2009 Servicing Contract, Navient is delegated the duties of the lender for FFEL Loans and the duties of the Department of Education for Direct Loans, specifically, "to manage all types of [federal] student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt." *Id.* at 19.

---

[91] 34 C.F.R. § 682.203(a).

[92] U.S. Dep't of Educ., *U.S. Department of Education Strengthens Federal Student Loan Servicing* (Aug. 29, 2014), https://www.ed.gov/news/press-releases/us-department-education-strengthens-federal-student-loan-servicing.

[93] *See* Restatement (Third) Of Agency § 1.01 (2006).

287. In carrying out those duties, Navient is obligated to comply with all requirements of the Higher Education Act and any statutory provisions or regulations governing the FFEL Program as authorized by the Higher Education Act.

288. The Statement of Objectives of the 2009 Servicing Contract states, "Recent legislation ... enabled the Department to accept former ... [FFEL] loans in the form of additional Direct Loan ... capacity, and to purchase [FFEL] loans as far back as 2003, in an effort to bring liquidity and stability back to the student loan market.... With the sudden increase in current and potential loan volume that the Department will be responsible for servicing, the need for increasing the ... student aid servicing vehicles is determined appropriate at this time." *Id.* at 19.

289. For this reason, the Department of Education sought to "[a]cquire efficient and effective commercial contract services to manage all types of ... student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt." *Id.*

290. The 2009 Servicing Contract specifies that "Public service loan forgiveness" is offered for Direct Loans (and, by extension, FFEL Loans that have been consolidated into Direct Consolidation Loans). *Id.*, Attachment A-3, at 4.

291. The 2009 Servicing Contract also:

- Instructs that Navient "will be required to meet all statutory and legislative requirements";

- Mandates Navient's "[s]pecific compliance activities," including but not limited to those listed on Attachments A-1 through A-3 to the Contract;

- Requires Navient to "provide innovative measures" and for "incentives [to] be based on performing assets, rather than transaction or activity based delinquency incentives;

- Ensures that Navient "will be responsible for maintaining a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of

74

the service continue to remain in compliance as changes occur"; and

- Requires Navient to have "a service flexible enough to handle new requirements generated by Congress and respond to legislative mandates and policy changes."

*Id.* at 19-20; *id.*, Attachment A-1, at 3.

292. The 2009 Servicing Contract also states that "the intent of the Department [is] to procure a performance-based contract(s) that … provides best of business services. To achieve this goal, the Department expects each servicer to provide commercially available services that will yield high performing portfolios and ***high levels of customer satisfaction***." *Id.*, Attachment A-1, at 3; *id.*, Attachment A-2, at 3; *id.*, Attachment A-3, at 3 (emphasis added).

293. Navient assumed the rights, obligations, and duties of the 2009 Servicing Contract when it acquired SLM Corporation. In 2014, Navient entered into an additional Servicing Contract with the Department of Education ("2014 Servicing Contract," and together with the 2009 Servicing Contract, "Servicing Contracts"). The 2014 Servicing Contract incorporates the 2009 Servicing Contract with minimal modifications. *See* Exhibit 11.

294. Navient has admitted in public filings that the Servicing Contracts have been modified hundreds of times through various change orders,[94] and "are very specific in what companies like Navient can and can't do for borrowers—so the options are very clear."[95] These change orders and modifications have not yet been made available to the public and could only be reviewed during discovery.

---

[94] Memorandum of Law In Support of Defendants' Motion To Dismiss Plaintiff's Complaint Under Rule 12(b)(6) Or, In The Alternative, For A More Definite Statement Under Rule 12(e) at 6, *Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-cv-00101 (M.D. Pa. Mar. 24, 2017), ECF No. 29.

[95] Farrington, *supra* note 33.

295. Thus, the Servicing Contracts govern Navient's interactions and communications with borrowers including with respect to providing information about repayment plans and forgiveness options for the benefit of the borrower.

296. Federal statutory or legislative requirements described above, which are expressly incorporated into the Servicing Contracts, specifically provide borrowers with access to benefits such as income-driven repayment plans and PSLF.[96] Navient is required to provide such options for eligible borrowers under their Servicing Contracts.

297. The Department of Education's statements indicate that these Servicing Contracts were entered into for the benefit of the borrowers. According to the Department of Education's press statement surrounding the release of the 2014 Servicing Contract, the modifications were implemented "to strengthen incentives for them to provide excellent customer service and *help borrowers stay up-to-date on their payments*. This action will help ensure that *borrowers receive the highest quality support* as they repay their federal student loans and help [the Department of Education] better monitor the performance of loan servicers to help them continue to improve."[97] At a minimum, the Department of Education's statements make clear that Navient was obligated under the Servicing Contract to provide truthful information that would materially benefit borrowers.

298. Borrowers, including Plaintiffs and all those similarly situated, are thus intended third-party beneficiaries of the Servicing Contracts.

---

[96] *See* 34 C.F.R. §§ 682.201(e)(5)(i), 682.208, 682.215, 685.208-685.209, 685.219, 685.221.

[97] U.S. Dep't of Educ., *U.S. Department of Education Strengthens Federal Student Loan Servicing*, *supra* note 92 (emphasis added).

299. The publicly available portions of the Servicing Contracts do not contain any provision disclaiming intent to benefit borrowers, including Plaintiffs and all those similarly situated, as third-party beneficiaries.

**Borrowers Rely On Navient For Accurate Information About Loan Repayment And PSLF**

300. The federal student loan repayment processes are opaque and enormously complex. Because the Department of Education has contracted out its loan-servicing obligations, borrowers must turn to Navient to guide them through the options for repaying their federal student loans.

301. The Department of Education and Navient both make clear that Navient has a material role in assisting borrowers—including public service borrowers—that extends far beyond simply collecting payments and processing paperwork.

302. According to the Department of Education's informational website directed at federal student loan borrowers: "A loan servicer is a company that handles the billing and other services on your federal student loan. The loan servicer will work with you on repayment plans and loan consolidation and will assist you with other tasks related to your federal student loan. It is important to maintain contact with your loan servicer. If your circumstances change at any time during your repayment period, your loan servicer will be able to help."[98]

303. The Department of Education's informational website also states:

    a.    Student loan servicers "are responsible for collecting payments on a loan, advising borrowers on resources and benefits to better manage their federal student loan obligations, responding to customer service inquiries, and performing other administrative

---

[98] U.S. Dep't of Educ., *Loan Servicers*, https://studentaid.ed.gov/sa/repay-loans/understand/servicers (last visited Jan. 16, 2019).

tasks associated with maintaining a loan on behalf of the U.S. Department of Education."[99]

    b.    "Contact your servicer to apply for income-driven replacement plans, student loan forgiveness, and more."[100]

    c.    "How do I apply to have my loan forgiven, canceled, or discharged? Contact your loan servicer if you think you qualify."[101]

    d.    "If you believe that your application [for PSLF] was denied in error, contact your loan servicer for more information."[102]

304. On its website, the Department of Education also directs borrowers to contact Navient if they have questions about income-driven repayment plans and PSLF, indicating that Navient is the best resource to help borrowers navigate this complex process.[103]

305. In a report issued on September 21, 2017, the Department of Education's Federal Student Aid office stated that if a borrower's Employment Certification Form is denied because the borrower is in the incorrect repayment plan, "the borrower will

---

[99] U.S. Dep't of Educ., *Loan Servicing Contracts*, https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing (last visited Jan. 16, 2019).

[100] U.S. Dep't of Educ., *Income-Driven Plans*, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven (last visited Jan. 16, 2019).

[101] U.S. Dep't of Educ., *Forgiveness, Cancellation, and Discharge*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation (last visited Jan. 16, 2019).

[102] *Id.*

[103] U.S. Dep't of Educ., *Loan Servicers*, *supra* note 98; U.S. Dep't of Educ., *Income-Driven Plans*, *supra* note 100; Consumer Fin. Prot. Bureau, *Staying On Track While Giving Back*, *supra* note 68, at 28; *see also* GAO Highlights, *supra* note 66, at 23 ("Once borrowers enter repayment, Education primarily relies on its loan servicers to communicate directly with them about repayment options.").

be counseled to switch to a PSLF-eligible repayment plan if he or she is otherwise eligible for PSLF (i.e. eligible loans and qualifying employment)."[104]

306.    The Direct Loan MPN Contract between the Department of Education and borrowers also informs borrowers that their loan servicer is a reliable source of information about their repayment options and PSLF, stating:

a.    "We contract with servicers to process Direct Loan payments, deferment and forbearance requests, and other transactions, and to answer questions about Direct Loans."

b.    "To request a loan discharge based on [PSLF or teacher loan forgiveness], you must complete an application. ***Your servicer can tell you how to apply***."

Exhibit 8, at 8, 19 (emphasis added).

307.    Other materials from the Department of Education inform borrowers that they can rely on their servicer to help them choose their best loan repayment option. The Department of Education's website tells borrowers: "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions. Your loan servicer will help you decide whether one of these plans is right for you."[105]

308.    The Department of Education's website also tells borrowers that they can expect their servicer to help them enroll in PSLF at no cost to them. A FAQ for borrowers on the Department of Education's website reads: "What should I do if I am contacted by someone who wants to charge me fees to consolidate my federal student loans or to apply for an income-based repayment plan? Contact your federal loan servicer; these services and more can be completed by your servicer for free! If you

---

[104] Sessa, *supra* note 48.

[105] U.S. Dep't of Educ., *Income-Driven Plans*, *supra* note 100.

are contacted by a company asking you to pay 'enrollment,' 'subscription,' or 'maintenance' fees to enroll you in a federal repayment plan or forgiveness program, you should walk away."[106]

309. As the Department of the Treasury has acknowledged, "[t]he natural consequence of [loan repayment] complexity is that it is difficult for borrowers, even those who are sophisticated, to navigate the program and effectively manage their repayment responsibilities. Because the program is difficult to understand, borrowers rely on servicers to answer questions about repayment, enroll borrowers in an appropriate and sustainable repayment plan, and assist borrowers when they struggle to make their payments."[107]

310. Moreover, the CFPB, which is required to examine servicers for compliance with federal law, looks to "[d]etermine whether the servicer has procedures, and whether the servicer follows its procedures, for circumstances where the borrower informs the servicer that a borrower is working in public service, including whether phone representatives assess the borrower's current circumstances and disclose the availability of any cancellation or loan forgiveness options reasonably believed to be the most appropriate to the borrower (e.g., PSLF, …)" and further to "[d]etermine whether the servicer processes requests for borrower benefits, including benefits or protections … (e.g., PSLF…), in a timely and accurate manner."[108]

---

[106] U.S. Dep't of Educ., *Loan Servicers*, *supra* note 98.

[107] U.S. Dep't of the Treasury, *supra* note 3, at 124.

[108] Consumer Fin. Prot. Bureau, Education Loan Examination Procedures, https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/201706_cfpb_Education-Loan-Servicing-Exam-Manual.pdf (last updated June 22, 2017).

311. Ultimately, because the Department of Education has contracted out its obligations to guide borrowers through the loan repayment process, those obligations are shared by Navient. The Department of Education has deputized Navient to help borrowers navigate the complex process of qualifying for PSLF.[109]

312. Navient has accepted that deputation, in exchange for lucrative servicing fees. In filings before this Court, Navient repeatedly asserted that it is the Department of Education's "agent."[110]

313. Navient has also explicitly promised borrowers that it would fulfill the Department of Education's obligations to help borrowers navigate their student loans. Navient and its leadership made and continues to make representations to borrowers about its roles and responsibilities that reinforced Navient's position as a trusted source of information for borrowers.

314. Navient acknowledged in its public investor presentations that "[t]oday's repayment options [for borrowers] are numerous and complex."[111] In Navient's annual public report to investors, Navient stated that its goal is to

---

[109] Consumer Fin. Prot. Bureau, *Staying On Track While Giving Back*, *supra* note 68, *see also* GAO Highlights, *supra* note 66, at 23 ("Once borrowers enter repayment, Education primarily relies on its loan servicers to communicate directly with them about repayment options.").

[110] Defs.' Mot. to Dismiss 2, 17-18 (ECF No. 23).

[111] Navient Solutions, LLC, *2018 1st Quarter Investor Deck* 28 (May 4, 2018), https://navient.com/assets/about/investors/webcasts/2018-Q1-Investor-Slides-Final.pdf; *see* Remondi, *Five Recommendations For Better Student Loans*, *supra* note 2, at 5 ("Today, there are more than 50 different repayment options. Borrowers who complete college must navigate this maze of complexity as they begin repaying their student loans."); *see also* U.S. Dep't of the Treasury, *supra* note 3, at 11 ("The program is complex due to a variety of loan types, repayment plans, and product features that make the program difficult for borrowers to navigate....").

"[l]everag[e] four decades of expertise" and "help customers understand the complex array of federal loan repayment options."[112]

315.   Navient has touted its ability to guide student loan borrowers through that complex process:

- "We use our deep expertise to help our customers succeed, and we do so with our commitment to the highest standard in loan servicing, business process solutions, and customer support."[113]

- "To help our customers successfully pay their education loans and build their credit, our Department of Education Loan Servicing provides financial literacy tools and in-depth customer service."[114]

- "We help students navigate the lifecycle of their loan with: Expert guidance while in school and beyond."[115]

- Navient is available to help—with "expert guidance"—if borrowers have questions or concerns about the types of repayment plans or forgiveness options available.[116]

- "Navient is committed to helping our student loan customers achieve successful loan repayment, and we are here to help you.  If you are having trouble managing your student loans, contact us."[117]

---

[112] Navient Corp., 2017 Annual Report, *supra* note 13, at 6.

[113] Exhibit 13.

[114] Exhibit 14.

[115] Exhibit 3.

[116] Exhibit 2.

[117] *Id.*

- "Contact us to discuss your student loan obligations. We can answer any questions you have about paying back your loans and the types of repayment plans available to you."[118]

316. On information and belief, Navient removed these particular statements from their prior locations on its website after this lawsuit was filed. But Navient's website continues to induce borrowers to reach out to it for help with questions about how to pay back their loans:

- "Student borrowers who reach out to their servicer when they have questions tend to be more successful in repayment. Navient is here to help."[119]

- "We keep in touch with you throughout your repayment period and are here to answer any questions along the way.… We're here to answer your questions, provide you with solutions, and process your payments."[120]

317. Jack Remondi, as President and Chief Executive Officer of both Navient Solutions and Navient Corp., personally stated that Navient is committed to assisting borrowers, including in their most difficult times:

- "At Navient, our priority is to help each of our 12 million customers successfully manage their loans in a way that works for their individual circumstances."[121]

- "Struggling federal borrowers who engage with their servicers will learn about the options to repay student loans in a way that best fits their individual circumstances. Income-driven repayment programs such as Pay As You Earn and Income-Based Repayment establish a monthly payment based on a percentage of discretionary income that can make short- or

---

[118] Exhibit 1.

[119] Navient Solutions, LLC, *5 Habits Of Successful Student Loan Borrowers*, *supra* note 19 (Exhibit 4).

[120] Navient Solutions, LLC, *New To Navient*, *supra* note 20 (Exhibit 5).

[121] Remondi, *It's Time To Put Students First*, *supra* note 15.

long-term financial challenges much more manageable. The Administration's new Revised Pay As You Earn (REPAYE) can make monthly payments even more affordable for many borrowers."[122]

- "At Navient, we make it a priority to educate our federal borrowers about income-driven options, with more than 170 million communications annually about repayment options. These programs are our primary tool in helping borrowers avoid default. As a result, we are a leader in enrolling borrowers in these programs."[123]

- "For some borrowers, student loan debt can be especially daunting. The good news is that borrowers can turn to their student loan servicers for help to navigate the complex repayment options. The key is contact."[124]

- "All borrowers, and especially those facing financial strain, should be encouraged to engage directly with their servicers —not driven away from them by misleading and false rhetoric. Together, we can ensure that even those who are anxious about their loans know they have options. Help is a phone call away."[125]

- "Default is avoidable, but borrower contact is key. If borrowers are led to believe that calling their servicer is useless, who benefits?"[126]

---

[122] *Id.*

[123] *Id.*

[124] Jack Remondi, *4 Ideas For A Better Student Loan Program: A common sense recipe for reform*, MEDIUM (Feb. 12, 2017), https://medium.com/@JackRemondi/4-ideas-for-a-better-student-loan-program-acommon-sense-recipe-for-reform-521e651d612.

[125] Remondi, *It's Time To Put Students First*, *supra* note 15.

[126] Jack Remondi, *Four Recommendations To Improve Student Loan Success*, MEDIUM (Apr. 12, 2016), https://medium.com/@JackRemondi/fourrecommendations-to-improve-student-loan-success-94488bf0bb7f.

- Navient's "priority is to help each of our 12 million customers successfully manage their loans in a way that works for their individual circumstances."[127]

## Navient Is Incentivized To Prevent Borrowers From Enrolling In PSLF To Retain More Revenue And Fees

318. In reality, Navient is incentivized to prevent borrowers from enrolling in PSLF to retain more fees and revenue for itself in at least three ways.

319. *First*, as outlined above, the Health Care and Education Reconciliation Act of 2010 provided FFEL borrowers incentives to consolidate their FFEL Loans into Direct Loans, with the Department of Education offering a discount of 0.25% interest on the resulting Direct Loan. When a borrower consolidates a FFEL Loan into a Direct Loan, the owner of the FFEL Loan—in many cases, Navient Corp.—faces an immediate loss of revenue from the prepayment of that FFEL Loan—a result Navient badly wants to avoid.

320. *Second*, as described above, Navient Corp. pools individual FFEL Loans held in its portfolio into securitized trusts known as SLABS, which are then sold to investors. The net interest income earned by SLABS backed by FFEL Loans are Navient Corp.'s greatest source of revenue.[128] According to Navient's 10-K, "we generate revenue primarily through net interest income on the FFEL[] Loan portfolio (after provision for loan losses). This segment is expected to generate significant amounts of earnings and cash flow over the remaining life of the portfolio.… Navient's goal is to maximize the amount and optimize the timing of the cash flows generated by its FFEL[] Loan portfolio. Navient also seeks to acquire FFEL[] Loan portfolios from third parties to add net interest income and servicing revenue.… As a result of

---

[127] Remondi, *It's Time To Put Students First*, *supra* note 15.

[128] *See* Navient Corp., 2017 Annual Report, *supra* note 13.

the long-term funding strategy used for our FFEL[] Loan portfolio and the insurance and guarantees provided on these loans, the portfolio generates consistent and predictable cash flows."[129]  Therefore, when FFEL Loans prepay, Navient Corp. faces another immediate loss of revenue.

321.  *Third*, Navient is paid servicing fees out of loan payments made by Plaintiffs and similarly-situated borrowers.  If Navient is the servicer of that loan and the borrower pursues the PSLF program, the borrower's loan would be transferred to FedLoan Servicing and Navient would lose the right to service the loan.  By preventing consolidation of FFEL loans or preventing Direct Loan borrowers from pursuing PSLF by completing their Employment Certification Forms, Navient benefits from the extra fees it would not have otherwise collected had borrowers been given correct information.

322.  As the GAO has explained, "Because servicers are not compensated for their loss when a loan is transferred, in effect, they are paid less than if they were able to keep all of their assigned loans.  Education officials acknowledged that the lack of compensation for transferred loans could be a disincentive for servicers to counsel borrowers about loan consolidation and PSLF."[130]

323.  As a result of these severely misaligned incentives, when borrowers inquire about the PSLF, Navient is incentivized to prevent borrowers from enrolling in or certifying their intent to pursue the PSLF program.

---

[129] *See id.*

[130] U.S. GAO, *Federal Student Loans: Education Could Improve Direct Loan Program Customer Service And Oversight: Highlights*, Report No. GAO-16-523, at 23 (May 16, 2016).

## Navient Trains And Incentivizes Its Employees To Steer Borrowers Away From PSLF To Raise Its Profits

324. Navient is also incentivized to steer borrowers away from PSLF to lower its own costs and thus to raise its own profits. As outlined in the Servicing Contracts and numerous other public statements, the Department of Education compensates Navient for helping consumers navigate repayment plans and the process of qualifying for PSLF. The Servicing Contracts provide that the Department of Education will compensate Navient on a per-loan basis with a fixed cap on total compensation. This system was designed to reward Navient for preventing delinquency and defaults.[131] In practice, however, these incentives are insufficient to keep Navient from providing false and misleading information to borrowers struggling with their student loan payments.

325. Navient is paid a set monthly amount for each loan it services based on the status of the loan. Navient's compensation decreases as a loan becomes more seriously delinquent. Between 2009 and 2014, Navient was paid between $2.11 and $0.50 per month for each loan that it serviced. Exhibit 10, at 13. Since the execution of the 2014 Servicing Contract, the monthly amount has been between $2.85 and $0.45. Exhibit 11, at 4.

326. The Servicing Contracts' fixed cap on the total revenue a servicer can earn from the Department of Education creates an incentive for Navient to minimize costs as a way to maximize its profits.[132]

327. The amount that Navient stands to lose if a borrower falls behind on payments or enters Forbearance is relatively small, ranging from $0.74 to $2.40 per month. By contrast, the cost of compensating employees for the time and skills

---

[131] Fink & Zullo, *supra* note 46, at 3.

[132] *Id.*

necessary to provide a borrower with accurate information about PSLF is far higher.[133] It may take months for the cost of engaging with a borrower to avoid a delinquency to be recouped through monthly fees.[134] Navient can therefore maximize its profits under its Servicing Contracts with the Department of Education by minimizing the resources it devotes to customer service.

328. For example:

> Assume that the contractor's average labor cost for a loan-servicing professional is $20.00/hour, and that it takes an average of 30 minutes for her to contact a borrower and arrange for a loan restructure or other appropriate repayment alternative. If an account is 31–60 days delinquent, and a single 30-minute call is sufficient to bring and keep that account current, the intervention would cost the contractor $10. For this expense, the contractor gains an extra $0.28 per month in revenue. Under these simple assumptions, it would take more than 35 months for the servicer to recoup the cost of intervention.[135]

329. Unsurprisingly, Navient's training programs, monitoring programs, and compensation plan for its customer service employees encourages these employees to minimize the amount of time they spend discussing borrowers' repayment options.

330. According to Navient, it has "developed extensive training programs and call flow procedures to guide representative discussions with borrowers," and it "regularly assess[es] representative adherence with [its] policies and practices."[136] These "training programs and call flow procedures" are within Navient's sole control.

---

[133] *See id.* at 9

[134] *Id.* at 10.

[135] *Id.*

[136] Fed. Student Aid, *Navient Use Of Forbearance Site Visit Review* 5 (May 18, 2017), https://assets.documentcloud.org/documents/5205070/May-2017-FSA-Audit-Report.pdf. This confidential report was first made public in November 2018. Elizabeth Warren, *Warren Releases New Evidence Of Navient Student Loan Malfeasance* (Nov.

331. Since at least June 2011, Navient has recorded phone calls between its call representatives and borrowers to assess compliance with these policies and procedures. Navient produced over two million call recordings to the Department of Education as recently as March 2017.[137]

332. Navient compensates its customer service representatives and pre-default collections employees using employee incentive plans. Those incentive arrangements are based, in part, on the employee's average call time. Therefore, those employees have an economic incentive to avoid engaging in lengthy conversations with a borrower about his/her financial situation and determining which repayment plan is the best option for the borrower.

333. Because a borrower is required to submit an application along with income documentation in order to enroll in an income-driven repayment plan, the process of ensuring that a borrower is enrolled can result in multiple phone conversations.

334. According to a survey by the CFPB, more than half of borrowers with Navient as their servicer who attempted to enroll in an income-driven repayment plan for the first time reported that they were unable to navigate the application process independently.[138]

335. Navient employees are also not incentivized to speak with borrowers already enrolled in an income-driven repayment plan who are seeking to recertify their income about the income-driven repayment renewal process because processing

20, 2018, https://www.warren.senate.gov/newsroom/press-releases/warren-releases-new-evidence-of-navient-student-loan-malfeasance.

[137] *Id.* at 10.

[138] Complaint for Permanent Injunction and Other Relief ¶ 44, *Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-cv-00101 (M.D. Pa. Mar. 24, 2017), ECF No. 1.

the renewal paperwork further increases the employee time that Navient must devote to borrowers who enroll in income-driven repayment plans.

336. Navient has even acknowledged that "technical barriers like a 10-page government application, which only the borrower not the servicer can complete, add to the burden for the very borrowers these [income-driven repayment] plans were meant to help."[139]

337. Unfortunately, Navient customer service employees often do not provide assistance to borrowers seeking help filling out these forms. One Navient customer service representative noted that other representatives sometimes *simply hung up* on borrowers rather than answering their questions about income-driven repayment forms.[140]

338. On the other hand, placing a borrower in the Graduated Repayment Plan, Extended Repayment Plan, Deferment, or Forbearance, none of which qualifies for PSLF, can be done over the phone quickly without a lengthy conversation and without the submission of any documentation.

339. Navient customer service representatives also mislead borrowers by telling them they are not eligible for certain income-driven repayment plans that could actually result in their payment being as low as $0 per month. According to the CFPB, over 50% of Navient borrowers who need payment relief and meet the eligibility criteria for income-driven repayment plans would qualify for a $0 monthly payment.[141]

---

[139] Remondi, *Five Recommendations For Better Student Loans*, *supra* note 2, at 5.

[140] Hensley-Clancy, *supra* note 28.

[141] Complaint for Permanent Injunction and Other Relief, *supra* note 138 ¶ 51.

340. Also according to the CFPB, between January 1, 2010 and March 31, 2015, nearly 25% of borrowers who ultimately enrolled in an income-driven repayment plan with a $0 payment were enrolled in voluntary Forbearance within the twelve-month period immediately preceding their enrollment in an income-driven repayment plan. During that same time period, nearly 16% of borrowers who ultimately enrolled in the specific income-driven repayment plan PAYE with a $0 payment were enrolled in voluntary Forbearance within the twelve-month period immediately preceding their enrollment in PAYE. The majority of these borrowers were enrolled in voluntary Forbearance for a period that exceeded three months immediately preceding their enrollment in the income-driven repayment plan.[142]

341. Because these borrowers were placed in Forbearance, they suffered negative consequences including: (i) delayed access to lower monthly payments; (ii) failure to make qualifying payments for PSLF; and (iii) the addition of interest to the principal balance of the loan that could have been avoided if the borrower had been enrolled in an income-driven repayment plan.

## Through Many Different Means, Navient Prevents Borrowers From Enrolling In PSLF

342. Despite its obligations as a servicer and its willingness to hold itself out to borrowers as an expert on student loan repayment, Navient gives borrowers inaccurate or misleading information about their repayment options, including income-driven repayment plans and PSLF. Borrowers rely on these statements because they are told, by the Department of Education as well as Navient, to trust Navient to provide them with the best repayment options for their circumstances.

---

[142] *See id.* ¶ 52.

## Navient Falsely Informs Borrowers They Are "On Track" For PSLF When They Do Not Have Direct Loans

343. Navient frequently brushes aside borrowers' questions about PSLF by telling borrowers incorrectly that they are "on track" for PSLF. Navient employees make these statements without reviewing any of the loan information that would allow them to make that statement accurately or informing borrowers that they must send in an application in order to determine conclusively their eligibility for PSLF.

344. In fact, the only way a borrower can actually determine whether he or she is "on track" for PSLF is to submit a completed Employment Certification Form to FedLoan Servicing.

345. In reliance on Navient's misrepresentations, borrowers believe that they are making qualifying payments for PSLF when in fact they may have the wrong type of loans to qualify for PSLF.

346. Specifically, Navient misrepresents to borrowers that they are "on track" for PSLF when these borrowers actually have FFEL loans that must be consolidated into a Direct Consolidation Loan to be eligible for PSLF.

347. Ms. Hyland was informed multiple times by Navient representatives that she was making progress toward PSLF and simply needed to continue making payments in order to qualify. These representations were false and misleading, as Ms. Hyland was making payments on FFEL Loans. In fact, none of Ms. Hyland's payments on these FFEL Loans counted toward PSLF because the loans had not been consolidated into Direct Loans.

348. Ms. Saint-Paul asked Navient in 2014 for assistance with PSLF. Navient improperly told Ms. Saint-Paul that in ten years, her loans would be forgiven under PSLF. This representation was false, as Ms. Saint-Paul actually had FFEL Loans that had to be consolidated into Direct Loans before she could begin making qualifying payments for PSLF.

349.    Ms. Taylor asked Navient in 2012 what she needed to do in order to qualify for PSLF.  Navient falsely represented to Ms. Taylor that she simply needed to continue making payments while working for a qualifying employer in order for her loans to be forgiven after ten years of repayment. This representation was false, as Ms. Taylor actually had FFEL loans that had to be consolidated into Direct Loans before she could begin making qualifying payments for PSLF.

350.    Similarly, when Mr. Church asked Navient in 2012 how to qualify for PSLF, he was falsely informed that he only needed to make 120 payments while working for a qualifying employer.  From 2012 until 2017, Navient misrepresented to Mr. Church that he was on track for PSLF and that his qualifying payments were increasing. These statements were false, as the majority of Mr. Church's loans were FFEL Loans and needed to be consolidated into a Direct Loan before he could begin making qualifying payments.  When Mr. Church consolidated his FFEL Loans into a Direct Loan in 2017, he lost years of qualifying payments toward PSLF.

Navient Obstructs Borrowers From Submitting Necessary Paperwork

351.    All borrowers seeking PSLF must submit Employment Certification Forms for each qualifying public service position they hold during the repayment period.  On its website, the Department of Education urges borrowers to submit these forms as soon as possible after beginning repayment in order to confirm that their loans and payment plan qualify for PSLF.[143]

352.    Navient falsely tells borrowers they should not submit PSLF forms until they have made 120 payments such that borrowers are unaware that their payments were not qualifying payments under PSLF.

---

[143] U.S. Dep't of Educ., *Public Service Loan Forgiveness*, *supra* note 73.

353. For example, when Ms. Garcia informed Navient that she had completed her Employment Certification Form for PSLF, Navient instructed her not to submit this form until she had made the 120 qualifying payments for PSLF.

354. As another example, when Ms. Taylor asked Navient if she should submit any paperwork in order to qualify for PSLF, Navient advised her that she did not need to submit any paperwork but should simply continue making payments and call back when she had made the required number of payments.

355. Navient has told borrowers that they should not submit any PSLF paperwork until 2017 because the program would not be effective until ten years after it was signed into law.

356. For example, Navient informed Ms. Hyland that she would be able to apply for PSLF in 2017 after the program had been effective for ten years, and that she did not need to submit any Employment Certification Forms before then (even though she had actually submitted them already to Navient). She subsequently marked her yearly calendar, reminding herself to call back in 2017.

357. In another example, after Ms. Guth specifically asked Navient about what actions she needed to take in order to qualify for PSLF, Navient advised her that she did not need to submit any paperwork at that time; rather, she should just make 120 payments under an income-driven repayment plan and then request forgiveness.

358. Navient's representation was false. As described above, borrowers may submit their PSLF forms at any time. While 2017 was the earliest possible year in which a borrower could have completed all 120 payments to qualify for PSLF, borrowers should have been encouraged ***not to wait*** until 2017 before submitting PSLF paperwork.

359. Although FedLoan Servicing is the designated servicer for PSLF and is responsible for processing PSLF paperwork, Navient does not inform borrowers they can seek PSLF by contacting FedLoan Servicing.

360. In reliance on Navient's misrepresentations, Plaintiffs and others similarly situated did not submit PSLF Employment Certification Forms and/or PSLF Applications for Forgiveness to FedLoan Servicing and continued making monthly payments that may not have qualified for PSLF.

361. For example, Navient informed Ms. Hyland that in order to apply for PSLF, she should contact Navient directly in 2017.

362. Navient also ignores Employment Certification Forms and PSLF Applications for Forgiveness that it receives from borrowers and fails to notify borrowers that they were sent to Navient, as opposed to FedLoan Servicing, in error.

363. For example, when Ms. Hyland submitted Employment Certification Forms to Navient in January 2015, Navient falsely told Ms. Hyland her Employment Certification Forms would be "kept on file" until then. In 2017, Navient informed Ms. Hyland that it had no record of these forms being sent.

364. Due to Navient's conduct, borrowers, including Plaintiffs and others similarly situated, have lost payments that could have gone toward qualifying for the PSLF.

365. Plaintiffs, and others similarly situated, have been damaged by Navient's actions because they must now make all of the payments, which include interest, principal, and fees, that otherwise would have been forgiven had Navient provided correct information.

366.    Even when borrowers have Direct Loans, Navient still falsely states that they are "on track" for PSLF when in fact borrowers are in a repayment plan or loan status that does not qualify for PSLF, including (i) the Extended Repayment Plan; (ii) the Graduated Repayment Plan; (iii) Deferment; and/or (iv) Forbearance.

367.    When borrowers contact Navient about their repayment options, Navient often steers them toward remaining in the Standard Repayment Plan, which deprives eligible borrowers of the benefits of PSLF.   Although the Standard Repayment Plan is technically a qualifying repayment plan for PSLF, a borrower on the Standard Repayment Plan will have no remaining balance left to forgive after 120 qualifying monthly payments as the term of the Standard Repayment Plan is ten years.   Therefore, the Standard Repayment Plan provides no benefit to borrowers eligible for PSLF.

368.    When Navient does provide borrowers with other repayment options with lower monthly payments, it often steers them toward programs that do not qualify for PSLF including: (i) the Extended Repayment Plan; (ii) the Graduated Repayment Plan; (iii) Deferment; and/or (iv) Forbearance.

369.    In a 2017 report on PSLF, the CFPB noted that "[b]orrowers complain that their servicer did not enroll them in a qualifying repayment plan, despite expressly telling their servicer that they are pursuing PSLF.   Instead, their servicer enrolled them into a non-qualifying plan, like a graduated or extended repayment plan with payments that are too low to be considered qualifying payments."[144]

370.    For example, Ms. Garcia told Navient that she was working toward PSLF but that she could not afford her payments.   Navient enrolled her in the

---

[144] Consumer Fin. Prot. Bureau, *Staying On Track While Giving Back*, *supra* note 40, at 33.

Graduated Repayment Plan, which does not qualify for PSLF. Had Ms. Garcia been aware that the Graduated Repayment Plan did not qualify her for PSLF, she would have chosen a repayment plan that qualified for PSLF.

371. If borrowers cannot afford the Extended or Graduated Repayment Plans, Navient frequently puts borrowers in Forbearance instead of assisting them in changing their repayment plans.

372. Dr. Gaede asked Navient about repayment options based on his income over a period of years. In repeated communications, Navient informed Dr. Gaede that there was no option for him to repay his loans based on his income, and instead steered him into repeated Forbearances. When Dr. Gaede finally obtained truthful information from a Navient representative and applied for income-driven repayment, he was able to lower his payments enough to begin paying back his loans. By the time he began repaying his loans, he had accrued over $100,000 in interest.

373. As another example, Ms. Means asked Navient about her repayment options over a period of years before she was finally able to sign up for an income-driven repayment plan. Then, after the birth of her child, Ms. Means informed Navient she could not make her payments. Instead of informing Ms. Means that she could submit a new income-driven repayment application based on her increased family size, Navient steered Ms. Means into a forbearance.

374. Dr. Nocerino also requested information about income-driven repayment and was informed that her best option was Forbearance. Remaining in Forbearance has resulted in additional interest accruing and prevented Dr. Nocerino from making qualifying payments toward PSLF.

375.     The GAO estimated that a borrower owing $30,000 in federal loans who spent three years in Forbearance would pay $6,742 more than a borrower who was in enrolled in the Standard Repayment Plan and was never in Forbearance.[145]

376.     The GAO also found that servicers that encourage Forbearance over income-driven repayment plans place borrowers "at risk of incurring additional costs without any long-term benefits."[146]

377.     Borrowers already enrolled in an income-driven repayment plan must recertify their income and family size on a yearly basis. However, Navient prevents borrowers from recertifying their income or delays such certification such that borrowers incur additional payments or are put into a status that does not qualify for PSLF.

378.     According to the CFPB report, "[b]orrowers complain that when their recertification application [for an income-driven repayment plan] is not timely processed by their servicers, rather than extending their current income-driven payments, servicers require that borrowers make their full, standard monthly payment amount, or direct them to enter [F]orbearance.  Borrowers complain that when their standard monthly payment is unaffordable, [F]orbearance is their only realistic option.  Borrowers further complain that their loans may spend months in [F]orbearance while their recertification application is under review, preventing them from progressing toward loan forgiveness available through [income-driven repayment] forgiveness options or PSLF."[147]

---

[145] U.S. GAO, Federal Student Loans, *supra* note 41, at 19.

[146] *Id*. at 20.

[147] Consumer Fin. Prot. Bureau, *Staying On Track While Giving Back*, *supra* note 40, at 13.

379. According to a September 2015 report by the CFPB, out of a 2015 sample of Direct Loan borrowers, "57 percent of borrowers did not have a timely recertification of income processed. In addition, nearly one in three borrowers in the sample did not recertify within the six months following their deadline."[148]

380. Furthermore, the CFPB found that borrowers who do not recertify receive billing statements based on the standard ten-year repayment schedule, with monthly payments that are often hundreds of dollars higher than the amount they paid under income-driven repayment.[149]

381. Borrowers whose recertification is not timely also have their unpaid interest capitalized, which can substantially increase the total cost of their loans.[150]

382. In a June 2017 report entitled "Staying on track while giving back," the CFPB provided an analysis of a sample of 8,494 federal student loan servicing complaints. Over 4,638, or 54%, of those complaints were against Navient, the highest of any of the Department of Education's servicers.[151]

383. The CFPB found that, of that sample, 13% of the student loan servicing complaints were related to income-driven repayment plan enrollment.[152]

---

[148] Consumer Fin. Prot. Bureau, Student Loan Servicing, *supra* note 51, at 32.

[149] *Id.* at 33.

[150] *Id.* at 34.
[151] Consumer Fin. Prot. Bureau, *Staying On Track While Giving Back*, *supra* note 40, at 12.

[152] The CFPB also issued a report in October 2017 that analyzed all complaints submitted to the agency by consumers between September 1, 2016 and August 31, 2017, including 12,900 federal student loan servicing complaints. 6,274 of the complaints, or 81%, were complaints about Navient. Of those complaints, 65% related to "dealing with your lender or servicer," 34% related to "struggling to repay your loan," and 1% related to "problem with credit report or credit score. Consumer Fin. Prot. Bureau, *Annual Report of the CFPB Student Loan Ombudsman: Strategies for Consumer-*

384.   In recognition of these problems, the Department of the Treasury has recommended that the Department of Education "establish and publish minimum effective servicing standards to provide servicers clear guidelines for servicing and help set expectations about how the servicing of federal loans is regulated."[153] These standards should specify "how servicers should handle decisions with significant financial implications (e.g., payment application across loans, prioritizing repayment plans, and use of Deferment and Forbearance options), minimum contact requirements, standard monthly statements, and timeframes for completing certain activities (e.g., processing forms or correcting specific account issues)."[154]

385.   Thus far, the Department of Education has not implemented such standards, and Navient continues to falsely inform borrowers they are ineligible for income-driven repayment plans and/or to steer them into plans that are ineligible for PSLF.

Additional Misrepresentations By Navient

386.   Navient also misdirects borrowers in PSLF-eligible positions by informing them Navient does not offer PSLF, without specifying that another servicer, FedLoan Servicing, administers PSLF, or falsely informs borrowers that there are no loan forgiveness programs available to them.

387.   For example, Navient told Dr. Gaede repeatedly that there was no loan forgiveness program available to him as a college professor.

388.   As another example, Ms. Spitler-Lawson was falsely informed by Navient that she could only qualify for PSLF if she had a single, full-time job, and

_Driven Reform_ 9 (Oct. 2017), https://files.consumerfinance.gov/f/documents/cfpb_annual-report_student-loan-ombudsman_2017.pdf.

[153] U.S. Dep't of the Treasury, _supra_ note 3, at 11.

[154] _Id_. at 125.

therefore her positions as an adjunct professor at two colleges would not qualify her for PSLF.

389.    But a borrower with multiple part-time positions can still qualify for PSLF so long as all of those positions are with qualifying employers and the borrower's weekly hours for those qualifying employers add up to more than 30 for at least eight months of the year.

390.    Navient has also informed borrowers seeking PSLF they may not miss any payments, leading many borrowers to believe that they could not qualify for PSLF at all.  This is also false, as the 120 qualifying payments for PSLF need not be made consecutively.  A late payment that is subsequently made, a Forbearance, or any other gap in payment is not disqualifying.

391.    For example, Ms. Means, a first-grade teacher who often pays for food and field trips for her students out of her own pocket, asked Navient about the qualifications for PSLF in 2012.  Navient falsely told Ms. Means that in order to qualify for PSLF, Ms. Means would be required to make 120 consecutive, on-time payments, with no late payments, Forbearances, or other gaps in payment.  Due to this false statement by Navient, Ms. Means did not pursue PSLF further, believing that she would be unable to make 120 payments without a single interruption. Instead, Ms. Means continued making payments under repayment plans that did not qualify for PSLF, including the Graduated Repayment Plan, losing years of payments that could have counted toward complete forgiveness of her student loans.

392.    In another example, Navient falsely informed Ms. Kaplan that she would need to make 120 consecutive, on-time loan payments in order to qualify for PSLF.  As a result, when Ms. Kaplan entered her master's degree program full-time and her loans were placed in Deferment, she believed this Deferment would prevent her previous $0 payments from qualifying for PSLF and that she would have to

restart her 120 qualifying payments. Because of this misrepresentation and Navient's incorrect statement that an income-driven repayment plan would cost more than the Standard Repayment Plan, Ms. Kaplan has unnecessarily made payments under the Standard Repayment Plan for the last two years.

393. As an additional example, Navient falsely advised Ms. Guth that qualifying payments for PSLF must be consecutive and that if she intended to enroll in school, she should not pursue PSLF. As a result, Ms. Guth entered into multiple Forbearances and now takes two community college courses per semester to ensure her loans remain in Deferment.

394. As a result of these false statements by Navient, public servants concerned about experiencing financial hardship in the future are discouraged from pursuing PSLF at all.

395. This is particularly damaging because public servants who are concerned about future financial hardship are the very people that PSLF was intended to help.

## CLASS ACTION ALLEGATIONS

396. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the following proposed Classes:

    a.    Nationwide Class: All individuals who have or had (i) FFEL or Direct student loans serviced by Navient; (ii) been employed full-time by a qualifying public service employer for purposes of PSLF; and (iii) contacted Navient regarding their eligibility for PSLF.

    b.    Nationwide Injunctive Class: All individuals who have (i) FFEL or Direct student loans serviced by Navient; (ii) been employed full-time by a qualifying public service employer for purposes of PSLF; (iii) contacted Navient regarding their eligibility for PSLF; and (iv) intend to contact Navient in the future regarding their eligibility for PSLF.

c. Maryland Sub-Class: All individuals who have (i) resided in or taken out FFEL or Direct Loans in Maryland; (ii) had FFEL or Direct student loans serviced by Navient; (iii) been employed full-time by a qualifying public service employer for purposes of PSLF; and (iv) contacted Navient regarding their eligibility for PSLF.

d. Florida Sub-Class: All individuals who have (i) resided in or taken out FFEL or Direct Loans in Florida; (ii) had FFEL or Direct student loans serviced by Navient; (iii) been employed full-time by a qualifying public service employer for purposes of PSLF; and (iv) contacted Navient regarding their eligibility for PSLF.

e. New York Sub-Class: All individuals who have (i) resided in or taken out FFEL or Direct Loans in New York; (ii) had FFEL or Direct student loans serviced by Navient; (iii) been employed full-time by a qualifying public service employer for purposes of PSLF; and (iv) contacted Navient regarding their eligibility for PSLF.

f. California Sub-Class: All individuals who have (i) resided in or taken out FFEL or Direct Loans in California; (ii) had FFEL or Direct student loans serviced by Navient; (iii) been employed full-time by a qualifying public service employer for purposes of PSLF; and (iv) contacted Navient regarding their eligibility for PSLF.

397. The Classes exclude Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors, and assigns.

398. The Classes are composed of hundreds to thousands of individuals and thus are so numerous that joinder of all members is impracticable.

399. The Classes can be readily ascertained through public documents and records maintained by Defendants.

400. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

401. Plaintiffs' claims are typical of the claims of members of the Classes. As alleged herein, Plaintiffs and members of the Classes sustained damages arising out of Defendants' common course of unlawful conduct.

402.     There are questions of law and fact common to the Classes, the answers to which will advance the resolution of the claims of all class members, including but not limited to:

a.     Whether Navient and/or its agents and employees made the misrepresentations described above;

b.     Whether the misrepresentations described above were false or misleading;

c.     Whether Navient acted as an agent for the Department of Education;

d.     Whether Navient and the Department of Education entered into the Servicing Contracts with the intent of benefiting the members of the Classes as third-party beneficiaries;

e.     Whether Navient's misrepresentations described above constituted breaches of the Servicing Contracts;

f.     Whether Navient had a duty of care due to its special position of confidence and trust with the members of the Classes;

g.     Whether Navient possessed special expertise regarding federal student loan repayment options and/or appears to possess such expertise as a result of representations made by Navient and the Department of Education;

h.     Whether Navient received an unjust benefit to the detriment of the members of the Classes through the misrepresentations described above; and

i.     Whether, by virtue of its position as a loan servicer, Navient owed a fiduciary duty to the members of the Classes.

403.     These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual class members.

404.     Plaintiffs will fairly and adequately represent and protect the interests of members of the Classes.  Plaintiffs have no claims antagonistic to those of members of the Classes.  Plaintiffs have retained counsel competent and experienced in

complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately, and vigorously protect the interests of members of the Classes.

405. Class action status is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Nationwide Injunctive Class, the Nationwide Injunctive Class has suffered or is in imminent threat of suffering irreparable injury, the remedies available at law are inadequate to compensate the Nationwide Injunctive Class for that injury, in light of the balance of hardships a remedy in equity is warranted, and the public interest is not disserved by a permanent injunction, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Classes as a whole.

406. Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

### Count I – Breach Of Contract For Violations Of The Servicing Contracts

### (On behalf of Plaintiffs, the Nationwide Class, and the Nationwide Injunctive Class)

407. Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

408. Plaintiffs bring this Count against Navient on behalf of members of the Nationwide Class and Nationwide Injunctive Class or, in the alternative, on behalf of the Maryland, Florida, New York, and California Sub-Classes.

409. Navient entered into Servicing Contracts with the Department of Education.

410. The Servicing Contracts, in addition to statements by the Department of Education and Navient as outlined above in paragraphs 283 and 297 through 317, make clear that Plaintiffs and those similarly situated were intended to be third-party beneficiaries of the Servicing Contracts and all subsequent modifications and change orders.

411. As detailed above at paragraphs 283 through 299, the Servicing Contracts obligate Navient to comply with all federal and state laws and regulations including those requiring that borrowers have access to PSLF and income-driven repayment.

412. The Servicing Contracts contain the following additional terms specifically obligating Navient to provide truthful information to borrowers about PSLF:

- "In some cases Direct Loans will need to be serviced differently than FFEL loans, a few examples of these differences are listed below (not an all inclusive list): … Public service loan forgiveness is only offered in the [Direct Loans]…." Exhibit 10, Attachment A-3, at 4.

- "The servicer shall support servicing of all Direct Loans, including Direct Consolidation Loans," which servicing includes offering PSLF to interested borrowers. *Id.*

413. The full text of the Servicing Contracts is not available without discovery, but the above-referenced portions of the Contracts, together with the Department of Education's statements, indicate that there may be further provisions in the Contracts requiring Navient to provide truthful information to borrowers about PSLF.

414. Navient materially breached the above-referenced obligations of the Servicing Contracts by giving borrowers incorrect and misleading information about PSLF and income-driven repayment plans, including: (i) falsely informing borrowers

that Navient "doesn't do" PSLF; (ii) advising borrowers to delay filing their PSLF applications and Employment Certification Forms so that they were making additional payments that may not have qualified for PSLF; (iii) steering borrowers into the Graduated Repayment Plan, the Extended Repayment Plan, Deferment, or Forbearance (which do not count as qualifying repayment plans under PSLF) instead of income-driven repayment plans that qualify for PSLF; and (iv) telling borrowers who had non-qualifying student loans or who were enrolled in non-qualifying repayment plans that they would qualify for PSLF.

415. As a result of Navient's breach of the terms of the Servicing Contracts, Plaintiffs and members of the Nationwide Class have suffered substantial damages including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

416. As a result of Navient's breaches of the terms of the Servicing Contracts, Plaintiffs and members of the Nationwide Injunctive Class have suffered and are at imminent risk of suffering irreparable harm, including but not limited to being misled by Navient about their eligibility for PSLF.

417. In the alternative, even if not a breach of the express terms of the Servicing Contracts, Navient's conduct breached the covenant of good faith and fair dealing implied in the Servicing Contracts.

## Count II – Breach Of Implied Warranty Of Authority

### (On behalf of Plaintiffs, the Nationwide Class, and the Nationwide Injunctive Class)

418. Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

419.     Plaintiffs bring this Count against Navient on behalf of members of the Nationwide Class and Nationwide Injunctive Class or, in the alternative, on behalf of the Maryland, Florida, New York, and California Sub-Classes.

420.     This claim is pleaded in the alternative to Count I if Navient establishes it did not owe Plaintiffs and others similarly situated duties under the Servicing Contracts as third-party beneficiaries.

421.     Federal law, including the College Cost of Reduction and Access Act, confers certain benefits on borrowers including, but not limited to, access to income-driven repayment plans and PSLF.

422.     As detailed more fully above in paragraphs 312 through 317, Navient repeatedly represented to borrowers that they should consult Navient for its advice and guidance, holding itself out as an advisor that borrowers could trust when evaluating their options for income-driven repayment plans and eligibility for the PSLF.   For example, Navient has indicated that its goal is to "[l]everag[e] four decades of expertise" to "help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals" by offering clients "financial literacy tools and in-depth customer service," "[e]xpert guidance while in school and beyond," and "[h]elp [that] is a phone call away."   Navient's CEO has stated that the company's "name—Navient—symbolizes the expertise, experience, and dedication we consistently deliver for our client and customers."

423.     Navient, purporting to act as an advisor and agent on behalf of the Department of Education, repeatedly gave borrowers who were relying on it inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for PSLF.

424. Given these representations, and as detailed more fully above, Plaintiffs and others similarly situated justifiably acted upon Navient's inaccurate and misleading statements by not consolidating FFEL Loans into Direct Loans, remaining in non-qualifying repayment plans, and failing to submit Employment Certification Forms.

425. As a result of Navient's conduct, Plaintiffs and members of the Nationwide Class have suffered substantial damages including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

426. As a result of Navient's conduct, Plaintiffs and members of the Nationwide Injunctive Class have suffered and are at imminent risk of suffering irreparable harm including, but not limited to, being misled by Navient about their eligibility for PSLF.

427. Plaintiffs had no reason to believe that Navient was acting outside the scope of its actual authority when it gave Plaintiffs inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for the PSLF program, and at no time did Navient inform Plaintiffs that it was doing so.

## Count III – Tortious Interference With Contract

### (On behalf of Plaintiffs, the Nationwide Class, and the Nationwide Injunctive Class)

428. Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

429. Plaintiffs and members of the Nationwide Class and the Nationwide Injunctive Class have each entered into a valid contract, namely an MPN Contract with a lender (FFEL Loans) or the Department of Education (Direct Loans).

430. As detailed above at paragraphs 222 and 229, the FFEL Loan MPN Contract and Direct Loan MPN Contract mandate that the lender or the Department of Education comply with both the Higher Education Act and the Department of Education's regulations.

431. Under the Higher Education Act and the Department of Education's regulations applicable to FFEL Loans, borrowers are entitled to access to income-sensitive repayment terms, income-based repayment plans, and an opportunity to consolidate their FFEL Loans into Direct Loans to pursue PSLF.

432. Under the Higher Education Act and the Department of Education's regulations applicable to Direct Loans, borrowers are entitled to access to income-driven repayment plans and PSLF.

433. Navient has knowledge of the aforementioned MPN Contracts and their rights and obligations.

434. Navient's conduct induces the Department of Education and others to breach the FFEL Loan MPN Contract and/or Direct Loan MPN Contract. The breach of these contracts would not have occurred but for Navient's conduct. Navient acts intentionally when it induces the Department of Education and others to breach the FFEL Loan MPN Contract and/or Direct Loan MPN Contract.

435. Specifically, Navient gave borrowers incorrect and misleading information, including: (i) informing borrowers who had non-qualifying student loans or who were enrolled in non-qualifying repayment plans that they would qualify for PSLF; (ii) preventing borrowers from consolidating their FFEL Loans into Direct Loans for the purpose of qualifying for PSLF; (iii) falsely informing borrowers that

Navient "doesn't do" PSLF; (iv) advising borrowers to delay filing their PSLF applications and Employment Certification Forms so that borrowers were making additional payments that may not have qualified for PSLF; and (v) steering borrowers into the Graduated Repayment Plan, the Extended Repayment Plan, Deferment, or Forbearance (which do not count as qualifying repayment plans under PSLF) instead of income-driven repayment plans that qualify for PSLF.

436. Navient's conduct tortiously interferes with the ability of Plaintiffs and others similarly situated to enjoy the benefits of the FFEL Loan MPN Contract and/or Direct Loan MPN Contract, specifically, to have access to and qualify for PSLF.

437. Since Navient has admitted that it was an agent of the Department of Education for the purposes of the MPN Contracts, Navient is liable under this Count for acting outside the scope of its agency by failing to comply with its obligations under the Higher Education Act and the Department of Education regulations, acting in bad faith, and committing independent torts and predatory acts as listed in this Amended Class Action Complaint for personal pecuniary gain.

438. As a result of Navient's tortious interference with the FFEL Loan MPN Contract and/or Direct Loan MPN Contract, Plaintiffs and members of the Nationwide Class have suffered substantial damages including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

439. As a result of Navient's tortious interference with the FFEL Loan MPN Contract and/or Direct Loan MPN Contract, Plaintiffs and members of the Nationwide Injunctive Class have suffered and are at imminent risk of suffering

irreparable harm, including but not limited to being misled by Navient about their eligibility for PSLF.

## Count IV – Tortious Interference With Expectancy

### (On behalf of Plaintiffs, the Nationwide Class, and the Nationwide Injunctive Class)

440.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

441.    The College Cost Reduction and Access Act[155] creates a statutory entitlement to PSLF for qualifying borrowers, guaranteeing that the balance of interest and principal due on a loan borrower's eligible Direct Loan not in default "shall" be "cancel[led]" when such borrower has made 120 monthly payments on such loan and is employed in a public service job at the time of such forgiveness and was similarly employed during the period the borrower made each of the required payments.

442.    Plaintiffs and others similarly situated have Direct Loans, or FFEL Loans that they are willing to consolidate into Direct Loans, and have been employed full-time by a qualifying public service employer and, as such, have a statutorily created expectancy that the balance of the interest and principal due on their eligible federal loans would be cancelled after 120 PSLF-qualifying payments.

443.    Navient knew of the statutorily created expectancy of Plaintiffs and others similarly situated that the balance of the interest and principal due on their eligible federal loans would be cancelled after 120 PSLF-qualifying payments.

444.    Navient intentionally interfered with that statutorily created expectancy by, as detailed above, making misrepresentations to Plaintiffs and others

---

[155] Pub. L. No. 110-84, § 401, 121 Stat. 784, 800 (2007) (codified at 20 U.S.C. § 1087e(m)).

similarly situated concerning their options for income-driven repayment plans and their eligibility for PSLF.

445. As detailed above, Navient knew or should have known that the misrepresentations Navient made to Plaintiffs and others similarly situated were false and misleading.

446. Plaintiffs and others similarly situated are reasonably certain that, absent Navient's independently tortious interference with their statutorily created expectancy, the balance of the interest and principal due on their eligible federal loans would be cancelled after 120 PSLF-qualifying payments.

447. Navient's conduct tortiously interferes with the statutorily created expectancy of Plaintiffs and others similarly situated that the balance of the interest and principal due on their eligible federal loans would be cancelled after 120 PSLF-qualifying payments.

448. As a result of Navient's tortious interference with the statutorily created expectancy of Plaintiffs and others similarly situated that the balance of the interest and principal due on their eligible federal loans would be cancelled after 120 PSLF-qualifying payments, Plaintiffs and members of the Nationwide Class have suffered substantial damages including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

449. As a result of Navient's tortious interference with the statutorily created expectancy of Plaintiffs and others similarly situated that the balance of the interest and principal due on their eligible federal loans would be cancelled after 120 PSLF-qualifying payments, Plaintiffs and members of the Nationwide Injunctive Class have

suffered and are at imminent risk of suffering irreparable harm, including but not limited to being misled by Navient about their eligibility for PSLF.

## Count V – Unjust Enrichment

### (On behalf of Plaintiffs and the Nationwide Class)

450.  Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

451.  This claim is pleaded in the alternative to each of Count I if Navient establishes Plaintiffs and others similarly situated are not intended third-party beneficiaries of the Servicing Contracts and no further remedy at law is found to exist.

452.  Plaintiffs bring this Count against Navient on behalf of members of the Nationwide Class or, in the alternative, on behalf of the Maryland, Florida, New York, and California Sub-Classes.

453.  As detailed above, borrowers have conferred a benefit upon Navient, including but not limited to Navient's loan servicing fees while borrowers are: (i) making excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) accruing unpaid interest added to the principal balance; and (iii) losing the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

454.  Navient has actual knowledge of such benefit, voluntarily accepted, and retained the benefit.

455.  Such benefit was conferred upon Navient without sufficient justification at the expense of Plaintiffs and the members of the Nationwide Class.

456.  Under the circumstances set forth above, it would be unequitable for Navient to retain the benefit of the loan servicing fees that borrowers would otherwise not have paid to Navient had Navient provided truthful and accurate information to borrowers regarding their student loans.

## Count VI – Breach Of Fiduciary Duty

### (On behalf of Plaintiffs, the Nationwide Class, and the Nationwide Injunctive Class)

457.  Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

458.  Plaintiffs bring this Count against Navient on behalf of members of the Nationwide Class and Nationwide Injunctive Class or, in the alternative, on behalf of the Maryland, Florida, New York, and California Sub-Classes.

459.  Navient has a fiduciary duty to borrowers to provide accurate information regarding their options for loan repayment, including income-driven repayment plans and the PSLF program.

460.  Navient holds itself out as an authority on student loan repayment options and encourages borrowers to contact it if they have any questions about their student loans.

461.  Navient's website is and was filled with assurances that borrowers can trust Navient's expertise in student loans, such as: "Student borrowers who reach out to their servicer when they have questions tend to be more successful in repayment. Navient is here to help," and "We help students navigate the lifecycle of their loan with expert guidance while in school and beyond."

462.  Navient assures borrowers it was "here to answer your questions, provide you with solutions, and process your payments," and previously urged borrowers, "Contact us to discuss your student loan obligations.  We can answer any questions you have about paying back your loans and the types of repayment plans available to you."

463.  Navient has made it clear to borrowers that they can trust its representatives to guide them through the PSLF and income-driven repayment application processes, stating: "Some third-party companies may claim they can

reduce or eliminate your student loan debt, but they charge fees for services that Navient and other federal loan servicers offer for free." Navient undertook the role of advising and counseling Plaintiffs about their student loan repayment options, including PSLF.

464. Navient induced Plaintiffs to depend on Navient and encouraged them to place special trust and confidence in Navient based on the representations made by Navient and the Department of Education about Navient's expertise regarding student loan repayment and PSLF.

465. Navient knew or should have known that Plaintiffs and others similarly situated placed their trust and confidence in Navient and depended on Navient to counsel and inform them about their student loan repayment options, including PSLF.

466. Navient has breached its fiduciary duty by repeatedly giving borrowers inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for the PSLF Program.

467. That breach has led to damages to Plaintiffs and members of the Nationwide Class including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

468. As a result of Navient's breaches of its fiduciary duty, Plaintiffs and members of the Nationwide Injunctive Class have suffered and are at imminent risk of suffering irreparable harm, including but not limited to being misled by Navient about their eligibility for PSLF.

## Count VII – Negligence

## (On behalf of Plaintiffs, the Nationwide Class, and the Nationwide Injunctive Class)

469.  Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

470.  Plaintiffs bring this Count against Navient on behalf of members of the Nationwide Class or, in the alternative, on behalf of the Maryland, Florida, New York, and California Sub-Classes.

471.  Navient, as a federal student loan servicer, has a duty of care due to its special position of confidence and trust with borrowers, who are told by Navient and by the Department of Education, as outlined above, that they should reach out to Navient if they require information about their eligibility for PSLF.

472.  Navient has breached that duty by compensating their employees for minimizing the amount of time they spend discussing borrowers' repayment options and incentivizing them to steer borrowers into the Extended Repayment Plan, the Graduated Repayment Plan, Deferment, or Forbearance, rather than income-driven repayment plans that qualify under PSLF.

473.  That breach has actually and proximately caused damages to Plaintiffs and members of the Nationwide Class including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

474.  As a result of Navient's negligence, Plaintiffs and members of the Nationwide Injunctive Class have suffered and are at imminent risk of suffering irreparable harm, including but not limited to being misled by Navient about their eligibility for PSLF.

117

## Count VIII – Negligent Misrepresentation

## (On behalf of Plaintiffs Means, Kaplan, and Guth and the Maryland Sub-Class)

475. Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

476. Plaintiffs bring this Count against Navient on behalf of members of the Maryland Sub-Class.

477. Navient, as a federal student loan servicer, has a duty of care due to its special position of confidence and trust with borrowers, who are told by Navient and by the Department of Education, as outlined above, that they should reach out to Navient if they require information about their student loan repayment options.

478. As detailed above, Navient, knowing and intending that Plaintiffs would act upon its advice, repeatedly gave Plaintiffs inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for PSLF.

479. As detailed above, Navient knew or should have known that this information was inaccurate and misleading.

480. As detailed above, Plaintiffs and others similarly situated justifiably acted in reliance upon Navient's inaccurate and misleading statements by not consolidating FFEL Loans into Direct Loans, remaining in non-qualifying repayment plans, and failing to submit Employment Certification Forms.

481. Navient's conduct has led to damages to members of the Maryland Sub-Class including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

## Count IX – Negligent Misrepresentation

## (On behalf of Plaintiffs Nocerino and Church and the Florida Sub-Class)

482.  Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

483.  Plaintiffs bring this Count against Navient on behalf of members of the Florida Sub-Class.

484.  Navient, as a federal student loan servicer, has a duty of care due to its special position of confidence and trust with borrowers, who are told by Navient and by the Department of Education, as outlined above, that they should reach out to Navient if they require information about their student loan repayment options.

485.  As detailed above, Navient made misrepresentations of material fact that were false, namely repeatedly giving Plaintiffs inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for PSLF.

486.  Navient knew and intended that Plaintiffs would rely upon its advice with respect to options for income-driven repayment plans and eligibility for PSLF.

487.  As detailed above, Navient was negligent because it knew or should have known that the advice it gave with respect to options for income-driven repayment plans and eligibility for PSLF was inaccurate or misleading.

488.  As detailed above, Plaintiffs and others similarly situated justifiably acted in reliance upon Navient's inaccurate and misleading statement by not consolidating FFEL Loans into Direct Loans, remaining in non-qualifying repayment plans, and failing to submit Employment Certification Forms.

489.  Navient's misrepresentations have led to damages to members of the Florida Sub-Class including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the

principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

## Count X – Negligent Misrepresentation

### (On behalf of Plaintiffs Hyland, Garcia, Gaede, and Taylor and the New York Sub-Class)

490.   Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

491.   Plaintiffs bring this Count against Navient on behalf of the New York Sub-Class.

492.   As detailed above, Navient possesses special expertise regarding federal student loan repayment options and/or appears to possess such expertise as a result of representations made by Navient and the Department of Education.

493.   As detailed above, Navient is in a special position of confidence and trust with student loan borrowers, who are told by Navient and by the Department of Education, as outlined above, that they can rely on Navient for information about their student loan repayment options, giving rise to a duty of care with respect to those borrowers.

494.   As detailed above, Navient, knowing and intending that Plaintiffs would act upon its advice, repeatedly gave Plaintiffs inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for PSLF.

495.   As detailed above, Plaintiffs and others similarly situated justifiably acted in reliance upon Navient's inaccurate and misleading statement by not consolidating FFEL Loans into Direct Loans, remaining in non-qualifying repayment plans, and failing to submit Employment Certification Forms.

496.   Navient's conduct has led to damages to members of the New York Sub-Class including, but not limited to: (i) excess payments under repayment plans or for

loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

## Count XI – Negligent Misrepresentation

### (On behalf of Plaintiffs Saint-Paul and Spitler-Lawson and the California Sub-Class)

497.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

498.    Plaintiffs bring this Count against Navient on behalf of the California Sub-Class.

499.    Navient, as a federal student loan servicer, has a duty of care due to its special position of confidence and trust with student loan borrowers, who are told by Navient and by the Department of Education, as outlined above, that they should reach out to Navient if they require information about their student loan repayment options.

500.    As detailed above, Navient, knowing and intending that Plaintiffs would act upon its advice, repeatedly gave Plaintiffs inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for the PSLF program.

501.    As detailed above, Navient had no reasonable ground for believing this information to be true.

502.    As detailed above, Plaintiffs and others similarly situated justifiably acted in reliance upon Navient's inaccurate and misleading statement by not consolidating FFEL Loans into Direct Loans, remaining in non-qualifying repayment plans, and failing to submit Employment Certification Forms.

503. Navient's conduct has led to damages to members of the California Sub-Class including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

## Count XII – Violations Of The Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-301 et seq.

### (On behalf of Plaintiffs Means, Kaplan, and Guth and the Maryland Sub-Class)

504. Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

505. Plaintiffs bring this Count against Navient on behalf of members of the Maryland Sub-Class.

506. Md. Code Ann., Com. Law § 13-303: prohibits "unfair or deceptive trade practice." Under Md. Code Ann., Com. Law § 13-301, "unfair or deceptive trade practice" includes: (i) "failure to state a material fact if the failure deceives or tends to deceive," and (ii) "false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers."

507. As detailed above, Navient engaged in "unfair or deceptive trade practice" in Maryland and elsewhere by repeatedly giving Maryland borrowers inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for PSLF.

508. Navient's conduct has led to damages to members of the Maryland Sub-Class including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance;

and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

509.    As a result of Navient's violations of Md. Code Ann., Com. Law § 13-301 et seq., Plaintiffs Means, Kaplan, Guth, and members of the Maryland Sub-Class have suffered and are at imminent risk of suffering irreparable harm, including but not limited to being misled by Navient about their eligibility for PSLF.

## Count XIII – Violations Of The Florida Deceptive And Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq.

**(On behalf of Plaintiffs Nocerino and Church and the Florida Sub-Class)**

510.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

511.    Plaintiffs bring this Count against Navient on behalf of members of the Florida Sub-Class.

512.    Fl. Code Ann. § 501.204 prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

513.    As detailed above, Navient engaged in "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices" in the State of Florida and elsewhere by repeatedly giving Florida borrowers inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for PSLF.

514.    Navient's unfair and deceptive practices occurred in the conduct of "trade or commerce" far beyond simply collecting payments. Navient's Servicing Contracts and its own statements indicate that Navient was responsible for providing "services" for the benefit of borrowers and managing "all types of" student loan obligations.

515.   More specifically, Navient was responsible for providing borrowers accurate information about the repayment and forgiveness options available under federal law, advising and communicating the best options given each borrower's specific financial circumstances, helping borrowers stay up-to-date on payments, and providing the highest quality support to borrowers.  These services, often involving frequent communication between Navient and each borrower to assist and advise each borrower, extended far beyond mere collection of loans.  Instead of properly providing these services, Navient engaged in "unfair or deceptive acts or practices" by repeatedly misrepresenting information to borrowers.

516.   Navient's conduct has led to damages to members of the Florida Sub-Class including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

517.   As a result of Navient's violations of Fl. Code Ann. § 501.204 et seq., Plaintiff Nocerino and members of the Florida Sub-Class have suffered and are at imminent risk of suffering irreparable harm, including but not limited to being misled by Navient about their eligibility for PSLF.

## Count XIV – Violations Of The New York Consumer Protection From Deceptive Acts And Practices Law, New York General Business Law § 349 et seq.

### (On behalf of Plaintiffs Hyland, Garcia, Gaede, and Taylor and the New York Sub-Class)

518.   Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

519.   Plaintiffs bring this Count against Navient on behalf of members of the New York Sub-Class.

520. New York General Business Law § 349 et seq. prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."

521. As detailed above, Navient engaged in "deceptive acts or practices" in the State of New York and elsewhere by repeatedly giving New York borrowers inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for PSLF.

522. As a servicer of federal student loans, Navient is engaged in consumer-oriented conduct. Because the New York Sub-Class is comprised of thousands of individuals whose student loans were serviced by Navient, Navient engaged in a pattern of deceptive conduct that affected not only Plaintiffs but consumers at large.

523. Navient's conduct has led to damages to members of the New York Sub-Class including, but not limited to: (i) excess payments under repayment plans or for loans that did not qualify for PSLF; (ii) unpaid interest added to the principal balance; and (iii) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

524. As a result of Navient's violations of New York General Business Law § 349 et seq., Plaintiffs Hyland, Garcia, and Gaede and the New York Sub-Class have suffered and are at imminent risk of suffering irreparable harm, including but not limited to being misled by Navient about their eligibility for PSLF.

## Count XV – Violations Of The California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq.

### (On behalf of Plaintiffs Saint-Paul and Spitler-Lawson, and the California Sub-Class)

525. Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 to 395 as if fully set forth herein.

526. Plaintiffs bring this Count against Navient on behalf of members of the California Sub-Class.

527. California Civil Code § 1750 prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer" including (i) "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have," and (ii) "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law."

528. As detailed above, Navient engaged in "unfair or deceptive acts or practices" in California and elsewhere by repeatedly giving California borrowers inaccurate and misleading information about their options for income-driven repayment plans and their eligibility for PSLF.

529. Navient's unfair and deceptive acts or practices occurred while providing "goods or services" beyond simply collecting payments. The Servicing Contracts and Navient's own statements indicate that Navient was responsible for providing "services" for the benefit of borrowers and managing "all types of" student loan obligations.

530. More specifically, Navient was responsible for providing borrowers accurate information about the repayment and forgiveness options available under federal law, advising and communicating the best options given each borrower's specific financial circumstances, helping borrowers stay up-to-date on payments, and providing the highest quality support to borrowers. These services, often involving frequent communication between Navient and each borrower to assist and advise each borrower, extended far beyond mere collection of loans. Instead of properly

126

providing these services, Navient engaged in "unfair or deceptive acts or practices" by repeatedly misrepresenting information to borrowers.

531. In accordance with California Civil Code § 1782, on October 3, 2018, Plaintiffs Saint-Paul and Spitler-Lawson notified Navient via certified mail, return receipt requested, of these alleged violations of the California Consumers Legal Remedies Act and demanded that Navient correct, repair, replace or otherwise rectify such violative conduct. Navient has not corrected, repaired, replaced, or otherwise rectified its conduct, nor has Navient responded to these demands.

532. Navient's conduct has led to damages to members of the California Sub-Class including, but not limited to: (i) financial harm associated with delayed qualification for PSLF; (ii) unpaid interest added to the principal balance as a result of Forbearances; (iii) excess payments under repayment plans that did not qualify for PSLF; and (iv) the loss of the benefit of PSLF by individuals who would have otherwise qualified for PSLF but for Navient's misconduct.

533. As a result of Navient's violations of California Civil Code § 1750, Plaintiffs Saint-Paul and Spitler-Lawson and the California Sub-Class have suffered and are at imminent risk of suffering irreparable harm, including but not limited to being misled by Navient about their eligibility for PSLF.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

*First*, certifying this action as a class action pursuant to Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

*Second*, declaring, adjudging, and decreeing the conduct alleged herein as unlawful including, but not limited to, Navient's improper incentivizing of Navient's employees to steer Plaintiffs and members of the Classes into Extended Repayment

Plans, Graduated Repayment Plans, Deferments, or Forbearances, rather than in-come-driven repayment plans that qualify under PSLF;

*Third*, enjoining Navient from continuing improperly to incentivize Navient's employees to steer Plaintiffs and members of the Classes into the Extended Repayment Plans, Graduated Repayment Plans, Deferments, or Forbearances, rather than income-driven repayment plans that qualify under PSLF;

*Fourth*, declaring, adjudging, and decreeing the conduct alleged herein as unlawful including, but not limited to, Navient's misrepresentation to Plaintiffs and members of the Classes that they are not eligible for PSLF, providing incorrect information to Plaintiffs and members of the Classes regarding PSLF, and affirmatively restricting Plaintiffs and members of the Classes ability to enroll in PSLF;

*Fifth*, enjoining Navient from continuing to misrepresent to Plaintiffs and members of the Classes that they are not eligible for PSLF, providing incorrect information to Plaintiffs and members of the Classes regarding PSLF, and affirmatively restricting Plaintiffs and members of the Classes' ability to enroll in PSLF; and to require Navient to change its incentive compensation programs so that Navient employees are not paid based on how quickly they can end a conversation with a borrower;

*Sixth*, awarding compensatory and punitive damages along with pre- and post-judgment interest;

*Seventh*, granting Plaintiffs the costs of suit, including reasonable attorneys' fees and expenses; and

*Eighth*, affording Plaintiffs and members of the Classes with such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all issues so triable as a matter of right.

Dated:  January 16, 2019
       New York, NY

Respectfully submitted,

SELENDY & GAY PLLC

By: */s/ Faith Gay*

Mark Richard
PHILLIPS, RICHARD & RIND, P.A.
9360 SW 72 Street, Suite 283
Miami, FL 33173
Telephone: 305-412-8322
E-mail: mrichard@phillipsrichard.com
(*pro hac vice*)

Faith Gay
Maria Ginzburg
Yelena Konanova
Margaret England
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000
E-mail: fgay@selendygay.com
      mginzburg@selendygay.com
      lkonanova@selendygay.com
      mengland@selendygay.com

*Attorneys for Plaintiffs*