# Exhibit 5

IC77HYLC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   KATHRYN HYLAND, et al.,

4                  Plaintiffs,

5            v.                              18 Civ. 9031 (DLC)

6   NAVIENT CORPORATION and
    NAVIENT SOLUTIONS, LLC,
7
                   Defendants.
8
    ------------------------------x
9                                            New York, N.Y.
                                             December 7, 2018
10                                           12:20 p.m.

11  Before:

12                        HON. DENISE L. COTE

13                                           District Judge

14                          APPEARANCES

15  SELENDY & GAY PLLC
         Attorneys for Plaintiffs
16  BY:  FAITH GAY
         YELENA KONANOVA
17       MARGARET ENGLAND

18  COVINGTON & BURLING LLP
         Attorneys for Defendants
19  BY:  ASHLEY SIMONSEN
         ANDREW RUFFINO
20       ALEX SETZEPFANDT

21

22

23

24

25

1              (Case called)

2              (In open court)

3              MS. GAY:  Good morning, your Honor.  Faith Gay for

4    Selendy & Gay.  I would like to introduce my colleagues Yelena

5    Konanova and Margaret England.

6              MS. SIMONSEN:  Good afternoon, your Honor.  Ashley

7    Simonsen, Covington & Burling, for the defendants, and my

8    colleagues Andrew Ruffino and Alex Setzepfandt.

9              THE COURT:  Welcome everyone.  I have a motion to

10   dismiss I believe recently filed, and I think a schedule for an

11   amended pleading potentially on January 16.  Do I understand

12   that correctly, Ms. Gay?

13             MS. GAY:  That's correct, your Honor.

14             THE COURT:  OK.  And it's unlikely that you will be

15   able to amend again after January 16 in response to any

16   arguments made in the November 30th motion to dismiss.

17             MS. GAY:  Your Honor, we're fully aware of that and

18   prepared to proceed with that ground rule in mind.

19             THE COURT:  Thank you very much.

20             And I have a 26(f) status report, which I looked at in

21   preparation for today's conference, but why don't we just begin

22   with a description of what this case is about.

23             Ms. Gay?

24             MS. GAY:  Thank you, your Honor.  And I'm going to

25   defer on the 26(f) discussions to my colleague Ms. Konanova.

IC77HYLC

1    The case, your Honor, is generally a case on behalf of public

2    servants -- firemen, public defenders, police officers -- who

3    have the ability under a law passed by Congress in 2007 to get

4    loan forgiveness.  Congress recognized that it wanted to

5    encourage two things:  One, for folks to take up public service

6    careers; and, two, recognizing that those folks should be as

7    educated as possible, a public service loan forgiveness program

8    that it envisioned as a mandatory program -- if people wanted

9    to take advantage of it -- after they made 120 qualifying

10   payments.

11            Under the program, this is how it works:  Students

12   take out a direct loan from the Department of Education.  The

13   Education Department hands off the loan servicing very

14   explicitly to a loan servicer, here Navient.  The Education

15   Department directs the borrowers to speak with Navient or

16   whoever the public loan servicer is about repayment plans or

17   any difficulties they might have.  Navient specifically holds

18   itself out to be able to guide borrowers in dealing with their

19   options for loan repayment, etc.  We've cited examples in the

20   complaint, and we can talk more about that if your Honor is

21   interested.

22            Navient promises -- promises -- and is required to

23   inform borrowers about their available options for repayment.

24   On the other hand we allege in our complaint -- and this will

25   remain true in our amended complaint -- that Navient's

1    financial incentives are totally misaligned here.  Once they

2    hand over -- if someone qualifies for the public service loan

3    forgiveness program, they go to a different servicer and

4    Navient is not paid for that service.

5            We also allege that their incentives are misaligned

6    because it takes more time, your Honor, to process these loans.

7    When people call with questions about what they can do about

8    loan forgiveness, it's much easier just to direct them to

9    forbearance or other easy-to-sign-up solutions rather than

10   helping them undergo the paperwork to qualify for the 120

11   payments and then give them at the end of ten years,

12   essentially automatic loan forgiveness if they are public

13   service workers.

14           THE COURT:  When the loan is forgiven, you don't get

15   your money back.  Or I'm asking, do you get your money back?

16   Or is it just you need make in order further payments?

17           MS. GAY:  You need make in order further payments.

18   You don't get your money back.  It is a pure paperwork loan

19   forgiven.

20           And with regard to that -- and of course there may be

21   other reasons that show up in discovery, but that is our

22   allegation, that they have a financial incentive to deny people

23   information, and they have a pattern of affirmatively giving

24   them bad information about public service loan forgiveness.

25           Your Honor, I think it's very clear to us already at

1     this early stage -- without discovery -- of the harm that has

2     been occasioned by this.  The program was passed in 2007, so

3     just now in 2017 people are actually eligible to have -- the

4     ten years have passed, and if they had qualifying payments from

5     the start, they should have their loans forgiven.  Only 98

6     people of 28,000 who applied for public service loan

7     forgiveness -- all of these teachers, policemen, public aid

8     lawyers, I guess 96 -- not even 98 -- out of 28,000 have been

9     able to take advantage of this program that Congress wrote in

10    mandatory language.  And the vast majority of that group, more

11    than 70 percent, is because they did not make the qualifying

12    payments, they did not follow the appropriate procedures.

13          And the crux of our complaint is that Navient has

14    given these people when they call -- and Navient is the

15    servicer designated by the Department of Education -- they have

16    given them false information about qualifying and going through

17    the appropriate paperwork steps to qualify for public service

18    loan forgiveness.

19          So, our action is on behalf --

20          THE COURT:  Could you give me just one example of why

21    someone doesn't qualify who with the right information would.

22          MS. GAY:  So essentially they do two types of things,

23    your Honor, which we allege.  They either enter into

24    forbearance, where they don't pay at all, instead of making the

25    qualifying payments, so Navient directs them into a forbearance

1    period; or they direct them not to submit the appropriate forms

2    as required in order to make their payments qualifying.  Those

3    are two basic categories -- two basic types of examples.  And

4    we think it's done in a consistent pattern with consistent call

5    scripts.

6             THE COURT:  Now, the program, the loan forgiveness

7    program, does it require you to make the 120 qualifying

8    payments without any breaks for forbearance?

9             MS. GAY:  No, your Honor, they just have to be 120

10   qualifying payments.

11            THE COURT:  And forbearance being a period of time

12   when you don't have to make any payments or make smaller

13   payments?

14            MS. GAY:  Correct.

15            THE COURT:  So, if you were part of a forbearance

16   program -- rightly or wrongly -- you could catch up with your

17   120 qualifying payments eventually and qualify for loan

18   forgiveness?

19            MS. GAY:  Eventually, but while you're also racking up

20   additional interest payments, etc. over time, and driving

21   yourself further into what turns out to be a lifetime cycle of

22   debt.

23            THE COURT:  But if correctly informed, someone may

24   choose that option if they were accurately informed of the

25   options.

IC77HYLC

1          MS. GAY:  Correct.  Correct.

2          THE COURT:  OK.

3          MS. GAY:  So, your Honor, in terms of the classes we

4    are proposing as of the current complaint, it's a nationwide

5    class of borrowers who both contacted Navient and would have

6    monetary damages -- either have done it or will do it -- we're

7    also seeking a nationwide injunctive relief for a class so

8    these practices stop.  And we also have four state subclasses

9    that are based on violations of state consumer protection

10   loans, and those are New York, Maryland, Florida and California

11   at this point in time, your Honor.  And the claims are laid out

12   in the complaint.  I won't go through those for you unless

13   you'd like me to.  Thank you.

14         THE COURT:  Ms. Gay, I didn't want to cut you off.  So

15   is there other litigation like this?

16         MS. GAY:  There is other litigation like this, your

17   Honor, but not directly like this.  This is one of two that

18   deals with this particular program for public service

19   employees, and with regard to that, that case is in a much

20   different posture.  I will defer to Ms. Konanova on that.

21         But there are a number of cases out there both by

22   private individuals and by various AG's offices not in New

23   York, but there are three or four AG actions all concerns

24   student loan servicing, but this one in particular is about the

25   public service program that I just outlined from Congress in

1    2007, and we are the only one of the two that are seeking a

2    nationwide injunctive relief class as well.

3            THE COURT:  OK.  So, Ms. Konanova, tell me about the

4    other action.

5            MS. KONANOVA:  The Daniel action focuses not just,

6    like Ms. Gay said, on a smaller set of plaintiffs, but it

7    requires individuals to be in repayment, so it's a smaller set

8    of individuals that they're trying to protect.

9            THE COURT:  Where is it filed?

10           MS. KONANOVA:  The Middle District of Florida.

11           THE COURT:  And when was it filed?

12           MS. KONANOVA:  Last year.  And after a very limited

13   discovery -- discovery is soon to close in that action -- a

14   number of motions to compel and a motion for sanctions for

15   noncompliance with discovery orders are also pending in that

16   action.

17           THE COURT:  OK.  So this Middle District of Florida

18   action, the Daniel action, brings what kind of claim now?

19           MS. KONANOVA:  Similar claims for violation of the

20   consumer protection laws of the four states.  It's a different

21   subset of states.

22           THE COURT:  Which states?

23           MS. KONANOVA:  Colorado, D.C., Illinois and Florida.

24           THE COURT:  So there is one overlap of Florida again.

25           MS. KONANOVA:  One overlap of Florida.  And it seeks

IC77HYLC

1    relief under consumer protection laws as well as a breach of

2    implied contract theory.

3              THE COURT:  OK.  And you said the theory is slightly

4    different than the theory being pursued here?  Narrower

5    perhaps, I think you said?

6              MS. KONANOVA:  It's narrower both in terms of the

7    class of plaintiffs because it has more restrictions on what it

8    would take to be a member of that purported class.  You have to

9    actually be in repayment.  Whereas we allege individuals who

10   have been steered into forbearance and are currently in

11   forbearance have also been damaged by Navient's

12   misrepresentations.  We also have a broader set of claims that

13   we are alleging, including our tortious interference with

14   statutorily created expectancy claim.  That is a claim that is

15   not made in any of the other actions, including Daniel.

16             THE COURT:  Thank you very much.

17             So, is it Ms. Simonsen?

18             MS. SIMONSEN:  Yes, your Honor.

19             So, a bit about the case from Navient's perspective.

20   This lawsuit at its heart is about alleged misrepresentations

21   by Navient customer service representatives relating to federal

22   student loans serviced by Navient pursuant to federal servicing

23   contracts with the Department of Education about a federally

24   offered program, the Public Service Loan Forgiveness Program.

25             There are two kinds of main points I would highlight

IC77HYLC

1      at the outset of this case, and one goes to the points about

2      the alleged misrepresentations, and that's that although this

3      case has been filed as a putative nationwide class action, at

4      its core all of the plaintiffs' allegations come down to

5      individualized allegations of alleged misrepresentations that

6      go to individual conversations between borrowers and Navient

7      customer service representatives.

8             Resolving each of those claims is going to require

9      highly individualized inquiries into what was said in those

10     conversations, borrower's actual eligibility for public service

11     loan forgiveness, depending on what kind of employers they were

12     working for.  You know, there are allegations in the complaint

13     that Navient drove students into forbearance.  Well, as your

14     Honor points out, for some students forbearance may have been

15     the best option available to them at a particular time in their

16     repayment plan if they couldn't afford to make payments at that

17     time.

18            There will also be individualized questions about

19     whether a particular borrower qualified for an income driven

20     repayment plan, which is also one of the allegations of the

21     complaint, that Navient didn't provide the borrowers with all

22     of their options for income driven repayment plans.

23            So, this is all by way of illustrating, your Honor,

24     that although we're not yet at the stage of class

25     certification, we do believe it's going to be an enormous

1    hurdle for plaintiffs to certify a class in this case.

2              THE COURT:  So, did Navient have a centralized sales

3    office?

4              MS. SIMONSEN:  Navient has a customer service -- has

5    customer service call centers that respond to calls from

6    borrowers.

7              THE COURT:  Was there more than one call service

8    center?

9              MS. SIMONSEN:  I believe there are more than one call

10   service centers, yes.

11             THE COURT:  Do you know how many?

12             MS. SIMONSEN:  I think there are probably about five.

13   Maybe around five.  I don't know for sure.

14             THE COURT:  And roughly how many employees at those

15   five centers?

16             MS. SIMONSEN:  I do not know the answer to that

17   question.

18             THE COURT:  I'm sure that changed over time.

19             MS. SIMONSEN:  Yes.

20             THE COURT:  So, did those employees work from a

21   script?

22             MS. SIMONSEN:  As I understand it, they did not.  The

23   Department of Education instructs Navient in its servicing

24   contracts with Navient -- and also in connection with change

25   orders that are issued subsequent to the servicing contracts

1          having been entered -- about how to communicate with borrowers

2          as it relates to public service loan forgiveness, and those

3          instructions have changed over time, but in general the

4          instruction is to refer the borrower to a different loan

5          servicer -- and that different loan servicer is FedLoan

6          Servicing -- or to the federal student aid website which

7          provides information about the Public Service Loan Forgiveness

8          Program.  As we understand it, you know, at this point in time

9          there were not call center scripts that customer service

10         representatives were following.

11                    THE COURT:  So, what kind of questions would be

12         answered then in a call to a call service center -- your

13         client's center?

14                    MS. SIMONSEN:  Well, it could have something to do

15         with any aspect of their student loan.  And these could be

16         federal student loans, they could be private student loans.

17         They could be questions about -- you know, the allegations in

18         this complaint is that they were questions about loan

19         forgiveness programs, but they could also be questions about:

20         I'm having trouble repaying my loan; what are my options?  Do I

21         qualify for an income driven repayment plan?  That sort of

22         thing.  So, it covers a range of topics, and our understanding

23         is that a very small percentage of those conversations actually

24         involve public service loan forgiveness, because this isn't a

25         topic that Navient is going out and raising with borrowers

1    during phone calls.  These subjects would come up if borrowers

2    are asking the questions on a call.

3              So, the second point I wanted to highlight relates to

4    our primary argument in the motion to dismiss that we filed,

5    which is, that all the plaintiffs' claims -- because they are

6    claims about alleged misrepresentations -- are preempted under

7    the Higher Education Act.  And the Higher Education Act

8    expressly preempts any state law that purports to regulate

9    disclosure requirements.

10             THE COURT:  And is there court authority regarding

11   this preemption argument?  Have decisions come down responding

12   to this argument?

13             MS. SIMONSEN:  Yes, they have.  The Ninth Circuit

14   issued a decision in Chae case, in which Navient -- then Sallie

15   Mae -- was also the defendant, holding that alleged

16   misrepresentations under state law are in essence the converse

17   of a disclosure requirement and, therefore, alleged

18   misrepresentations are -- claims based on alleged

19   misrepresentations are expressly preempted by the Higher

20   Education Act.

21             There have also been a number of lower court decisions

22   cited in our motion to dismiss which have held that alleged

23   misrepresentations very similar to those alleged here are

24   expressly preempted, and that includes alleged

25   misrepresentations very, very similar to this case about a

1    borrower's eligibility for the Public Service Loan Forgiveness

2    Program.  These other cases also involve alleged

3    misrepresentations, as alleged here, about the availability of

4    income-driven repayment plans, also about allegedly steering

5    borrowers into forbearances.

6         THE COURT:  Why didn't the Daniel court agree with the

7    preemption argument?

8         MS. SIMONSEN:  The Daniel court, as I read the

9    decision, determined that because the plaintiff's claims in

10   that case were misrepresentation claims and not claims based on

11   omissions, the court believed that they were not subject to the

12   express preemption provision.  But that holding is a misreading

13   not only of the Ninth Circuit's decision in Chae -- which makes

14   clear that a misrepresentation claim is simply the converse of

15   a disclosure requirement -- it's also in conflict with recent

16   guidance that was issued by the Department of Education this

17   past spring, interpreting, offering its view on preemption in

18   this context, and in that interpretation Ed made clear,

19   specifically endorsed the Chae court's reasoning about how

20   preemption would apply not only to alleged omissions but also

21   to misrepresentation.

22        The Daniel court also does not appear to have

23   considered the Ed's -- Department of Education's -- recent

24   guidance.  I believe it was brought to the court's attention in

25   supplemental briefing on the motion to dismiss, but it hadn't

IC77HYLC

1    yet been issued at the time that the motion was briefed.  That

2    may have been why the court did not consider it, but that may

3    have had an impact on the court's decision.

4            THE COURT:  Thank you.  What else do you wish to share

5    with me, Ms. Simonsen?  Anything else?

6            MS. SIMONSEN:  Your Honor, I would be happy to walk

7    through the claims and go through some the other reasons why

8    they failed, but the primary argument here is that these claims

9    are preempted under federal law.

10           THE COURT:  All right.  Thanks.

11           MS. KONANOVA:  Your Honor, may I have a few moments to

12   respond?

13           THE COURT:  Ms. Konanova, yes, just briefly if there

14   is anything you want to say.

15           MS. KONANOVA:  Very briefly, to correct a point about

16   the call scripts.  The audit report done by the Department of

17   Education of Navient in May of 2017, that became public just

18   recently, incorporates a response from Navient to the audit,

19   and it actually references -- and I'm quoting -- "extensive

20   training programs and call flow procedures to guide

21   representative discussions with borrowers".  So, based on

22   that, our position is there are -- they don't call them

23   scripts, they call them call flow procedures that guide call

24   center interactions with borrowers.

25           THE COURT:  Thank you very much.

1      MS. KONANOVA:  And just on a preemption point, we

2  disagree with the reading of Chae.  A number of courts have

3  held that it only includes disclosure requirements because the

4  state law at issue in Chae was attempting to set forth

5  different requirements for how the student loan servicer had to

6  disclose interest rate calculations.  And so it's just a very

7  different allegation than the allegation that we're making,

8  that the Daniel case is making, which is that Navient was

9  making affirmative misrepresentations misleading borrowers.

10      A number of courts actually rejected the

11  persuasiveness of the Department of Education's March 2018

12  interpretive guidance because it was poorly reasoned, because

13  it misread Chae.  That point was made very clearly at the

14  Nelson Seventh Circuit oral argument on this issue just in late

15  October.  So, we don't believe that interpretive guidance has

16  any persuasive value.

17      THE COURT:  Thank you.  Thank you.

18      So, I think we don't need to spend a lot of time

19  talking about what schedule we may follow here.  I think

20  everyone needs a ruling on the motion to dismiss, and I will

21  give you that ruling as soon as I can after the briefing is

22  fully submitted.  Then I think we will have another conference

23  if the motion to dismiss is denied.  I understand that in order

24  one wants to engage in mediation before I decide that motion,

25  so I don't need to explore that with you either.

IC77HYLC

1          OK.  Anything else we need to do, Ms. Gay?

2          MS. GAY:  No, your Honor.  If we're going to proceed

3    in that manner, we can hold everything else until we see you

4    again.

5          THE COURT:  Good.  Thanks.

6          Ms. Simonsen, anything else?

7          MS. SIMONSEN:  Nothing further from us, your Honor.

8          THE COURT:  Thank you all.

9                                    - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25