JAHHHYLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

KATHYRN HYLAND, et al.,

                Plaintiffs,

        v.                              18 Civ. 9031 (DLC)

NAVIENT CORPORATION, et al.,

                                        Telephone Conference

                Defendants.

------------------------------x

                                        New York, N.Y.
                                        October 17, 2019
                                        11:00 a.m.

Before:

                    HON. DENISE COTE,

                                               District Judge

                        APPEARANCES

SELENDY & GAY PLLC
     Attorneys for Plaintiffs
BY:  FAITH E. GAY
     YELENA KONANOVA

COVINGTON & BURLING LLP
     Attorneys for Defendants
BY:  ASHLEY MARGARET SIMONSEN
     ANDREW A. RUFFINO
     ALEX SETZEPFANDT

JAHHHYLC

(In chambers)

THE COURT:  Good morning, counsel.  I have you on the speakerphone because the court reporter and my law clerk are with me.

Counsel for the plaintiffs, please place your appearance on the record.

MS. GAY:  Yes.  Good morning, your Honor.  It's Faith Gay and Yelena Konanova, for the plaintiffs.  Ms. Konanova will handle the arguments.

THE COURT:  Thank you.

And for the defendants.

MS. SIMONSEN:  Good morning, your Honor.  Ashley Simonsen along with Andrew Ruffino and Alex Setzepfandt.

THE COURT:  Thank you.

Let me ask a couple of preliminary questions.  Ms. Konanova, how many named plaintiffs remain in this case for New York?

MS. KONANOVA:  Three, your Honor.

THE COURT:  We have a schedule in this case with class certification motion being due, I believe, December 20, fact discovery closing March 6, any summary judgment motion to be filed April 17.  The motion to dismiss opinion was delivered on July 8.  I had a conference at the end of last year and another conference on July 26 of this year, so I have some familiarity with the issues arising in this litigation.  This call is being

JAHHHYLC

held to address two letters received from counsel.  The October 11th was received from plaintiffs' counsel raising three discovery requests, and I have a responsive letter of October 16 from defense counsel.

So let's take these issues one by one.  The first issue has to do with a request from the plaintiffs to get the deposition transcripts that were created from litigation that occurred in the Middle District of Pennsylvania, or really still is ongoing there, in an action filed by a federal agency, the CFPB, I believe.

To give some background here, I have required all of the discovery from the *Daniel* litigation, which is ongoing in Florida, to be produced to the plaintiffs, including the deposition transcripts from the depositions taken in that Florida litigation.  At our December 7 conference at pages 7 and 8, the counsel for the plaintiffs identified the *Daniel* litigation as the only other litigation that is "like this," that is, the one proceeding before me.

Let me turn to you, Ms. Konanova.  You've received the defendants' letter.  Is there something else you want to say?

MS. KONANOVA:  Thank you very much, your Honor.

The only thing I would add to your Honor's summary of the deadlines in this case is that December 20 is our deadline for class certification briefing as well as expert reports.  So we intend to put both a brief and the expert reports in on that

JAHHHYLC

date.

*To take your Honor's question as to the similarity of this action, Daniel*, and the *CFPB*, Navient had conceded in their letter of last night that, in fact, *CFPB* overlaps with our action as well as *Daniel*.  The reason why we had previously mentioned *Daniel* as being like this one is because it was a class action focused on PSLF issues, but the core similarities between *CFPB*, *Daniel*, and us, as is conceded by Navient, is that the CFPB also alleges that Navient steered and conveyed borrowers into forbearance to keep costs down and misrepresented the suitability of repayment options for struggling borrowers.  That is one of our two fundamental buckets of proof of how we intend to prove class certification, commonality and predominance, in this case.

We intend to prove the uniformity of misrepresentations by Navient agents to borrowers with evidence of what the agents said to borrowers, but also with evidence that Navient is structured so as to maximize profits at the expense of borrowers, leading the agents to make uniform misrepresentations.

We believe that there are three main aspects to this structure which are at issue in our case and also at issue in the *CFPB* action.  Those three main assets, we understand, based on what we've seen so far, are the average handle time, or AHT, which Navient uses to track call times and keep them as low as

JAHHHYLC

possible, and which is tied to agents in the sense of compensation so that all agents are pressured to get off the phone as quickly as possible, including by giving borrowers incorrect information.  That relates to agents pushing borrowers into forbearance which does not qualify for PSLF and not taking the time to calculate income-driven repayment options which are qualifying for PSLF.

Finally, the third aspect of our proof of Navient's structure which leads to uniform misrepresentations is that there's little to no training on PSLF for call agents, as far as we can tell so far, including the requirement to consolidate FFEL loans into direct loans before borrowers would qualify.

Your Honor, on each one of these issues we have some proof so far, enough to demonstrate that it's not just smoke here; there's actual fire.  The reason why we need the requested *CFPB* transcripts, as well as the additional targeted custodial searches, is to fully develop this evidence.  So if I may give an example, on AHT, the average handle time, we already have some evidence that Navient was using compensation to incentivize low call times, that agents felt rushed to end a call, and internal emails recognizing that Navient had to keep average handle times down to maximize profits.  But what we don't have are any depositions of executives or managers who are responsible for implementing these AHT protocols purportedly bound against the quality of calls.

JAHHHYLC

We believe these are exactly the depositions that were taken in the *CFPB* action.  So it would be extraordinarily efficient, as courts in this district and others recognize, to share that discovery between the two actions instead of us serving deposition notices and subjecting our resources and the resources of Navient and those employees sitting for depositions, asking and answering the same questions.  We should instead be able to share that deposition testimony from the *CFPB* action.

Similarly, on the second aspect of the company structure, steering borrowers into forbearance instead of IDR, which is a core component of our case as well as the *CFPB* case. We have, from recently unsealed docket filings in the *CFPB* action, one example, a reference to a memo to the CEO of Navient which says:  Our battle cry remains forebear them, forebear them, right?  But what we don't have yet are emails about IDR and forbearance or emails from key custodians, like Lisa Stashik who was a 30(b)(6) witness in *Daniel* and was the one person that Navient named in its initial disclosures here as having knowledge of issues relevant to our action.

This is actually an example of why Navient's production in *Daniel* is deficient.  The depositions that Navient has produced from *Daniel*, it's not even fair to call them depositions.  It was just a 30(b)(6) deposition of Ms. Stashik, which was the only deposition, as far as we

JAHHHYLC

understand, taken in the *Daniel* case.  Again, in contrast, in the *CFPB* action, we believe the *CFPB* proposed a variety of midlevel Navient employees, such as call center supervisors, a VP of student loan servicing, regarding these accusations of steering that are directly parallel to ours.  So, again, we believe that it's far more efficient for us to be able to take on those depositions and not have to retake them.

To update your Honor, pursuant to your order of this week, the parties attempted to meet and confer on this issue on Tuesday evening, and Navient said that there is no middle ground that they are willing to negotiate.  They asked us if we had any offers for middle grounds, and we said we are absolutely willing to negotiate each one of our requests.  So we are willing to negotiate for some subset of the *CFPB* depositions that would be most relevant, and we asked for a list of the depositions that were taken in the *CFPB* action so that we may make a middle ground proposal.  Navient has refused to give us even a list of the deponents from the *CFPB* action so that we may make an offer to resolve this issue.  So that is why that entire request is still pending before your Honor.

THE COURT:  Do I understand correctly, Ms. Konanova, that there was only one deposition taken in the *Daniel* action?

MS. KONANOVA:  It was, as far as we understand, your Honor, only a 30(b)(6) deposition taken over two days of Ms. Lisa Stashik.  Moreover, we understand that Ms. Stashik was

JAHHHYLC

not even a custodian in the *Daniel* action.  So the *Daniel* plaintiffs took her deposition without apparently access to her emails.  We only received that deposition on the evening of October 15, so just less than two days ago, but that's all we've received so far.

THE COURT:  Ms. Simonsen.

MS. SIMONSEN:  Yes, thank you, your Honor.

As your Honor pointed out, plaintiffs only previously identified *Daniel* as a litigation like this.  To the extent that the *CFPB* matter overlaps with this case, it also overlaps substantially with *Daniel* and indeed, I just heard Ms. Konanova say that the core similarity "between *CFPB*, *Daniel*, and us is that Navient steered borrowers into forbearance, supposedly, and misrepresented the suitability of repayment options.

Now, we've produced all of the documents that were produced in *Daniel*, excluding documents specific to named plaintiffs in that case.  We've produced the 30(b)(6) deposition transcripts from *Daniel* which covered the issues at issue in this case.  The *CFPB* case, by contrast, dealt with numerous issues not at issue here, including things like dealings with credit reporting agencies, whether loan payments were processed correctly, and the rehabilitation of defaulted loans.  So the depositions taken covered these topics and other topics that just have zero relevance to this case, while we've produced all materials from the litigation that is -- that this

JAHHHYLC

case is virtually a copycat of.

Plaintiffs seem to suggest that in order to avoid producing the dozens of deposition transcripts taken on wholly irrelevant topics in *CFPB*, that Navient should be required to go in and pull potentially overlapping transcripts, but they've cited no authority for the proposition that just because two lawsuits may have some overlapping issues -- and, again, those overlapping issues are also apparent in *Daniel*, and therefore, they already have materials relevant to those overlapping issues -- that the defendant has to parse through all of the discovery and extensive deposition transcripts made to identify the potentially overlapping material.  It's just not how discovery works about.

But to the extent that plaintiff noticed a deposition of a Navient employee who was also deposed in the *CFPB* action, we are completely open to considering producing that employee's deposition transcript if that employee was deposed on relevant issues to this case in the *CFPB* and agreeing that the parties may use it in this proceeding, and that's, in fact, exactly what we've agreed to consider doing with respect to the *Daniel* deposition transcript.  But producing wholesale dozens of deposition transcripts on issues that have no relevance to this case is far from the most efficient way to proceed if we're talking about trying to use any materials from the *CFPB* depositions in this case.

What plaintiffs should do is, as they have already have begun doing, review the over 700,000 pages of materials we've produced that actually deal with the issues in this case, identify the individuals who they believe would have relevant testimony to give beyond a 30(b)(6) deposition, notice those people's depositions, and we would be open to talking about whether those people were deposed in the *CFPB* action and whether it makes sense, for efficiency purposes, to just go ahead and use the transcript from that deposition in this case. Giving plaintiffs a list of the deponents in the *CFPB* litigation doesn't make any sense because, again, many of those people were deposed on issues that have nothing to do with this case. So it's not going to tell plaintiffs anything.

I would also note that that request was made yesterday by plaintiffs. It's the first time we've heard that request. Plaintiffs didn't even request deposition transcripts from the *CFPB* action in their request for production. That request came in the middle of meet-and-confer discussions between the parties, so they haven't even made a formal request for these materials.

I also would just want to respond to Ms. Konanova's suggestion that documents bearing on the structure of Navient as a company could somehow prove uniform misrepresentations. That just doesn't make sense. This case is about one narrow claim, and it's a claim for individual oral misstatements made

JAHHHYLC

to individual borrowers.  As your Honor pointed out at the July conference, this claim must focus on the particular conversation with an individual borrower.  And to certify a class, plaintiffs have to show that common proof exists showing that Navient made uniform misrepresentations to New York borrowers.  We have produced all of the materials that could possibly be construed as relevant to these issues.  We've produced the recordings of conversations with the New York named plaintiff.  We've produced any instructions from the Department of Education about how to communicate with federal student loan borrowers and, most importantly, all of the material on which Navient customer service representatives rely when they speak to customers about public service loan forgiveness and income-driven repayment.  Whether or not plaintiff can suggest there was some kind of profit motive doesn't show that there were common misrepresentations made to borrowers, and the materials relied on by customer service representatives who speak with borrowers were perfectly accurate.

But even assuming plaintiffs have a viable theory here for proving common misrepresentation, we've already produced the materials that they're seeking.  I heard Ms. Konanova reference average handle time.  We produced voluminous materials relating to average handle time in the *Daniel* litigation.  There is extensive discovery into that issue,

JAHHHYLC

extensive search terms run over many custodians' emails. Ms. Konanova acknowledged that they already have some evidence, she says, that agents felt rushed to get off calls.  So they already have documents bearing on these issues.  They've conceded that our production contains responsive material.

The third aspect of proof I heard Ms. Konanova refer to was that she believed that, I suppose, there was limited training relating to PSLF.  Well, all of the training materials relating to PSLF were requested in *Daniel*, and they've been produced.  And there's absolutely no reason why plaintiffs need deposition transcripts from the *CFPB* action when they can go through the documents we've already produced to them that bear on all the issues in this case and notice depositions that are narrowly tailored to the claims at issue here.

THE COURT:  Ms. Simonsen, were you representing Navient in the Florida action and in the Pennsylvania action?

MS. SIMONSEN:  No, I was not, your Honor.

THE COURT:  OK.  Were you representing Navient in either of those?

MS. SIMONSEN:  No, neither.

THE COURT:  Is it true that there was only one deposition, a 30(b)(6) deposition, taken in the *Daniel* litigation?

MS. SIMONSEN:  That's correct.  It was continued, so I believe it was a two-day deposition --

JAHHHYLC

THE COURT:  OK.

MS. SIMONSEN:  -- covering extensive topics, of course, extensive 30(b)(6) topics.

THE COURT:  Before ruling on this first topic, I want to go to the second issue raised by plaintiffs' counsel, and that is a desire for searches of three custodians with respect to four topics.

Ms. Simonsen, these three custodians that were identified, I take it they were not custodians in the *Daniel* litigation?

MS. SIMONSEN:  Actually, one of them was.  I'm not sure why they've -- Mike Maier was one of the custodians in the search term -- in the *Daniel* litigation, so I'm not sure why they've identified him as a new custodian.  One of the other custodians they sought to add, Ms. Stashik, is one of the principal people that Navient has gone to, to perform targeted document collection.  Plaintiffs' requests for additional search terms and custodians here is focused narrowly on search terms, but, of course, a defendant's search strategy, which is entitled to a presumption of reasonableness, is not -- in this case was not limited to search terms.  In many instances we determined that a much more efficient and comprehensive approach to identifying responsive documents was to go to individuals with firsthand knowledge of where those documents exist and go collect them and produce them.  Ms. Stashik is an

JAHHHYLC

example of someone who performed many of those targeted collections.

The third person I've identified, Allison Scott, all they have to say about this person is that she's an education specialist and that she posted average handle time contests and trained Navient call agents. The fact that someone may have some relation to issues in this case doesn't make them a custodian when we've already identified other custodians likely to have responsive material related to average handle time and plaintiffs have identified absolutely no deficiency in the documents we've produced.

THE COURT: Is there more than one education specialist or more than one person in Navient that performs functions like Ms. Scott?

MS. SIMONSEN: I don't know the answer to the specific question. I believe the answer is yes. I have to believe there is more than one education specialist at Navient, but I would have to confirm that for your Honor.

THE COURT: Were any of the other education specialists or their supervisors part of the search that was conducted for the *Daniel* litigation?

MS. SIMONSEN: We identified individuals, custodians, likely to have documents relating to average handle times. I don't at this point -- because I was not involved in that search, I don't know off the top of my head exactly what each

JAHHHYLC

of their roles was with respect to training, but I can certainly follow up and gather that information.

THE COURT:  So Maier -- I don't have the names in the letters from the parties.  I have one listed as VP of the Office of Consumer Advocate.  Which one is that?

MS. KONANOVA:  That's Ms. Stashik, your Honor.  That's a person that Navient has listed in the initial disclosures in this case and what the person who was did he supposed as the 30(b)(6) witness in *Daniel*.

Ms. Simonsen -- I may be correct that she ran some searches for some centrally located documents, but she's not a custodian herself.  So her emails, which have been a very fulsome source of evidence of misconduct, as cited in the unsealed *CFPB* action filings, her actual emails are not -- have not been searched, your Honor.

THE COURT:  Excuse me.  Excuse me.  This is Ms. Konanova speaking?

MS. KONANOVA:  Yes, your Honor.

And your Honor -- this is still Ms. Konanova -- if I may respond on the issue of the targeted custodial searches and the reasons why we have asked for the searches and custodians who we do believe have unique relevant information that has not already been given to us?

There are four core issues that are core to our case and were not the subject of custodial searches in *Daniel*, and

JAHHHYLC

those are income-driven repayment plans; forbearance, which again go to our issue of Navient call agents steering borrowers into forbearance instead of income-driven repayment plans; those terms were not searched in *Daniel*; FFEL loan consolidation, which goes to the issue that Navient call agents are not asking borrowers -- or incorrectly telling borrowers they don't have to consolidate their FFEL loans into direct loans in order to qualify for PSLF; and fourth, the verification forms that borrowers need to submit to actually get on track for PSLF which Navient call center agents are not accurately describing to borrowers.  None of those four terms were searched in *Daniel*, and they are at the heart of our case and the reason why we're asking for those custodial searches.

With respect to the two custodians that we are requesting to be added, Ms. Simonsen is correct that on the third custodian, Mr. Maier, we have been able to identify that he was one of the *Daniel* custodians; but the other two, Ms. Stashik, this supposedly one person with knowledge, according to Navient's initial disclosures, and Ms. Scott, who is the education specialist and who was responsible not only for running these contests that pressure call agents to get off the phone as quickly as possible but also responsible for training -- and, your Honor, in the materials that we've been able to review so far, there is practically nonexistent training on PSLF requirements.  We have a call center agent --

reference to a call center agent's declaration submitted in the *Daniel* case in which this agent says PSLF training was limited and confusing and that the agents provided incorrect information to borrowers.  We have a reference to that declaration but not the declaration itself.

In order to fully develop this evidence, we need custodial searches of Ms. Scott, who is responsible for training, as well as the *CFPB* deponent, someone like this call center supervisor by the name of Ms. Croft who was deposed in *CFPB* and who was also focused on training, in order to be able to fully develop this evidence that Navient was not training its call center agents to give accurate information on PSLF requirements.

If I may briefly add just two more points, your Honor, on the *CFPB* transcripts, we requested the entire *CFPB* production in our RFPs, the second set, RFP No. 2, and we have then in the meet-and-confer process made the offer for just the deposition transcripts as a means of attempting to reach a compromise with Navient on that request.

Then, finally, as to Ms. Simonsen's point about our proof of misrepresentations through a common scheme, we are in fact planning to prove these uniform misrepresentations through both evidence of actual oral misstatements to borrowers -- and that goes to our third request here -- as well as the common company structure of Navient that led to misrepresentations.

JAHHHYLC

And three cases that we submitted to your Honor in our letter of July 30 make it crystal clear that class plaintiffs are entitled to rely on evidence of company structure of a common scheme that leads to uniform misrepresentations as evidence of commonality.

THE COURT:  Let me ask you, Ms. Konanova, your request, your second request here, is now to name two additional custodians, not three but two, Stashik and Scott?

MS. KONANOVA:  Yes, your Honor.

THE COURT:  Then it's a request for four additional searches addressed to what you consider four key issues.  Now, these four searches, they are to be run against which custodians, Stashik and Scott, or all the custodians in the *Daniel* litigation, or what?

MS. KONANOVA:  We are requesting for those searches to be run against the same set of documents that Navient previously ran its *Daniel* searches on, which, as we understand it, are documents produced to *CFPB*, documents produced to the Pennsylvania and the Washington Attorney General, and the *Daniel* custodians, plus our two additional custodians, Ms. Scott and Ms. Stashik.

THE COURT:  OK.  You're saying that these searches were not done in either the *Daniel* litigation or the *CFPB* litigation?

MS. KONANOVA:  Your Honor, we know they were not done

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JAHHHYLC

in *Daniel*.  Navient counsel has not disclosed to us the searches done on the *CFPB* –– searches done to result in the *CFPB* production.  They refused to give us any information on that production whatsoever.  What we do know, your Honor, from briefs submitted in the *CFPB* action and recently unsealed is that the *CFPB* have had to go to court multiple times to get production out of Navient.  The bureau has argued in its papers that over and over again it encountered resistance from Navient in producing documents.  The bureau has challenged the accuracy of Navient's representation as to the completeness of their production, as to the burden that it takes to produce documents, and it appears from the docket that the bureau has actually been quite successful in compelling Navient's production of documents in that action.

Your Honor, it appears that stands in some contrast with what happened in the *Daniel* action where we understand Navient also resisted production, and the Court in that case, nonetheless, proceeded to evaluate the class certification and summary judgment motions, resulting ruling in a total win for Navient at the district court.  It looks like it was successful in that *Daniel* action, but in the *CFPB* action, the reason why we're so focused on it, it appears that as a result of the bureau's efforts with the court to compel production, a substantially more useful set of documents were actually produced in the *CFPB* that, again, go directly to supporting the

JAHHHYLC

bureau's claims and claims that are relevant to our case of, for example, steering borrowers into forbearance instead of income-driven repayment plans which qualify for PSLF.

THE COURT:  Ms. Konanova, I think I am missing something here.  There's been a shift in the plaintiffs' argument, which is just fine.  As you learn more about a case, you emphasize different aspects of it.  But when this case was first described to me, the description was that the Florida action was like this litigation, in contrast to the other lawsuits, including the *CFPB*.  And I don't think there's any disagreement that the *CFPB* case has many other avenues of interest in addition to those articulated in this Hyland action, the New York action.

So you want these four additional search terms to be run against the production or the custodians' documents that were gathered in the Florida action, the custodians' documents that were gathered in the Pennsylvania action, and one other?

MS. KONANOVA:  The Washington Attorney General action, your Honor.

But just to clarify, that is only because counsel for Navient told us that was the collection on which the *Daniel* search terms were run.  That's not something that we came up with ourselves.  But the way Navient's counsel explained it to us is the *Daniel* search terms were run on this previously collected and produced set of documents.

JAHHHYLC

THE COURT:  OK.  Let me ask you, Ms. Simonsen, how many custodians' documents were collected with respect to this database against which the *Daniel* searches were run?

MS. SIMONSEN:  Your Honor, Navient identified 12 custodians whose -- and of the search terms that were used in *Daniel* were applied to emails of those 12 custodians going back to January 1, 2016.  The documents previously collected, as Ms. Konanova explained, the documents previously produced in the *CFPB* action to the Washington Attorney General's Office and to the Pennsylvania Attorney General's Office were searched using a very broad set of search terms, and those documents were also produced.

THE COURT:  OK.  Maier was one of the 12 custodians; Stashik and Scott were not?

MS. SIMONSEN:  That's correct, your Honor.  Although I am not certain -- I don't have in front of me a list of exactly all of the custodians whose documents were searched and collected for purposes of arriving at the collection of documents that was produced in the *CFPB* action, the Washington Attorney General's Office, and the Pennsylvania Attorney General's Office.  I imagine it was a much more voluminous set of custodians.  And I can go back and look at that, and we can take a look and see if these other two custodians that the plaintiffs are requesting were part of that collection.

THE COURT:  I'm sorry.  What does the 12 represent,

JAHHHYLC

then?

MS. SIMONSEN:  The way the documents were collected in *Daniel* is as follows:  Documents that were previously produced to the CFPB, the Washington Attorney General's Office, and the Pennsylvania Attorney General's Office were searched using a set of very broad search terms.  In addition to that, the search terms were applied to emails of 12 custodians, and then additional search terms were applied to the resulting document set.

THE COURT:  So you don't know how many custodians' documents contributed to the set that were searched, but you know that only 12 contributed to the email collection?

MS. SIMONSEN:  At least as far as the kind of supplemental *Daniel* production goes, but for the searches that were run on the documents previously produced in the *CFPB* action and the two attorney general actions, I do not know which custodians were used to identify those documents.

THE COURT:  Explain to me again what the 12 represents, Ms. Simonsen.

MS. SIMONSEN:  So those were custodians identified in the *Daniel* litigation as having potentially responsive documents to the plaintiffs' document requests in *Daniel*.  And the search terms that were applied to their emails were the same search terms that were applied to the documents produced to the CFPB and to the two attorney general offices.  Then in

JAHHHYLC

addition to that, additional search terms were applied to the resulting document set that were focused on the issues in *Daniel*, things like public service loan forgiveness, incentive compensation plan, average handle time, the very issues that Ms. Konanova claims were not searched in *Daniel* that were, in fact, searched in *Daniel*.  So it was a very broad search.

I feel I need to correct something, your Honor, that Ms. Konanova said.  She suggested that the judge in *Daniel* somehow allowed that case to proceed without compelling additional documents.  In fact, there were motions to compel granted in the *Daniel* action requiring extremely broad, extremely broad, discovery relating to PSLF, average handle time, incentive compensation plans for customer service representatives.  And in a short period of time, Navient ran searches over these custodians' emails, conducted extensive searches and collections, and produced all of those materials in the *Daniel* action.  So the suggestion that there was somehow some constrained discovery in that case is absolutely unfounded.  I don't know where Ms. Konanova is coming up with that.

The fact that in the *CFPB* action there may have been some additional documents compelled to be produced, it just says nothing about whether Navient in this case has met its discovery obligations because the *CFPB* case involved entirely different issues.  I think this has been a common theme I've

JAHHHYLC

heard from Ms. Konanova.  She keeps trying to point to what she perceives as bad behavior by Navient in other cases to try to argue that they should get more in this case, but there's been absolutely no showing that our discovery efforts to date have been deficient, absolutely none.  All I've heard from Ms. Konanova to the contrary is that we've produced documents that she thinks are responsive and that support her case.

I will add, your Honor, that we produced the *Daniel* document request, sought documents relating to income-based repayment plans for student loans.  Document requests 5 and 14 of the first set of document requests in *Daniel* requested those document.  Requests 9 and 13 requested documents concerning loan consolidation.  In the second set of requests in *Daniel*, document request No. 4 requests documents regarding average handle times.  No.  1 through 3, documents related to Navient compensation structure for customer service representatives.  So we've produced documents responsive to requests in *Daniel* that relate to the very issues that Ms. Konanova is seeking, and we've produced all of those materials to the plaintiffs here.

I just want to make one additional point, your Honor, which is even if there might be additional email communications talking about, I guess, PSLF training or IDR or average handle times, none of that shows common misrepresentations made to class members.  We are getting far, far afield from the very

JAHHHYLC

narrow claim in this case.  Plaintiff has to show that there were common misrepresentations made to class members.  And contrary to Ms. Konanova's suggestion, the cases cited in her letter to your Honor don't suggest that you can just point to an incentive structure that suggests Navient customer service representatives tried to be efficient in their handling of calls -- which, by the way, is what every customer service call center that's maintained across this country strives for.  It's part of running a business -- that somehow the fact that incentives exist can prove that misrepresentations were made. We've produced every document that plaintiffs could possibly need to show that there was a common inaccurate statement made to borrowers.

THE COURT:  OK.

MS. SIMONSEN:  The plaintiffs don't need to look any further than all recordings we've produced for the named plaintiff to see that those individual conversations were just that, they were very individualized.  There were no common misrepresentations in even those communications.

THE COURT:  So, counsel, thank you very much.  We're not going to be able to do these conferences by phone unless these conversations are a little bit shorter, because it's very difficult to control the conversation by phone.  So I'm going to ask counsel to be more pointed in your remarks.

Ms. Simonsen, if I understand correctly, you do not

JAHHHYLC

know whether Stashik and Scott's documents were collected; you only know that they were not part of the 12 custodians whose emails were searched in *Daniel*?

MS. SIMONSEN:  That's correct, your Honor.

THE COURT:  With respect to the terms, the four additional searches -- I shouldn't say "the terms" because the second request from the plaintiffs, I suppose, could be more than four search terms.  It's four additional searches about four key issues.  Do these overlap, from your point of view, Ms. Simonsen, with respect to the searches that were already done in *Daniel*?

MS. SIMONSEN:  I think they do, your Honor.  I mean, just as one example, they've requested -- they're calling them four searches, but, of course, if you actually combine all the combined terms in each of the four searches, you're going to get to hundreds, if not thousands, of individual searches.

As just one example, their first search string asks us to search "average handle time" or "AHT" or "talk time" within 20 of "IDR," "income-driven repayment," "PSLF," "consolidation," "forbearance," "incentive compensation," "bonus," or "IPP."  Now, we ran the following search terms over the documents that were produced to the CFPB and the attorney general's office.  We ran the term "incentive compensation plan" within ten of servicing, "CRS," "ED," "call center," "CCC" or "CFC."  We ran "average handle time" within ten of

those words.  We ran "AHT" within ten of those words.  We ran "ICP," the abbreviation for incentive compensation plan, within ten of those words.  Those words were much broader than the words plaintiff is now asking us to run in combination with terms like "average handle time."

So I think that -- and Navient, again, is entitled to deference on the search terms that it identifies as necessary to extract responsive materials.  We've run those search terms.  They've produced responsive documents, according to Ms. Konanova, so plaintiffs have simply not even come close to meeting their burden of showing a basis to believe that the search terms we ran were deficient.

THE COURT:  OK.  Let's handle the search term issue this way:  I, Ms. Konanova, am reluctant to put the burden on the parties, and it would be both sets of parties here, of redoing searches.  And I'm not convinced, since the litigation in Florida is so closely aligned with the subject matter of this current litigation, that the searches done with respect to the 12 custodians in *Daniel* wouldn't have captured the four subject matter areas that you seek additional searches to be conducted on.  So I'm going to give you a chance to show me I'm wrong.

You can identify, pull out, three of the searches you've requested of the defendants that they have declined to conduct, and I'll have the defendants explain to me why those

JAHHHYLC

three searches have already been captured by the searches undertaken in the *Daniel* litigation.  So if you make your case with respect to three, then we might go further.  But if you can't make your case with respect to three, then that's done. I think the presumption has to be that the production made within *Daniel* has to be sufficient.

With respect to adding two custodians, Stashik and Scott, I need to know from you, Ms. Simonsen, whether or not their documents were collected as part of the Pennsylvania litigation or otherwise.  I know they weren't searched in *Daniel*, as I understand it, but I'd like to know if they were collected and are available to be searched.

MS. SIMONSEN:  Yes, your Honor.

THE COURT:  With respect to Stashik and Scott, I don't have a clear understanding of why they in particular are so uniquely appropriate here.  I think I need a better understanding of how they line up against the 12 custodians that were searched in *Daniel*.  So I'd like a list from you, Ms. Simonsen, of the 12 custodians by title and short job description.

Ms. Konanova, you can then explain to me why the searches with respect to those 12 are not sufficient and why you need Stashik and Scott as well.

MS. KONANOVA:  Yes, your Honor.

THE COURT:  Let's go to the third issue.

JAHHHYLC

Ms. Konanova, I don't know why you need a sample of New York borrower call recordings.  You have your named plaintiffs' calls serving as that sample.  Why do you need more?

MS. KONANOVA:  Thank you, your Honor.

That is because sampling of unnamed class members and discovery into unnamed class members is a classic way of demonstrating uniformity, commonality in class actions.  That is clearly laid out in the *Chen-Oster* case that we discuss in our papers at page 304, and it's also being undertaken in the *CFPB* action specifically to demonstrate the prevalence of steering into forbearance instead of income-driven repayment.  That is the core overlap between our action and the *CFPB* action.

THE COURT:  So how many more do you want, Ms. Konanova?

MS. KONANOVA:  Our approach is as follows, your Honor: Navient has conceded that it can search terms in the correspondence history.  We propose that they search New York borrower call logs for a limited set of terms relating to PSLF, produce those call logs to us, and then our expert will be able to choose a sample of calls for Navient to produce.

In the recently unsealed *CFPB* docs, a Navient deponent has confirmed that this is possible and easy to do.  He said we can search for calls, and I've never been unable to find a

JAHHHYLC

call.  Once we get that sample of calls, we will auto transcribe those call and review those recordings for evidence of uniform misrepresentations of Navient telling borrowers they're on track when they're really not and then steering borrowers into forbearance.  It is a straightforward process that will generate proof of, we expect, uniform misrepresentations by call agents and will allow us to fully develop the argument of uniform misconduct, which, as we know, is Navient's core challenge to plaintiffs' class certification.

THE COURT:  Again, Ms. Konanova, if you could keep your remarks pointed, I'd appreciate it.

MS. KONANOVA:  Of course.

THE COURT:  How many do you want?

MS. KONANOVA:  We would work with our expert to select a number, but typically, as your Honor is well familiar with the *RMBS* litigation, samples of about 100 generate a slightly larger confidence interval.  Samples of 400 create a tighter confidence interval.  So I would say at least 100, your Honor.

THE COURT:  Describe to me, Ms. Simonsen, the burden that that would produce for you.

MS. SIMONSEN:  The burden would be enormous, your Honor.  Ms. Konanova's representation that there's a declaration in the *CFPB* action saying it's easy to search for call recordings is not true.  It's not.  It's an incredibly burdensome, laborious manual process.

JAHHHYLC

There are three different call recording sort of storage systems at Navient.  You have to go through individual calls to first identify what phone numbers are associated with the borrower.  Sometimes you can search for a call by looking for that phone number in the database.  Sometimes you can't find it that way, then you have to try using other information about the borrower.  Sometimes that doesn't work, then you have to go back to the correspondence histories and look for other clues that might help you identify the call.

We have been working extensively since February to identify all of the call recordings for the named plaintiffs, and it's taken months to do because it is so time intensive. Producing all the call recordings for 100 borrowers, your Honor, there's no way we could get -- I mean, it's not feasible for that to happen before class certification.  I don't even know if that's feasible to get done before motions for summary judgment are due.  Frankly, even assuming that we produced all of these call recordings and plaintiffs could identify a couple recordings here or there where two borrowers were told, I guess, the same thing that was inaccurate, that still wouldn't prove that conversations with every single class member in this case had a misrepresentation made to them.  So it just simply doesn't prove uniform misrepresentation.

THE COURT:  I think that Ms. Konanova was talking about an initial step, which is that it is fairly easy to

JAHHHYLC

identify the set of conversations in which particular terms are used.  Is that true or not?

MS. SIMONSEN:  We can search correspondence history for terms like "PSLF" or "loan forgiveness."  We can do that, and we can do that for borrowers, I suppose, who have current addresses in New York, and we can identify the borrowers who had a conversation with someone at Navient where the word "PSLF" was recorded in their correspondence history, but pulling all of those calls is an intensely -- a very labor-intensive process.

MS. KONANOVA:  Your Honor --

THE COURT:  Ms. Konanova, please don't interrupt.

Ms. Simonsen, with this first step, if you did that kind of search, how long would it take to do that?

MS. SIMONSEN:  I'm not certain of how long it would take, your Honor, but I think it would be a fairly programmatic exercise, I think, if we identified a couple of terms.  I would just note anytime somebody asks a question about PSLF or it's raised on a call, it could be noted in their correspondence history.  There's absolutely no indication whatsoever that there's been any kind of misrepresentation, of course, so we're going to result in -- this is going to result in probably a lot of calls where there was a reference to PSLF having no indication whatsoever that there was a misrepresentation made to a borrower.

THE COURT:  Ms. Konanova, let us say that the search is done and you have a sense of the number of calls in which the phrase or the word or the words you've identified appears. Are you suggesting your expert then needs anything more before identifying the number of recordings that need to be identified and produced?

MS. KONANOVA:  No, your Honor.

THE COURT:  OK.  Let's take this one step at a time. Please talk today about doing such a search and what terms you want to use and what timetable you want it done on.  If you have any dispute with respect to that such that we need to talk with each other again, I'd like to know first thing in the morning so we could talk tomorrow.  I'm not suggesting the search would be done by tomorrow, but agreement as to the parameters of that search.  I'm just talking about the first stage of the search which we'd need the identification of how many, the universe of phone calls that may be relevant here.

Counsel, I do think there is an underlying problem here with respect to the plaintiffs' theory, which I've been frank about in my prior conferences, so I'm not going to move the December 20 class certification date which I understand is also the date on which the plaintiffs' expert reports in support of their class certification motion will be served.  So you will be, then, in short order, that is, the plaintiffs, in a position to know how large a universe of potentially

JAHHHYLC

responsive materials you're asking the defendants to produce a sample of.

I don't think, Ms. Konanova, that the sample procedure from some other litigation, particularly in the litigation that was handled before me with respect to mortgage loans -- I think that's actually a very different kind of theory of the case, and I'm not sure a sample of conversations here is going to have the same ability to make the broader point that you're arguing for. So I don't want to suggest as we begin to march down this road, and we are just beginning, that it's necessarily going to be productive. I just want to have a better handle on the burden here and give the parties a chance to look at it with care.

Turning back to the first issue, and that is the requirement that the defendant produce all the deposition transcripts from the Pennsylvania action to the plaintiffs, I'm going to decline that request. I will adopt the defendants' suggestion that the plaintiff identify who they want their deponents to be. They have had a volume of discovery materials produced. Once they decide who they think their deponents are, they should talk with each other to determine whether or not these people have already been deposed. And of course, they are permitted depositions. The depositions were limited in the Florida action. I did not previously understand that, that there was only one 30(b)(6) deposition in Florida. So the

JAHHHYLC

plaintiffs here are absolutely entitled to take depositions.

Good luck, counsel, and let me know if you're unable to work through these issues promptly, because I don't want us to lose further time in addressing them.

Thank you so much.

(Adjourned)