**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KATHRYN HYLAND, MELISSA GARCIA, ELIZABETH TAYLOR, JESSICA SAINT-PAUL, REBECCA SPITLER-LAWSON, MICHELLE MEANS, ELIZABETH KAPLAN, JENNIFER GUTH, MEGAN NOCERINO, and ANTHONY CHURCH individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NAVIENT CORPORATION and NAVIENT SOLUTIONS, LLC, <br><br> Defendants. | Case No. 18-cv-9031-DLC |

**MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED**
**APPLICATION FOR SERVICE AWARDS FOR CLASS REPRESENTATIVES**

Date:  August 28, 2020

Mark Richard
PHILLIPS, RICHARD & RIND, P.A.
9360 SW 72 Street, Suite 283
Miami, FL 33173
Telephone: (305) 412-8322
E-mail: mrichard@phillipsrichard.com
(*pro hac vice*)

Faith Gay
Maria Ginzburg
Yelena Konanova
Margaret Siller
Amy Nemetz
SELENDY & GAY, PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
E-mail:  fgay@selendygay.com
mginzburg@selendygay.com
lkonanova@selendygay.com
msiller@selendygay.com
anemetz@selendygay.com

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

**Pages**

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ...............................................................................................................2

ARGUMENT ....................................................................................................................8

I.    SPECIAL CIRCUMSTANCES JUSTIFY SERVICE AWARDS TO THE CLASS
      REPRESENTATIVES .................................................................................................9

      A.    The Class Representatives Sacrificed Their Own Interests  By Agreeing
            To A Broader Release Of Claims Against  Navient In Order To Secure
            Class-Wide Relief .........................................................................................10

      B.    The Class Representatives Spent Significant Time And Effort Making
            Meaningful Contributions To This Action ..........................................................11

      C.    The Class Representatives Incurred Costs In Prosecuting This Action.................14

      D.    The Class Representatives Faced Significant Risks And Endured
            Substantial Burdens From Participating In This Action .......................................16

            1.    The Class Representatives Faced Personal And Professional Risks .........16

            2.    Significant Media Coverage Exposed The Class Representatives
                  To Criticism, Ridicule, And Public Scrutiny ............................................18

II.   SERVICE AWARDS PROMOTE CLASS GOVERNANCE AND DO NOT
      CREATE ANY CONFLICT OF INTEREST HERE ........................................................20

CONCLUSION.................................................................................................................23

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Bellinghausen v. Tractor Supply Co.*,
    306 F.R.D. 245 (N.D. Cal. 2015) .................................................................. 14, 16

*Castagna v. Madison Square Garden, L.P.*,
    2011 WL 2208614 (S.D.N.Y. June 7, 2011) ......................................... 9, 11, 16

*Cifuentes v. CEVA Logistics U.S., Inc.*,
    2017 WL 4792425 (S.D. Cal. Oct. 23, 2017) .................................................. 10

*Dupler v. Costco Wholesale Corp.*,
    705 F. Supp. 2d 231 (E.D.N.Y. 2010) ......................................................... 9, 22

*Edelen v. Am. Residential Servs., LLC*,
    2013 WL 3816986 (D. Md. July 22, 2013) ....................................................... 16

*Flores v. One Hanover, LLC*,
    2014 WL 2567912 (S.D.N.Y. June 9, 2014) ............................................. 11, 14

*Frank v. Eastman Kodak Co.*,
    228 F.R.D. 174 (W.D.N.Y. 2005) ..................................................................... 16

*Henry v. Little Mint, Inc.*,
    2014 WL 2199427 (S.D.N.Y. May 23, 2014) ........................................ 8, 16, 23

*Hicks v. Stanley*,
    2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ................................................... 14

*Holman v. Experian Info. Sols., Inc.*,
    2014 WL 7186207 (N.D. Cal. Dec. 12, 2014) .................................................. 10

*In re Bear Stearns*,
    909 F. Supp. 2d 259 (S.D.N.Y. 2012) ......................................................... 14, 21

*Lilly v. Jamba Juice Co.*,
    2015 WL 2062858 (N.D. Cal. May 4, 2015) .................................................... 23

*Low v. Trump Univ., LLC*,
    246 F. Supp. 3d 1295 (S.D. Cal. 2017) ............................................................ 18

*Matheson v. T-Bone Rest., LLC*,
    2011 WL 6268216 (S.D.N.Y. Dec. 13, 2011) ............................................. 8, 18

*McLaughlin v. IDT Energy*,
    2018 WL 3642627 (E.D.N.Y. 2018)..............................................................................22

*Mentor v. Imperial Parking Sys.*, Inc.,
    2010 WL 5129068 (S.D.N.Y. Dec. 10, 2010) ................................................................11

*Parker v. Jekyll & Hyde Ent. Holdings, L.L.C.*,
    2010 WL 532960 (S.D.N.Y. Feb. 9, 2010)..................................................................9, 21

*Parker v. Time Warner Entm't Co., L.P*,
    631 F. Supp. 2d 242 (E.D.N.Y. 2009) .......................................................................12, 14

*Roberts v. Texaco, Inc.*,
    979 F. Supp. 185 (S.D.N.Y. 1997)..........................................................................passim

*Rodriguez v. Kraft Foods Grp., Inc.*,
    2016 WL 5844378 (E.D. Cal. Oct. 5, 2016)..................................................................18

*Sauby v. City of Fargo*,
    2009 WL 2168942 (D.N.D. July 16, 2009) ...............................................................19, 21

*Spann v. AOL Time Warner Inc.*,
    2005 WL 1330937 (S.D.N.Y. June 7, 2005) .............................................................11, 14

*Stinson v. City of New York*,
    256 F. Supp. 3d 283 (S.D.N.Y. 2017)............................................................................8

*Sykes v. Harris*,
    2016 WL 3030156 (S.D.N.Y. May 24, 2016) ...............................................................18

*Talone v. Am. Osteopathic Ass'n.*,
    2018 WL 6318371 (D.N.J. Dec. 3, 2018)......................................................................12

*Wise v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
    2020 WL 1492672 (E.D. Cal. Mar. 27, 2020) ...............................................................10

*Yuzary v. HSBC Bank USA, N.A.*,
    2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013)..................................................................16

## Other Authorities

Principles of the Law of Aggregate Litigation § 1.05 cmt. h (Am. Law Inst. 2009)................9, 21

## PRELIMINARY STATEMENT

Class representatives are an indispensable element of every class action.  In recognition of the effort, sacrifice, and hardship that the few undertake in service of the many, courts across the country regularly allow service awards to class representatives.  The same should be true here.

The ten Class Representatives here are deserving of service awards in the amount of $15,000 each, as agreed by the parties.  Settlement Agreement, Konanova Decl. Ex. 4, § VIII.1. The Class Representatives publicly disclosed personal financial information about their student loan debt and participated in dozens of press interviews to bring attention to Navient's allegedly harmful practices for the benefit of the class.  And they did so at great cost.  While this publicity garnered attention for the class, it also subjected the Class Representatives to vitriolic online comments and hostile interactions with co-workers and members of the public who suggested they were lazy and entitled.  Plus, the Class Representatives contributed hundreds of hours to prosecuting this action, including reviewing their loan documentation and personal notes, responding to discovery requests, mediating and settling this action equitably on behalf of thousands of others like them, and losing wages and taking time from work to attend a mediation session with the Court.  The Class Representatives, alone among the entire class, agreed to release their rights to seek monetary relief from Navient in the future (including on appeal of their dismissed claims), while preserving the rights of absent class members to pursue such claims.

Service awards in this case will not only compensate the Class Representatives for their dedication, but also will promote the service of others in the future.  Service awards are widely viewed as one tool to promote class governance and encourage individuals to serve as private attorneys general who pursue bad actors in addition to government enforcement.  The awards in this case do not give rise to any conflict of interest between the Class Representatives and absent class members; the service awards do not reduce the $1.75 million *cy pres* award, and these awards

were not offered by Navient as a means of buying its way out of this lawsuit.  Not a single objection to the proposed settlement received so far has contended that the Class Representatives should not receive these awards.

Given the circumstances in this case and the lack of any conflict of interest, as explained in further detail below, Plaintiffs respectfully request that the Court award each Class Representative a sum of $15,000.

**<u>BACKGROUND</u>**

The ten named plaintiffs in this action represent a class of student loan borrowers, all public servants, who alleged that Defendants Navient Solutions, LLC and Navient Corporation (collectively, "Navient") wrongfully advised borrowers about loan repayment and consequently hindered their ability to take advantage of the PSLF program.

As described further below, eight of these representatives were involved from the very beginning of this litigation, well before the complaint was filed, and two more joined before the amendment.  The Class Representatives publicly disclosed highly sensitive personal information, including detailed descriptions of their finances, their outstanding loan balances, and their ability to repay those loans in order to prosecute this case.  That information was widely circulated by various national news outlets including The New York Times, NPR, and CNN, and will remain in the public domain indefinitely.  Each devoted a significant amount of time and energy to every stage of the litigation by, among other things, recovering years of loan documents and correspondence necessary for the prosecution of the action, diligently reviewing filings, and discussing the litigation and settlement terms at length with counsel.  They personally attended a mediation hearing in New York, for which each of them had to miss at least one, if not two days of work, at their own expense, sometimes without pay from their employers, and sometimes at the added cost of experiencing severe anxiety or health issues as a result of travel.  In particular:

**Kathryn Hyland:**  Ms. Hyland is an 8th grade English Language Arts teacher in New York who alleged Navient led her to believe for years that she would be eligible for forgiveness, but later informed her she had to consolidate her loans first, at which point she could only begin making qualifying payments.  Hyland Decl. ¶¶ 3, 6–10.  Ms. Hyland then joined this litigation, to which she has contributed at least 170 hours.  *Id.* ¶ 16.  As a result of her involvement in several interviews that brought greater attention to the action, she was the subject of offensive Internet comments that "made [her] concerned for [her] safety and the safety of [her children].  *Id.* ¶ 32. Ms. Hyland postponed her plans to pursue a degree in special education or school leadership and took significant time away from her family, including her two young children, to focus on this litigation.  *Id.* ¶¶ 27, 29.  Ms. Hyland and her family endured serious emotional stress, heightened anxiety, and depression.  *Id.* ¶¶ 28, 30.  In April 2019, Michael Lewis of Against the Rules with Michael Lewis interviewed Ms. Hyland for his podcast; Ms. Hyland alone was fortunate enough that individuals who heard her interview asked how they could help her, and Mr. Lewis launched a charitable campaign to pay off the balance of her student loans as of 2019.  *Id.* ¶ 20.

**Melissa Garcia:**  Ms. Garcia is a Special Education teacher in New York.  She was "devastated" to learn in 2018 that she had made "so little progress towards loan forgiveness after trusting Navient to provide [her] with accurate information."  Garcia Decl. ¶¶ 3, 9.  Ms. Garcia volunteered to serve as a Class Representative to "speak up for others who had not been given correct information by Navient and were continuing to make payments, unaware that they were not making progress towards PSLF."  *Id.* ¶ 10.  Ms. Garcia dedicated at least 62 hours to this action, sacrificing time that she would have spent with her young child and using precious paid time off—of which she had little, given a recent maternity leave—to attend the mediation.  *Id.* ¶¶ 13, 22–23. Ms. Garcia suffered from stress and anxiety as a result of personal and professional risks from

3

publicly affiliating herself with this litigation, disclosing personally embarrassing information, and receiving criticism from individuals who took issue with her involvement or the litigation as a whole. *Id.* ¶¶ 24–26.

**Elizabeth Taylor:** Ms. Taylor is a Program Research Specialist for the New York State Department of Education who alleges Navient led her to believe she was on track for PSLF, though in fact she needed to consolidate her loans before her payments would qualify. Taylor Decl. ¶¶ 3– 7. Ms. Taylor has dedicated at least 58 hours to this action as a Class Representative, "divert[ing] time and energy away from [her] job and other responsibilities." *Id.* ¶ 12. Ms. Taylor also incurred personal expenses, including paying out-of-pocket for costs associated with her transportation to and from the November 2019 mediation, and missing two days of work (valued at $415) while attending. *Id.* ¶¶ 11, 19, 24. Ms. Taylor had to disclose personal health information to her super- visor to explain "that [she] was not using the lawsuit as an excuse to miss work." *Id.* ¶ 31. Given the stress of the litigation, Ms. Taylor, her friends, her family, and her coworkers were concerned about the impact that the action might have on her health. *Id.* ¶ 28.

**Jessica Saint-Paul:** Ms. Saint-Paul is a full-time director of a non-profit organization and an adjunct college professor. Saint-Paul Decl. ¶ 3. Ms. Saint-Paul also alleges Navient led her to believe she was on track, though she had not consolidated her loans, and so her first eight years of loan payments—against a balance of over $93,000—did not count towards loan forgiveness. *Id.* ¶¶ 4, 7–10, 52. Ms. Saint-Paul spent at least 153 hours contributing to the action, often working "during breaks between classes, late at night, or early in the morning." *Id.* ¶¶ 18–19. Ms. Saint- Paul was severely criticized for participating in interviews, and commenters on articles in which she was profiled suggested that she and others with loans were lazy, entitled, unintelligent, and "too dumb to go to school in the first place." *Id.* ¶¶ 40 n.2. Ms. Saint-Paul suffered "extreme

emotional stress" related to her work on behalf of the class, which continues each time she must re-live her experiences with Navient and causes her and her family to worry about the physical and emotional toll that the lawsuit has taken on her. *Id.* ¶¶ 32, 35-36.

**Rebecca Spitler-Lawson:**  Ms. Spitler-Lawson is an adjunct professor at two nonprofit colleges in California.  She alleges she chose not to pursue PSLF-eligible repayment options after Navient incorrectly told her that she could not qualify for PSLF until she was employed full-time by a single employer.  Spitler-Lawson Decl. ¶¶ 3, 11–12.  She devoted approximately 105 hours to representing the interests of the class.  *Id.* ¶ 16.  Because Ms. Spitler-Lawson suffers severe anxiety from flying she also paid approximately $600 out-of-pocket for her wife to join her.  *Id.* ¶ 27.  Even with her wife's support, Ms. Spitler-Lawson suffered two panic attacks prior to the trip, for which she missed two days of teaching.  *Id.*  Because of the publicity surrounding this litigation, Ms. Spitler-Lawson has had several negative interactions with colleagues and friends, at least one of whom openly mocked her financial situation.  *Id.* ¶ 32.

**Michelle Means:**  Ms. Means is a full-time first grade teacher in Maryland who alleges she did not pursue PSLF after Navient provided her with misinformation about the program on a number of occasions.  Means Decl. ¶¶ 3, 5.  Ms. Means contributed at least 58 hours to this action, often by working late at night.  *Id.* ¶¶ 13–14.  She missed one and a half days of work to attend the mediation session in New York.  *Id.* ¶¶ 20–21.  Her participation included presenting on the lawsuit to her local AFT union chapter and speaking to several media outlets, including the New York Times.  *Id.* ¶ 17.  Ms. Means was criticized by some of her colleagues and by Internet commenters who suggested she was "entitled," "lazy," and that "if [she] stopped spending money on food then maybe [she] could pay off [her] loans."  *Id.* ¶¶ 34–35, 42.

5

**Elizabeth Kaplan:**  Ms. Kaplan is a third-grade teacher in Maryland who alleges she did not enroll in a qualifying IDR plan after Navient incorrectly told her that PSLF required 120 consecutive payments.  Kaplan Decl. ¶¶ 3, 6–7.  Hoping to hold Navient accountable and help future public servants receive the loan forgiveness they are owed, Ms. Kaplan became a Class Representative and contributed at least 56 hours to this action.  *Id.* ¶¶ 10, 12.  Ms. Kaplan's participation in this action, which included traveling and attending the mediation session in New York, has "taken a significant mental toll," as she has experienced serious frustration, uncertainty, and defeat concerning Navient's actions.  *Id.* ¶¶ 16, 23.  She and her parents grew concerned about her well-being and privacy as a result of her involvement in this action:  "The public nature of my participation in this action has also been a source of tremendous stress" because "[m]y students' parents, future employers, and others may judge me based on my participation in the action or on what they read in the Complaint."  *Id.* ¶¶ 24, 26.

**Jennifer Guth:**  Ms. Guth is a library teacher in Maryland who alleges she did not pursue PSLF after Navient incorrectly told her that her 120 qualifying payments must be consecutive.  Guth Declaration ¶¶ 3, 7.  She spent at least 130 hours on the prosecution and settlement of this action.  *Id.* ¶ 14.  She used a personal day to take off from work to travel to and from New York in a single day to attend the mediation session.  *Id.* ¶¶ 21.  Aiming to shed light on the issues that face public service borrowers and to "speak for the interest of the class," Ms. Guth spoke with other members of her local union about the litigation, her experience with student loans, and was interviewed by the Baltimore Sun.  *Id.* ¶¶ 17, 26, 29.  In response, several of Ms. Guth's work colleagues criticized her and online commenters suggested she was unwilling to repay her debts; at one point, all of her personal information, including her address and phone number, was released publicly on Twitter.  *Id.* ¶ 30, 31.  Consequently, Ms. Guth suffered serious emotional and mental

6

stress requiring her to take anti-anxiety medication for the first time, and she fears that finding future employment may be difficult should she ever need to do so.  *Id.* ¶¶ 35–38.

**Megan Nocerino:**  Ms. Nocerino is a full-time middle school literacy teacher in Florida. Nocerino Decl. ¶ 3.  Having taken out a total of $145,943 in FFEL and Direct Loans to obtain her masters and doctorate degrees, Ms. Nocerino alleges Navient told her she was not eligible for forgiveness programs and instead steered her into multiple forbearances, which led her total loan balance to balloon to over $268,000 by the time this action was filed.  *Id.* ¶¶ 6, 9-12.  Ms. Nocerino agreed to serve as a Class Representative because "[p]art of [her] calling as an educator is to support [her] fellow teachers," including by sharing her experiences with Navient to "ensure that other public servants get the information they need about PSLF and never experience the feeling of hopelessness that I felt."  *Id.* ¶¶ 16-17.  Ms. Nocerino spent approximately 108 hours working on this litigation, including describing her interactions with Navient to counsel, collecting and reviewing her loan documentation, and traveling to and attending the mediation in New York which required her to use two vacation days (valued at approximately $200 each) and incur approximately $500 in childcare and incidental costs.  *Id.* ¶¶ 21-25.  Her participation in this case has taken a serious toll on her everyday life by causing her to "miss[] many evenings of quality time with [her] sons" and exposing her to harassment from anonymous phone calls after she participated in press interviews.  *Id.* ¶¶ 27-31.

**Anthony Church:**  Mr. Church is a full-time middle school band director in Florida.  He alleges that after Navient told him for five years that he was on track for loan forgiveness, he found out he was not because he had not consolidated his loans.  Church Decl. ¶¶ 3, 5–7.  Mr. Church decided to serve as a Class Representative so that, "by stepping into the spotlight," he could use his experience to help provide a "route to change and a means of holding [Navient] accountable"

7

and "encourage others to come out of the woodwork and share their experiences."  Church Decl. ¶¶ 13–14.  Mr. Church spent approximately 388 hours on the prosecution and settlement of this action.  *Id.* ¶ 16.  He used two vacation days (worth approximately $350 each) and incurred about $180 in personal expenses to attend the mediation session in New York.  *Id.* ¶ 21.  Between sacrificing time typically spent with his family and the "emotional and psychological" toll that his involvement took, "[t]his litigation, and the time that [he] spent contributing to it, has affected [his] work, [his] home, and every facet of [his] day-to-day life."  *Id.* ¶¶ 25–27.

## ARGUMENT

"The guiding standard in determining an incentive award is broadly stated as being the existence of special circumstances including the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and, of course, the ultimate recovery."  *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 200 (S.D.N.Y. 1997).  A wide variety of circumstances may suffice.  Importantly, courts have granted service awards to class representatives who agreed to broader individual releases in exchange for preserving the rights of absent class members, *Henry v. Little Mint, Inc.*, 2014 WL 2199427, at *11 (S.D.N.Y. May 23, 2014), or who faced intense media scrutiny, *e.g.*, *Matheson v. T-Bone Rest., LLC*, 2011 WL 6268216, at *9 (S.D.N.Y. Dec. 13, 2011).  Courts also commonly consider (1) the time and effort expended by the class representatives in pursuit of the action and the value added thereby, *Roberts*, 979 F. Supp. at 200, (2) "expenses incurred" from their involvement, *Stinson v. City of New York*, 256 F. Supp. 3d 283, 295 (S.D.N.Y. 2017), and (3) the risks class representatives faced and any burdens they sustained as a result of their active involvement in the litigation, *Roberts*, 979 F. Supp. at 200.  *See also Castagna v. Madison Square Garden, L.P.*,

8

2011 WL 2208614, at *8 (S.D.N.Y. June 7, 2011) ("[Service awards] are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff.").

Moreover, service awards promote good class governance and encourage individuals to pursue the enforcement of rights as private attorneys general. The purpose of such awards "should be to make it economically advantageous for potential named plaintiffs to volunteer to serve in class actions," Principles of the Law of Aggregate Litigation § 1.05 cmt. h (Am. Law Inst. 2009), an incentive recognized by numerous courts, *e.g.*, *Roberts*, 979 F. Supp. at 201 n.25 ("[I]ncentive awards in [some] context[s] serve the salutary purpose of encouraging private attorneys general to further policies that seek to bar unlawful [] practices and policies."); *Parker v. Jekyll & Hyde Ent. Holdings, L.L.C.*, 2010 WL 532960, at *1 (S.D.N.Y. Feb. 9, 2010) (awards incentivize individuals "to seek enforcement of the law" by serving as private attorneys general). And service awards cannot give rise to a conflict of interest in cases where they "will not diminish the recovery of any other class members." *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 246 (E.D.N.Y. 2010) (granting service awards).

## I.    SPECIAL CIRCUMSTANCES JUSTIFY SERVICE AWARDS TO THE CLASS REPRESENTATIVES

After dedicating significant time and effort, and incurring monetary and non-monetary costs to represent absent class members, the Class Representatives alone sacrificed individual damages claims against Navient to obtain class-wide relief. Many of them faced personal and professional difficulties and negative public attention as a result of participating in this action. For the reasons explained below, these circumstances warrant granting the requested service awards of $15,000 to each Class Representative.

9

A.      **The Class Representatives Sacrificed Their Own Interests
        By Agreeing To A Broader Release Of Claims Against
        Navient In Order To Secure Class-Wide Relief**

Service awards are warranted to class representatives who "executed a broader release than

other Class Members" under the settlement agreement." *Henry*, 2014 WL 2199427, at *11. *See*

*also Wise v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 2020 WL 1492672, at *9 (E.D. Cal. Mar.

27, 2020) (awarding $10,000 to each class representative in part because they "enter[ed] into a

broader release of claims than all other class members"); *Cifuentes v. CEVA Logistics U.S., Inc.*,

2017 WL 4792425, at *7 (S.D. Cal. Oct. 23, 2017) ("Plaintiff also signed a broader release than

other class members, further justifying . . . . the $7,500 incentive payment."); *Holman v. Experian*

*Info. Sols., Inc.*, 2014 WL 7186207, at *6 (N.D. Cal. Dec. 12, 2014) (awarding $10,000 for each

named plaintiff "to compensate them for their release of all claims against" the defendant, who

"demanded their broad release of individual claims … a much broader release than the release that

is given by the unnamed Class Members").

The Class Representatives here, unlike absent class members, forfeited their right to indi-

vidual damages claims against Navient, *see* Settlement Agreement, Ex. 4, §§ II.37, IX.A (provid-

ing that class representatives shall release "any and all Claims for monetary relief or non-monetary

relief"), even though they obtained discovery from Navient in support of their claims, *see*

Konanova Decl. ¶ 16.  They also are bound by the same release of all non-monetary and aggregate

claims surrendered by the class as a whole.  *Id.*  As Ms. Guth explains: "In the simplest of terms,

we are relinquishing our *right* to vindicate our own stories so that a broader group of people may

both benefit from the relief provided by this settlement and also seek that very vindication should

they choose to do so." Guth Decl. ¶ 41.  This is equally true for those Class Representatives whose

claims were dismissed because they are forfeiting, at the very least, the right to appeal that deci-

sion.  In their own words, they do not take this loss lightly:  "Although I am making th[e]se

10

sacrifices willingly to place the interests of the class before my own, I do not believe that they are insignificant in any respect. . . .  And although [my] claims were ultimately dismissed, the release still requires that I give up my right to appeal with respect to those claims."  Church. Decl. ¶ 33; *see also* Guth Decl. ¶ 40 ("Even if most of us would not have been able to successfully bring a claim against a massive corporation, that does not change the fact that we are relinquishing the *ability* to even make that attempt. . . . I have no doubt that the loss of that option is a substantial one.").  These sacrifices thus further justify the requested service awards.

### B.     The Class Representatives Spent Significant Time And Effort Making Meaningful Contributions To This Action

Service awards are used "to compensate named plaintiffs for efforts expended for the benefit of the lawsuit." *Spann v. AOL Time Warner Inc.*, 2005 WL 1330937, at *9 (S.D.N.Y. June 7, 2005) (internal quotation marks omitted); *see also Roberts*, 979 F. Supp. at 200 (compensating class representatives for "the[ir] time and effort expended . . . in assisting in the prosecution of the litigation"); *Castagna*, 2011 WL 2208614, at *8 (S.D.N.Y. June 7, 2011) (same).  Courts have cited a wide variety of activities performed on behalf of the class in granting such awards, including providing facts and documents to counsel, participating in discovery, communicating with putative class members, participating in mediation and settlement activities, and traveling across the country to do so.  *See, e.g.*, *Mentor v. Imperial Parking Sys., Inc.*, 2010 WL 5129068, at *2 (S.D.N.Y. Dec. 10, 2010) (granting incentive awards where named plaintiffs "reviewed documents, spoke to [potential class members] about the case, and traveled . . . to attend conferences"); *see also Flores v. One Hanover, LLC*, 2014 WL 2567912, at *7 (S.D.N.Y. June 9, 2014) (granting incentive awards to named plaintiffs whose involvement included "informing counsel of the facts initially and as the case progressed, providing counsel with relevant documents in their possession, informing putative Class Members of the lawsuit and encouraging them to participate, assisting

11

counsel to prepare for mediation, and reviewing and commenting on the terms of the settlement"); *Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 276 (E.D.N.Y. 2009) (granting awards for plaintiffs' efforts in "monitoring the lawsuit, producing documents, testifying at depositions and approving the settlement").

Here, the Class Representatives went "above and beyond in order to represent [their] fellow class members and to make things better for future public servants," Hyland Decl. ¶ 38, and thus warrant compensation.  The Class Representatives each contributed, on average, approximately 125 hours to the prosecution and settlement of this action by, among other things, independently researching various aspects of this case, *e.g.*, Saint-Paul Decl. ¶¶ 21–23, Church Decl. ¶¶ 19, 24, 34; speaking to potential class members about their experiences with Navient, Means Decl. ¶ 17; participating in media interviews to bring attention to this action, Hyland Decl. ¶ 31, Means Decl. ¶ 17, Guth Decl. ¶¶ 17; and providing substantive edits on various filings, Spitler-Lawson Decl. ¶¶ 18, 24, Taylor Decl. ¶¶ 15–16.  A number of Class Representatives spent considerable time on the discovery process by responding to Navient's interrogatories and requests for production, which required discussions with counsel and producing their own records in order to provide accurate information.  Hyland Decl. ¶ 19; Garcia Decl. ¶15; Taylor Decl. ¶ 17.  Even Class Representatives whose individual claims were dismissed continued to work on behalf of the class by, for example, continuing to pore over years of billing records and correspondence to assist in the further prosecution of the action, Guth Decl. ¶¶ 20, 27, and participating in settlement discussions with counsel and the mediation session before Judge Moses, *id.* ¶ 21, Kaplan Decl. ¶ 16, Church Decl. ¶ 21, Nocerino Decl. ¶¶ 24-26 .[1]

---

[1] That the Class Representatives' hours contributed to this action varied is of no moment.  *See, e.g.*, *Talone v. Am. Osteopathic Ass'n.*, 2018 WL 6318371, *17 (approving $15,000 incentive

The Class Representatives' recollections and records formed the very basis of this action. Unlike many consumer class actions where the source of the alleged harm (e.g., an advertisement) is publicly available, here, every alleged misrepresentation and piece of misinformation was obtainable in the first instance only through the notes, planners, and recollections of the individuals who were affected by the conduct at issue. The Class Representatives spent hours detailing Navient's representations about PSLF to counsel and searching for documents such as student loan statements, Employment Certification Forms, PSLF applications, and personal notes to support their recollections. For example, Ms. Hyland detailed her interactions with Navient over the course of several lengthy interviews with counsel and combed through her records to locate the personal notes on those interactions that she kept in her planner. Hyland Decl. ¶¶ 7, 17. Without the Class Representatives' time, there would have been no action.

The Class Representatives' extraordinary efforts here also helped ensure that the settlement of this action would benefit the class. Each of the Class Representatives here spent time reviewing the settlement terms and discussing them with counsel, efforts which were critical to the resolution of this action. Ms. Spitler-Lawson, for example, took time to speak with counsel about the importance of "provid[ing] call center employees with information about what constitutes full-time employment" for PSLF purposes, Spitler-Lawson Decl. ¶ 20, while Mr. Church and Ms. Hyland emphasized the creation of the non-profit organization meant to provide borrowers with accurate information about PSLF, Church Decl. ¶ 31; Hyland Decl. ¶¶ 33–34. These ideas all form part of the proposed settlement in this case. Settlement Agreement, Ex. 4, §§ V.B. (practice enhancements for call center employees), V.C. (*cy pres* recipient). Moreover, all of the Class

---

award for each of four named plaintiffs who participated "to varying degrees") (D.N.J. Dec. 3, 2018).

Representatives attended the mediation session in November 2019, where they further discussed their beliefs about what a fair settlement entailed both with counsel and amongst themselves. Courts routinely recognize these efforts as compensable through service awards. *See, e.g.*, *Flores*, 2014 WL 2567912, at *7 (named plaintiffs assisted with mediation preparation and reviewed and commented on settlement terms); *Spann*, 2005 WL 1330937, at *4 (named plaintiffs "participated in the settlement process"); *Parker*, 631 F. Supp. 2d at 276 (same).

### C.    The Class Representatives Incurred Costs In Prosecuting This Action

Service awards are also used to "reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages[.]" *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 272–73 (S.D.N.Y. 2012) (quoting *Hicks v. Stanley*, 2005 WL 2757792, at *10 (S.D.N.Y. Oct. 24, 2005)). This may include out-of-pocket costs as well as lost wages, vacation days, and other expenses. *E.g.*, *Roberts*, 979 F. Supp. at 203 (class representative was often "required to take vacation days . . . to participate in the discovery and mediation phases"). Courts also have recognized that time devoted to serving the interests of the class instead of personal and professional endeavors is equally worthy of compensation. *E.g.*, *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267–68 (N.D. Cal. 2015) ("Plaintiff has spent 73 hours on this case, including travel time, during which he might have otherwise spent time with family, working or pursuing other personal matters.").

The Class Representatives here incurred significant costs in furtherance of their efforts in aid of this litigation. Each Class Representative took time off from work to attend the settlement mediation by using personal or vacation days. Many incurred expenses related to their travel, Church Decl. ¶ 21 ($530 in travel expenses and lost wages to attend mediation hearing); Taylor Decl. ¶ 19 ($541 in travel expenses and lost wages to attend mediation hearing); Guth Decl. ¶ 22 ($104 in travel expenses to attend mediation hearing); Nocerino Decl. ¶ 25 ($500 on childcare and

14

incidentals in traveling from Florida to New York), and some Class Representatives who experience travel-related stress paid extra fees for family members to join them to help manage their anxiety so they could attend the meditation, Means Decl. ¶ 21 (paying $182 out-of-pocket to avoid traveling alone), Spitler-Lawson Decl. ¶ 26 (paying $600 out-of-pocket to avoid flying alone).

The Class Representatives also sacrificed significant time to fight on behalf of the class's interests instead of pursuing their own. Ms. Hyland, for example, deliberately delayed pursuing her degree in special education or school leadership so that she could maintain her commitment to the class without stretching herself too thin, and had serious concerns that she might be "passed over for professional opportunities or advancement because [she] was viewed as having too much on [her] plate," or simply that her participation "could negatively impact [her] professional reputation." Hyland Decl. ¶ 29. Similarly, Ms. Taylor "had to divert effort and time away from [her] work and responsibilities in a way that impacted [her] coworkers." Taylor Decl. ¶ 27. Many Class Representatives also gave up spending time with their families in order to further this litigation on behalf of the class. *E.g.*, Garcia Decl. ¶ 22 ("I have a young child who was an infant at the start of this case, and it was frequently difficult to balance the demands of being a class representative with caring for him."); Church Decl. ¶ 26 ("I would often have to step away from my family and work late into the night. That is all time that I cannot get back, and that I sacrificed in order to serve the class as best I could."); Means Decl. ¶ 14 ("Because I am a full-time teacher and a mother of two children, much of this work needed to occur late at night after my children were asleep and my work was finished."). As Ms. Hyland explains in her declaration, her dedication to this case had a negative impact on her family because it was more difficult for her to provide the proper care and resources for her child with special needs. Hyland Decl. ¶¶ 27-28 ("I will never be able to make up for missing special events and everyday moments like homework and playtime.").

15

> **D.      The Class Representatives Faced Significant Risks And Endured Substantial Burdens From Participating In This Action**
>
> **1.      The Class Representatives Faced Personal And Professional Risks**

The special circumstances inquiry recognizes that compensation is warranted in exchange for personal and professional "risks incurred by becoming and continuing as a litigant" and the "other burdens sustained" in the class representative's role. *Castagna*, 2011 WL 2208614, at *8; *see also Yuzary v. HSBC Bank USA, N.A.*, 2013 WL 5492998, at *12 (S.D.N.Y. Oct. 2, 2013) (same); *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187 (W.D.N.Y. 2005) (considering the "personal risk . . . incurred by the plaintiff applicant in becoming and continuing as a litigant"); *Bellinghausen*, 306 F.R.D. at 267–68 (approving service award for class representative who lost job opportunities as a result of participation in action and feared lost opportunities in the future); *Henry*, 2014 WL 2199427, at *10-11 (approving service awards for class representatives who faced "considerable personal risk" and "substantial professional risks and burdens" as a result of their participation). Even where the court has "no reason to believe" that the class representative will face direct "retaliatory action" by an employer, the representative's sincere "fear of adverse consequences or lost opportunities cannot be dismissed . . . ." *Frank*, 228 F.R.D. at 187–88; *see also Edelen v. Am. Residential Servs., LLC*, 2013 WL 3816986, at *16 (D. Md. July 22, 2013) ("[A]lthough there is no indication that [the class representative] faces any specific challenges in his current or future job prospects as a result of his participation in this lawsuit, there clearly is a risk that he could.").

*First*, the Class Representatives in this case faced professional hardship as a result of their involvement in this action. Many experienced hostility from coworkers that developed into confrontations at work. *See, e.g.*, Church Decl. ¶ 29 ("publicity has caused me some grief with a few colleagues"); Guth Decl. ¶ 33 ("I also experienced some general bitterness from some people …

16

they expressed resentment over the possibility that the lawsuit might contribute to my ability to repay my loans or receive loan forgiveness, even when, in reality . . . the requested service award is only a small fraction of my outstanding loan balance. This is something that I have encountered everywhere, not just at work, and at times that resentment would shift to outright hostility."); Spitler-Lawson Decl. ¶ 32 ("As a result of the publicity surrounding this litigation…. [o]ne colleague openly mocked the amount of debt that I had and bragged that they had not taken out student loans."). Others feared that negative reactions from their coworkers might fuel similar confrontations, *e.g.*, Means Decl. ¶ 30, or that future employers might hold press coverage and their participation against them, Guth Decl. ¶ 35; Kaplan Decl. ¶ 26. Ms. Hyland forwent professional advancement (as noted above), Hyland Decl. ¶ 29, and Ms. Taylor feared that her involvement in the action "would negatively impact [her] coworkers, [her] ability to do [her] job, and thus [her] reputation at work." Taylor Decl. ¶ 27.

*Second*, many Class Representatives experienced serious personal, emotional, and psychological stress over the course of the litigation. For example, some Class Representatives experienced sharp increases in anxiety and depression throughout their involvement. *See* Guth Decl. ¶¶ 36–38 (explaining that re-living her experiences with Navient for the past three years and focusing on the financial stress Navient caused led her to take anxiety medication for the first time); Hyland Decl. ¶ 30 ("I have struggled with anxiety and depression for many years, and these issues have been greatly exacerbated by the stress and worries I have experienced."); Garcia Decl. ¶ 27 ("It has been stressful just knowing that someone, particularly a colleague or parent of a student, could recognize my name and make judgments about me based on my participation."). At times, that added stress created additional burdens on the families of the Class Representatives. *See* Saint-Paul Decl. ¶ 36 ("My family worried about me and the physical and emotional toll this

17

lawsuit has put on me."); Kaplan Decl. ¶ 24 ("My parents were particularly concerned for my wellbeing and privacy."); Hyland Decl. ¶¶ 27-28 (describing burden to her family, including finding care for her child with special needs).

### 2.    Significant Media Coverage Exposed The Class Representatives To Criticism, Ridicule, And Public Scrutiny

The Class Representatives all had to publicly affix their names to this lawsuit and disclose details of their personal financial situations, and many furthered the interests of the class through media outreach.  Service awards are justified under these circumstances to recognize the "sacrifice of . . . anonymity," particularly where the representatives are "required to expose their private financial affairs." *Sykes v. Harris*, 2016 WL 3030156, at \*18 (S.D.N.Y. May 24, 2016) (internal quotation marks omitted) (awarding $30,000 service payments each to class representatives who "subjected themselves to the publicizing of their private financial information" with the attendant "risk[ of] the stress and stigma of sharing their personal experiences with debt collection").  Class representatives who were the "subject of media coverage about the case" serve the interests of the class by, for example, maintaining pressure on the defendant to reach a global settlement and raise public awareness to call for regulatory reform, such that media coverage "can benefit the class . . . [and] further support[] a service award," *Matheson*, 2011 WL 6268216, at \*9.  The same media attention, however, can further exacerbate the risks and burdens already faced by class representatives.  *E.g.*, *Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1313 (S.D. Cal. 2017) (analyzing "notoriety" and "public scrutiny" faced by class representatives); *Rodriguez v. Kraft Foods Grp., Inc.*, 2016 WL 5844378, at \*16 (E.D. Cal. Oct. 5, 2016) ("Plaintiff also suffered . . . [from] the stigma that the lawsuit placed on him in the community…. former co-workers have spread rumors and made extremely negative comments about him, and he believes the lawsuit has hurt his chances for future employment within [his] industry."); *Sauby v. City of Fargo*, 2009 WL 2168942, at \*2

18

(D.N.D. July 16, 2009) (service award justified in part by facts that "[t]he media closely followed this lawsuit" and class representative was "harassed, ridiculed, criticized, confronted, and otherwise abused directly and indirectly in the media by members of the public").

The subject matter of this lawsuit required all of the Class Representatives to publicly disclose their names, their decisions to incur tens of thousands of dollars each in student loan debt, and their continued struggles with paying back their loans.  But releasing such sensitive information was not easy for many of the Class Representatives.  Ms. Guth, for example, "was constantly targeted on Twitter and Facebook, and in one instance all of [her] personal information was released on Twitter, including [her] address and [her] place of work."  Guth Decl. ¶ 31.  Ms. Hyland similarly "received a handful of nasty, derogatory comments from strangers on the Internet," which "made [her] question why [she] had gotten involved in the action in the first place" and "made [her] incredibly anxious to know that people had access to information about [her,]" and caused her "concern[] for [her] safety and the safety of [her] children."  Hyland Decl. ¶ 32.

These tensions were exacerbated by intense media scrutiny and criticism of the Class Representatives, a burden they bore to further the interests of the class.  As Ms. Guth and Ms. Hyland describe, media involvement was an important aspect of serving as a Class Representative:  they viewed their responsibilities as raising awareness about their struggles with Navient and giving a voice to absent class members.  Guth Decl. ¶¶ 17, 29; Hyland Decl. ¶ 31.  As Ms. Hyland explained, "it was important to bring attention to the action and the stories of others like [her]," Hyland Decl. ¶ 31, and, for Ms. Guth, "it was the right thing to do as a class representative to speak for the interest of the class and to foster public awareness," Guth Decl. ¶ 29.  In the words of Mr. Church:  "I believed that, by stepping into the spotlight, I could encourage others to come out of the woodwork and share their experiences, which I felt would make it more likely that Navient be

19

held accountable for its conduct in a manner that would secure relief for a broader group of people." Church Decl. ¶ 14.

But many Class Representatives faced unfair backlash from the public, frequently littered with racial and classist slurs. For example, after Ms. Saint-Paul participated in interviews with NPR and CNN, she faced comments that questioned her intelligence, called her lazy, and called out her race. Saint-Paul Decl. ¶¶ 38, 40. Although much of this litigation was difficult, "this backlash . . . was especially traumatizing" for Ms. Saint-Paul. *Id.* at ¶ 40. Similarly, "[t]he prominent display of [Ms. Means's] photograph in the *New York Times* made [her] a focal point of the media coverage," and, as a result, she was the subject of Internet comments that were "deeply personal, hurtful, degrading, and offensive." Means Decl. ¶¶ 33–34. Beyond comments suggesting that she and others "were acting entitled to [] money," *id.* ¶ 34, Ms. Means was the subject of online criticism "exhibit[ing] racial bias and disparaging comments about [her] appearance," *id.* ¶ 35. "Commenters, for example, would remark that if [she] stopped spending money on food then maybe [she] could pay off [her] loans." *Id.* at ¶ 35. Comments about her appearance, as well as those demonstrating "racial vitriol," were so "shocking and emotionally traumatizing" for Ms. Means and her family that she deleted her social media accounts and "stop[ped] taking media requests." *Id.* ¶ 36. After participating in press interviews, Ms. Nocerino "received several anonymous phone calls about [her] role in the case" that made her so "terrified" she "slept with [her] children in bed… for weeks." Nocerino Decl. ¶ 30.

## II.    SERVICE AWARDS PROMOTE CLASS GOVERNANCE AND DO NOT CREATE ANY CONFLICT OF INTEREST HERE

Beyond serving an important compensatory function, service awards are consistent with basic theories of class governance and are viewed as reducing conflicts of interest between class representatives and absent class members. Nominal service awards that are not subsidized by a

common damages fund—as in this case—do not give rise to conflicts of interest that render the class representatives inadequate or the service awards inappropriate. These factors further support granting the $15,000 service awards to the Class Representatives in this case.

"Courts in this Circuit routinely" grant requests for service awards not only to "reimburse" class representatives but also "to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *In re Bear Stearns*, 909 F. Supp. 2d at 272–73 (internal quotation marks omitted). Thus, recognizing that in order to vigorously represent the interests of the class, representatives "must on occasion bear additional responsibilities and face the possibility of the adverse demands and consequences of being a named party to litigation," the availability of service awards promotes good class governance and adequate representation by "incentiviz[ing] [class representatives] to represent others well." Principles of the Law of Aggregate Litigation § 1.05 cmt. h (Am. Law Inst. 2009) ("[T]he purpose in awarding [service awards] should be to make it economically advantageous for potential named plaintiffs to volunteer to serve in class actions."). These authorities further support granting the requested service awards here.

Service awards may also promote the effective representation of class members by "provid[ing] an incentive to seek enforcement of the law despite [the] dangers" associated with doing so. *Parker*, 2010 WL 532960, at *1. This is primarily because awards "recognize a willingness to act as a private attorney general," *Sauby*, 2009 WL 2168942, at *2, by encouraging individuals "to further policies that seek to bar unlawful [] practices and policies," *Roberts*, 979 F. Supp. at 201 n.25.

This rationale is profoundly applicable to this case: shortly before the Complaint was filed in October 2018, the Department of Education revealed that it had rejected a staggering 98% of the 28,000 PSLF applications it received since October 2017. Compl. ¶¶ 14, 15. Fewer than 100

21

individuals had received loan forgiveness under the program. *Id.* ¶ 14. The Class Representatives spent hundreds of hours working to vindicate the rights of thousands of public servants who are crushed with student loan debt. Service awards here will encourage individuals to continue vindicating the legal rights of absent class members in the future on critical issues. This is the precise situation in which courts reward class representatives for their willingness to step forward and aid in the prosecution of a matter of public interest.

Moreover, the service awards do not create any conflicts of interest between the Class Representatives and absent class members. While some courts have noted that if Class Representatives "expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard," *Roberts*, 979 F. Supp. at 200–01, those concerns do not apply here for two primary reasons.

*First*, the service awards here "will not diminish the recovery of any other class members." *Dupler*, 705 F. Supp. 2d at 246 ("not[ing] with approval" that defendant "agreed to pay these incentive awards directly"); *see also McLaughlin v. IDT Energy*, 2018 WL 3642627, at *15 (E.D.N.Y. 2018) (providing service awards "which defendants have agreed to pay using their own resources—meaning the service awards will not reduce the benefits paid to class members"). Under the Settlement Agreement, the service awards will not reduce the amount of the *cy pres* fund or the extent of the practice enhancements to be implemented by Navient. *See* Settlement Agreement, Ex. 4, § V.C.4. Nor would any change to the requested service awards constitute grounds to terminate the settlement. *Id.* §§ VIII.4, XII.3. The "direct" funding of these awards by Navient therefore protects the interests of absent class members.

22

*Second*, only the Class Representatives have released the ability to pursue individualized damages claims against Navient in the future, despite the fact that their claims are premised on significant financial harms. *Id.* §§ II.37, IX.A. Because "[t]he settlement protects the rights of class members by ensuring that [they] retain their individual damages claims," *Lilly v. Jamba Juice Co.*, 2015 WL 2062858, at \*7 (N.D. Cal. May 4, 2015), there is little reason to believe that the Class Representatives here discounted those rights in favor of their own interests. That there have been no objections by class members to the service awards themselves confirms as much. This, too, favors granting the requested awards. *See Henry*, 2014 WL 2199427, at \*10 ("No Class Member has objected to the Service Awards.").

## CONCLUSION

For the reasons explained above, Plaintiffs respectfully request that the Court approve a service award of $15,000 for each Class Representative, as agreed to by the parties in the proposed settlement.

Dated:   New York, NY
         August 28, 2020

Respectfully submitted,

SELENDY & GAY PLLC


By:   ___/s/_____*Faith Gay*_____

Faith Gay
Maria Ginzburg
Yelena Konanova
Margaret Siller
Amy Nemetz
SELENDY & GAY, PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
E-mail:  fgay@selendygay.com
mginzburg@selendygay.com
lkonanova@selendygay.com
msiller@selendygay.com
anemetz@selendygay.com

Mark Richard
PHILLIPS, RICHARD & RIND, P.A.
9360 SW 72 Street, Suite 283
Miami, FL 33173
Telephone: 305-412-8322
E-mail: mrichard@phillipsrichard.com
(admitted *pro hac vice*)

*Attorneys for Plaintiffs*

24