**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KATHRYN HYLAND, MELISSA GARCIA, ELIZABETH TAYLOR, JESSICA SAINT-PAUL, REBECCA SPITLER-LAWSON, MICHELLE MEANS, ELIZABETH KAPLAN, JENNIFER GUTH, MEGAN NOCERINO, and ANTHONY CHURCH individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NAVIENT CORPORATION and NAVIENT SOLUTIONS, LLC,<br><br>Defendants. | No. 18-cv-9031-DLC |

**DECLARATION OF ANTHONY CHURCH IN SUPPORT OF**
**APPLICATION FOR SERVICE AWARDS**

**ANTHONY CHURCH**, being duly sworn, declares as follows:

1. I am one of the Class Representatives appointed in the Court's Preliminary Approval Order, Dkt. 108, as a representative of the Settlement Class in the above-captioned action.

2. I submit this affidavit in support of Plaintiffs' motion for final approval of the settlement and for a $15,000 service award to each Class Representative. The facts giving rise to my participation as Class Representative and my role in securing the settlement discussed herein support the requested service award.

**Background**

3. I am a full-time middle school band director residing in Florida.

4. To obtain both my bachelor's and master's degrees in Studio Music and Jazz Performance, I took out Family Federal Education Loans ("FFEL") and Direct Loans, which were, and to this

day still are, serviced by Navient. I took out eleven loans, five of which were FFEL loans, five of which were Direct Loans, and one of which was a Graduate Direct PLUS Loan. In total, I took out $88,368 in loans.

5. In 2012, when I began teaching, I asked Navient about the Public Service Loan Forgiveness ("PSLF") program. At that time, they told me that all I needed to do was make 120 payments while working for a qualifying employer and that my loans would then be forgiven.

6. Over the next five years, I spoke with Navient at least ten more times, and during every conversation they informed me that I was on track for PSLF and provided me with an updated number of qualifying payments. As a borrower, I trusted Navient to provide me with truthful and accurate information about my loan repayment options.

7. As it turned out, I was not on track for PSLF. In fact, my FFEL Loans—which represented the majority of my loan balance—did not qualify. Instead, they had to first be consolidated into Direct Loans, which Navient failed to tell me until late December 2016, at which point I had been making payments for almost five years.

8. In January 2017, I consolidated my FFEL Loans into Direct Loans in order to make them eligible for PSLF. But by doing so, I reset the counter on my forgiveness payments, meaning that the first five years of payments that I made did not count towards the 120 payments required for forgiveness. Had Navient made me aware of the need to consolidate my FFEL Loans, I would have done so at the outset and would be closer to obtaining forgiveness today.

9. Moreover, there were multiple occasions when Navient directed me into forbearance rather than helping me to maintain an income-driven repayment ("IDR") plan, which would have allowed me to make qualifying low- or no-dollar payments towards PSLF.

10. In total, Navient directed me into forbearance for almost two years. Any time spent in forbearance does not count towards the PSLF total but does result in the accrual of additional interest. As a result of my loans being in forbearance, my total loan balance has nearly doubled due to interest alone. At the time the amended complaint was filed, I owed approximately $131,965.

11. When I was told in December 2016 that my first five years of payments had not counted and my interest had increased substantially, I was crushed. Both my financial and professional futures were dependent upon the availability of loan forgiveness. To have that opportunity suddenly pulled out from under me made it feel as if I was now stuck on a linear path for another 10 years. And because my loans would stay with Navient until I qualified for PSLF-based transfer to FedLoan Servicing, I felt that I was trapped on that path with the same people whose failures had brought me there in the first place.

12. I have already suffered economic setbacks as a consequence of artificially increased debt. Most notably, my inflated loan balance posed a substantial barrier while I was attempting to purchase a home, as I was disqualified from a number of mortgage options in light of my outstanding debt alone, regardless of my income.

### Role as Class Representative

13. When I found out that Navient had failed to inform me about consolidating my loans after five years of speaking with them, I knew that something about their system was broken. The blatant manner in which Navient had mishandled my loans left little doubt that Navient's practices needed reform. It was my hope that legal action against Navient would be a route to change and a means of holding them accountable for how they had treated me and, I imagined, many others like me.

14. I also knew that my experiences were not an isolated occurrence—there were likely others who had problems with Navient similar to my own. I believed that, by stepping into the spotlight, I could encourage others to come out of the woodwork and share their experiences, which I felt would make it more likely that Navient be held accountable for its conduct in a manner that would secure relief for a broader group of people.

15. It was for this reason that, after filling out a student debt survey and subsequently learning about this action, I decided to serve as a class representative.

### Efforts

16. As a class representative, I have expended considerable effort directly participating in this action—in total, approximately 388 hours—that I believe aided in its prosecution and settlement.

17. From December 2018, when I became involved in this action, until the amended complaint was filed on January 16, 2019, I spent roughly 50 hours assisting counsel. This involved significant time speaking with counsel about my experience and about the action, providing documents at the request of counsel, and carefully reviewing and commenting on drafts of the amended complaint.

18. Following the complaint filing, I had frequent and often lengthy discussions with counsel about the status of the action and the numerous filings by each party. I carefully reviewed each filing to better understand the action and inform my discussions with counsel. When Navient filed its motion to dismiss the amended complaint, I reviewed it closely along with the cases cited in the motion. I spoke frequently with class counsel about Navient's arguments and discussed potential responses. I spent approximately 150 hours on this work between January 2019 and July 2019.

19. In addition, since the complaint was filed, I have spent many hours each week conducting independent research to educate myself on the issues surrounding the case and the settlement negotiations. I also followed other actions that have been filed against loan servicers and re-viewed filings in those cases. This research has given me additional background knowledge that enabled me to participate more fully in this action.

20. After the Court dismissed some of the claims, including mine and those of the other Florida putative class members, I carefully reviewed the opinion and spoke with counsel at length about what it meant for me and for the class. I felt discouraged but also motivated to find the best way to proceed, which I still believed was in a manner that included as many class mem-bers as possible. To that end, I continued to speak frequently with counsel about which direc-tion the litigation should take and carefully reviewed documents related to potential settlement of the action. In total, between the Court's order granting Navient's motion to dismiss the Florida claims and the mediation in early November 2019, I spent about 80 hours reviewing the Court's opinion, reviewing settlement-related documents, and communicating with counsel via phone and email.

21. In November 2019, I took time to travel to New York for a mediation between the parties. In total, that trip took around 25 hours in total. I also had to take two of my vacation days—worth about $350—to travel for the mediation, and I incurred about $180 in personal expenses on meals and cab fare as a result of my travel.

22. Following the mediation, as the parties moved towards class-wide settlement, I continued to invest considerable time speaking with counsel and other class representatives about how the litigation was proceeding, what various settlement terms would mean for the class, and how we could best protect their interests. In total, I spent roughly 70 hours on these tasks.

23.  On June 10, 2020, I listened in on the preliminary approval hearing, which lasted about one hour.  The next day, I also participated in a call with counsel and the other class representatives, which lasted around 2 hours.  Finally, I spent approximately 10 hours reviewing and discussing this declaration with counsel.

24. In addition, throughout this time I continued conducting independent research to better inform myself about the dismissal and potential settlement so that the class and I can be as prepared as possible for the Court's final approval hearing.

### Risks & Burdens

25. This litigation, and the time that I spent contributing to it, has affected my work, my home, and every other facet of my day-to-day life.

26. From the early stages of the case, when I was reading as much information as I could about our case and the complicated issues that affect this type of litigation, I would often have to step away from my family and work late into the night.  That is all time that I cannot get back, and that I sacrificed in order to serve the class as best I could.

27. My role as a class representative was also incredibly taxing on an emotional and psychological level.  On the one hand, working on this action was a constant reminder of the financial hardships that Navient has caused me, and the fact that I am trapped with them as my servicer until I can meet the PSLF requirements.

28. On the other hand, the settlement process also proved incredibly difficult for me as I, like all of the class representatives, was faced with whether or not to accept the settlement terms, which required me to release my individual claim for money damages against Navient.  Undoubtedly, this settlement is a big step in the right direction, but I also knew that I was giving up a lot of potential gain in exchange for something that would help the whole class.  And while it was

ultimately clear that the class benefits outweighed whatever I thought I was due as an individual, that decision was one that I took incredibly seriously as we negotiated the final Settlement Agreement.

29. Although I try to maintain my privacy, there is no hiding my involvement in this litigation. My name, and my personal financial information, are attached to a complaint that is publicly available and that has been published in a number of newspapers nationwide.  I thus recognize that my name will forever be tied to an action with which some people disagree, including individuals with whom I work.  While I am thankful to have not received any threats as a result of my involvement, that publicity has caused me some grief with a few colleagues.

### Settlement

30. One of my principal motivations for joining this action was a desire to hold Navient accountable and prevent them from continuing to harm public servants in the way that they have for the duration of the PSLF program's existence.  I believe that this settlement, at its core, provides that accountability and protection by forcing change within Navient.

31.  I also believe that this settlement takes a major step in the right direction by creating a non-profit organization that will arm borrowers with the tools they need to pursue the forgiveness that they are owed.  This aspect of the settlement was particularly important to me, and I am proud of the fact that we were able to secure this victory for borrowers despite the significant barriers that we faced.

32. I recognize, however, that these victories come with a cost.  I, along with the other class representatives, had to sacrifice both the opportunity for an individual settlement and, unlike the remainder of the class, the option of pursuing monetary claims against Navient in the future.

33. Although I am making those sacrifices willingly to place the interests of the class before my own, I do not believe that they are insignificant in any respect. To the contrary, I believe that my individual claims against Navient, which I release under this settlement, are both meritorious and could have resulted in a substantial judgment in my favor given the egregiousness and frequency of Navient's mistakes in my case, as well as the availability of telephone records of my conversations with Navient. And although those claims were ultimately dismissed, the release still requires that I give up my right to appeal with respect to those claims.

34. In a word, my involvement in this litigation has been arduous. Not only did I spend a substantial amount of time reading, researching, and conferring with counsel about this action, I endured significant hardships and incurred personal costs a result of those efforts.

35. Yet, despite those hardships, I remained dedicated to the task of using my own experience with Navient to secure benefits for a greater group of people who, like me, have been harmed by Navient's actions. This was as true at the start of my involvement in the action as it was when I signed the final Settlement Agreement.

36. In the end, I believe wholeheartedly that this settlement provides for the practice enhancements that I hoped it would, and that a $15,000 service award, as agreed to by the parties, is reasonable in light of my role in obtaining those changes.

Dated:    August 28, 2020

_____

Anthony Church