**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KATHRYN HYLAND, MELISSA GARCIA, ELIZABETH TAYLOR, JESSICA SAINT-PAUL, REBECCA SPITLER-LAWSON, MICHELLE MEANS, ELIZABETH KAPLAN, JENNIFER GUTH, MEGAN NOCERINO, and ANTHONY CHURCH individually and on behalf of all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>NAVIENT CORPORATION and NAVIENT SOLUTIONS, LLC,<br><br>　　　　　　　Defendants. | No. 18-cv-9031-DLC |

**DECLARATION OF JENNIFER GUTH**
**IN SUPPORT OF PLAINTIFFS' APPLICATION FOR SERVICE AWARDS**

**JENNIFER GUTH**, being duly sworn, declares as follows:

1. I am one of the Class Representatives appointed in the Court's Preliminary Approval Order, Dkt. 108, as a representative of the Settlement Class in the above-captioned action.

2. I submit this affidavit in support of Plaintiffs' motion for final approval of the settlement and for a $15,000 service award to each Class Representative. The facts giving rise to my participation as Class Representative and my role in securing the settlement discussed herein support the requested service award.

**Background**

3. I am a full-time elementary and middle school library teacher residing in Maryland.

4. To finance my JD and LLM degrees, as well as my master's degree in library science, I took out Federal Family Education Loans ("FFEL"), which I consolidated to Direct Loans in 2011

in order to pursue Public Service Loan Forgiveness ("PSLF").  In total, I took out $140,200 in loans, which were, and to this day still are, serviced by Navient, whom I trusted to provide me with truthful and accurate information about my loan repayment options.  By the time the complaint in this action was filed, the total balance on my loans was approximately $273,744.

5.  In 2014, I contacted Navient about transitioning to an income-driven repayment ("IDR") plan to begin making the necessary qualifying payments for PSLF.

6.  After a series of mistakes on Navient's part that resulted in my loans being placed in deferment rather than on a qualifying IDR plan, Navient misinformed me that I did not need to file any paperwork as a part of the PSLF program.  What Navient failed to tell me, however, is that the Department of Education strongly encourages borrowers to submit their Employment Certification Forms ("ECF") at the start of the repayment process—and in any event, on an annual basis—to ensure that their loans and employment qualify for PSLF.

7.  Moreover, Navient falsely informed me that PSLF payments had to be consecutive.  Because I knew that I was going to take additional coursework in order to renew my certification, I entered forbearance instead of making what would have been qualifying payments.

8.  I have since been forced to take two college courses per semester—indefinitely—to qualify for a deferment on my loans, as I am unable to make the required monthly payments on my loans and do not want to enter a forbearance where my loans will continue to accrue interest.  To afford those courses, I often have to negotiate some sort of payment plan or put the cost on my credit card.

**Role as Class Representative**

9. My involvement in this action began with an email from the Baltimore teachers' union, which informed me that the American Federation of Teachers ("AFT") was considering supporting legal action against Navient.

10. After filling out AFT's student debt survey, I was contacted by counsel and walked through some of my survey answers with them. It was at this point that I began to realize how egregious my interactions with Navient had been and that others had likely been treated in exactly the same way.

11. One of the main reasons that I joined this litigation was a belief that Navient needed to make changes to its practices, particularly when it came to their treatment of borrowers interested in PSLF.

12. I also believed that this was a problem in desperate need of publicity. Even as someone who had been directly impacted by Navient's practices, I was unaware of how widespread the problem was until I became involved in this action. And I can recall telling stories about what Navient had done with my loans only to be met with shock and a level of disbelief. To me, this action was a way to combat that—to combat the shamefulness and silence with which we tend to surround discussions of debt—to highlight a very real and very important problem that is facing public servants around the nation.

13. My decision to serve as a class representative was similarly motivated. On the one hand, I believed that my experiences with Navient could help shed light on this issue and demonstrate for the court and others the harm that Navient was causing. On the other, as a former attorney, I knew that it can be difficult to find individuals who are willing to put their name and face out there in support of an action; I was willing to be that person.

**Efforts**

14. Serving as a class representative has required significant time and effort on my part.  In total, I spent between 130 and 170 hours over the course of this litigation.

15. From the time that I joined the action until we filed the initial complaint on October 3, 2018, I spent a substantial amount of time pulling documents requested by counsel.  Because my loans go back to 1991, and because I had four different loans at the outset, I had to search through pages upon pages of old correspondence and records that I had saved over the past twenty-plus years.  On top of those records and correspondence, I went through all of my old phone records and emails, to the extent possible, to create a record of my conversations with Navient.  This process proved particularly difficult because I was attempting to access multiple accounts between different servicers.  In total, I spent roughly 60 hours compiling these documents.

16. During this stage of the litigation, there were also many phone calls with counsel, some that were up to an hour long, to establish the basic background of what had happened.  I also spent several hours carefully reviewing the draft complaint that was sent to me by counsel.

17. In mid-October, shortly after the initial complaint was filed, I participated in an interview with the Baltimore Sun that was coordinated by my local teachers' union.  The interview itself took one hour, but I spent about 4 or 5 hours beforehand preparing for the interview and coordinating with the union.  I felt that, by participating in the interview, I would both move towards my goal of raising awareness about this issue while also serving the best interests of the class by sharing my story, which is representative of the experience of so many others.

18. While counsel was drafting the amended complaint, which was filed on January 16, 2019, I spent another 10 to 15 hours going back through my records and emails to make sure that I had provided all of the information that I could.

19. While the class contested Navient's motions to dismiss from December 2018 until July 2019, I continued to discuss the case with counsel, and I spent 5 to 10 hours conducting research on similar actions that were taking place around the country.

20. After the partial dismissal of the class's claims, including my own, I still spent considerable time providing counsel with updated data, including loan data from the National Student Loan System Database ("NSLDS").  I also had a number of conversations with counsel over the phone and through email about what the next steps were for the class and what potential remedies might look like.  For my part, I remained focused on achieving relief on a class-wide, rather than individual, basis because I believed that it was the most effective way of forcing Navient to change the way that it interacts with PSLF-eligible borrowers.

21.  I also attended the mediation between the parties on November 5, 2019, which in total required between 20 and 25 hours of travel and work.  In order to attend, I had to take a personal day and attempt to get from Maryland to New York and back within that day to avoid taking more than one day off.  I left around 5:00 AM that morning and did not return home until about 10:00 PM.

22.  For the mediation, I had to pay several out-of-pocket costs including a dog-sitter ($50), parking ($14), and meals for the day (approximately $40).  Moreover, because teachers have to prepare their materials before taking time off, I spent 3 to 4 extra hours at work the day prior to prepare plans for whomever was covering for me.

23. While the parties were negotiating a classwide settlement beginning in late November 2019, I spent several hours reading drafts of the agreement and talking with counsel about the various terms.

24. As a part of considering the settlement terms, I spent 10 to 20 hours going through the news and social media to see what people had been saying about the action and their own experiences with Navient. For me, it was important to understand both the public sentiment around the action and also the state that Navient was in at the time to get a better sense of what the impact of the settlement terms might be.

25. Although I was not able to listen in on the preliminary approval hearing because my work was chaotic with the continued impact of COVID-19, I did participate in the phone call with counsel that took place the following day on June 11, 2020, which lasted for about 2 hours.

26. Throughout the course of this litigation, I spent between 4 and 6 hours speaking with other members of the union about the litigation and my experience, as well as speaking with counsel to ensure that I did not provide more information than I was permitted to give.

27. In the time since preliminary approval, I have spent 13 hours discussing this filing with counsel as well as going back through my emails and records to make sure that I had provided counsel with all of the information asked of me and that I would be able to accurately present to the Court what my involvement with this litigation has been.

### Risks & Burdens

28. My involvement in this action has also come with significant hardships, as I have dealt with substantial harassment and criticism both at work and online.

29. Much of that backlash has stemmed from the Baltimore Sun interview that I did in October 2018.[1] I understand that it was ultimately my choice to participate in the interview, but as someone who joined this action in part because of a belief that this issue needed as much

---

[1] Liz Cowie, "2 Baltimore city teachers among group suing loan servicer Navient," The Baltimore Sun (Oct. 13, 2018), *available at* https://www.capitalgazette.com/bs-md-ci-navient-lawsuit-20181010-story.html.

publicity as possible, I felt that it would be a disservice to the action for me not to do so. Moreover, I felt it was the right thing to do as a class representative to speak for the interest of the class and to foster public awareness.

30. On more than one occasion, I had colleagues come to my classroom and make negative comments about the litigation and my involvement. I saw similar comments online: that I didn't want to pay may debts; that I expected the taxpayers to pay for my school. After a period of time, it became enough of a problem that I felt I could no longer safely participate in any further media.

31. I was constantly targeted on Twitter and Facebook, and in one instance all of my personal information was released on Twitter, including my address and my place of work. I have since gone private on all accounts, but the harassment has not ended.

32. To make matters worse, the article that I did with the Baltimore Sun did not originally paint my employer in the most accurate or favorable light, and as a result I had to warn my supervisor about what the story was going to say. This only added to the stress caused by media involvement, as I was worried about what consequences there might be as a result of the misinformation in the article.

33. Beyond the Baltimore Sun article, I also experienced some general bitterness from some people that I came into contact with who were aware of the action. Often, they expressed resentment over the possibility that the lawsuit might contribute to my ability to repay my loans or receive loan forgiveness, even when, in reality, the only payment I might receive is the requested service award that is only a small fraction of my outstanding loan balance. This is something that I have encountered everywhere, not just at work, and at times that resentment would shift to outright hostility.

34. Moreover, even if I had not participated in the Baltimore Sun article, I cannot change the fact that my name is tied to this action, my sensitive financial information is in a publicly available complaint that has been published through various news organizations, and, as a result, anyone who searches for my name, and even some who do not, will quickly learn that I have substantial student loan debt that I cannot pay. I understand that this is a part of being a class representative—and that it is something that may often discourage people from serving in this role—but that does not make its impact any less severe.

35. I am grateful to be in a position that I do not feel the need to leave soon, or likely at all, before retirement. I am well aware, however, that my involvement in this action may prevent me from ever transitioning to a different job should I desire to do so. My name—and my private financial information—are indefinitely tied to this action. Given the frequency with which I have faced backlash for my involvement, I fully expect that I would face challenges from potential future employers if I am ever in the position of applying for a new job.

36. Between the time that I have spent and the criticism I have received, my involvement in this action has taken a serious mental toll. While I have struggled with anxiety for some time, it has become more difficult to manage since becoming involved in this action; as a result, I have had to take medication for the first time in my history of dealing with anxiety.

37. Much of my anxiety stems from reviewing all of my old records and correspondence, which highlighted for me all of the times I was misled, the thousands of dollars that I have lost as a result, and all of the ways in which my loan situation could have played out in a vastly different manner.

38. Before my involvement in this action, these were not experiences that I had to focus on daily. I would interact with Navient when I had to, be frustrated for a few days, and continue with

8

the rest of the things that I have to deal with.  But now, I have no choice but to constantly revisit the last twenty-plus years of misinformation, misguidance, and outright lies that have led me to the financial situation in which I now find myself.  For almost three years, there was unending focus on that financial situation—on exactly how much money I owe and precisely how Navient's conduct exponentially increased that amount—and it has caused me an incredible amount of stress and anxiety.

### Settlement

39.  On top of the stress and anxiety that my role as class representative has caused me, this settlement requires that I, along with the other class members, make additional sacrifices above and beyond those required of the remainder of the class.  Most notably, all of the class representatives are required to release their individual damages claims against Navient, which I view as a significant sacrifice on our part.

40. Even if most of us would not have been able to successfully bring a claim against a massive corporation, that does not change the fact that we are relinquishing the *ability* to even make that attempt.  Having listened to the stories and anguish of the other class representatives—and having revisited my own experiences with Navient while contributing to this action—I have no doubt that the loss of that option is a substantial one.

41. In the simplest of terms, we are relinquishing our *right* to vindicate our own stories so that a broader group of people may both benefit from the relief provided by this settlement and also seek that very vindication should they choose to do so.

### Conclusion

42. Notwithstanding these hardships and sacrifices, I am pleased with what this settlement will provide.  For me, a major source of frustration was and has been wasting time calling Navient,

9

knowing that they will not be able to help, but also knowing that I must try everything I can to follow the proper—and labyrinthine—procedures that accompany PSLF. What's worse, given what I know now, I believe that this lack of guidance may be intentional, designed to keep borrowers like myself with Navient for as long of a period as possible, all to Navient's financial gain.

43. The structure of this settlement helps cut through all of that by fixing the biggest problem that borrowers interested in PSLF face—the hurdles put in their way to make sure they cannot get the information they need to stay on track. When I think about how many people have been hurt by those hurdles, as I have, it becomes evident that these structural changes are exactly what I hoped to achieve when I joined this action.

44. To me, a $15,000 service award would be a recognition of the role that I played in achieving those changes, and the personal costs that I endured in the process of doing so.

45. The title "class representative," at least in this action, does not simply indicate that I filled out a survey and signed my name on a line. It is instead a marker of significant effort, unrelenting hardship, incredible stress, and personal sacrifice, all in the name of bringing some benefit to all who were wronged by Navient, not just myself. It is an acknowledgment that the settlement reached in this action, and the changes that it will bring to the lives of borrowers nationwide, came at the cost of the time, mental wellbeing, and opportunities of every class representative. That is the trade-off that I made willingly when I signed on as a class representative, and that is why I ask the Court to approve the requested service award.

Dated:    August 28, 2020

_____
Jennifer Guth