**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

KATHRYN HYLAND, MELISSA GARCIA,
ELIZABETH TAYLOR, JESSICA SAINT-
PAUL, REBECCA SPITLER-LAWSON,
MICHELLE MEANS, ELIZABETH
KAPLAN, JENNIFER GUTH, MEGAN
NOCERINO, and ANTHONY CHURCH
individually and on behalf of all others
similarly situated,

             Plaintiffs,

    v.

NAVIENT CORPORATION and NAVIENT
SOLUTIONS, LLC,

             Defendants.

No. 18-cv-9031-DLC

## DECLARATION OF MICHELLE MEANS
## IN SUPPORT OF APPLICATION FOR SERVICE AWARDS

**MICHELLE MEANS**, being duly sworn, declares as follows:

1. I am one of the Class Representatives appointed in the Court's Preliminary Approval Order, Dkt. 108, as a representative of the Settlement Class in the above-captioned action.

2. I submit this affidavit in support of Plaintiffs' motion for final approval of the settlement and for a $15,000 service award to each Class Representative. The facts giving rise to my participation as Class Representative and my role in securing the settlement discussed herein support the requested service award.

### Background

3. I am a resident of Maryland and a full-time first grade teacher in a Title I school that serves many students living in poverty.

4. After participating in the Teach For America program, I decided to remain in the classroom.

In 2008 I took out four Direct Loans and five FFEL Loans to purse my graduate degree in film. In total, I took out $60,125.00 in public loans.

5. When I took out my loans, I asked Navient about the different repayment and forgiveness options that I believed might be available to me as a teacher. Navient, first in 2012 and multiple times afterward, told me that to be eligible for the Public Service Loan Forgiveness ("PSLF") Program, I would need to make 120 consecutive on-time payments. Navient also told me if I missed even one of those payments, or if I went into deferment or forbearance, I would be disqualified from PSLF. Based on these repeated representations from Navient, I chose not to pursue PSLF because I had faced some financial difficulties that required me to enter into several forbearances. At the time the complaint in this action was filed, my loan balance was $96,040—*more* than my original loan balance.

6. I have made many sacrifices to account for my student loan payments. For example, I have not been able to purchase a home and have had to request assistance from my parents. Professionally, I have decided not to pursue additional teaching certifications because of the associated cost. Having to forgo those certifications means that advancements that I would like to take, toward a principal position for example, are sidelined until my debt payments become more manageable. The certifications I am required to take, like my early childhood education certification, require me to find programs that are cost free so that I do not need to take loans out for these recertifications. This summer I was lucky enough to find a free program through my district, but often these programs do not coincide with my teaching schedule or offer the courses for which I need recertification.

7. In addition to providing for my own family, I am constantly saving food and money to provide for my students, many of whom live in poverty. Each day, many of my students come into the

classroom hungry and asking for food. I keep an emergency pantry of food so that they do not need to leave my classroom hungry.

8. The impact of COVID-19 has only worsened the reality of owing student debt. Even though my loans are currently in forbearance, for a period of time, I was the only person providing income for my four-person household because of COVID-19 related job loss. As a result, even with the forbearance, I am further in debt.

**Role as Class Representative**

9. I learned about a possible legal action against Navient regarding PSLF when I received the Student Debt Survey (the "Survey") from my local union chapter of American Federation of Teachers ("AFT"). I completed the Survey and spoke to counsel about the legal action shortly thereafter.

10. I joined this lawsuit as a class representative because Navient provided false information to me that led me to stop pursuing PSLF, a program I could otherwise be eligible for. Navient's misrepresentations have caused me to pay thousands of dollars in loan payments that could have been forgiven under PSLF.

11. I volunteered to be a class representative for several reasons. *First*, I wanted to be a part of the demand for change in Navient's practices. *Second*, I knew that I was only one of the many teachers and public servants who have struggled because of Navient's deception. Several colleagues and peers have substantial debt and mistakenly believed they could not have their debt forgiven based on what they heard from Navient. I wanted to serve as an advocate for these individuals who, like me, pursued public sector jobs to serve their communities and were misled by Navient. *Third*, the interactions that I had with Navient were often extremely hostile and left me, and others like me, dealing with unnecessary stress.

12. My personal experiences with Navient motivated me to advocate for settlement provisions that would protect borrowers like me. After having many antagonistic conversations where I was provided with false information about the eligibility criteria for PSLF, it became clear to me that Navient needed to have a different protocol. Based on this experience, I requested that, as part of the updates to its practices required by the settlement, Navient provide call center employees with accurate information about a borrower's eligibility for PSLF or other forgiveness programs, including keywords or phrases that would signal potential eligibility for PSLF.

**Efforts**

13. Starting nearly two years ago, I have spent a substantial amount of time participating in this case and its resolution. I have incurred many other personal costs as well. In total, I conservatively estimate that I have dedicated approximately 58 hours to this case.

14. Because I am a full-time teacher and a mother of two children, much of this work needed to occur late at night after my children were asleep and my work was finished.

15. I first became involved in this action in September 2018 when I spoke with class counsel about my experiences with Navient. During that call and many follow-up calls and emails, I provided class counsel with a detailed history of my student loans and my interactions with Navient.

16. At the request of class counsel, I gathered loan documents, communications with Navient, and all other relevant records. I carefully reviewed the complaint and the amended complaint and provided edits in writing and over the phone. I also carefully reviewed Navient's motions to dismiss the action and the filings in response and discussed them with class counsel. In total, I spent approximately 12 hours on the complaint, the amended complaint, and Navient's motions to dismiss.

17. In addition to gathering my loan documents and reviewing counsel's filings and responses, I

4

also made myself available to provide more information for teachers who were in a similar position to me. For example, I made a presentation to my local AFT union chapter on the lawsuit and spoke to several media outlets including the *New York Times*.[1] In total, I spent about 10 hours on these tasks. I also had to take a day off of work to participate in media interviews and speak to the AFT Executive Council on the day this action was filed. I have a limited amount of days of leave, and they have a value of $297.26 each.

18. I learned in July 2019 that Maryland was dismissed from the action. At the time, I was very taken aback by this decision because it felt like a dismissal of the real wrongdoing I had faced. I also felt defeated, just as I had felt defeated by Navient and my student debt many times over the years. However, as a dedicated public servant, I decided to continue to participate because I wanted to help reform Navient's practices.

19. In August and September 2019, during the individual settlement negotiations, I spent approximately 2 hours reviewing documents related to the settlement and discussing acceptable settlement terms with class counsel. During these discussions, it was important to me that the agreed-upon practice enhancements would protect borrowers like me.

20. On November 5, 2019, I attended the mediation in New York. I had to miss one and a half days of work and prepare lesson plans for a substitute teacher to attend the mediation. I spent approximately 22 hours traveling to and from New York to attend the mediation, preparing for my absence from school, and discussing mediation with counsel.

21. My attendance at the November 5, 2019 mediation hearing was very important to me, but it was also very burdensome and stressful. I was incredibly anxious about traveling alone to

---

[1] Stacy Cowley, *Teachers Sue Navient, Claiming Student Loan Forgiveness Failures*, NEW YORK TIMES (Oct. 3, 2018), available at https://nyti.ms/2O0RkeO.

discuss my experience with Navient, in large part because of the emotional toll caused by the loan servicer. Because of this, I brought my sister but needed to pay $182.00 out-of-pocket for her train tickets. I also paid $30 out-of-pocket for meals. The travel also spanned long hours – I left home at five in the morning and did not return until two in the morning. The travel caused me to miss more school than I had anticipated and resulted in the sudden stress of needing to plan for a substitute teacher at the last minute. Even without the last-minute planning, missing days of school is challenging because of the extra work I take on to prepare my substitute teachers. I had to take a day and a half of my limited leave time, at a total combined value of $445.89, to attend the mediation.

22. Following the mediation, I was involved in several tasks related to the parties' initial agreement in January 2020 and when counsel submitted the final Settlement Agreement to the Court. During that time, I communicated with class counsel via phone and email about Navient's settlement demands and the settlement terms I felt were acceptable. I also joined a call with the other plaintiffs to discuss settlement terms. I carefully reviewed drafts of the Memorandum of Understanding and the final Settlement Agreement and discussed them with class counsel. In total, I spent approximately 7 hours on these tasks.

23. Since the preliminary approval hearing, I have spent approximately 5 hours on the settlement of this action, including reviewing a summary of the settlement approval, locating documents with information for this filing, and discussing and editing this filing.

**Risks & Burdens**

24. I agreed to this settlement because it is important to me that Navient stop, what I believe to be, its misleading practices. This settlement is a major victory for public servants, like me, who

6

have dedicated their life to public service and to their communities by holding Navient accountable for giving borrowers incorrect information.

25. As a result of this settlement, Navient must change its business practices so that borrowers like me will receive accurate information about the eligibility criteria for PSLF.  This aspect of the settlement was crucial to me, particularly as someone who stopped pursuing PSLF because of Navient's statements.  I am proud that this settlement provides a more honest path forward for public servants to pursue the forgiveness they are entitled to under PSLF.

26. The nonprofit that will be formed as a result of this settlement brings me a lot of hope.  Though I will not be able to recoup the payments and time that I have lost, I am proud that this action, in part through the nonprofit, will create a different landscape for borrowers like me.  I wish that I had access to a resource like this when I was going through the most misleading and confusing interactions with Navient.

27. This settlement, however, does not come without its cost to the individuals, particularly the Class Representatives.  Because I agreed to settle on a class-wide basis, I have agreed to sacrifice the right to raise monetary claims against Navient in the future arising out of the conduct alleged in the complaint, unlike the remainder of the class.  Lastly, because my claims were dismissed, I gave up my right to appeal those claims as well.

28. I made my decision to settle willingly but the loss of my individual claims was significant.  My experience with Navient had left me feeling defeated and like I had no recourse.  To learn that I did have the ability to bring claims against Navient and then to give up those claims was a sacrifice I made to protect future borrowers.

29. In addition to the time I have spent on this case, I have also incurred significant personal hardship—both financially and emotionally.

7

30. Even after I decided to join this action as a class representative, I constantly worried about what my colleagues and friends might think of this decision because people often view individuals involved in litigation to be difficult. I was worried that I would be reprimanded by my workplace, though luckily this was not the case. Nonetheless, this stress was compounded by my existing anxieties about being able to pay my debt and my bills.

31. I also expended time and energy taking media requests. Initially, these requests were empowering and motivated me to speak on behalf of other teachers who had been deceived by Navient.

32. Some media requests, however, demonstrated to me how sorely misunderstood this issue was. In one of my interviews, the reporter gave me unsolicited advice about how to manage my finances. Upon hearing that I would be eligible for a raise, the reporter automatically assumed that it meant it would be easier to pay off my loans, assuming that I am not already taking reasonable steps to attempt to pay off my student debt and that paying off student debt is as simple as having more money. No one appreciated that I am living paycheck to paycheck and trying to support myself and my family or that I had worked while pursuing both my undergraduate and graduate degrees. These assumptions made me feel misunderstood and exacerbated the unrealistic perspective that others have about how individuals should pay off their loans.

33. As a result of my media coverage, I have borne the brunt of social media and mainstream media backlash. The prominent display of my photograph in the *New York Times*[2] made me a focal point of the media coverage. I never shared my involvement in this action publicly on my social media accounts, but some of the Facebook groups in which I am involved started posting articles about me and the action.

---

[2] *See supra* note 1.

34. The comments in response to my involvement in this action were deeply personal, hurtful, degrading, and offensive.  Some of the comments expressed the sentiment that teachers did not deserve to have their debt forgiven.  Many commenters believed that I, and others, were acting entitled to our money, that I was lazy, or that I was spending my money on other "needless" expenses.

35. The comments often exhibited racial bias and disparaging comments about my appearance.  Commenters, for example, would remark that if I stopped spending money on food then maybe I could pay off my loans.

36.  My involvement in this legal action was the first time I had been exposed to such racial vitriol.  It was shocking and emotionally traumatizing.  Even when I stopped going to the Facebook group pages to read the posts commenting on the lawsuit, the Facebook algorithm continued to circulate these comments on my newsfeed.  I eventually decided to temporarily disconnect from Facebook and permanently stop taking media requests because of the toll it took on me.  Moreover, my family had become worried about my wellbeing.

37. By being involved with this lawsuit, I have disclosed highly personal information about my job, my location, and my finances.

38.  I prefer to keep my job and my approach to my job private.  I see myself as an advocate and caretaker for my students.  Sharing that I save and provide food for them is information I typically do not share outside of my classroom.  I also prefer to keep my geographic location private so that I do not expose any of my students or their families.

39. Intimate details about my financial situation, and my family's financial situation, are now available for anyone who searches for me on the internet.  The amount of my student debt and my struggle to pay it back are pieces of my life I would never have shared with anyone besides

my close family.

40. In addition, anyone on the internet can now look up my name and see some of the offensive comments about me that have nothing to do with the lawsuit or its merit but are rooted in bias.

41. Though I knew none of this information would be private, it is still jarring to have such personal information readily accessible to anyone that searches for it.

42. As a result of the publicity surrounding this litigation, I was approached by several colleagues and friends.  Many of my colleagues assumed I was involved in the action for the money, asking me constantly how much money I was going to get.  I repeatedly had to explain that I was involved because I believe that Navient needs to change their practices, not for the monetary benefit.

**<u>Settlement</u>**

43. The Settlement Agreement in this action holds Navient accountable and requires them to develop better business practices that will benefit the members of the Class.  It also makes it possible for borrowers like me to find the right loan repayment plan and forgiveness options.

44. I agreed to participate in the settlement because it will provide accurate information, and hopefully hope and relief, to public servants like me who have dedicated their lives to serving the community.  As a teacher and a mother, I am proud that we were a part of reshaping barriers to programs like PSLF.

45. Before I participated in this action, I had thought about bringing an action against Navient because I knew that their actions were completely wrong and likely illegal.  But I did not pursue a legal action on my own because I do not have the resources to do so.  I understand that by agreeing to this settlement, I am waiving my right to sue Navient for damages.

46. Every day, I get up and teach Maryland first graders who are being raised in poverty.  I hope

10

that when the time comes for my students, and my own children, to decide to go to college and perhaps take out student loans, that they will do so with an accurate understanding of how it will impact their future.  My goal for this litigation was to ensure everyone has accurate information about student loans, and I am glad that the Settlement Agreement will help achieve that goal.

47. I believe that the efforts of all of the Class Representatives resulted in a positive outcome for the Class that fully justifies the $15,000 individual service awards that are included in the Settlement Agreement.

Dated:    August 28, 2020

Michelle Means