**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KATHRYN HYLAND, MELISSA GARCIA, ELIZABETH TAYLOR, JESSICA SAINT-PAUL, REBECCA SPITLER-LAWSON, MICHELLE MEANS, ELIZABETH KAPLAN, JENNIFER GUTH, MEGAN NOCERINO, and ANTHONY CHURCH individually and on behalf of all others similarly situated,<br><br>         Plaintiffs,<br><br>     v.<br><br>NAVIENT CORPORATION and NAVIENT SOLUTIONS, LLC,<br><br>         Defendants. | No. 18-cv-9031-DLC |

## DECLARATION OF JESSICA SAINT-PAUL
## IN SUPPORT OF APPLICATION FOR SERVICE AWARDS

**JESSICA SAINT-PAUL**, being duly sworn, declares as follows:

1. I am one of the Class Representatives appointed in the Court's Preliminary Approval Order, Dkt. 108, as a representative of the Settlement Class in the above-captioned action.

2. I submit this affidavit in support of Plaintiffs' motion for final approval of the settlement and for a $15,000 service award to each Class Representative. The facts giving rise to my participation as Class Representative and my role in securing the settlement discussed herein support the requested service award.

### Background

3. I am a resident of California and currently serve as a full-time director of a non-profit organization while also serving as an adjunct college professor. I recently completed my doctoral degree in medical science.

4. I took out student loans under the Federal Family Education Loans ("FFEL") program to pay for my graduate degree in public health. My original loan balance was $93,290.00

5. Since I finished my undergraduate degree in 2001, I have been dedicated to working with non-profit organizations. For over seventeen years—even when my financial situation made it difficult to pay for school loans—I continued to work in non-profit agencies. Serving communities in need has always been deeply important to me.

6. I am the daughter of two formally educated, hard working parents that instilled in me the value of education. My family supported me in pursuing the highest education I could possibly attain. I dedicated my life to pursuing my education so that I could give back to communities in need and support my family. My decision to spend my life helping others has often come with great personal sacrifices, but it was my decision to make, and I have always felt that it was worth it. The PSLF program was developed for borrowers like me who work full time in non-profit organizations and have limited financial resources with which to pay their student loans.

7. I learned about PSLF for the first time shortly after the program became law in 2007. In 2008, I called Navient to ask how I could qualify for PSLF. Navient told me that my loans would be forgiven if I worked in public service and made payments for ten years. I later learned that this was incorrect. Because my loans were FFEL loans, I could not qualify for PSLF after ten years of payments and public service work without first consolidating my loans into Direct Loans. Had Navient informed me of this requirement, I would have immediately consolidated my loans and started making qualifying payments.

8. I continued making payments on my FFEL loans and working for nonprofits, believing that I was working toward loan forgiveness based on Navient's incorrect information. On numerous

occasions, I called Navient to discuss my difficulties in paying my student loans and to ask if there was any way to reduce my payments.  Navient told me that my only option for reducing my payments was to enter into a deferment or forbearance.  Relying on Navient's information, I entered into multiple deferments or forbearances, which resulted in my principal balance increasing when the interest from the forbearance periods was capitalized.

9.  In 2014, I transitioned to refocusing my service as the Program Director for a nonprofit organization.  This position gave me the ability to make a huge positive impact in the community, but it came with a significant salary cut.  Knowing that this move would affect me financially, I contacted Navient again to ask about repayment options.  Navient again did not offer an income-driven repayment plan even though I stated that I was pursuing PSLF, and did not inform me that an income-driven repayment plan was a requirement for PSLF (along with having Direct Loans).  Instead, Navient enrolled me in an interest-only plan and a graduated repayment plan for my loans.

10.  Also in 2014, I asked Navient again about qualifying for PSLF.  Navient told me again that to qualify for PSLF I should continue working in public service and paying my loans, and my loans would be forgiven after I had done so for ten years.  This was incorrect.  In fact, not a single one of my payments so far had counted toward PSLF, and none of them would count unless I consolidated my loans into a Direct Consolidation loan.  Navient also told me that I did not need to submit any PSLF paperwork until I had been in repayment for the full 10 years. I later learned that borrowers can submit a PSLF Employment Certification Form at any time and are encouraged to do so annually to ensure that they are making qualifying payments.  Had I submitted a PSLF Employment Certification Form, I would have received a response informing me that my loans did not qualify for PSLF, which would have enabled me to consolidate

them and immediately begin making qualifying payments.  Instead, I continued believing that I could simply continue paying and would be eligible for PSLF after ten years.

11. Because of Navient's misrepresentations about the effect of the payments I was making on my eligibility for PSLF, I lost years of progress on repaying my loans.  Had Navient given me correct information about how I could qualify for PSLF when I first asked, I would have consolidated my loans into Direct Loans and entered a qualifying repayment plan.  Had I done so, I would have begun making qualifying payments in 2008.  Instead, my qualifying payments began when I consolidated my loans with FedLoan Servicing on May 5, 2020.  My loan balance at the time the complaint in this action was filed was $57,358.

12.  In the fall of 2018, I attended an American Federation of Teachers ("AFT") 1521 Benefits Conference.  At the time of the conference, I believed that I was on track for PSLF but wanted to learn more about the benefits provided to adjunct faculty at the AFT Debt Clinic workshop.  When I was reviewing the instructions provided at the AFT Debt clinic to apply for PSLF, however, I realized that I did not have qualifying loans.  I reached out to an AFT staff member at the clinic, and we immediately called counsel while at the conference to review my loans.  At that time, I learned about a possible legal action against Navient regarding PSLF.

13. Learning about Navient's misrepresentations was devastating to me—I was in disbelief for some time.  I had thought I was finishing my eighth year of repayment and that I had two years left before my loans would be forgiven.  After learning otherwise, I kept thinking there was no way I had to start over.

### Role as Class Representative

14. I knew I needed to be a voice for others like me to hold Navient accountable.  I am beholden to my students who I believe should be able to pursue—with clear and accurate information—

loan forgiveness because they have chosen to dedicate their lives to their community.  Ultimately, I agreed to be involved with this legal action because I believed Navient needs to change their practices and to stop providing false information about crucial support programs like PSLF.

15. My personal experiences with Navient motivated me to advocate for settlement provisions that would protect borrowers like me, many of whom are my students who intend to pursue a career in the public service.  After having many conversations where Navient provided me with false information about the eligibility criteria for PSLF, it became clear to me that Navient needed to have a different protocol.  Based on this experience, I asked that as part of the updates to its practices required by the settlement, Navient would provide call center employees with  accurate information about a borrower's eligibility for PSLF or other forgiveness programs, including keywords or phrases that would signal potential eligibility for PSLF.

### Efforts

16. I have spent a substantial amount of time participating in this case and its resolution over the past two years.  I have incurred many other personal costs as well.

17. I first became involved in this action in September 2018 when I spoke with class counsel about my experiences with Navient.  During that call and many follow-up calls and emails, I provided class counsel with a detailed history of my student loans and my interactions with Navient.

18.  In total, I conservatively estimate that I have dedicated approximately 153 hours to this case.  As detailed below, even calculating the amount of time put into this legal action was difficult.

19. I had little time to be involved with this legal action between my jobs as a director of a non-profit, my role as an adjunct professor, and my pursuit of a doctorate degree.  But I did it because I wanted student debt to be more transparent, accurate, and accessible for my students.

I had to fit the work for this legal action in the limited time that I have—during breaks between classes, late at night, or early in the morning.

20. At the request of counsel, I labored over gathering all the relevant loan documents. I spent over the course of two weeks approximately 20 hours assembling my documents. Because of my inquiries to Navient about my eligibility for PSLF, I had communicated frequently with Navient and needed to find each of those conversations. Collecting over eight years of loan payments, relevant bank statements, and communications was hugely burdensome.

21. I carefully reviewed the complaint and the amended complaint and provided edits in writing and over the phone. I also carefully reviewed Navient's motions to dismiss the action and the Plaintiff's filings in response and discussed them with class counsel.

22. This type of review would already be time consuming, but it was particularly so in this case. After feeling completely deceived by Navient—an institution that was supposed to provide me with correct information in my best financial interest—I was determined to do my own re-search into the legal documents I was reviewing. This extra layer of review—one that was motivated by Navient—almost doubled my time spent reviewing the documents sent to me. In total, I spent approximately 40 hours on the complaint, the amended complaint, and Navient's motions to dismiss.

23. In July of 2019, I learned that the Court had dismissed the claims of California sub-class of borrowers, of which I was a member. I spent a significant amount of time doing my own independent research into this issue to be sure I fully understood why my claims were dis-missed. I remember several late nights reading through endless articles and re-reading my conversations with Navient. I estimate that I spent 32 hours researching this issue on my own.

Even after my claims were dismissed, however, I continued to serve because I wanted to do my best to represent the class overall.

24. In August and September 2019, during the settlement negotiations, I spent approximately 8 hours reviewing documents related to the settlement and discussing acceptable settlement terms with class counsel. During these discussions, it was important to me that the agreed-upon practice enhancements would protect borrowers like me and my students who I had mentored about entering the public sector. To me, securing these practice enhancements for the class was vital.

25. Around this time, I also agreed to settle on a class-wide basis rather than individually. I was willing to do so because I know that this settlement would help the little girl or high school graduate in STEM (Science, Technology, Engineering, and Mathematics) or Education who has a dream of dedicating her life to service. She will know that even though she may not have generational wealth to fund her education, she can rest assured that we fought for her and thousands of those in public service. For as long as PSLF is available, she does not have to choose a higher paying job just to pursue an education. She will have equal access to a quality education and can focus on her mission to serve.

26. On November 5, 2019, I attended the mediation in New York. I spent approximately 48 hours traveling to and from New York to attend the mediation, preparing for my absence from my job, and discussing mediation with counsel. I prepared for the mediation with counsel and traveled from California to New York to attend. To attend the mediation, I had to miss two days of work without pay. However, to reduce the burden I put on my colleagues and staff in my absence, I continued to take meetings and phone calls while working remotely, which added an additional stressor to the otherwise overwhelming trip.

27. Following the mediation, I was involved in several tasks related to the parties' initial agreement in January 2020 and when counsel submitted the final Settlement Agreement to the Court in April 2020.

28. During that time, I communicated with class counsel via phone and email about Navient's settlement demands and the settlement terms I felt were acceptable.  I also joined a call with the other plaintiffs to discuss settlement terms.  In preparation for filing, I also carefully reviewed drafts of the Memorandum of Understanding and the final Settlement Agreement and discussed them with class counsel.  I completed all these tasks carefully, keeping in mind my belief that Navient's practices must change to protect borrowers like me.  In total, I spent approximately 3 hours on the Memorandum of Understanding and the final Settlement Agreement.

29. Since the preliminary approval hearing, I have spent approximately 5 hours on the settlement of this action, including reviewing a summary of the settlement approval and discussing this filing.

### Risks & Burdens

30. In addition to the time I have spent on this case, I have also experienced significant personal hardship.

31. The emotional toll of serving as a class representative in this action has been tremendous.  I have made many sacrifices in pursuit of education, but the amount of pain that I have experienced while trying to get PSLF is something I never imagined.  It has interfered with every aspect of my life.

32. When I came to the crushing realization that I had not made a single qualifying payment since Navient advised me how to qualify for PSLF, I experienced extreme emotional stress.  I felt

deceived and betrayed by a company that I had trusted to help me with a huge financial responsibility.

33. In addition to frustration and hopelessness, I also experienced feelings of guilt as a result of Navient's deception. Even though I logically understood that I had thoroughly communicated with Navient and, at the time, reasonably trusted them, I still felt like their deception was somehow my fault.

34. I also felt like I would lose my students' trust as a result of Navient's deception. Navient's misrepresentations caused me to unintentionally misinform many of my students that I mentor. I have always believed that serving your community is highly important and that money should not stand in the way—PSLF is a program that supports this principle. I have been sharing information about PSLF so students would not have to give up their passion to serve unrepresented communities due to their employer's tax status. I, however, was misled into believing that I was working toward debt forgiveness. I now worry that I have provided misinformation to my students and unintentionally discouraged them from believing it is possible to professionally serve your community.

35. This stress has been greatly amplified by my participation in this action. Since the first phone call with counsel, my involvement has required me to describe and re-live these traumatic events over and over again. Laying out my history with my student loans in public documents for all to see left me feeling incredibly vulnerable. Suddenly, my own life-saving financial decisions were part of a legal dispute and could be second-guessed by people who had no understanding of my situation. It left me feeling worthless.

36. My family worried about me and the physical and emotional toll this lawsuit has put on me.

37. Even after I decided to join this action as a class representative, I constantly worried about what my colleagues and peers might think of this decision as people often believe that plaintiffs are conflict-prone or difficult to deal with.  Even though my workplace was supportive of my involvement, this additional stressor compounded on my existing anxieties about being able to pay off my debt.

38. I also made myself available to several media outlets to discuss my experience with Navient. I was interviewed by NPR and CNN which were then reproduced in other media outlets.[1]  I spent between ten to 15 hours preparing for and participating in media interviews.

39. My experience with the media was perhaps the most traumatizing part of my involvement in this action.   First, the circulation of my story and having to tell and retell it was like reliving my trauma all over again.  My interview preparation often led to the same unhealthy thought processes, that I must have brought this upon myself.

40. But worse was the reaction to my media appearances.  It was this backlash that was especially traumatizing.  By being involved with this lawsuit, I have discussed my family, concerns with education, income inequality, and microaggressions that were never part of the deception by Navient.  After I spoke out about these issues, many individuals took the chance to publicly comment on whether I was entitled to debt forgiveness.[2]  Many comments were charged with racial bias: those comments were the most offensive, calling me lazy, entitled, unintelligent,

---

[1] Chris Arnold, "CFPB Chief Says Education Department Is Blocking Student Loan Oversight," NPR (May 16, 2019), *available at* https://www.npr.org/2019/05/16/723568597/cfpb-chief-says-education-department-is-blocking-student-loan-oversight.

[2] Jillian Berman, "All the ways student debt exacerbates racial inequality — 'it's like landing in quick sand'," MarketWatch (July 27, 2019), *available at* https://www.marketwatch.com/story/all-the-ways-student-debt-is-exacerbating-racial-inequality-its-like-landing-in-quick-sand-one-black-student-says-2019-07-18. There are several comments on this page that express sentiments such as: "sounds like many of these people are too dumb to go to school in the first place."

and that I had played up the issue of race. There was no need to discuss my education and career trajectory or blame me for taking loans because I did not have access to generational wealth that many of my colleagues in my field may have had. Those were not the issues at hand.

41. Further, intimate details about my financial situation are now available for anyone who searches for me on the internet. Information about the amount of debt I owe and my struggles to pay it off are now completely accessible to anyone. While I had reviewed the complaint and all supporting documents in this action extensively and was aware it would be public, it is still a visceral shock to see that information so easily available. These same searches will also turn up evidence of the racial harassment I experienced as a result of my involvement with this lawsuit. That type of information, while not necessarily private, is offensive and derogatory. I have never intended, and in fact resent, that Navient's deception has been transformed some-how into a racial issue in the media. This case is about how Navient deceived borrowers and prevented them from qualifying for PSLF. Unfortunately, the backlash—which is completely out of my control—has forced me to be a public figure in ways I had not expected.

42. The public nature of this information is even more stressful for me as a clinician and public health professional. I interact with many professionals and students on a regular basis. My position is not about me—it's about helping others. However, with all of this information in the public eye, I fear that some may see me as a litigant rather than as the highly educated and trained professional I am.

43. Being a class representative has been exhausting. I make many sacrifices as a public servant and this role added a new set of responsibilities on top of those. I took those responsibilities very seriously, but that came at a cost to my wellbeing. I understand why some people simply

accept that they have been wronged and move on—trying to hold anyone accountable, especially a huge corporation like Navient, takes time and energy that most people simply do not have.

## Settlement

44. In addition to the costs and expenses associated with traveling for the mediation as described above, I also incurred other costs associated with this action.

45. I agreed to this settlement because it accords with my motivation to be involved in the first place—Navient will be held accountable and must change their business practices. I agreed to this settlement because it is a major victory for future public servants, like my students, who should feel the ability to serve their community as their livelihood.

46. I am proud that as a result of this settlement, a nonprofit will be created for future borrowers that are interested in pursuing PSLF. I was motivated to join this legal action because of the ways that I could help build an infrastructure for future borrowers who are like me and my students. This nonprofit is crucial to the landscape of a fair, accessible path toward debt forgiveness for individuals that dedicate their lives to public service.

47. As a result of this settlement, Navient must change its procedures so that borrowers like me will receive accurate information about loan repayment and forgiveness options. This aspect of the settlement was crucial to me, particularly as someone that spent eight years making payments with the belief that I would be reaching debt forgiveness shortly. I am proud that this settlement provides a clearer and more honest path forward for public servants to pursue the forgiveness they are owed.

12

48. This settlement, however, does not come without its cost to the individuals. Because I agreed to settle on a class-wide basis, I have agreed to give up all my individual claims against Navient. I also sacrifice the opportunity to raise monetary claims against Navient in the future, unlike the remainder of the class.

49. I made my decision to settle willingly but it was a very difficult decision for me knowing that I lose all rights to an individual claim. I am must restructure my life and start all over again. I will need to make personal sacrifices because I now have over $144,000 in loans I will need to repay before being eligible for PSLF. Though I had to sacrifice my individual claims, many others like me will not have to go through this injustice again. Ultimately, it is not about me, but about ensuring that others will not continue to suffer under crushing debt that was promised to be forgiven.

## Conclusion

50. The Settlement Agreement in this action holds Navient accountable and requires them to develop better business practices that will benefit the members of the Class. I agreed to participate in the settlement because it will provide accurate information, and hopefully hope and relief, to public servants like me who have dedicated their lives to serving the community. It is now Navient's job to give us accurate and complete information about our student loans.

51. I am proud that my involvement in this lawsuit will go towards mandating changes in Navient's practices. Ultimately, that is why I agreed to be a class representative.

52. The process of this lawsuit, however, often left me feeling defeated and hopeless. Few people understand the feeling of losing hundreds of thousands of dollars and eight years' worth of loan payments. Those eight years were not easy and were pursued with a belief that relief was within sight. Learning that I was not two years away from debt forgiveness because my loan

servicer had lied to me devastated me in ways that are not totally describable. There will be no difference between me and a borrower starting their first year of repayment despite 2020 being the year I thought I would be receiving a notice of debt forgiveness. Instead, I am receiving notice to keep track of 120 consecutive payments. Assuming that PSLF is still in existence in 2030, I will finally have my educational loans forgiven even though I have always worked in nonprofit and public sector jobs.

53. Throughout my career, my primary focus has been to serve my community. Now I know that when I mentor young students who want to give back through the public sector, I am telling them the truth—that money should not keep them from giving back and serving the communities they love. I hope that when the time comes for my students to choose a loan repayment plan, that they will be able to do so with an accurate understanding of how it will impact their future.

Dated: August 28, 2020

Jessica Saint-Paul