**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KATHRYN HYLAND, MELISSA GARCIA, ELIZABETH TAYLOR, JESSICA SAINT-PAUL, REBECCA SPITLER-LAWSON, MICHELLE MEANS, ELIZABETH KAPLAN, JENNIFER GUTH, MEGAN NOCERINO, and ANTHONY CHURCH individually and on behalf of all others similarly situated, | No. 18-cv-9031-DLC |
| Plaintiffs, | |
| v. | |
| NAVIENT CORPORATION and NAVIENT SOLUTIONS, LLC, | |
| Defendants. | |

**DECLARATION OF REBECCA SPITLER-LAWSON**
**IN SUPPORT OF APPLICATION FOR SERVICE AWARDS**

**REBECCA SPITLER-LAWSON**, being duly sworn, declares as follows:

1. I am one of the Class Representatives appointed in the Court's Preliminary Approval Order, Dkt. 108, as a representative of the Settlement Class in the above-captioned action.

2. I submit this declaration in support of Plaintiffs' motion for final approval of the settlement and for a $15,000 service award to each Class Representative. The facts giving rise to my participation as Class Representative and my role in securing the settlement discussed herein support the requested service award.

**Background**

3. I am a resident of California and currently work as an adjunct professor at two nonprofit colleges.

4. I took out federal student loans totaling $60,850 under the Family Federal Education Loan ("FFEL") and Direct Loan programs to pay for my master's degree in English. At the time this action was filed, I had $52,143 in outstanding student loans.

5. I graduated with my master's degree in 2011 and began making payments on my student loans the same year.

6. Since obtaining my master's degree in 2011, I have taught English as an adjunct professor at community colleges and universities in California. Many of my students arrive in the classroom facing significant obstacles to academic success. For example, many come from underserved communities and are the first in their families to pursue higher education. As a result, many have slipped through the cracks of the public education system and require intensive developmental instruction in order to work at the college level. Others are juggling full-time work and family responsibilities along with their studies—they often are forced to take out loans or work long hours to pay for school. They are among the most vulnerable students in higher education.

7. My students' success is my success, and I do everything I can to help them. For many students, I am often the first teacher to provide them with individualized attention. I often teach introduction to college writing, and my class serves not just as composition course but also as an introduction to college-level critical thought, vocabulary, and research. When I teach a morning section of this class, it is often quite literally the first college class for many students, and consequently can set the tone for their entire college career. I am ever mindful of this responsibility, and I work tirelessly to make sure every student gets my personal attention, respect, and guidance. This regularly goes far above and beyond what I am paid for. Students regularly

contact me even after the class is over for guidance, advice, letters of recommendation, and so on.

8. I am paid a set amount for each class I teach, so my income is dependent on the number of classes available for me to teach. Each semester, I learn which classes are available and after I have accepted those classes I develop and build the class—from assignment prompts and schedules to readings and activities. Every semester, I face uncertainty about my teaching load: will I get enough classes to make ends meet? Agreeing to take on a class is not a guarantee of payment: a class may be cancelled for insufficient enrollment or other reasons. I am sometimes working until the last minute to fill my schedule for a semester, and there have been times when not enough classes are available to me and I have to get by on savings, credit cards, or taking on additional jobs.

9. Most of the institutions where I teach limit adjunct professors to a certain number of classes each semester. For this reason, to teach enough classes to make a living, I typically teach on a part-time basis at two or more institutions each semester.

10. Since I began repaying my student loans in 2011, I have had numerous telephone conversations with Navient and its predecessor Sallie Mae about difficulties paying my student loans.

11. In 2018, I asked Navient about qualifying for Public Service Loan Forgiveness ("PSLF"), explaining that I worked a full-time schedule as an adjunct professor at multiple colleges. Navient informed me that I could not qualify for PSLF because I was not employed full-time by a single employer. In fact, my hours did add up to full-time for PSLF purposes, and I could have made qualifying payments for PSLF by consolidating my loans into Direct Loans and switching to an income-driven repayment plan. Instead, I did not pursue PSLF and continued

3

making non-qualifying payments, often struggling to pay more than the required amount in order to pay off my loans more quickly.

12. It was only after responding to a survey from the American Federation of Teachers ("AFT") and speaking to class counsel that I learned that simultaneous part-time positions could count as full-time employment. I was shocked and devastated to learn that I had missed out on years of qualifying payments.

**Role as Class Representative**

13. I joined this lawsuit as a named plaintiff because I felt that my struggles with student loans and PSLF were representative of countless other borrowers who, like me, make a living teaching college courses as adjunct professors while struggling to pay off the student loans they took out for their own degrees.

14. I volunteered to be a named plaintiff for several reasons. *First*, I wanted to act as a voice for other public servants, especially other adjunct professors. Despite our enormous role in higher education, particularly in serving underprivileged students, our struggles are often invisible. Many people do not even know what an adjunct instructor is, or how our jobs work, or how insecure those jobs really are. People regularly make assumptions about my job security, my pay level, and/or the resources and choices that are available to me. Sometimes this includes full time faculty who do not always take the special challenges that adjuncts face into consideration, even when we teach the bulk of classes in the department. I chose to take on this public role, and all of the risks associated with it, to bring attention to how Navient's misrepresentations have harmed adjuncts.

15. *Second*, I also wanted to ensure that any resolution of the action addressed the specific needs of borrowers like me so that what happened to me would never happen again to another adjunct professor.

### Efforts

16. Starting nearly two years ago, I have spent a substantial amount of time participating in this case and its resolution and have incurred many other personal costs as well.  In total, I conservatively estimate that I have spent approximately 105 hours assisting with the prosecution of this action.

17. I first became involved in this action in September 2018 when I spoke with class counsel about my experiences with Navient.  During that call and many follow-up calls and emails, I provided class counsel with a detailed history of my student loans and my interactions with Navient.  At the request of class counsel, I gathered loan documents, communications with Navient, and other records including screenshots of my online Navient account and my National Student Loan Database System ("NSLDS").

18. I carefully reviewed the complaint and the amended complaint and provided edits in writing and over the phone.  I also carefully reviewed Navient's motions to dismiss the action and Plaintiffs' filings in response and discussed them with class counsel.  In total, I spent approximately 20 hours on the complaint, the amended complaint, and Navient's motions to dismiss.

19. On July 8, 2019, I learned that the Court had dismissed the claims of the California sub-class of borrowers, of which I was a member.  I was disappointed in the outcome, but I felt that this action could still lead to accountability for Navient and improvements in its practices.  I decided to continue participating in the action in the hopes that I would be able to have a say in the outcome, either though appealing the dismissal or through settlement.  My hope was that I

could prevent this injustice from happening to someone else and that I could perhaps gain some relief as well. In August and September 2019, during the settlement negotiations, I spent approximately 5 hours reviewing documents related to the settlement and discussing acceptable settlement terms with class counsel.

20. In particular, I asked that the settlement require Navient to provide call center employees with information about what constitutes full-time employment for purposes of PSLF and include words or phrases relating to part-time employment in the "keywords" that would trigger follow-up questions about PSLF in Navient's call flow procedures.

21. On November 5, 2019, I attended the mediation in New York before Magistrate Judge Barbara Moses. I prepared for the mediation by discussing my requests for the settlement to address the lack of understanding by Navient of PSLF's full-time employment requirement with counsel and traveled from California to New York to attend. After the mediation, I discussed the next steps in the settlement process with counsel. I spent approximately 50 hours traveling to and from New York to attend the mediation and discussing it with class counsel.

22. Following the mediation, I communicated with class counsel via phone and email about Navient's settlement demands and the settlement terms I felt were acceptable, including my specific requests. I also carefully reviewed drafts of the Memorandum of Understanding and the final Settlement Agreement and discussed them with class counsel. In total, I spent approximately 10 to 20 hours on the Memorandum of Understanding and the final Settlement Agreement.

23. On June 10, 2020, I listened to the Preliminary Approval Hearing via telephone. I discussed the hearing in a teleconference with class counsel and the other Class Representatives the following day. In total, I spent approximately 3 hours listening to the Preliminary Approval Hearing and discussing it with class counsel and the other Class Representatives.

24. Since the preliminary approval hearing, I have spent approximately 7 hours on the settlement of this action, including reviewing a summary of the settlement approval and discussing and editing this filing.

## Risks & Burdens

25. In addition to the time I have spent on this case, I have also incurred significant personal expenses, both financial and otherwise.

26. My attendance at the November 5, 2019 mediation was incredibly important to me, but it caused significant financial and personal challenges. I suffer from severe anxiety about flying and would have been in great distress if I traveled alone, so I paid out of pocket for my wife to join me. Her meals and round-trip air travel cost approximately $600. Even with my wife's support, it was very difficult, and I suffered two panic attacks prior to the trip. I also missed two days of teaching while attending the mediation, which required me to take two of my limited personal days. I also had to prepare alternative and additional online materials for my students and keep in contact with them via email while I was gone as they were preparing for their final capstone paper.

27. My decision to serve as a class representative in this action caused me significant anxiety and fear despite my conviction that it was the right thing to do. I had no experience with litigation in the past and was afraid that I would be labeled "litigious" by others. In addition, every time I did anything related to the litigation, I was reminded of how much Navient's misinformation

7

had cost me, how much debt I still had to pay off, and the effect of the debt on my and my wife's future. Because of the size of my monthly student loan payments, my ability to put money in savings is very limited. This has delayed our dream of homeownership substantially as our down payment savings have come entirely from my wife's income. When we were finally able to begin the pre-approval process for a mortgage, my student loans impacted the interest rate we were able to get. These constant reminders led to countless panic attacks and moments of sadness and helplessness.

28. I have also disclosed highly personal information in furtherance of this lawsuit, such as the fact that I had difficulty making payments and had to go into forbearance, the types of payment plans I have been on, and that I had to make significant financial sacrifices to make my loan payments. That information available is now easily available to anyone who searches for me on the internet. This includes my students, my employers, my colleagues, family members, friends, and strangers.

29. Financial issues that were once private for me and my wife are now in the public domain. Anyone who reads the complaint will learn that I took out large student loans for graduate school and have often had a hard time paying them back, and that I had to go into forbearance for a time when I could not make the payments.

30. I also revealed specific details about my job as part of this action. While I am glad that I was able to show how adjunct professors must often scramble for classes and teach at multiple schools to make a living, those struggles are no longer private for me.

31. The public nature of this information is all the more anxiety-provoking for me because I know it is permanent. I know that even after the Settlement Agreement is approved, and even after

my loans are paid off, everything about my involvement in this action will still be publicly available.

32. As a result of the publicity surrounding this litigation, I was approached by several colleagues and friends. One colleague openly mocked the amount of debt that I had and bragged that they had not taken out student loans. Others expressed sympathy or even pity, which was very uncomfortable.

33. I did not participate directly in any press for this action, but I am aware that other Class Representatives who did agree to be interviewed experienced highly upsetting and traumatic feedback from members of the public. Their treatment has contributed to my continuing anxiety about the public nature of my role in this action. I purposely do not read the comments that follow any article about this action because I am afraid of what they may say.

### Settlement

34. The Settlement Agreement in this action holds Navient accountable and requires them to develop better business practices that will benefit the members of the Class. It also requires Navient to fund a new organization that will help student loan borrowers seeking PSLF.

35. I am hopeful that the settlement provisions will result in fewer borrowers like me making years of non-qualifying payments. Crucially from my perspective, the settlement requires Navient to train its representatives to listen for keywords and phrases indicating potential PSLF eligibility and to ask leading questions about borrowers' public service employment. This is something I asked for in settlement negotiations because I believe it could help people who, like me, are not aware that their employment qualifies for PSLF. The employee training requirements in the Settlement Agreement will also help ensure that when Navient representatives ask

those questions about borrowers' employment, they will be able to provide accurate, consistent information to help borrowers make decisions.

36. I agreed to participate in the settlement because I am optimistic that it will provide some hope and relief to public servants like me who work incredibly hard for our students. My fellow adjunct professors and I are required to obtain higher education in order to qualify for our jobs, but we struggle to make our loan payments with low compensation and virtually no job security. The PSLF program was designed to allow public servants like us to focus on serving our communities rather than struggling under the weight of the debt that we had to take on in order to qualify to serve those communities in the first place. However, in order to qualify for PSLF and stay on track, borrowers need support and accurate information.

37. Missing out on PSLF because of inaccurate information is a nightmare that is all too real for me and many others like me. The requirements for PSLF are complex and make every student loan decision into a minefield. Choosing the wrong repayment plan or consolidating loans (or sometimes, not consolidating them) could cost a public servant tens of thousands of dollars in non-qualifying payments, as it cost me. I participated in this action because I did not want that to happen to anyone else, and I believe that this settlement represents a significant step toward that goal.

38. Before I participated in this action, I had thought about bringing an action against Navient. However, I knew that it was not a realistic option because I did not have the resources to do so. I understand that by agreeing to this settlement, I am waiving my right to appeal the dismissal of my claims and my right to sue Navient for damages. While I would have liked to get an individual recovery from Navient, I do not feel that bringing an individual suit in the future

would be a realistic option given the cost.  I feel that the Settlement Agreement is the best result for me and the rest of the Class given the risks of further litigation.

39. As a professor, I teach a new generation of student loan borrowers.  I hope that when the time comes for my students to repay the loans that paid my salary (and my loan payments), Navient will have made these changes and started providing borrowers with the helpful, accurate information that its representatives should have given me.

Dated: August 28, 2020

Rebecca Spitler-Lawson