**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KATHRYN HYLAND, MELISSA GARCIA, ELIZABETH TAYLOR, JESSICA SAINT-PAUL, REBECCA SPITLER-LAWSON, MICHELLE MEANS, ELIZABETH KAPLAN, JENNIFER GUTH, MEGAN NOCERINO, and ANTHONY CHURCH individually and on behalf of all others similarly situated, | No. 18-cv-9031-DLC-BLM |
| Plaintiffs, | |
| v. | |
| NAVIENT CORPORATION and NAVIENT SOLUTIONS, LLC, | |
| Defendants. | |

**CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>OBJECTIONS TO THE SETTLEMENT AGREEMENT</u>**

Date:  September 25, 2020

Mark Richard
PHILLIPS, RICHARD & RIND, P.A.
9360 SW 72 Street, Suite 283
Miami, FL 33173
Tel: 305-412-8322
E-mail: mrichard@phillipsrichard.com
(*pro hac vice*)

Faith Gay
Maria Ginzburg
Yelena Konanova
Amy Nemetz
Ronald J. Krock
David Coon
SELENDY & GAY, PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
E-mail: fgay@selendygay.com
mginzburg@selendygay.com
lkonanova@selendygay.com
anemetz@selendygay.com
rkrock@selendygay.com
dcoon@selendygay.com

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................3

I.     THE SETTLEMENT AGREEMENT PRESERVES VALUABLE INDIVIDUAL
DAMAGES CLAIMS WITHOUT THE CORRESPONDING CHALLENGE OF
ESTABLISHING CLASS-WIDE UNIFORM MISREPRESENTATIONS .......................3

II.    THE SETTLEMENT AGREEMENT PROVIDES SIGNIFICANT NON-
MONETARY RELIEF TO THE SETTLEMENT CLASS ...................................................8

     A.    The *Cy Pres* Contribution Funds Student Loan Education And Counseling
To Further The Relief Envisioned By PSLF...........................................................9

     B.    The Business Enhancements Will Ensure Navient Provides Better Service
To Those Seeking Loan Forgiveness Consistent With Congress's Intent............13

III.   THE SERVICE AND FEES AWARDS ARE APPROPRIATE......................................15

     A.    The Service Awards Acknowledge The Significant Work Performed By
Class Representatives And The Valuable Individual Claims They Released........16

     B.    The Attorneys' Fees Award Acknowledges The Substantial Work
Performed By Counsel In Achieving The Settlement And Partially
Reimburses The Non-Profit Which Paid For Time Billed.....................................18

CONCLUSION...........................................................................................................25

# **TABLE OF AUTHORITIES**

**Pages**

## **Cases**

*Amara v. CIGNA Corp.*,
 775 F.3d 510 (2d Cir. 2014)......................................................................... 15

*Berni v. Barilla S.p.A.*,
 964 F.3d 141 (2d Cir. 2020)......................................................................... 15

*Bowes v. Melito*,
 140 S. Ct. 677 (2019).................................................................................. 16

*Central Railroad & Banking Co. v. Pettus*,
 113 U.S. 116 (1885)........................................................................... 16, 17, 18

*China Agritech, Inc. v. Resh*,
 138 S. Ct. 1800 (2018)................................................................................ 18

*Crawford v. Equifax Payment Servs., Inc.*,
 201 F.3d 877 (7th Cir. 2000) ...................................................................... 14

*Daniel v. Navient Sols., LLC*,
 2019 WL 4671169 (M.D. Fla. Apr. 26, 2019) ................................................. 5

*Fraley v. Facebook, Inc.*,
 966 F. Supp. 2d 939 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638 F.
 App'x 594 (9th Cir. 2016) ............................................................................ 6

*Gallego v. Northland Grp.*,
 814 F.3d 123 (2d Cir. 2016)......................................................................... 25

*Gammon v. GC Servs. Ltd. P'ship*,
 162 F.R.D. 313 (N.D. Ill. 1995)..................................................................... 9

*Google St. View Elec. Commc'ns Litig.*,
 2020 WL 1288377 (N.D. Cal. Mar. 18, 2020)............................................... 12

*Heer v. N. Moore St. Devs., L.L.C.*,
 140 A.D.3d 675 (1st Dep't 2016) ................................................................ 21

*Henry v. Little Mint, Inc.*,
 2014 WL 2199427 (S.D.N.Y. May 23, 2014) ................................................ 17

*In re "Agent Orange" Prod. Liab. Litig.*,
 818 F.2d 216 (2d Cir. 1987)................................................................... 24, 25

*In re Dry Max Pampers Litig.*,
  724 F.3d 713 (6th Cir. 2013) ........................................................... 14

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
  934 F.3d 316 (3d Cir. 2019)......................................................... 9, 13

*In re NCAA Student-Athlete Concussion Injury Litig.*,
  314 F.R.D. 580 (N.D. Ill. 2016)........................................................ 7

*In re NCAA Student-Athlete Concussion Injury Litig.*,
  332 F.R.D. 202 (N.D. Ill. 2019), *aff'd sub nom. Walker v. NCAA*, 2019 WL
  8058082 (7th Cir. Oct. 25, 2019)...................................................... 7

*Jacoby & Meyers, LLP v. Presiding Justices*,
  852 F.3d 178 (2d Cir. 2017).......................................................... 20

*Johnson v. NPAS Sols., LLC*,
  2020 WL 5553312 (11th Cir. Sept. 17, 2020) ........................................ 17, 18

*Koby v. ARS Nat'l Servs.*,
  846 F.3d 1071 (9th Cir. 1999). ....................................................... 14

*Laumann v. Nat'l Hockey League*,
  907 F. Supp. 2d 465 (S.D.N.Y. 2012)................................................... 7

*Masters v. Wilhelmina Model Agency, Inc.*,
  473 F.3d 423 (2d Cir. 2007)........................................................... 9

*Melito v. Am. Eagle Outfitters, Inc.*,
  2017 WL 3995619 (S.D.N.Y. Sept. 11, 2017)......................................... 17, 18

*Melito v. Experian Mktg. Sols., Inc.*,
  923 F.3d 85 (2d Cir. 2019).......................................................... 16, 18

*Meredith Corp. v. SESAC*,
  87 F. Supp. 3d 650 (S.D.N.Y. 2015)............................................... 21, 22, 25

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002).......................................................... 4

*Motor Fuel Temp. Sales Pracs. Litig.*,
  872 F.3d 1094 (10th Cir. 2017) ...................................................... 12

*Orellana v. Macy's Retail Holdings, Inc.*,
  2018 WL 3368716 (S.D.N.Y. July 10, 2018) ............................................ 4

*Perkins v. Linkedin Corp.*,
  2016 WL 613255 (N.D. Cal. Feb. 16, 2016) ........................................... 12

iii

*Richardson v. L'Oreal USA, Inc.*,
  991 F. Supp. 2d 181 (D.D.C. 2013) ...................................................................... 8

*Roberts v. Texaco, Inc.*,
  979 F. Supp. 185 (S.D.N.Y. 1997) ...................................................................... 16

*Shane Grp., Inc. v. Blue Cross Blue Shield*,
  825 F.3d 299 (6th Cir. 2016) .............................................................................. 16

*Smith v. Bayer Corp.*,
  564 U.S. 299 (2011) ............................................................................................ 8

*Standard Fire Ins. Co. v. Knowles*,
  568 U.S. 588 (2013) ............................................................................................ 8

*Sykes v. Mel S. Harris & Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015) ................................................................................. 15

*Trustees v. Greenough*,
  105 U.S. 527 (1882) ................................................................................ 16, 17, 18

*Weiner v. Snapple Beverage Corp.*,
  2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ...................................................... 4

*Zucker v. Occidental Petroleum Corp.*,
  192 F.3d 1323 (9th Cir. 1999) ..................................................................... 23, 24

## Other Authorities

1A Carmody-Wait 2d § 3:245 ................................................................................. 21

4 Newberg on Class Actions § 12:26 (5th ed.) ....................................................... 9

ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Op. 01-423 .......... 19

Dep't of Educ., Student Loans Overview: Fiscal Year 2020 Budget Proposal,
  Q-10 (2020) .......................................................................................................... 6

Doug Bandow, *Student Loans: the Taxpayers Lose Again*,
  Cato Institute (Dec. 29, 2015),
  https://www.cato.org/publications/commentary/student-loans-taxpayers-lose-
  again ................................................................................................................... 11

FedLoan Servicing, *Public Service Loan Forgiveness*,
  https://myfedloan.org/borrowers/special-programs/pslf .................................. 14

NYCBA Formal Op. 2014-1 .................................................................................... 20

## <u>Rules</u>

Fed. R. Civ. P. 23(b)(2) ............................................................................ 2, 4, 5, 7, 9, 10, 13

Fed. R. Civ. P. 23(b)(3) ....................................................................................... 4, 6, 7, 9

Fed. R. Civ. P. 23(e) ...................................................................................... 22, 23, 24

L. Civ. R. 23.1 ....................................................................................................... 23

Model R. Prof'l Conduct 1.8(f) .............................................................................. 23

Model R. Prof'l Conduct 1.8(f) cmt. 4 ................................................................... 23

N.Y. Gen. Bus. Law § 349 ....................................................................................... 4

N.Y. Judiciary Law § 491(1) .......................................................................... 21, 22

N.Y. R. Prof'l Conduct 1.5(g) ................................................................................ 24

N.Y. R. Prof'l Conduct 1.8(f) .......................................................................... 22, 23

N.Y. R. Prof'l Conduct 1.8 cmt. 11 ........................................................................ 22

N.Y. R. Prof'l Conduct 5.4(a) ................................................................................. 19

N.Y. R. Prof'l Conduct 5.4(a) cmt. 1 ..................................................................... 20

Selendy & Gay, PLLC ("S&G" or "Lead Counsel") and Philipps, Richard & Rind, P.A. ("PR&R" and, collectively with S&G, "Class Counsel")[1] respectfully file this opposition to the objections to the proposed settlement.

## INTRODUCTION

Following this Court's June 19, 2020 preliminary approval of the proposed settlement, setting a deadline of September 11, 2020 for any objections, Dkt. 108 at 5, a total of 109 timely objections were filed with the Court or submitted to the Settlement Administrator.[2]  That only 0.0229% of the individuals receiving notice objected suggests the vast majority of the Class supports the agreement reached here, which affords significant non-monetary remedies to the class without waiving the rights of any individual to pursue Navient for damages.  None of the objections—not the two by professional objectors, Richard E. Carson III, filed by E. Isaacson, Dkt. 167 ("Carson Obj."), and William Yeatman, filed by Hamilton Lincoln Law Institute's Center for Class Action Fairness, Dkt. 161 ("Yeatman Obj."), nor the 107 *pro se* objections—undermines the fairness, adequacy, and reasonableness of the settlement.  This deal is a leap forward for student borrowers facing tremendous debt burdens—especially significant in this class action given the individualized circumstances of each borrower.  Adopting the objections would harm the class by dismantling the promised relief, including the valuable enhancements to Navient's business

---

[1] Unless otherwise specified, defined terms have the meaning ascribed to them in the Settlement Agreement.  Dkt. 98-1.  Detailed support for final approval of the settlement, the service awards, and the fee award are contained in the Motion for Final Approval of Settlement ("Final Approval Motion") (Dkt. 120) and the Applications for Fees ("Application for Fees") (Dkt. 122) and Service Awards ("Application for Service Awards" (Dkt. 124), collectively with the Final Approval Motion and Application for Fees, the "Motions"), as well as the consolidated declaration that accompanied those Motions ("Konanova Decl.") (Dkt. 125).

[2] The Declaration of Yelena Konanova in support of this Opposition (the "Konanova Opp. Decl.") lists each of the objections filed with the Court or submitted to the Settlement Administrator, and attaches as part of Exhibit 1 ("Ex. 1") each objection not already filed with the Court.

practices that will further its delivery of accurate information, and the new non-profit dedicated to helping borrowers in public service understand their options for loan forgiveness.

Most of the objections principally protest that the settlement does not provide direct monetary relief to Settlement Class members.  But the Court has repeatedly made clear that such relief was improbable given that this class action is based on individual oral misrepresentations.  *E.g.*, Oct. 17, 2019 Conf. Tr., Dkt. 81, at 33:18–34:9 (Court noting that "there is an underlying problem here with respect to the plaintiffs' theory" due to difficulties proving that Navient's misrepresentations were uniform).  Crucially, Settlement Class members expressly retain the right to bring individual actions for damages, which the Court has suggested represents the most significant avenue for monetary relief.  *See* June 10, 2020 Prelim. Approval Hrg. Tr., Dkt. 106, at 4:9–12 (Court "expressed skepticism that a damages claim could be pursued in this action on behalf of a class," but has never "expressed skepticism … that there could be individual claims for damages.").

Some objections, including in particular those from Messrs. Yeatman and Carson, raise concerns with the adequacy of the non-monetary benefits provided by the settlement—even claiming, in Mr. Yeatman's case, the relief violates the First Amendment.  That is baseless.  The relief delivers meaningful benefits to the class to help fulfill the promise of the federal government's PSLF program, is fully consistent with Rule 23(b)(2), and does not constitute compelled speech by the class.  It is not clear exactly what is motivating the professional objectors here, but surely adopting their arguments would affirmatively harm the class.  Depriving the class of these meaningful resources—the new nonprofit's education and counseling services for student borrowers in public service, and the enhancements to Navient's business practices—would leave borrowers worse off, at a time when the nation and those burdened with student debt surely cannot afford it.

Finally, a small number of objectors take issue with the proposed service and attorneys'

fees awards.  None of the authorities relied upon by the professional objectors—not Supreme Court precedent, rules of professional conduct, nor a criminal statute—bars these awards.  The awards are consistent with Supreme Court and Second Circuit precedent, state law, and ethics rules, and are fully justified by the intensive efforts of the Class Representatives and Class Counsel in securing the meaningful benefits of the Settlement Agreement for the class despite numerous challenges.[3]  The involvement of the American Federation of Teachers ("AFT") in particular—paying Class Counsel's fees without making any strategic decisions for Plaintiffs (which decisions belonged to the Class Representatives alone)—allowed Plaintiffs to litigate this action with gusto and achieve real results for student loan borrowers across the United States.

Accordingly, for the reasons described herein, Class Counsel respectfully request this Court overrule the objections and grant final approval of the settlement.

## ARGUMENT

## I.   THE SETTLEMENT AGREEMENT PRESERVES VALUABLE INDIVIDUAL DAMAGES CLAIMS WITHOUT THE CORRESPONDING CHALLENGE OF ESTABLISHING CLASS-WIDE UNIFORM MISREPRESENTATIONS

Most of the objections ask that the settlement include direct monetary relief to class members.  *See, e.g.*, Ex. 1 at 1, 42, 52; Yeatman Obj. at 7–8.  Many put forward detailed individual stories of alleged misinformation and demand that Navient treat the objectors' payments as qualifying payments for PSLF or forgive their loans entirely.  *See, e.g.*, Ex. 1 at 209, 216, 248.  Mr. Yeatman cites (at 19) the "individualized assessments of damages" and the "intangible, subjective differences of each class member's circumstances" as factors favoring individual monetary

---

[3] In addition to the objections addressed herein, 19 other individuals submitted statements without objections, Konanova Opp. Decl. ¶ 4, including five who requested to opt out, seven who sought to speak at the hearing, seven who described their experiences with Navient or otherwise asked for loan forgiveness, and one who requested a claim form.  *Id.* ¶¶ 10, 14, 25, 32, 35–36, 53, 57, 63, 68, 73, 75, 80–81, 100, 116, 127, 136–37 & supporting exhibits.

relief.  Yet these individual stories and varying requests are precisely why this Court has repeatedly stated that Plaintiffs faced likely insurmountable hurdles to certification of a Rule 23(b)(3) damages class action and why Plaintiffs negotiated a Rule 23(b)(2) settlement that preserves the right to bring individual damages claims.  *See, e.g.*, Oct. 17, 2019 Conf. Tr., Dkt. 81, at 33:18–34:8 ("[T]here is an underlying problem here with respect to the plaintiffs' theory"; the Court doubted "a sample of conversations" between Navient and borrowers would "have the … ability to make the broader point" that Navient's misrepresentations were uniform.); July 26, 2019 Conf. Tr., Dkt. 63, at 17:18–18:9 ("[T]here is an enormous hurdle to certifying this class" because the Court "just can't imagine there would be any uniform[] oral representation[s].").

And indeed, to obtain Rule 23 certification under New York General Business Law § 349, Plaintiffs needed common evidence to show class members suffered injury as a result of Navient's allegedly deceptive acts and practices.  *See, e.g.*, *Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *6 (S.D.N.Y. Aug. 5, 2010).  Where the alleged "oral (mis)representations … vary significantly among the plaintiffs," this variation "poses a problem for plaintiffs in establishing predominance."  *Orellana v. Macy's Retail Holdings, Inc.*, 2018 WL 3368716, at *21 (S.D.N.Y. July 10, 2018).  Such plaintiffs "face significant challenges at the class certification stage."  *Id.* at *20; *see also Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002).

As this Court well knows, prior to the class certification deadline, Plaintiffs zealously endeavored to persuade the Court they could meet this burden.  *See, e.g.*, Dkt. 59 (Plaintiffs' letter citing case law in support of certification); July 26, 2019 Conf. Tr., Dkt. 63, at 17:25–18:7; 21:9–22 (Plaintiffs' argument concerning same).  For example, Plaintiffs aggressively pursued discovery of a sample of borrower conversations to show uniformity of representations and retained experts who intended to analyze the same—a technique borrowed from successful RMBS cases.  *See,*

4

*e.g.*, Oct. 17, 2019 Conf. Tr., Dkt. 81, at 29:6–30:9.  Yet this Court continued to express doubt about a damages class.  At the same time, Navient also defeated class certification in the related PSLF class action in Florida, *Daniel v. Navient Solutions, LLC*, in part on the ground that plaintiffs' "misrepresentation theory require[d] a highly fact-intensive and individualized analysis of the conversations" between borrowers and Navient, such that there was no commonality and typicality.  2019 WL 4671169 at *8 (M.D. Fla. Apr. 26, 2019).  That court granted summary judgment for Navient shortly thereafter.  No. 8:17-CV-2503-T-24JSS, Dkt. 156 (M.D. Fla. Aug. 28, 2019).  In this context, the Settlement Agreement's release of class damages claims is "appropriate" under Rule 23(b)(2) because "the class members aren't giving up really a viable claim for relief, that is, a class action claim for damages."  June 10, 2020 Prelim. Approval Hrg. Tr., Dkt. 106, at 11:8–11.

While the Court has "expressed skepticism that a damages claim could be pursued in this action on behalf of a class," it has never "expressed skepticism … that there could be individual claims for damages." *Id.* at 4:9–12.  The settlement preserves that valuable avenue for monetary relief.  Settlement Agreement § IX.A.7.  The settlement release also has an important carve-out in that it does not cover existing or future actions or investigations by any governmental agency, including for restitution benefitting class members.  *Id.* § IX.B.2.

Ignoring this important background altogether, Messrs. Carson and Yeatman argue that the settlement should not be approved without class-wide monetary relief and that individual damages claims are impossible to pursue.  Neither of these contentions has any merit.  ***First***, Mr. Yeatman argues (at 8) the *cy pres* award should be distributed to the class through a claims process—something he says is "entirely feasible" even though the class, on Plaintiffs' estimate, contains up to 324,900 members.  But Mr. Yeatman's suggested settlement structure is unfair and economically infeasible:  his theory would pay each class member approximately $5.39 in individual monetary

relief pursuant to a Rule 23(b)(3) settlement that would ***require a release of all damages claims, including individual ones***.  Even if the claims rate were 10%, each claimant would receive just over $50, and the rest of the class would receive $0.  It is unconscionable to suggest the class should release individual damages claims—worth hundreds of thousands of dollars in some cases—for a pittance.  Moreover, proof of individual claims would be extraordinarily burdensome, requiring detailed documentation of class members' individual financial circumstances and their oral communications with Navient, raising the costs of the claims process and further reducing the amount available to distribute.[4]

The declaration of Mr. Yeatman's counsel, T. H. Frank (Dkt. 164 at 23–25), cites various cases that supposedly show that "it is economically feasible to distribute $1.75 million to a class of less than 400,000 members."  But there is no comparison between the relief proposed by Mr. Yeatman here and those cases, which arise from plainly distinguishable circumstances, such as privacy litigation in which "there is slim indicia class members suffered ***any*** pecuniary harm as the result of" the misconduct.  *See, e.g.*, *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 943 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016).  And even *Fraley* noted the $15-per-claimant monetary relief "certainly would not be ideal" as "a means of providing recompense to any genuinely injured parties."  *Id.*  Here, in contrast, Settlement Class members allege genuine injuries quantifiable on an individual basis.  Releasing such claims in exchange for minimal relief, as Mr. Yeatman suggests, would be outrageous.

---

[4] Mr. Carson's reliance (at 12–13) on stock-market data to demonstrate that "Navient is eminently capable of paying a large judgment" is baseless.  Even assuming, contrary to the above, one could be reached, a monetary judgment on behalf of hundreds of thousands of class members for an average of tens of thousands of dollars in alleged damages would amount to a sum far greater than Navient's $1.67 billion market capitalization.  *See* DEP'T OF EDUC., STUDENT LOANS OVERVIEW: FISCAL YEAR 2020 BUDGET PROPOSAL, Q-10 (2020) (Department of Education estimates that the median PSLF participant borrowed $57,000 and will receive $27,000 in forgiveness.).

There is also no merit to Mr. Yeatman's claim (at 17–19) that class certification under Rule 23(b)(2) is improper because individual monetary relief is the "appropriate" remedy for Plaintiffs' claims.  That utterly disregards the Court's statements indicating it would not be reasonably possible to certify a Rule 23(b)(3) damages class because of the non-uniformity of Navient's alleged misrepresentations.  Courts have recognized that a Rule 23(b)(2) settlement in which a class releases the ability to assert class-wide claims but retains the right to pursue individual damages claims is appropriate where, as here, there is "very little likelihood that a Rule 23(b)(3) [class] … could be certified on a nationwide … basis."  *E.g.*, *In re NCAA Student-Athlete Concussion Injury Litig.* ("*NCAA*"), 314 F.R.D. 580, 604–05 (N.D. Ill. 2016), *final approval granted*, 332 F.R.D. 202 (N.D. Ill. 2019), *aff'd sub nom. Walker v. NCAA*, 2019 WL 8058082 (7th Cir. Oct. 25, 2019).[5]  Relatedly, Mr. Carson's suggestion (at 7 & n.5) that Plaintiffs lack Article III standing to pursue non-monetary relief is meritless.  As long as "at least one plaintiff … plausibly alleges continuing harm," representative plaintiffs have standing to pursue a class action for injunctive relief.  *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 480 n.76 (S.D.N.Y. 2012).  That requirement is satisfied here:  Plaintiffs Church, Garcia, Guth, Kaplan, Means, and Spitler-Lawson each continue to have their federal student loans serviced by Navient.  Konanova Opp. Decl. ¶ 5.  As alleged in the complaint, without this settlement those Plaintiffs are likely to suffer future injury because of Navient's alleged conduct; therefore, Article III standing is satisfied.

**Second**, Mr. Carson's notion (at 13–14) that individual damages actions are "not economically feasible" across the board is baseless.  This is not a typical consumer class action in which

---

[5] Mr. Yeatman misstates (at 8 n.1) that *NCAA* provided "direct relief" to the class.  *NCAA*, a Rule 23(b)(2) settlement, included no direct monetary relief to class members; instead, the court directed that certain funds should not be used for *cy pres* if they could be used to meaningfully extend the injunctive relief.  314 F.R.D. at 607.  That has no analog here, where the *cy pres* award meaningfully supplements, and does not reduce, the Business Practice Enhancements.

an individual suit to recoup a few dollars overpaid for shampoo is unimaginable. Here, where borrowers may allege tens of thousands of dollars in damages as a result of their high loan balances, it may well be economical to retain counsel on a traditional or contingency fee basis.[6] Mr. Carson himself retained an attorney just to file his objection. He further observes (at 13–14) that four of the ten Class Representatives stated in their declarations that they could not afford to bring individual actions. But he overlooks the fact that the *cy pres* relief provided by the settlement did not exist at the time the Class Representatives were evaluating their rights, and will be a valuable resource for individuals, including Settlement Class members, who will be able to get help understanding their options and locating attorneys who could bring legal action on their behalf.[7]

## II. THE SETTLEMENT AGREEMENT PROVIDES SIGNIFICANT NON-MONETARY RELIEF TO THE SETTLEMENT CLASS

Certain objectors—principally Messrs. Yeatman and Carson—claim that the non-monetary relief provided by the settlement is insufficient and inappropriate. In reality, the settlement provides meaningful and appropriate non-monetary benefits to all Settlement Class members.

---

[6] Mr. Yeatman's suggestion (at 12–14) that the settlement should provide an "opt out" right is similarly meritless. Individual class members already retain their individual damages claims. For the same reason, his citation (at 20) to *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181 (D.D.C. 2013), is inapposite, as that court's ruling turned on its determination that a class action was "essentially the only way absent class members could ever recover any damages." *Id.* at 199.

[7] Mr. Carson wrongly argues (at 16) individual Settlement Class members would be barred from bringing claims dismissed in the motion to dismiss decision. He cites no authority from the class action context in support, and Class Counsel have found none. As he acknowledges (at 15), a "proposed class action … may [not] bind nonparties," *Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011); *see also Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593 (2013). Here, the Court's pre-certification motion to dismiss decision does not preclude Settlement Class members from bringing any claims for damages in future individual actions. Moreover, the Settlement Agreement and the proposed Final Approval Order, Dkt. 125-1, expressly preserve Settlement Class members' rights to bring such individual damages actions, without reservation.

## A.      The *Cy Pres* Contribution Funds Student Loan Education And Counseling To Further The Relief Envisioned By PSLF

Mr. Yeatman argues (at 5, 7) that the Second Circuit "recognize[d] *cy pres* should be limited to" Rule 23(b)(3) settlements in which "class members are difficult to identify, or where they change constantly, or where there are unclaimed funds." That is spurious. The sole Second Circuit case Mr. Yeatman cites for that proposition, *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007), concerns a district court's distribution of unclaimed funds from a Rule 23(b)(3) settlement under the *cy pres* doctrine, but does not hold that *cy pres* awards are permissible *only* in that context. In fact, *Masters* notes that "[f]ederal courts have frequently approved [the *cy pres*] remedy in the settlement of class actions *where the proof of individual claims would be burdensome* or distribution of damages costly." *Id.* at 436 (emphasis added). Here, even if monetary relief to the class were economically feasible, proof of individual claims would be extraordinarily burdensome for the reasons discussed in Section I, *supra*.

Contrary to Mr. Yeatman's claim, the *cy pres* award here provides meaningful and appropriate Rule 23(b)(2) relief. As previously discussed, Public Service Promise will devote the $1.75 million in *cy pres* funds to providing education and student loan counseling to borrowers employed in public service, thus working to prevent harm similar to that alleged in Plaintiffs' complaint from occurring in the future and enhancing the settlement's deterrent effect. *See In re: Google Inc. Cookie Placement Consumer Privacy Litig.* ("Google"), 934 F.3d 316, 328 (3d Cir. 2019); *see also* 4 Newberg on Class Actions § 12:26 (5th ed.) ("Full *cy pres* distributions serve several purposes," including "ensur[ing] that the defendant is disgorged of a sum certain, even if that money does not compensate class members directly," which "furthers the deterrence goals of the class suit[.]"); *Gammon v. GC Servs. Ltd. P'ship*, 162 F.R.D. 313, 321 (N.D. Ill. 1995) (certifying Rule 23(b)(2) class and assuming, without deciding, that if plaintiffs prevailed, "*cy pres* distribution would be

appropriate … and thus class members would actually receive no part of a monetary award").

Mr. Yeatman further suggests (at 1, 10–12) that the *cy pres* award is suspect because the parties' *cy pres* Term Sheet (Dkt. 125-8) contemplates the potential involvement of certain senior attorneys from the National Student Legal Defense Network ("Student Defense") who have a preexisting relationship with AFT, and Class Counsel, supposedly creating the "appearance[]" of a conflict of interest. Mr. Yeatman identifies no actual or potential conflict—because there is none. AFT had no ability to direct Plaintiffs' strategic decisions in this case; those decisions belonged to the Class Representatives alone (who are required to, and did, act in the best interests of the class as a whole). Mr. Yeatman's suggestion (at 11–12) that AFT somehow engineered the settlement to relieve itself of having to devote resources to borrower counseling makes no sense— if anything, AFT's payment of Class Counsel fees demonstrates its willingness to contribute substantial resources for the benefit of borrowers (as discussed in Section III, *infra*).[8] In any event, the parties and their counsel—not AFT—put forth the *cy pres* recipient (subject to Court approval) after extended arms-length negotiations. AFT's members, along with hundreds of thousands of non-AFT-affiliated borrowers, will benefit from the settlement, including the *cy pres* relief. And Mr. Yeatman's argument (at 12) that AFT has an "ideological interest in the formation of a new organization" that will engage in "advocacy and public policy work" also falls flat. The point of the lawsuit was to represent a class interested in obtaining the benefit of PSLF, and Public Service Promise's advocacy and public policy work, combined with its primary mission of borrower education and counseling, will help borrowers obtain that benefit. It is possible that Mr. Yeatman's

---

[8] Mr. Yeatman's claim (at 12) that "AFT focuses on benefiting its own members and their families—not on improving the lives of students more broadly" is thus specious.

employer (Dkt. 162 ¶ 3),[9] Mr. Yeatman's counsel,[10] and perhaps Mr. Yeatman himself, are ideologically opposed to PSLF.  But it is the law of the land, and Public Service Promise will benefit the class by helping to ensure that the federal government's promise of PSLF becomes a reality.

There can be no serious question as to the independence of Public Service Promise, which is baked into the Term Sheet (requiring that Public Service Promise "maintain independent decision-making authority from Student Defense," and "be governed by a separate Board of Directors," Dkt. 125-8 ¶ 5.1), and only underscored by the experience of the initial members of Public Service Promise's Board of Directors—Joseph A. Smith, Jr., Rebecca Fertig Cohen, and LaRue Robinson. Mr. Smith is currently a Senior Fellow at the Global Financial Markets Center at Duke University School of Law, and has previously served as President of the Office of the Mortgage Settlement Oversight, where he served as the monitor of seven consent judgments between major mortgage servicers, the United States, and 49 states, and as Special Master for Borrower Defense at the U.S. Department of Education.  Ms. Fertig Cohen is the Chief of Staff and Corporate Secretary at the Legal Services Corporation.  She previously served as the Congressional Liaison Officer at the U.S. Agency for International Development.  And Mr. Robinson is Counsel in the Litigation Department at Willkie Farr & Gallagher LLP, having previously served as a partner at Jenner & Block

---

[9] *See* Doug Bandow, *Student Loans: The Taxpayers Lose Again*, CATO INSTITUTE (Dec. 29, 2015), https://www.cato.org/publications/commentary/student-loans-taxpayers-lose-again    (describing the "forgiveness program for 'public service[]'" as "nonsensical").

[10] Mr. Yeatman's counsel are professional objectors with an apparent ideological agenda.  *See, e.g.*, Opening Br. of Appellant Theodore H. Frank, *In re: Citigroup Inc. Sec. Litig.*, 2016 WL 6566369, at *2 (2d Cir. Nov. 6, 2016) (objecting to settlement in part because "the three proposed *cy pres* recipients—The South Brooklyn Legal Services' Foreclosure Prevention Project, National Consumers League, and Consumer Federation of America" supposedly "take controversial stands on political issues that many class members disagree with"); Opening Br. of Appellants Theodore H. Frank and Melissa Holyoak, *In re: Google Referrer Header Privacy Litig.*, 2015 WL 5211307, at *5 (9th Cir. Sept. 4, 2015) (objecting to settlement on grounds that *cy pres* recipient AARP, Inc. "takes a variety of controversial political positions," such as supporting the Affordable Care Act).

in Chicago, Illinois, and as a trial attorney with the Judge Advocate General for the U.S. Army. Additional individuals may be added to the Board of Directors, and Public Service Promise is committed to considering feedback from stakeholders regarding potential candidates.

Accordingly, while the Board of Public Service Promise may decide to draw (or not) on the experience of senior attorneys from Student Defense, Dkt. 125-8 at 4–5, the substantial experience of the Public Service Promise Board in law, public interest organizations, student borrower protection, and the monitoring of consent judgments involving loan servicers, coupled with the Term Sheet requirement that the organization maintain independent decision-making authority from Student Defense, ensures their independence.

Finally, Mr. Yeatman (at 12) claims that the *cy pres* award "violates the First Amendment rights of class members to refrain from supporting or associating with [Public Service Promise's] agenda and activities." This argument, roundly rejected when Mr. Yeatman's counsel raised it in other courts, fails. As an initial matter, "[t]he settlement agreement between the parties is not state action." *In re Google St. View Elec. Commc'ns Litig.*, 2020 WL 1288377, at *14 n.10 (N.D. Cal. Mar. 18, 2020) (rejecting the same argument from Mr. Yeatman's counsel); *In re Motor Fuel Temp. Sales Pracs. Litig.*, 872 F.3d 1094, 1113–14 (10th Cir. 2017) (same). The *cy pres* award is also being paid by Navient, not by individual class members. *See Perkins v. Linkedin Corp.*, 2016 WL 613255, at *11 n.9 (N.D. Cal. Feb. 16, 2016) (objector "fail[ed] to explain why a *cy pres* distribution upon a court order serves as speech by [class members]"). Because the Settlement Agreement expressly preserves individual lawsuits for damages, the value of those claims is not being used to subsidize any organization. Instead, Public Service Promise represents a Rule 23(b)(2) benefit "to the class as a whole," and is not "monetary compensation" directed to Public Service Promise from class members who would otherwise be entitled to receive it. *See*

Section I, *supra*; *see also Google*, 934 F.3d at 328.

**B.    The Business Enhancements Will Ensure Navient Provides Better Service To Those Seeking Loan Forgiveness Consistent With Congress's Intent**

Mr. Yeatman suggests (at 25) that the Business Practice Enhancements provide "little value" to class members. Not so. The practice enhancements are meaningful relief directly aimed at preventing the kind of harm alleged by Plaintiffs and the class. For example, Plaintiffs alleged that Navient inappropriately steered many PSLF-eligible borrowers into non-qualifying repayment plans instead of the option to pursue PSLF. *E.g.*, Dkt. 32 ("Am. Compl.") ¶¶ 324–41, 366–85. The Business Practice Enhancements directly address this issue, including by ensuring that ***prior to*** offering forbearance during calls in which borrowers express interest in repayment options or indicate they have difficulties repaying their loans, Navient representatives assess borrowers' potential eligibility for loan forgiveness, including PSLF, and discuss forgiveness with borrowers. Plaintiffs additionally alleged that Navient incorrectly informed borrowers that they were "on track" for PSLF, incorrectly informed other borrowers that they were ineligible for PSLF, and incorrectly advised borrowers not to submit necessary paperwork for PSLF. *E.g.*, Am. Compl. ¶¶ 343–65, 386–95. The Business Practice Enhancements help ensure that Navient's employees deliver correct information to borrowers regarding PSLF eligibility and avoid restricting borrowers' ability to enroll in PSLF by conducting mandatory training on PSLF, regularly monitoring calls with borrowers to ensure adherence to policies and procedures, designing forms to be sent to borrowers who request additional information on or express interest in PSLF, and providing borrowers with direct links to the Department of Education's central database for federal student aid.

The case law cited by Messrs. Yeatman (at 7–8, 20) and Carson (at 12) concerning inadequate settlement relief is inapposite. For example, in *In re Dry Max Pampers Litigation*, the settlement provided only "illusory" injunctive relief in the form of a refund program that most class

members had already taken advantage of independent of settlement, and cursory labeling changes to defendant's product packaging and website, 724 F.3d 713, 719–21 (6th Cir. 2013). Nevertheless, the settlement awarded $2.73 million in attorneys' fees to counsel who "did not take a single deposition, serve a single request for written discovery, or even file a response to [the] motion to dismiss." *Id.* at 718. In *Crawford v. Equifax Payment Services, Inc.*, the settlement would have foreclosed class members' rights to participate in two ***already-certified*** class actions that had prospects for monetary relief, in exchange for injunctive relief that was of no value because the defendant had already voluntarily discontinued the problematic practice and was unlikely to resume it, 201 F.3d 877, 882 (7th Cir. 2000). Similarly, in *Koby v. ARS National Services*, the injunctive relief was "of no real value" because it did "not obligate [the defendant] to do anything it was not already doing" voluntarily, and it was "doubtful" that class members were likely to suffer future wrongful conduct by the defendant, 846 F.3d 1071, 1079–80 (9th Cir. 1999).

This case stands in stark contrast. Here, as discussed, the released class-wide monetary relief had no reasonable prospect of success despite Class Counsel's tenacious efforts. Settlement Class members faced serious risk of future alleged harm, as borrowers who seek PSLF with loans serviced by Navient cannot leave Navient by choice. Rather, PSLF-eligible borrowers could be transferred to FedLoan Servicing if they are already on track for PSLF. *See* FedLoan Serv., *Public Service Loan Forgiveness*, https://myfedloan.org/borrowers/special-programs/pslf. But Plaintiffs alleged Navient's misrepresentations concerned borrowers' "on track" status. *See, e.g.*, Am. Compl. ¶ 17. The Business Practice Enhancements thus provide material benefits to the Settlement Class in their continuing relationships with Navient. Moreover, to the extent a borrower may have previously received incorrect information, the Business Practice Enhancements may help reveal whether the borrower has been harmed and therefore has a potential individual claim for damages.

14

Certain objectors argue that class members who no longer have loans serviced by Navient do not benefit from the settlement because they cannot be served by the Business Practice Enhancements.[11]  *E.g.*, Ex. 1 at 36, 650; Yeatman Obj. at 14–21; Carson Obj. at 3–4, 6–7.  That is not true.[12]  Even borrowers no longer serviced by Navient will benefit from Public Service Promise, a first-of-its-kind organization providing education and counseling services to borrowers in public service under the leadership of a powerhouse Board of Directors.  Its services will be open to ***all*** borrowers in public service, regardless of their servicer.  Current estimates suggesting Public Service Promise may reach up to 11,250 borrowers per year, *see* Dkt. 125-8 at 4, are by no means a cap—the actual scope of its reach will be determined by the actions of its Board, with its sole focus on improving access to PSLF.  In any event, Second Circuit precedent makes clear that class members may benefit to varying degrees.  *See, e.g.*, *Amara v. CIGNA Corp.*, 775 F.3d 510, 522 (2d Cir. 2014); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 97–98 (2d Cir. 2015).

## III.    THE SERVICE AND FEES AWARDS ARE APPROPRIATE

A handful of objectors raised concerns about the proposed service and attorneys' fees awards.  Some *pro se* objectors say they, too, deserve monetary compensation (even though the

---

[11] Mr. Carson is also wrong (at 3) that "many Settlement Class members' loans—perhaps most— no longer are serviced by Navient."  In fact, according to Navient, less than half of the individuals who received class notice have had their loans transferred for servicing away from Navient to FedLoan Servicing.  *See* Konanova Opp. Decl. ¶ 6.  Moreover, Mr. Carson's suggestion (at 8) that Class Representative Jessica Saint-Paul "confirm[ed] … that the *cy pres* relief is not designed to help current members of the Settlement Class, but rather is designed to help other individuals in the future" is false.  Ms. Saint-Paul conveyed her sincere hope that the settlement helps current and future borrowers, including by creating "a fair, accessible path toward loan forgiveness for individuals that dedicate their lives to public service," like Ms. Saint-Paul and other class members.  *E.g.*, Saint-Paul Decl. in Supp. of App. for Service Awards, Dkt. 134 ¶ 46.

[12] As the parties already explained in their July 20, 2020 letters to the Court (Dkts. 110, 111), the settlement is consistent with the Second Circuit's decision in *Berni v. Barilla S.p.A.*, 964 F.3d 141 (2d Cir. 2020), contrary to the claims of Messrs. Carson and Yeatman.

service awards are not damages awards), while the professional objectors, relying on nineteenth-century case law, argue that service awards for class representatives are never appropriate.  As to the fee award, Messrs. Yeatman and Carson go so far as to claim that it constitutes illegal fee-splitting with AFT.  Those objections are without basis.  Without the efforts of the Class Representatives and Class Counsel, and without AFT's support, this lawsuit could have gone the way of similar cases, dismissed before plaintiffs could provide any relief to putative classes of borrowers.  The awards are consistent with Second Circuit precedent and justified by the significant work performed by the Class Representatives and Class Counsel in achieving a valuable settlement.

### A.    The Service Awards Acknowledge The Significant Work Performed By Class Representatives And The Valuable Individual Claims They Released

Several *pro se* objectors complain that only the Class Representatives would receive service awards upon approval of the settlement.  Mr. Carson specifically contends (at 20) that service awards are impermissible as a matter of law under *Trustees v. Greenough*, 105 U.S. 527 (1882), and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885), because they are "created … out of whole cloth" and, at a minimum, must be "[]tethered" to the hours of service provided by each Class Representative supported by "specific documentation—in the manner of attorney time sheets."  Carson Obj. at 18–20 & n.8 (citing *Shane Grp., Inc. v. Blue Cross Blue Shield*, 825 F.3d 299, 311 (6th Cir. 2016)).  That is wrong.  It is well established in this Circuit that class representatives who provide a service to the class at great personal expense to themselves deserve special recognition for that service.  *See, e.g.*, *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir. 2019), *cert. denied sub nom. Bowes v. Melito*, 140 S. Ct. 677 (2019); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 200 (S.D.N.Y. 1997).  In *Melito*, 923 F.3d at 96, the Second Circuit, finding *Greenough* and *Pettus* inapposite, affirmed the district court's approval of $2,500 incentive awards for each class representative despite the fact that "Class Counsel ha[d] neither provided

16

documentation of the time or effort that each representative expended in furtherance of this case nor identified any personal risks or burdens incurred by the representatives," *Melito v. Am. Eagle Outfitters, Inc.*, 2017 WL 3995619, at *16 (S.D.N.Y. Sept. 11, 2017).[13] Here, the Class Representatives' declarations describe in painstaking detail the specific tasks they undertook to further the lawsuit and settlement, their best estimates of the hours spent on each, and the significant personal risks and burdens they sustained.[14] The objectors point to no controlling authority requiring anything more, especially given that a court considers factors beyond mere time spent on tasks advancing the litigation in approving such awards. *See* Application for Service Awards (Dkt. 124) at 8–9.[15]

The recent out-of-circuit decision by a divided panel in *Johnson v. NPAS Solutions, LLC*, 2020 WL 5553312 (11th Cir. Sept. 17, 2020)—the subject of Mr. Carson's supplemental submission (Dkt. 174)—does not counsel a different conclusion. There, the majority ruled the Supreme Court's decisions in *Greenough* and *Pettus* (which predate the enactment of Rule 23) "prohibit the

---

[13] As the briefs in *Melito* make clear, *Greenough* and *Pettus* (which interpreted *Greenough*) stand for the narrow proposition that a plaintiff bondholder suing a trustee and others for depleting a fund intended to pay interest on the bonds could not recover "a salary" and "private expenses" incurred in bringing the case. Br. of Plaintiffs-Appellees at 61 (Dkt. 166), *Melito*, No. 17-3279 (CON) (citing *Greenough*, 105 U.S. at 537–38). Allowing that kind of direct reimbursement "would present too great a temptation to parties to intermeddle in the management of valuable property or funds in which they have only the interest of creditors, and that perhaps only to a small amount." *Id.* at 61–62 (citing same). Service awards serve an entirely different purpose—they encourage private individuals "to litigate a common wrong," *id.* at 62, by providing an award that recognizes the full range of efforts, risks, and sacrifices required in doing so.

[14] *See* Dkt. 127 ¶¶ 16–29 (Church); Dkt. 128 ¶¶ 13–27 (Garcia); Dkt. 129 ¶¶ 14–38 (Guth); Dkt. 130 ¶¶ 16–32 (Hyland); Dkt. 131 ¶¶ 12–28 (Kaplan); Dkt. 132 ¶¶ 13–42 (Means); Dkt. 133 ¶¶ 21–31 (Nocerino); Dkt. 134 ¶¶ 16–43 (Saint-Paul); Dkt. 135 ¶¶ 16–33 (Spitler-Lawson); Dkt. 136 ¶¶ 12–31 (Taylor).

[15] Relevant case law also confirms service awards are appropriate where, as here, the Class Representatives alone have waived claims for monetary damages. *See Henry v. Little Mint, Inc.*, 2014 WL 2199427, at *11 (S.D.N.Y. May 23, 2014).

type of incentive award … that compensates a class representative for his time and rewards him for bringing a lawsuit." 2020 WL 5553312, at *12. *Johnson* is distinguishable because the petition in support of the service award contained only general descriptions of the representative's role in the litigation, *see id.* at *10, with no supporting detail provided in the accompanying declaration, *see* No. 18-12344, App'x Vol. 2 at 44-1 (¶¶ 74–77) (Aug. 13, 2018).  Here, in contrast, the class representatives themselves extensively documented the tasks performed, hours expended, and risks incurred.  *See supra* n.14.  Moreover, the *Johnson* majority acknowledged its holding was contrary to the Second Circuit's ruling in *Melito*, *see* 2020 WL 5553312 at *9 n.8 ("We are unpersuaded by the Second Circuit's position.").  This Court, of course, is bound by *Melito*, not *Johnson*.[16]  The *Johnson* majority also recognized that service awards are "commonplace in everyday class-action practice." *Id.* at *1.  As Judge Martin's partial dissent elaborates, most circuit courts "routinely uphold" such awards "[i]f it does not appear that [they] 'compromise[] the interest of the class' for the class representative's personal gain"; "[n]one" prohibits them. *Id.* at *16–17 (dissenting in part) (collecting circuit cases), *19.  And, Judge Martin noted, the Supreme Court has recently acknowledged the availability of service awards in class action litigation. *Id.* at *17 n.2 (citing *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1810–11 & n.7 (2018) ("The class representative might receive a share of class recovery above and beyond her individual claim.")).

### B.   The Attorneys' Fees Award Acknowledges The Substantial Work Performed By Counsel In Achieving The Settlement And Partially Reimburses The Non-Profit Which Paid For Time Billed

Messrs. Yeatman and Carson challenge the proposed attorneys' fees award, arguing that:

(i) Lead Counsel violated ethical rules and state law in accepting the up-front payment of its fees

---

[16] Mr. Carson unsuccessfully advanced his argument concerning *Greenough* and *Pettus* to the *Melito* court for Objector–Appellant Kara Bowes.  *See* 923 F.3d at 96.

by its non-profit partner, AFT; (ii) Lead Counsel failed to disclose its "opaque" relationship to AFT or to obtain the Settlement Class's informed consent to partially reimburse AFT; and (iii) even if properly disclosed, the requested fees award is nevertheless improper because it is neither supported by adequate records nor proportionate to the "near valueless" relief afforded by the settlement.  These challenges, concerning matters of public knowledge, are unavailing.  No applicable laws prohibit AFT from funding, and then being partially reimbursed for funding, this litigation.  Importantly, AFT had no ability to control the litigation, much less decide to settle it. And the requested fees are well-supported and justified as only a fraction of the lodestar, especially given the settlement value.

*First*, Mr. Yeatman argues (at 24) the proposed fees award violates Rule 5.4(a) of the New York Rules of Professional Conduct and even criminal law prohibiting a lawyer from sharing fees with a non-lawyer, including in exchange for referrals.  Neither contention is correct.  Lead Counsel seeks approval of the fees award in order to partially *reimburse*—rather than *share*—the $5.9 million in fees billed to their non-profit partner, AFT.[17]  The ABA has emphasized that Rule 5.4 is "directed mainly against entrepreneurial relationships with nonlawyers," ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Op. 01-423, and such a relationship does not exist here. AFT made no investment in this litigation designed to yield pecuniary returns, because there was no expectation, much less any requirement, that Lead Counsel seek an award.  Moreover, AFT may be reimbursed for at most 8.45% of Lead Counsel's total billed time—the very opposite of an investment for pecuniary returns.

The plain language of Rule 5.4 omits any reference to *reimbursement* of fees already paid;

---

[17] Mr. Yeatman's suggestion that AFT "spent an untold amount funding the case" (at 22) is belied by the record, which contains Lead Counsel's detailed time entries and applicable rates billed to AFT in this litigation.  Dkt. 122 at 2, 8; *see also* Konanova Decl. Exs. 9–10.

it does not deem returning a fraction of the money spent funding a litigation to the one who spent it a "shar[ing]" of legal fees. Moreover, the official commentary on that rule provides that the fee-splitting provision is intended to "protect the lawyer's professional independence of judgment." N.Y. R. Prof'l Conduct r. 5.4(a) cmt. 1; *see also* NYCBA Formal Op. 2014-1; *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 191 (2d Cir. 2017). Objectors have pointed to nothing suggesting Lead Counsel's professional independence was compromised by AFT's commitment to fund this litigation on behalf of the class. Again, AFT had no right to control the litigation, including decisions about whether and on what terms to settle the case, as Class Counsel explained to Mr. Yeatman's attorneys. Dkt. 163 at 11 (Ltr. to HLLI at 3) ("AFT did not control or set litigation strategy. Litigation strategy decisions—including about whether to settle and on what basis—belonged to the Class Representatives alone, as evidenced by the Class Representatives' participation in a November 5, 2019 in-person mediation before Magistrate Judge Barbara Moses, Dkt. 125 ¶ 17, and the fact that the Settlement Agreement was executed by each of the Class Representatives, *see* Dkt. 125-4."). All such decisions on behalf of Plaintiffs belonged exclusively to the Class Representatives as stewards for absent class members. *Id.*

Moreover, the funding arrangement here created better incentives for Class Counsel than in a typical class action, where lawyers may be inclined to reach a quick settlement in exchange for an earlier fee award (often orders of magnitude larger than their payment in a regular case). Class Counsel here faced no such pressure because they received hourly compensation regardless of how, or how quickly, the case was resolved. Class Counsel's singular focus in this litigation has been advancement of the class's interests, as amply supported by the record of hard-fought battles before this Court—including Class Counsel's endeavor to pursue novel legal theories, to obtain comprehensive discovery, and to retain experts in support of class certification—all in the

face of strong opposition by Navient.  Konanova Decl. ¶¶ 6, 9–16.  These facts cannot be squared with objectors' conjecture about AFT's supposed pecuniary motives for funding the case.

Mr. Yeatman is likewise incorrect (at 24) that the proposed award would violate N.Y. Judiciary Law § 491(1), which criminalizes only dividing fees "as an inducement **for placement**, or in consideration of having placed, in the hands of such attorney-at-law … a claim or demand of any kind for the purpose of collecting such claim, or bringing an action thereon, or of representing claimant in the pursuit of any civil remedy for the recovery thereof."  N.Y. Jud. Law § 491(1) (emphasis added); *see also* 1A Carmody-Wait 2d § 3:245 (explaining this provision makes it unlawful for anyone "to divide with or receive from an attorney any portion of his or her fee ***for having provided a claim of any kind*** to the attorney for the purpose of collecting it …") (emphasis added).  Here, AFT had no claims to "provide[]" or "place[]" with Lead Counsel because the claims belonged to the Class Representatives.  AFT also has not "divide[d]" or "receive[d]" Lead Counsel's fees and would not do so if the fee award here is granted—rather, AFT ***already paid*** those fees and would be partially reimbursed for that payment.  Judiciary Law § 491(1) simply does not sweep as broadly as Mr. Yeatman suggests.  For example, it does not prohibit "litigation loans obtained by law firms and secured by their accounts receivable."  *Heer v. N. Moore Street Developers, L.L.C.*, 140 A.D.3d 675, 676 (1st Dep't 2016).  Here, there is even less potential for abuse—AFT's payment of invoices for hourly fees is not a litigation loan and AFT's receipt of the partial reimbursement is no security interest in accounts receivable.  *A fortiori*, Judiciary Law § 491(1) does not capture the partial reimbursement of paid fees sought here.

Finally, contrary to Mr. Yeatman's suggestion, *Meredith Corp. v. SESAC*, 87 F. Supp. 3d 650 (S.D.N.Y. 2015), actually supports funding arrangements like the one in this case.  In *Meredith*, a nonprofit association that was not a class member—the Television Music License

Committee ("TMLC")—paid class counsel's hourly fees at a discounted rate to fund a class action suit. *Id*. at 655, 669 n.15. The Court approved an award of attorneys' fees, noting that "TMLC has paid some of the legal fees it owes [class counsel]" and "[t]he fee award here would enable TMLC to pay [class counsel] the outstanding fees and compensate TMLC for the fees it previously paid." *Id*. at 669 & n.15. Mr. Yeatman fails (at 24–25) to distinguish *Meredith*: As he admits, TMLC, a non-profit that was not a class member, paid hourly fees throughout the litigation and the Court awarded attorneys' fees to class counsel with full knowledge that it would be used to reimburse TMLC for the fees it had paid. That is exactly this case: AFT, which is not a class member, paid Lead Counsel's fees in litigating and settling the case on behalf of the class; now Lead Counsel seeks to partially reimburse that outside group for funding the litigation effort. *Meredith* thus provides additional authority favoring the proposed fee award here.

**Second**, Messrs. Yeatman (at 24) and Carson (at 22–23, 25) both contend the settlement and accompanying awards are proscribed by Rule 23(e) because Class Counsel failed to disclose the fact that AFT provided up-front payment of Class Counsel's fees, and in so doing failed to obtain the Settlement Class's informed consent to partially reimburse AFT.[18] Both contentions are meritless. As indicated in the Motions, AFT's involvement in this suit was disclosed in national news outlets from the outset of this litigation, and thus has long been a matter of public record. Dkt. 122 at 2 n.2. More importantly, the fact of that funding is ultimately irrelevant to the overall fairness of the settlement where, as here, AFT had no control over litigation strategy—only

---

[18] Under the commentary to Rule 1.8(f) of the New York Rules of Professional Conduct, "[l]awyers are frequently asked to represent clients under circumstances in which a third person will compensate them." *Id*. cmt. 11. Such an arrangement is permissible when "(1) the client gives informed consent; (2) there is no interference with the lawyer's independent professional judgment or with the client-lawyer relationship; and (3) the client's confidential information is protected." Rule 1.8(f).

the Class Representatives did.  *See supra* at 20 (citing Dkt. 163 at 11 (Ltr. to HLLI at 3)).[19]

Mr. Carson's own authorities (at 23) demonstrate the propriety of AFT's participation and undermine his suggestion that AFT may not be reimbursed without advance consent from all class members.  *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323 (9th Cir. 1999), in particular explains that, although the Rules of Professional Conduct require that an individual client must consent before a lawyer may receive compensation from a third party, "[w]here the client is a class, consent may be obtained on behalf of the class by court-supervised procedure," *id.* at 1327 (alteration in original) (quoting Model Rule of Prof'l Conduct. 1.8(f) cmt. 4 (1983)).[20]  This enables the court to "assure that the amount and mode of payment of attorney's fees are fair and proper," *id.* at 1328, and to guard against the possibility that class counsel is "throwing the fight," *id.* at 1327. That is precisely what a Rule 23(e)(2) fairness hearing provides.

*Zucker* demands no additional proceeding; rather, it observes that "[t]he supervisory power of the district court affords a mechanism for assuring loyal performance of the attorneys' fiduciary duty to the class" and therefore mitigates "the risk of collusion" against which ethics rules—including the requirement of informed consent—are designed to guard.  *Id.*  In other words, given the impracticality of obtaining each class member's individual consent to the financing arrangement, *Zucker* licenses a court to examine a class settlement to ensure that its terms, including any fee award, protect the class.  The court's substantive fairness review serves as a proxy for the

---

[19] Nor can Messrs. Yeatman and Carson complain about the class notice when each asserted timely objections to the settlement, including as to the proposed fee award.  Local Civil Rule 23.1 also did not require any disclosure because it governs only "fee sharing arrangements," and as discussed above, Class Counsel's arrangement with AFT is not a fee sharing arrangement.  The professional objectors have received all the process to which they are reasonably entitled.

[20] Rule 1.8(f)(1) of New York's Rules of Professional Conduct, which applies here, is identical to Rule 1.8(f)(1) of the ABA's Model Rules, which comment 4 addresses.

class's informed consent.[21]  Here, there is no evidence that AFT "interfere[d] with [Lead Counsel's] wholehearted duty to [its] client," *id.*, and so the proposed award should be approved.

Likewise, Mr. Yeatman's citation (at 24) to *In re "Agent Orange" Product Liability Litigation* ("*Agent Orange*") is unavailing as that case did not address at all the question of whether a firm may reimburse paid fees out of a fee award, 818 F.2d 216 (2d Cir. 1987).  Rather, the case narrowly examined the validity of an undisclosed fee-sharing agreement between a group of lawyers that purported to divide a future award as a ***multiple*** of the funds advanced by the lawyers, regardless of how a court ultimately allocated fees between them under Rule 23.  *Id.* at 221–22.  Internal fee-sharing among lawyers is governed by a separate rule of professional conduct, Rule 1.5(g), and the Court of Appeals reversed the district court's determination that the fee-sharing lawyers formed an *ad hoc* law firm to abide by that rule.  *Id.* at 220, 226.  There is no analogous contention here.  The lawyers in *Agent Orange* were also speculating on the litigation outcome, fronting the costs of the litigation in exchange for significant potential upside in the form of a multiple on their initial investment.  *Id.* at 218.  Here, by contrast, AFT has been paying hourly fees, without any expectation of or right to demand reimbursement.  The sought award would reimburse AFT for a small fraction—not a multiple—of Lead Counsel's total billed time.  Finally, the lawyers in *Agent Orange* used their private agreement to reallocate the fees the court awarded to each individual attorney, effectively overriding the court's allocations, which override the Second Circuit rejected.  *Id.* at 219–20, 223.  Nothing of the sort is proposed here.

***Third***, Mr. Yeatman attacks the terms of the fee award itself, contending that the requested fees are "opaque" and that "AFT's prepayment of class counsel's fees unmoors their fees from the

---

[21] Otherwise, every settlement in which the defendant paid class counsel's legal fees—as is common—would require something more than a Rule 23(e)(2) fairness hearing.

class relief, raising concerns about the alignment of interests." Yeatman Obj. at 22 (citing *Gallego v. Northland Grp.*, 814 F.3d 123, 129 (2d Cir. 2016)). In particular, he claims there is "not … any evidence" that AFT accrued a single hour of legal work on the case, violating the principle that "the distribution of fees must bear some relationship to the services rendered." *Id.* at 24 (quoting *Agent Orange*, 818 F.2d at 223). But Class Counsel never argued AFT is entitled to fees because it performed legal work; rather, AFT paid Class Counsel's fees and would only receive a fraction of those paid fees as reimbursement. *See Meredith*, 87 F. Supp. 3d at 669 & n.15. And here, Lead Counsel submitted its applicable rates and nearly 250 pages of billing entries, representing the tasks for which it billed AFT—thus establishing a direct relationship between the fees sought and services rendered. Neither *Agent Orange* nor *Gallego* deals with non-parties receiving reimbursement for fees already paid. Unlike those cases, this case does not involve a non-party to the litigation seeking a financial windfall for work it had no involvement in performing or funding.

Mr. Yeatman separately suggests (at 25) the fee award is not reasonable relative to the class benefit, which relief he arbitrarily values at "$0" and less than "$1.4 million" respectively for the *cy pres* and business enhancement components of the settlement. That argument is meritless. *See* Section II, *supra*. In any event, while the Court should consider settlement value in determining the ultimate fairness of a proposed fee award, that is only one element in the overall analysis. Federal courts routinely approve fee awards in settlements providing only non-monetary relief. Dkt. 122 at 6. The reasonableness of Lead Counsel's fees request is reinforced by the fact that the percentage fee would represent a significant negative multiplier of the lodestar. *See id.* at 10.

## CONCLUSION

For the foregoing reasons, Class Counsel respectfully request this Court overrule the objections.

Dated:   New York, NY
   September 25, 2020

Respectfully submitted,

SELENDY & GAY, PLLC


By:  /s/   *Faith Gay*
    Faith Gay
    Maria Ginzburg
    Yelena Konanova
    Amy Nemetz
    Ronald J. Krock
    David Coon
    SELENDY & GAY, PLLC
    1290 Avenue of the Americas
    New York, NY 10104
    Tel: 212-390-9000
    E-mail: fgay@selendygay.com
    mginzburg@selendygay.com
    lkonanova@selendygay.com
    anemetz@selendygay.com
    rkrock@selendygay.com
    dcoon@selendygay.com

    Mark Richard
    PHILLIPS, RICHARD & RIND, P.A.
    9360 SW 72 Street, Suite 283
    Miami, FL 33173
    Tel: 305-412-8322
    E-mail: mrichard@phillipsrichard.com
    (admitted *pro hac vice*)

    *Attorneys for Plaintiffs*